# EXHIBIT 1

LATANYA COLLINS,

                    Plaintiff,

    -against-

THE CITY OF NEW YORK, and the
NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendants.

**SECOND AMENDED COMPLAINT**

Jury Trial Demanded

23 CV 9248 (JAM)

Plaintiff Latanya Collins ("Ms. Collins"), through counsel, stands before this honorable court seeking justice and compensation for unlawful religious discrimination carried out by their employer, the New York City Department of Education ("DOE") in concert with the City of New York (the "City"). Plaintiffs asserts claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 4200 U.S.C. § 2000e, *et seq*; 42 U.S.C.§1983, for the deprivation of rights under the First Amendment and Fourteenth Amendment of the United States Constitution; the New York City Human Rights Law ("CHRL"), NYC Administrative Code Title 8, and the New York State Human Rights Law ("SHRL"), NY Executive Law § 296, *et seq.* They bring this lawsuit on behalf of themselves, and others similarly situated.

## INTRODUCTION AND SUMMARY OF THE CASE

1.  This case arose because the City, working in concert with its DOE, engaged in widespread religious discrimination in an attempt to evade statutory obligations to accommodate religious practices of DOE employees that conflicted with the City's Covid-19 vaccine mandate.

2.  Through this lawsuit, Plaintiffs seek to safeguard religious freedom for herself and

others and to restore justice and dignity to educators who spent their careers faithfully serving New York City's public-school children.

<strong><u>JURISDICTION AND VENUE</u></strong>

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear related claims arising under New York State law because they are so related to the federal claims that they form part of the same controversy.

4.     Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiff's claims occurred.

<strong><u>PARTIES</u></strong>

5.     Plaintiff LATANYA COLLINS is a resident of Queens County, New York. Prior to being denied religious accommodation, Ms. Collins was a tenured Master Teacher for Special Education, Citywide School Administrator, and Transition Career and Technical Education Leader ("CTE") in good standing. She worked in Queens with over twelve years of service at DOE. She is one of thousands harmed by Defendants discriminatory religious accommodation policies and seeks justice for herself and others similarly situated.

6.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

7.     Defendant DOE is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City

of New York exercises mayoral control over the DOE.

## **BACKGROUND FACTS**

### *The Pandemic*

8.  At some point between the fall of 2019 and spring of 2020, the Covid-19 virus began circulating in New York City and around the world.

9.  In March 2020, New York State declared a state-disaster emergency due to the Covid-19 pandemic.

10.  Schools were closed for the remainder of the Spring 2020 semester across the state.

11.  In the fall of 2020, DOE schools reopened for in-person learning, with the option of remote instruction if families preferred that option.

12.  Teachers and most staff were required to return to in-person instruction.

13.  However, DOE liberally granted accommodations to most DOE employees who wished to work from home or remotely.

14.  In or around December 2020, vaccines became available against Covid-19.

15.  But there was no vaccine mandate during the 2020-2021 school year, and DOE allowed Plaintiff to continue to work unvaccinated for the entire rest of the school year and following summer.

16.  On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

17.  By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts:

    a.  vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; and

3

b. herd immunity could not be achieved through vaccination; and

c. any vaccine protection waned significantly after a matter of weeks.

18.    By August 2021, governments around the world publicly acknowledged that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

***The City's First Mandates***

19.    After all of this occurred, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines.

20.    In a press conference, the Mayor described his "Key to NYC" mandate as the "first-in-the-nation" of its kind, since it had no mechanism for religious or medical accommodation.

21.    Two days later, Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of Covid-19.

22.    Dr. Walensky said: "what [the vaccines] can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky further stated, "that's exactly right."[1]

23.    The CDC's public acknowledgment that the Covid-19 vaccines cannot stop transmission only triggered the Mayor to become more zealous about mandating them.

24.    Earlier that summer, New York City had adopted a vaccination policy that allowed DOE employees to test weekly if they did not want to get vaccinated, which was supposed to go

---

[1] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

into effect in September 2021.

25.     On or about August 24, 2021, Mayor Bill de Blasio and Commissioner Chokshi changed course, issuing the first version of a new "emergency" regulation *mandating* Covid-19 vaccination for most DOE employees and removing the testing option in lieu of vaccination.

26.     No new emergency justified this new aggressive mandate.

27.     There were no urgent increases in hospitalizations or deaths necessitating the implementation of these policies in New York City in August or September 2021.

28.     Nor did it make sense to remove the option of testing in lieu of vaccination.

29.     Most DOE employees had been working in person unvaccinated for over a year.

30.     Most employees, including Plaintiff, already had natural immunity.

31.     By August it was well established that natural immunity provided superior immunity to Covid-19 than vaccination.

32.     Children are also the least vulnerable population, when it comes to Covid-19, with few hospitalizations and essentially zero deaths.

33.     Nonetheless, both the City and DOE announced that not only were they imposing this Mandate, but they would also not even consider any religious or medical accommodation requests from the vaccine Mandate for any DOE employee.

34.     Meanwhile, there were carve-outs made for secular reasons that defeated the stated purpose of the Mandate in the same way and defeated any possibility of herd immunity.

35.     Importantly, there was no mandate for students in the fall of 2021.

36.     In or around December 2021, the City imposed an "emergency" regulation that mandated vaccines for students engaging in extracurricular activities.

37.      But even then, it declined to extend the same mandate to all students, leaving

5

most of the one million students in the New York City public schools free to attend in person unvaccinated so long as they did not attend engage in certain specified extra-curricular activities.

38.     Given this fact, herd immunity would not have been possible even if the vaccines could have stopped transmission, as students would still be exposed to their unvaccinated classmates even if 100% of all teachers and staff were fully vaccinated.

39.     If all 100,000 plus DOE staff were vaccinated, they would still reflect less than ten percent of the population in schools.

40.     It was well-established science that ten percent vaccination rates could never stop transmission of Covid-19 in a community, even for vaccines that can prevent infection and transmission in the recipient.

41.     The vaccine status of one teacher in a classroom with twenty to fifty unvaccinated students could not have any impact on stopping the spread of Covid-19, even if the vaccines did stop transmission.

42.     The Mandate allowed other carve-outs for secular reasons as well.

43.     For example, unvaccinated bus drivers were allowed to continue driving students in enclosed buses due to staffing issues.

44.     And unvaccinated members of the public could come to the schools to vote and man volunteer tables, among other reason.

45.     The DOE Mandate states on its face that it relied in part on the state's healthcare worker mandate to justify its imposition of the DOE Mandate.

46.     The healthcare worker mandate was later struck down as arbitrary and capricious, in part because of the New York State Department of Health's admission that the vaccines cannot stop the spread of the Covid-19 virus.

*Pfizer's Influence*

47.     Upon information and belief, one reason that the City decided to pass such aggressive mandates and keep them in place so long despite the scientific consensus that they could not stop transmission was due to political and economic pressure and/or incentives from Pfizer, Inc ("Pfizer").

48.     Pfizer exercises significant financial influence in New York City politics.

49.     Pfizer is headquartered in New York City and was the only pharmaceutical company to gain FDA approval of their Covid-19 vaccine in 2021.

50.     The DOE Mandate was timed to coincide with Pfizer's receipt of FDA approval for the first licensed Covid-19 vaccine in or around August 2021.

51.     Pfizer is a major donor and employer in New York City.

52.     Pfizer donated money to help elect Mayor de Blasio.

53.     Pfizer also donated money that went to help elect Mayor de Blasio's successor, Eric Adams.

54.     Pfizer also donated money that was to be given to the DOE.

55.     Upon information and belief, both Mayor de Blasio and Mayor Adams own stock in Pfizer.

56.     Pfizer's stock prices would be significantly impacted by the amount of vaccine uptake in the first two quarters after vaccine approval (ending September 30, 2021, and December 31, 2021).

57.     It has been well-documented that vaccine mandates impact Pfizer's stock prices significantly too.

58.     The Key to NYC and DOE Mandates were the first "no accommodation"

employee vaccination mandates in the country.

59. Upon information and belief, eliminating, or at least vastly reducing, the availability of accommodations to vaccine mandates, was part of Pfizer's business model.

60. Pfizer knew, before the Mandate went into effect, that its vaccine was not effective against the new strains of Covid-19, including Delta and Omicron strains.

61. Aggressive vaccine mandates could help ensure that the vaccine would be profitable as people began to realize that the vaccinated were catching Covid-19 as readily as the unvaccinated – because they would have no choice but to keep taking the vaccines if they wanted to keep their jobs.

62. The City and the DOE colluded with Pfizer to achieve Pfizer's financial goal.

63. Upon information and belief, Pfizer was in communication with the Mayor's office prior to the enactment of the Mandate and encouraged the Mayor to enact aggressive mandates on or before the end of September, 2021.

64. Upon information and belief, Pfizer and the City attempted to implement New York City's no or low accommodation mandate to serve as a model that could be adopted by other cities after it was established in New York City.

65. Pfizer agreed to give the NYC DOE over one million dollars in grants after the mandate was implemented.

***Labor Disputes and Lawsuits***

66. Whatever the motive, New York City labor unions unanimously decried the DOE Mandate from the start as reckless and unlawful and announced that they would be taking legal action.

67. Leaders from all major impacted unions, as well as the Municipal Labor

Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the DOE Mandate violates basic legal rights.

68.     Mass protests, lawsuits, and labor disputes ensued immediately upon the announcement of the Mandate.

69.     On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

70.     On September 14, 2021, the Supreme Court, New York County, issued a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at \*2 (N.Y. Sup. Ct. Sep. 22, 2021).

71.     The next day, on September 15, 2021, the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[2]

72.     The New York State Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment allowing for religious and medical accommodation. *Mun. Labor Committee,* 2021 WL 4502854, at \*3.

73.     What was not before the Court was the Defendants' religious accommodation policies, which were clearly designed to try to evade the DOE's responsibility to consider religious accommodation in good faith.

---

[2] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.

*DOE Implements and Ratifies the "Stricken Standards"*

74.　　In a parallel proceeding, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that the DOE's failure to provide religious and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection.

75.　　On September 10, 2021, an impact arbitration decision was rendered by Arbitrator Martin Scheinman requiring that the DOE provide UFT members with reasonable religious accommodation. [Exhibit 1 – not offered for the truth of the document, but to show what the policy said].

76.　　Subsequently, Arbitrator Scheinman issued materially identical awards covering Counsel of School Supervisors and Administrators ("CSA") employees and District Council ("DC37) DOE employees.

77.　　The policies are collectively referred to hereafter as the "Stricken Standards" since they were later struck down as unconstitutional by the Second Circuit Court of Appeals.

78.　　The arbitrator, Martin Scheinman served as a major donor and fundraiser for Mayor de Blasio and his neutrality is and was contested at the time that DOE adopted the Stricken Standards.

79.　　As a threshold matter, the award required *both* the DOE and the City to allow for religious accommodation.

80.　　It also provided that the parties could either use "any other statutory reasonable accommodation process" or the Stricken Standards set forth in the arbitration award.

81.　　Specifically, the arbitrator began the opinion by stating that: "As an alternative to any other statutory reasonable accommodation process, the City, the Board of Education of the

City School District for the City of New York ('the DOE') and [the UFT] shall be subject to the following Expedited Review Process to be implemented immediately…"

82.     The Stricken Standards were clearly designed to deny most applicants by unconstitutionally narrowing the definition of what beliefs could qualify for religious accommodation.

83.     On their face, the Stricken Standards express denominational preferences and categorically exclude most religions from protection and access to accommodation.

84.     For example, the Stricken Standards provide the following criteria for determining who could access accommodation: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." Stricken Standards at 9.

85.     The language in the above quoted paragraph was almost entirely drafted and proposed by Defendants' attorneys.

86.     Multiple problems stand out in this definition of what constitutes so-called acceptable religious beliefs.

87.     First, the policy favors Christian Scientists, predefining Christian Science as the only enumerated example of a "recognized" and "established religious organization." This gives Christian Scientists an unfair advantage.

88.     Second, the policy requires the government to decide which other religions than Christian Science are "recognized" as "established religious organizations."

89. Pursuant to the Stricken Standards, if an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

90. Defendants knew, or should have known, that the government cannot "establish" which religions are "recognized" and thus valid and which are not "recognized" or "established" and thus invalid.

91. Third, the policy also provides that religious objection based on personally held or "philosophical" religious beliefs must be denied.

92. But under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are endorsed by official church dogma.

93. In fact, even moral or philosophical beliefs are defined by the EEOC and governing law as expressly protected religious beliefs, but under the Stricken Standards, they were excluded from protection even if the beliefs were sincerely held.

94. Fourth, the Stricken Standards require that the religious objection "must be documented in writing by a religious official (e.g. clergy)."

95. The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have different religious beliefs than their pastor or church leader.

96. Defendants were on notice that the clergy requirement was illegal.

97. It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

98.    Fifth, the Stricken Standards require that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination.

99.    "Leader" is not defined in the Stricken Standards, but in practice, the DOE repeatedly interpreted this concept broadly to deny accommodation to whole categories of religious employees based on Defendants' assumptions about who the leader of a faith might be.

100.    Pursuant to these determinations, DOE representatives repeatedly asserted that all Jews, Muslims, Hindus, Buddhists, Catholics, and even non-denominational Christians other than Christian Scientists had to be denied.

101.    In sum, the DOE conditioned access to accommodation based on membership in preferred religious organizations.

***DOE showed additional bad faith by initially denying 100% of applicants without review.***

102.    Notwithstanding that the Stricken Standards already was designed to categorically deny most applicants, Defendants applied the Stricken Standards to exclude even more employees from protection than the discriminatory policy allowed.

103.    As bad as the Stricken Standards were, the one thing that the policy did for employees was to guarantee that the DOE had to grant religious accommodation if an applicant qualified under its criteria.

104.    There was no provision for undue hardship under the Stricken Standards.

105.    Rather, pursuant to the arbitrators' order, at both the initial DOE review and in the appeals, any applicant who qualified "within the specific criteria identified above **shall be permitted the opportunity to remain on payroll**…"

106. The Stricken Standards applied both to the DOE's initial determinations and to the appeals to the arbitrator.

107. However, within hours or days of submitting their application, every single applicant who initially applied under the Stricken Standards received the same autogenerated email, stating:

> Dear [NAME],
>
> We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation.
>
> Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.
>
> Sincerely, *HR Connect* Medical, Leaves, and Records Administration
>
> Please do not reply to this message via e-mail. This email address is automated.

108. Those who applied on or before the deadlines set forth in their union's version of the Stricken Standards had the following additional language tacked on:

> This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

109. In addition to violating the arbitrator's award, the autogenerated denials violated statutory standards in multiple ways.

110. <u>First</u>, the DOE did not engage in any good-faith individualized attempts to accommodate employees before issuing blanket "undue hardship" denials to 100% of applicants.

111.    No one at the DOE individually reviewed any of the applications before sending out the autogenerated emails denying accommodation.

112.    Applicants were not contacted by any person at DOE to discuss their applications before they were denied.

113.    No cooperative dialogue was offered or took place before the denials were issued.

114.    The same or substantially the same email was sent to all applicants.

115.    The DOE also sent out the same email to employees who were already approved to work remotely and those who did not have student-facing jobs.

116.    Second, the denial incorrectly states that the Mandate did not allow DOE employees to work in person.

117.    It was not true that the Mandate did not allow DOE employees to work in person– on the contrary, the Mandate had been expressly amended to allow for religious accommodation, which would include in person accommodation if an employee did not constitute a direct threat that could not be mitigated through reasonable accommodation.

118.    The Stricken Standards and the DOE's own policies show that DOE understood that the Mandate did not prohibit them from offering in person accommodation that would expose employees to other covered personnel.

119.    For example, DOE arranged for employees to work unvaccinated around other DOE employees from one of the remote work locations that the DOE set up for those accommodated under the arbitration awards, or from an administrative building, even though the DOE's undue hardship denials stated that the Mandate prohibited employees from working around other DOE staff unvaccinated.

120.    Ultimately, the DOE admits it accommodated at least 163 persons in this manner,

some of them teachers.

121. And one or more unvaccinated teachers were even knowingly allowed by the DOE to go back in person to teach their class in person with students while the Mandate was in effect.

122. Nothing in the Mandate provided justification for a blanket ban on in-person accommodation without individualized analysis of the statutory factors for each employee.

123. By law, employers bear the burden of proving that an employee is a direct threat and of proving that no reasonable accommodation could be made without undue hardship.

124. Neither the DOE nor the City met this burden.

125. Third, the denials admitted - on their face - that Defendants applied the wrong legal standard for assessing whether accommodation would pose an undue hardship.

126. The denials stated that Defendants used the "more than a minimal burden" (*de minimis*) standard.

127. Under the SHRL and CHRL, the employer bears the burden of proving that accommodation would create a "significant" burden or expense, and under Title VII, the employer must prove substantial hardship, not *de minimis* hardship.

128. Pursuant to federal, state and local law, employers also must prove that they made the undue hardship determination after assessing specific statutory criteria, using the best available evidence, on a good-faith individualized basis before denying an applicant.

129. For example, under all three statutes, if the hardship has to do with a safety concern, the employer bears the burden of proving on an individualized basis that an employee would pose a direct threat before segregating them or imposing any adverse employment consequence on them.

130. The direct threat analysis cannot be speculative or generalized. Rather, under the

CHRL, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

131.    Similar analysis is required under the SHRL and Title VII.

132.    Defendants did not make any good faith attempt to individually analyze these or the other required statutory factors for any applicant before conclusively denying them all based on alleged undue hardship.

133.    The best-available objective science at the time did not support a blanket policy that in person accommodation was *per se* a direct threat.

134.    The DOE did not prove or individually assess whether any employee was a direct threat due to their vaccination status before sending out the autogenerated blanket denials.

135.    The DOE did not prove or individually assess whether it would be an undue hardship to provide reasonable accommodation for any employee deemed a direct threat before sending out the autogenerated blanket denials.

136.    Some employees were already working remotely, or could have easily worked remotely, when they received the blanket undue hardship denials.

137.    Most of those who received the email denial had already been accommodated to work remotely in the past and could have easily been accommodated to do so again.

138.    And all employees could have been easily accommodated in person or remotely, as they had been for the entirety of the pandemic, without undue hardship or safety concerns.

139.    DOE employees seeking religious accommodation from the Mandate did not pose

a threat to anyone based on their vaccination status and could have been accommodated without undue hardship.

140.    The vaccines could not stop transmission.

141.    Moreover, even if Covid-19 vaccines could meaningfully stop transmission, it is illogical to mandate vaccination for only a small fraction of the school population.

142.    It makes no scientific sense to say that one million students could safely come to school unvaccinated, riding in busses with unvaccinated school-district employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with thousands of their unvaccinated peers, but that they would suddenly be in severe danger just because one or two teachers in the building were also unvaccinated.

143.    If being in proximity with a few unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

144.    A few extra unvaccinated people in each building could not make any difference to herd immunity when the bulk of the population in that building are unvaccinated as well.

145.    By the fall of 2021, it was already well-understood that the Covid-19 vaccines could not create herd immunity no matter what percentage of the population was vaccinated.

146.    As one of many examples, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

147.    Even in 2021, the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

148.     Defendants were on notice of this fact.

149.     Defendants were also on notice that the *de minimis* standard did not apply before they fired Plaintiff and most other unvaccinated employees for failing to violate their religious beliefs by getting vaccinated.

150.     Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation at various relevant points from public health experts at Johns Hopkins (Exhibit 2 – Dr. Makary), Yale (Exhibit 3 – Dr. Risch), and Stanford (Exhibit 4 – Dr. Bhattacharya).

151.     As the declarations point out, the great weight of the objective science, even at the time the Mandate was imposed and shortly thereafter, showed the vaccine could not stop transmission and did not offer robust or durable protection from infection or symptoms.

152.     The declarations establish that DOE employees did not pose a direct threat and could have been accommodated in person.

153.     Moreover, the vaccines were still at an experimental stage.

154.     There was insufficient data available to determine what the risks and benefits were, or that a benefit overrode risks to particular people, especially those with underlying health conditions.

155.     And, though Pfizer's vaccine was being rushed through for FDA approval, Pfizer did not actually offer any of the FDA approved vaccines in New York State.

156.     It was not possible to obtain an FDA approved Covid-19 vaccine in New York State at any time between August 2021 through September 2022.

157.     The only available vaccines that Pfizer made available in New York State during this timeframe were those authorized under Emergency Use Authorization ("EUA").

158.    EUA vaccines cannot be mandated, by the terms of their authorization.

159.    Additionally, children had the lowest risk from Covid-19 of any population, and their risk of severe harm from the disease was so low as to be statistically insignificant.

160.    Tellingly, every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

161.    These other school districts did not see any statistically significant increase in infection rates from the infection rates at the NYC DOE after the DOE's Mandate went into effect.

162.    Moreover, there were numerous additional measures that could have been taken, including but not limited to weekly testing, symptom checks, or other protective measures, each of which could have mitigated any perceived or actual increased risk of transmission from unvaccinated employees.

163.    Remote accommodation would not have been a significant hardship either.

164.    Every Plaintiff had previously been accommodated remotely for short or long periods of time during the pandemic.

165.    The Mandate was supposed to be a temporary emergency measure (and indeed, did have to be continued or renewed repeatedly throughout the year and a half it was imposed).

166.    The DOE had accommodated widespread remote work for the past year and a half, and the DOE could have continued to allow those needing religious accommodation to work remotely.

167.    Despite the DOE's argument that they had moved most instruction back to in person in 2021, the DOE continued to provide a parallel remote program for many students

throughout the 2021-2022 school year.

168.   The DOE could have accommodated eat least some classroom teachers who needed to opt out in this remote program.

169.   Indeed, the DOE continued to advertise vacancies for and hire remote teachers throughout the 2021-2022 school year, even as they claimed it would be an undue hardship to accommodate any unvaccinated DOE teacher remotely.

170.   There were other ways that DOE employees could have been accommodated through remote work as well without significant hardship.

171.   For example, before sending out the denials, DOE set up buildings specifically for remote work for those who would be accommodated under the Stricken Standards.

172.   At all times relevant to this Complaint, those building stood largely empty and well below capacity.

173.   Teachers and paraprofessionals could have worked with a co-teacher (which many already had) and pushed in through Google Classroom (from home or the remote worksites) to work with individuals or groups or modules throughout the day.

174.   There was also plenty of work that could be done that did not require in person presence that they could have been reassigned to temporarily until the "emergency" was over.

175.   Upon information and belief, the summary blanket denials were issued to demoralize and harass religious employees, who got the message, loud and clear, that DOE was not acting in good faith.

176.   Employees had poured their hearts out into their religious accommodation letters, which is a vulnerable thing to do.

177.   They were given only a few days to commit their most sacred innermost thoughts

to paper, and to gather a clergy letter if they could.

178.    Receiving an autogenerated response, almost immediately, with a boilerplate denial from a "donotreply" email address felt like a mockery of their faith and showed many employees – both the recipients and their colleagues who were considering whether to apply or litigate - that further efforts were futile.

179.    Tellingly, many who received the autogenerated undue hardship denials did not even work in student facing positions – or in person at all in some cases - in the Fall of 2021.

180.    But these remote and administrative employees still received the same autogenerated email asserting they were denied because the Mandate did not allow employees to work unvaccinated around students.

181.    DOE's initial autogenerated denials stated, on their face, that they were issued in accordance with the Stricken Standards.

182.    But pursuant to the Stricken Standards, DOE was not authorized to deny *any* applicant based on undue hardship.

183.    Rather, the Stricken Standards, which were supposed to apply (per the policy) to both the initial DOE review and the appeals to the arbitrators, had no mechanism for undue hardship denial.

184.    According to the Stricken Standards, employees who met the defining criteria for qualifying religious beliefs "shall be" accommodated.

185.    The DOE's decision to violate even the one helpful aspect of the Stricken Standards by proactively denying 100% of the applicants through an autogenerated email pretextually asserting "undue hardship" shows animus and bad faith and leads to a reasonable inference that all subsequent religious accommodation decisions and policies implemented by

DOE were pretextual.

***The DOE refused to allow many employees to appeal their denials***

186.    The DOE's policies made it very difficult for employees to apply for religious accommodation and even harder to appeal their denials.

187.    The Stricken Standards were not widely announced, and deadlines were not clearly explained to employees.

188.    Many employees were never told when the "deadline" to apply for religious accommodation was, only that they had to get vaccinated before September 27, 2021, and that this deadline was later moved to October 1, 2021, due to the Second Circuit's temporary restraining order issued in September 2021.

189.    The deadlines were also irrelevant.

190.    In truth, pursuant to all three accommodation statutes, an employer cannot impose an arbitrary cutoff deadline to apply for religious accommodation.

191.    Rather, the statutes each specify that the employer has an affirmative obligation to accommodate an employee or prospective employee's religious practices when the employer knows, or should know, that the employee needs accommodation, whenever that may occur.

192.    Each one of the various arbitration awards provided a different "deadline" to get the expedited review available under the Stricken Standards.

193.    Each was circulated, if at all, only a few days before these deadlines.

194.    Plaintiff and her similarly situated colleagues were in a state of emergency.

195.    The start of a new school year is already a hectic time for educators.

196.    This was particularly hectic, as many students were returning from a year and a half of remote instruction, and there was quite a bit to work out.

197.    The DOE's sudden and aggressive announcement had DOE employees scrambling, attempting to secure loans and contingency plans in case they were suddenly out of a job, raise money to file lawsuits to challenge the blatantly unconstitutional religious accommodation policy, run around town trying to gather medical records and clergy letters, write long heart-felt letters that could explain their innermost sacred beliefs to secular and hostile strangers, and ensure that the students were taken care of and that they met their extensive job responsibilities.

198.    To make matters worse, the SOLAS system, where the applications were supposed to be uploaded, froze repeatedly, especially during the deadlines to apply or appeal, leaving some unable to apply by the "due date."

199.    Those that were able to get their applications in before the "due dates" then had only 24 hours to appeal their initial DOE denials.

200.    These denials were sent by email, and many employees did not see them within the twenty-four hours allotted.

201.    Too often, the denials were issued on the Sabbath or a holy day, leaving those with religious practices that forbid Sabbath work with no time to appeal.

202.    And, once again, many employees were unable to appeal, since the SOLAS system crashed during their brief window to appeal.

203.    Many others felt it was futile to appeal, after receiving DOE's insulting autogenerated generic denials in response to their good-faith and heartfelt accommodation requests and hearing from colleagues that everyone was getting the same denial, even those who already worked remotely.

204.    Employees that submitted religious accommodation requests "late" were allowed

to apply, and were issued formal denials through a nearly identical autogenerated email as those who applied on time, but they were not allowed to appeal.

205.    And, of course, those who were shut out of appealing due to problems with the SOLAS website were also denied the right to appeal.

206.    Those who did get to appeal did not fare much better.

207.    Most were provided with no explanation whatsoever, just given a paper that had an "x" next to the word "Denied."

208.    The decision whether to grant a hearing or not was arbitrary.

209.    Employees who met the criteria in the Stricken Standards were denied the right to a hearing and denied with no further explanation than an "x" next to the word "denied."

210.    Some applicants were allowed a zoom hearing.

211.    There was no apparent reason why some were granted, and others denied.

212.    Arbitrators were given unfettered discretion whether to allow a hearing.

213.    Neither DOE nor the arbitrators kept any records explaining the decisions and DOE admitted in other lawsuits and position statements to the EEOC that it cannot explain the reasons why some were granted a hearing, and others denied.

214.    At the zoom hearings, the arbitrators and DOE representatives engaged in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

215.    For example, DOE openly and repeatedly took the position that all Jews must be denied because of a Jerusalem Post article stating that a Rabbi in Israel was vaccinated.

216.    DOE representatives repeatedly referenced this article in zoom hearings to assert that all Jews must be categorically denied accommodation.

217. Jewish applicants from related lawsuits repeatedly documented that though they explained that their own Rabbi did not share the Israeli Rabbi's opinion, that Judaism is a diverse religion, and that a random Rabbi in Israel could not be deemed the "leader" of all Jews, they were still told that Jews could not qualify under the Stricken Standards because of the Jerusalem Post article.

218. Similarly, DOE also took the repeated position that all Catholics had to be denied, because Pope Francis is vaccinated.

219. There is substantial debate within the Catholic faith, like many other faiths, about whether it is religiously permissible to take a Covid-19 vaccine.

220. In fact, a whole council of Catholic Bishops set forth a document asserting that it is likely *not* permissible for Catholics to take any of the Covid-19 vaccines due to the use of aborted fetal cell lines in production and development of the vaccines.

221. Moreover, while Pope Francis is vaccinated and expressed his public opinion that vaccination might be permissible despite the connection to abortion, he also instructed Catholics that they must each consult their religious conscience to make the choice for themselves.

222. Nonetheless, DOE argued repeatedly in the zoom hearings that all Catholics should be denied because the Catholic Pope was vaccinated.

223. DOE maintained this position even if the applicant provided a letter from their own Priest or religious leader stating that they had a valid religious belief.

224. DOE representatives went so far as to argue in at least one documented case that a Buddhist applicant should be denied because his views were not shared by the Catholic Pope even though the DOE representative acknowledged that DOE found his religious beliefs sincere.

225. DOE representatives also often argued that all non-denominational Christians

other than Christian Scientists should be denied due to the Pope's beliefs.

226. Even in cases where applicants submitted letters from their own religious leaders, explaining that the whole congregation opposed vaccination, DOE argued that the Pope's beliefs controlled all Christians other than Christian Scientists, and the applicant had to be denied, even if sincere.

227. Similarly, the DOE representatives routinely pulled out a letter purporting to be from a Seventh Day Adventist leader to assert that all Seventh Day Adventists must be denied.

228. And, DOE representatives repeatedly argued that anyone who belonged to a non-denominational Christian faith must be denied, both because the Pope is vaccinated (even though non-denominational churches do not follow the Pope) and because the nondenominational churches are allegedly not "established and recognized" religious organizations according to the Defendants.

229. DOE also argued that all Buddhists had to be denied because the Dalai Lama was vaccinated.

230. The Dalai Lama is a spiritual leader of the Gelug ("Yellow Hat") sect, which is one of at least four sects of Tibetan Buddhism.

231. There are many other sects of Buddhism - perhaps thousands of other sects, outside of Gelug Buddhism.

232. Moreover, according to spiritual texts, Buddha told his followers not to take any leader when he was dying, but rather, that each must rely on the dharma to examine the truth for themselves.

233. But DOE still repeatedly argued that all Buddhists should be categorically denied because the Dalai Lama was vaccinated.

234. DOE also argued repeatedly that all Muslims must be denied due to the alleged discovery of an alleged "leader" of that diverse faith who was vaccinated.

235. The DOE's discriminatory statements and ignorant assumptions about faith were common and well-documented throughout the accommodation process.

236. Arbitrators often joined in in the discriminatory positions and comments, accusing applicants of being wrong about what their faith required, or essentially, of being heretics for not allegedly following Pope Francis or the Dalai Lama or the Israeli Rabbi or whoever they decided to deem the leader of the faith.

237. DOE representatives encouraged such harassment from the arbitrators, joining in and doing nothing to remediate the comments when made.

238. DOE also categorically denied several types of belief.

239. Especially, DOE representatives argued that any religious objection based on concerns about the use of aborted fetal cell lines was presumptively invalid.

240. The City provided DOE with a letter from Health Commissioner David Chokshi, in which the Commissioner argued that concerns about aborted fetal cells did not merit religious protection.

241. It is well-documented that aborted fetal cell lines were used in the production and development of the available Covid-19 vaccines.

242. DOE's attorneys have admitted they have no basis to contest this fact.

243. Mr. Chokshi's opinion that these concerns do not merit religious protection is impermissible governmental entanglement in religious questions and constitutes discrimination.

244. Nonetheless, the DOE repeatedly used Commissioner Chokshi's letter in zoom hearings, arguing that concerns about the use of aborted fetal cell lines did not merit religious

protection.

245. After their zoom hearings, each applicant received a denial, with no explanation whatsoever, just an "x" next to the word "Denied."

246. Conversely, at least 163 other DOE employees were accommodated after the administrative appeals, some of them classroom teachers.

247. Upon information and belief, most of these employees were accommodated after a group of educators filed for an emergency injunction protecting them from the discriminatory religious accommodation policies on or about October 4, 2021.

248. Upon information and belief, DOE hoped that by accommodating some employees from various religious groups previously categorically denied, it could try to defend against their obvious and widespread discrimination.

249. But whatever the reason, DOE showed that it could accommodate employees by accommodating these 163 who were deemed to meet the unconstitutional criteria applied by DOE and the arbitrators.

250. Some of the accommodated classroom teachers were given alternative assignments.

251. Others were assigned to teach some of the online students who remained in the remote program.

252. And many were accommodated by allowing (or hiring) a co-teacher to stay in the classroom while the accommodated teacher taught via Google Classroom.

***The City aided, abetted and colluded in DOE's discrimination.***

253. The City is jointly liable for the DOE's discriminatory religious accommodation policies and practices.

254. As a threshold matter, in 2002, the New York State Legislature granted the City "Mayoral Control" over New York City's public schools. At all times relevant to this Complaint, pursuant to this authority, as extended and amended over the years, the Mayor's office exercised control over DOE and its operations.

255. At all times relevant to this Complaint, the Mayor's office worked closely with DOE to oversee and direct the religious accommodation policies and their discriminatory implementation.

256. The City was also jointly responsible for carrying out the arbitration award, as reflected in the opening paragraphs of the opinion, which list the City as a party that was required to carry out the Stricken Standards. [Ex 1 at 6-7].

257. The City also actively participated in harassing and discriminating against DOE employees who sought religious accommodation from the Covid-19 vaccine mandate, aiding and abetting violations of the statutory protections for religious accommodation.

258. The Mayor's office and Mayor's legal counsel initially directed DOE not to offer any religious or medical accommodation from the Mandate.

259. The Mayor's office and/or Mayor's legal counsel participated in drafting the proposed language for what criteria to use in judging a valid religious accommodation requests, which were later adopted in the Stricken Standards.

260. Upon information and belief, the criteria for religious exemption were composed entirely, or nearly entirely, of language and procedures proposed by the City's attorneys.

261. Attorney Eric Eichenholtz, who was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York, was one of the City's attorneys who drafted the proposed criteria adopted in the Stricken Standards.

262.     At the time, Mr. Eichenholtz directed the labor and employment litigation group.

263.     As such, he was essentially in charge of the City's legal defense to the discrimination charges.

264.     After assisting Defendants with blatant, widespread religious discrimination, both in the original DOE policies and then during the pretextual Citywide Panel "reviews" (which he was in charge of), Mr. Eichenholtz was promoted to Managing Attorney for the New York City Law Department.

265.     The City was also intimately involved in directing the DOE in the implementation of these policies and aiding and abetting the exclusion of as many applicants as possible from accommodation based on unconstitutional criteria.

266.     In a press briefing held on September 23, 2021, the day before the DOE appeal hearings began, Mayor de Blasio was asked how the City intended to implement the religious exemption policies for DOE employees and what criteria the City would use. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition.** But overwhelmingly the faiths all around the world have been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific longstanding objection**.[3]

267.     This statement admits an intention to categorically discriminate against most religions and only grant religious accommodation to members of certain faiths that have "a very,

---

[3] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcriptmayor-de-blasio-holds-media-availability

very specific longstanding objection" according to the Mayor.

268.    It is also an admission that the City was involved in and directing DOE to discriminate against most faiths in the appeals.

269.    If the City had no involvement, the Mayor would have stated that the City was not involved, in response to questions about how it was going to decide which teachers to accommodate.

270.    Moreover, the Mayor would not have said "we are saying, very clearly" that a person has to be "a member of a faith that has a very, very specific longstanding objection" but rather would say the DOE was taking that position.

271.    "We" indicates the Mayor's participation and collusion with this discriminatory policy.

272.    There is additional evidence that the City was intimately involved in and aided and abetted the DOE's discriminatory policies.

273.    The Mayor's office and/or City's legal counsel provided the letter from the Jerusalem Post to DOE and advised DOE to deny Jewish applicants based upon that article.

274.    The Mayor's office and/or City's legal counsel also directed DOE to categorically exclude Buddhists, because of the Dalai Lama.

275.    The Mayor's office and/or City's legal counsel also directed DOE to deny Muslims, because of a random City-defined "leader" of Muslims who the City believed was vaccinated.

276.    The Mayor's office and/or City's legal counsel directed the DOE to deny Catholics, because Pope Francis was vaccinated.

277.    The Mayor's office and/or City's legal counsel directed the DOE to deny Seventh

Day Adventists, because of an alleged leader's position statement which they provided to the DOE.

278.    The Mayor also took an official City position on religious questions, announcing to the press that "Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated" when explaining that the City would not allow people with personally held religious beliefs that differed from the leaders of their faith to get accommodation.

279.    The City also provided a letter from Commissioner Chokshi to DOE and the arbitrators and instructed them to use it to deny those with religious objections based on the use of aborted fetal cell lines.

280.    The Mayor and/or City's legal counsel also directed DOE to deny all personally held religious beliefs.

***DOE's religious accommodation policies declared unconstitutional.***

281.    On or about September 21, 2021, a group of educators brought a proposed class action lawsuit against the City and DOE, titled *Kane v. de Blasio et al*, in the Southern District of New York arguing, among other things, that the DOE's religious accommodation policies were unconstitutional.

282.    This verified complaint, which was served on the Board of the DOE and the City, notified both Defendants that the Stricken Standards were discriminatory and violated the rights of <u>all</u> DOE employees seeking religious accommodation.

283.    Both Defendants acknowledged receipt of the notice by entering the *Kane v. de Blasio* case.

284.    The Complaint was timely served on the Department of Education and the City of

New York.

285. Multiple other employees also served notices of claim, alerting the City and the DOE of classwide claims that needed to be adjusted, and fatal problems with their discriminatory religious accommodation policies.

286. Plaintiff also served an EEOC claim on Defendants in or around October 2021, which serves as functional notice of her claims against DOE and the City.

287. Neither Defendant adjusted the class wide claims or Plaintiff's individual claims within the statutory period.

288. In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and deserved injunctive relief.

289. As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

290. First, the Court held that DOE's policies were not neutral, pointing out that it violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

291. The Court particularly chastised the Defendants for denying Catholics and other Christians just because the Pope was vaccinated.

292. Second, the Court held that the policies were not generally applicable, as Defendants had discretion whether to grant accommodation.

293. The Court rejected Defendants attempts to pin the illegality on the arbitrators or

to argue that *Kane* plaintiffs had to sue the union, not the DOE and the City.

294. Nothing in the arbitration award, or in the governing collective bargaining agreement waived employees' rights to challenge the religious discrimination inflicted by DOE or the City in Court.

295. Both Defendants knew or should have known, that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make or enforce unconstitutional policies, nor can it encourage, aid or abet discrimination.

296. Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate and the City participated in and was complicit in these discriminatory denials.

297. In *Kane*, in the proceedings before the Second Circuit, Defendants' attorneys admitted that the religious accommodation policies adopted by DOE were likely unconstitutional.

298. The City asked the Court to let them try to mitigate the harm by providing a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, particularly, Mr. Eichenholtz.

299. The City promised that any employee whose religious beliefs qualified under lawful standards would be reinstated with back pay.

300. The DOE agreed to this plan.

301. In November 2021, first a motion panel and then a merits panel of the Second Circuit Court of Appeals issued an order requiring the City to give fresh consideration through a new "Citywide Panel" and reinstate those who qualified with backpay.

302. Though the Second Circuit's order did not apply to non-named plaintiffs in the *Kane* lawsuit, the orders acknowledged that the Court's decision to limit relief to named plaintiffs

in the preliminary injunction order was impacted by the fact that the City promised to make the Citywide Panel review and reinstatement available more broadly on a voluntary basis.

303.    However, the Citywide Panel did not review the vast majority of employees denied under the Stricken Standards.

304.    According to later representations by Defendants counsel in related litigation, the Citywide Panel only reviewed about 500 of an estimated 5,000 to 7,000 applicants denied religious accommodation from the DOE Mandate.

305.    According to DOE, only employees who had been able to submit an appeal within 24 hours of their initial denial were reviewed by the Citywide Panel.

306.    But those who were deprived of an appeal suffered from the discriminatory and pretextual policies too and had no recourse even after Defendants admitted that their original policies were unconstitutional.

307.    Many applicants, like Plaintiff, who did appeal under the original Stricken Standards, and were informed after the *Kane* decision that their applications were under review by the Citywide Panel, never even got a decision before being terminated.

**The Citywide Panel denials were also pretextual and showed ongoing animus**

308.    The Citywide Panel reviews did not comply with the statutory standards and created further equal protection problems.

309.    The reviews were not carried out in good faith.

310.    Out of an estimated five hundred reviewed, only one applicant's denial was reversed by the Citywide Panel.

311.    This reversal was done *subjudice* and was only granted so Defendants could argue to the Court that the Citywide Panel was a valid remedial measure to the initial acknowledged

discrimination.

312.    The Citywide Panel did not engage in cooperative dialogue about possible accommodations.

313.    Between February 2022 and August 2022, the Citywide Panel sent out autogenerated emails from an email address called "noreply@salesforce.com" which stated that the denial was the final denial, and that employees had to get vaccinated within three days.

314.    The reasoning was generic, typically stating in generic language that DOE had demonstrated that it would be an undue hardship given the need for safe in-person learning and sometimes tacking on a statement indicating that the applicant had failed to establish that their religious beliefs preclude vaccination.

315.    Some employees never received a decision at all.

316.    Most employees were then terminated a few weeks or a few months later.

317.    The Citywide Panel reviews were also infected by the same animus that plagued the initial denials of accommodation.

318.    First, the Citywide Panel imposed a different undue hardship standard on those given fresh review than had been imposed on those accepted under the discriminatory policy.

319.    Specifically, the Citywide Panel applied a complete blanket undue hardship ban on accommodation for all teachers and most administrators, even those with sincere religious beliefs, claiming that DOE "had demonstrated" it would be an undue hardship to accommodate anyone who worked in a building with children.

320.    By contrast, under the Stricken Standards, if an employee's religion met the discriminatory definition for determining they had a qualifying religious belief, they had to be accommodated without regard to undue hardship.

321.    Under the discriminatory Stricken Standards policy, at least 163 employees were therefore accommodated, some of them classroom teachers.

322.    The rest of the applicants were denied the same accommodation, not because they would somehow be harder to accommodate than the 163 who were granted accommodation under the discriminatory policy, but because DOE disfavored their religions and particular religious objections.

323.    In sum, the Citywide Panel's more rigorous blanket undue hardship bar for those who qualified under "lawful" standards versus those that qualified under the openly discriminatory standards, constituted a fresh incident of discrimination (since it was not applied to those who were impermissibly favored under the old policy).

324.    Second, the Citywide Panel's blanket undue hardship determinations violated statutory factors.

325.    In related litigation, the City offered Mr. Eichenholtz, who created and was in charge of supervising the Citywide Panel, to be deposed for the purpose of addressing the Citywide Panel's policies.

326.    Mr. Eichenholtz was the "architect" of the Citywide Panel and oversaw it and had veto power over determinations.

327.    He admitted in his sworn deposition that neither the City nor the DOE analyzed any of the statutory factors before denying applicants.

328.    He further admitted that neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be accommodated before issuing the undue hardship denials.

329.    He further admitted that the Citywide Panel did not know or assess whether the

vaccine could stop transmission of disease or whether unvaccinated employees were more dangerous than vaccinated ones.

330.    Mr. Eichenholtz further admitted under penalty of perjury that DOE never provided information to the Citywide Panel "as to the number of employees it could afford to employ without causing undue hardship."

331.    He also swore that the "inability to pay employees" who were not able to work in person "has not come up" nor had DOE submitted any information about increased costs that could present an undue hardship if employees were accommodated.

332.    Mr. Eichenholtz said the Citywide Panel did not ask the DOE to explain whether the remote worksites it set up were at capacity (they were not).

333.    He also said that he was not aware of any direct threat analysis conducted for any employee.

334.    Mr. Eichenholtz could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19.

335.    He finally conceded that the Panel had not imposed "no evidentiary requirement" from any agency on the undue hardship issue. When pressed, Mr. Eichenholtz stated that he did not think analysis of any statutory factors was necessary for an appellate body like the Citywide Panel, and he had made sure there was no requirement that the DOE or any other agency "provide that kind of data."

336.    Bizarrely, Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated.

337.    He confirmed that the Citywide Panel did not assess the duration of any risk or

any of the other statutory factors on direct threat either.

338.   From this testimony alone, it is patently clear that the Citywide Panel, like the DOE before it, failed to meet its burden of proof on undue hardship.

339.   Outrageously, throughout the winter of 2021-2022, when the Citywide Panel was making its undue hardship decisions, the DOE was sending *actively infected and infectious* vaccinated teachers with Covid-19 back into the classrooms.

340.   Meanwhile, thousands of uninfected teachers with natural immunity were kept on leave without pay, and even terminated on the unsupported claim that it would be an "undue hardship" to allow them to be around the students unvaccinated.

341.   Third, the Citywide Panel applied the wrong legal standard to determine undue hardship.

342.   In his deposition and in many sworn pleadings, Mr. Eichenholtz repeatedly admitted under oath that the City and DOE used the same unlawful "*de minimis*" standard for undue hardship rather than the significant or substantial standard required by the three controlling statutes even though they had been repeatedly put on notice that the statutes required more.

343.   Using the unlawful *de minimis* standard, the City and DOE made blanket assumptions that any accommodation would be "more than a minimal burden" and justified denial of all classroom teachers on that basis.

344.   Citywide Panel members under Mr. Eichenholtz' direction routinely went even further and continued to recommend that even applicants who already worked remotely should be denied based on unsupported "undue hardship" assumptions.

345.   Fourth, the Citywide Panel failed to engage in cooperative dialogue with any applicant about possible accommodations and challenges thereto before denying their

applications.

346.    This leads to an inference that the undue hardship determinations were pretextual and discriminatory, especially because some of those denied under these blanket bans already worked remotely or in buildings without students.

347.    <u>Fifth</u>, nothing in the Mandate specified that DOE employees could not be given religious accommodation that would allow them to work in person.

348.    On the contrary, the Mandate specified that nothing in it prevented reasonable accommodation as required by law.

349.    Pursuant to statute, employers must grant religious accommodation unless they can show that there is a safety concern.

350.    Defendants' own decisions show that safety concerns were pretextual.

351.    For example, shortly after all unvaccinated employees were excluded, thousands of fully vaccinated DOE employees were infected with Covid-19.

352.    In or around January 2022, before the Citywide Panel undue hardship denials were issued and before most unvaccinated employees were terminated, DOE adopted an open policy of encouraging and cajoling *actively infected* teachers to come back to the classroom within five days of onset of infection due to staffing shortages.

353.    It was well-understood at the time that Covid-19 was still transmissible five days after onset in most cases.

354.    But, while DOE allowed actively infected teachers to teach children in person, they excluded Plaintiff and her religiously opposed colleagues, who were not infected and were willing to test and take other precautions to protect themselves and the students.

355.    Moreover, DOE did not enforce the Mandate equally.

356.    For example, DOE allowed thousands of employees to remain only partially vaccinated in violation of the Mandate.

357.    DOE did this even though the Mandate required that employees get their second dose within 45 days and even though it was well-understood that one dose provided no protection against transmission or even personal progression of disease.

358.    Yet, these teachers were allowed to keep teaching in person unvaccinated in violation of the Mandate.

359.    The City was aware of this fact and did nothing to require compliance.

360.    But the City and DOE were totally inflexible when it came to religious accommodation, refusing to even consider reasonable accommodation as required by the Mandate itself.

361.    Sixth, the Citywide Panel failed to assess individual circumstances, claiming it would be an undue hardship to accommodate employees even when those employees already had remote non-student facing jobs.

362.    Seventh, by the time the Citywide Panel began issuing undue hardship denials, the vast majority of its vaccinated workforce had gotten Covid-19.

363.    When the undue hardship denials were issued, there was no good faith basis to assert that unvaccinated employees posed a direct threat due to their religious practices.

364.    The objective scientific consensus overwhelmingly showed that vaccination could not stop transmission of Covid-19.

***The City continued to discriminate***

365.    The Citywide Panel also continued to apply discriminatory criteria to determine whether an applicant had, so called, qualifying religious beliefs.

366. First, the Citywide Panel continued to apply a blanket ban on anyone whose religious belief included objection to the connection between the vaccines and abortion.

367. All three of the available Covid-19 vaccines at the time used aborted fetal cell lines in production or development of the product.

368. Emails exchanged between a Panelist and Mr. Eichenholtz provide evidence that Mr. Eichenholtz instructed the panel that such beliefs do not merit religious protection and should be rejected as invalid.

369. Mr. Eichenholtz's own sworn testimony and statements show that he and the Citywide Panel improperly denied accommodation to applicants with religious objections to the use of aborted fetal cell lines, on the arrogant assumption that they are "wrong."

370. When deposed, Mr. Eichenholtz admitted that he did not know whether aborted fetal cell lines were used in the development and production of the Covid-19 vaccines and had not researched this issue.

371. But shortly before this testimony, he wrote to various applicants to the Citywide Panel who had this concern and told them, flat out, that they were wrong, and there was no connection.

372. Mr. Eichenholtz has also filed numerous sworn pleadings in related cases which admit that the Citywide Panel substitutes judgment about whether abortion related concerns are "religious in nature" and deny sincere applicants who assert this religious concern.

373. Multiple employees with this religious objection received a notation in the spreadsheet kept by the Citywide Panel indicating that their beliefs do not actually preclude vaccination.

374. The City has later explained that regardless of what the applicant sincerely

believes, the City routinely substituted judgment to decide whether the applicant was wrong about their beliefs and whether the applicants' religious beliefs truly prohibit vaccination even if the applicant believes that they do.

375.     The Citywide Panel also continued to deny beliefs grounded in prayer or consultation with the moral conscience, on the mistaken theory that such beliefs are somehow personal and not "religious."

376.     Beliefs derived from prayer and conscience are religious in nature and are protected as such.

377.     As one of many examples, it is a foundational catechism of Catholicism that the Holy Spirit, and ultimately God, speaks to us and reveals truth through the conscience.

378.     Many Catholics believe they are required to consult their conscience and follow the guidance of the Holy Spirit when it is provided, regardless of what any other person may believe.

379.     Many other religious people have similar beliefs.

380.     But the Citywide Panel routinely decided that such beliefs are not religious because they allegedly allow a person to pick and choose what they believe they should do.

381.     This is ignorant, as many religious people would say that instructions from God or the Holy Spirit *do not* allow a person to pick and choose what they want to do, since religious people believe they are required to follow such guidance even over black letter law handed down by man.

382.     But in any event, the rejection of these beliefs is also discriminatory.

383.     In a nutshell, the Citywide Panel continued the same discrimination against unorthodox faiths that had been codified in the Stricken Standards, that is, requiring that a

person's religious objection come from dogma or instruction from church leaders, rather than from guidance from God or other personally held sources of religious belief.

384. The Citywide Panel also entangled itself to an unconstitutional degree with religious questions, denying applicants because their beliefs were allegedly not logical or articulated in a sufficiently coherent manner.

385. The Citywide Panel also denied employees if they'd taken other vaccines, even if the employee explained that they took the previous vaccine before they converted to their current beliefs system, or that their religious objection did not apply to that vaccine (for example, if the other vaccine did not use aborted fetal cell lines in production or development).

386. The Citywide Panel also refused to credit applicants' own interpretation of their faiths, instead adopting a policy that the City was tasked with the job of determining what their faith required of them.

387. These are just some of the discriminatory policies applied by the City to uphold all but one of the original denials.

388. Ultimately, the fact that the Citywide Panel arrived at nearly the same result as the original admittedly discriminatory process leads to an inference that the City's reasons were pretextual.

389. The goal of the Citywide Panel was to try to get out of liability for the acknowledged original discrimination by upholding nearly all the original discriminatory denials, rather than review them in good faith to remediate the discrimination, as promised.

390. The history of Defendants' religious accommodation policies also supports the inference that the Citywide Panel's denials were pretextual.

391. Before the Mandate was implemented, Defendants' religious accommodation

policy was to assume that an applicant had sincerely held religious beliefs and focus on whether a request would present an undue hardship.

392. Denials based on sincerity or adequacy of religious beliefs were rare before the Mandate, both at DOE and at other City agencies.

393. In all other contexts, the DOE did not require extensive recitation of a person's religious basis for a religious accommodation request, and routinely granted religious accommodation requests where a person did not specify the specific religious tenents that guided their need for accommodation.

394. After the Mandate was implemented, Defendants changed the policy and attempted to circumvent accommodation requirements by issuing blanket undue hardship denials, without individualized analysis, categorically excluding whole categories of religious belief as invalid, and aggressively denying beliefs as somehow "not religious in nature" or not valid or sincere without any good-faith basis to do so.

395. Even if there had been a legitimate interest in limiting the number of exemptions given, the government cannot lawfully winnow the number down by discriminating against certain faiths or beliefs it disfavors.

396. But this is precisely what the City and DOE did, both in the original denials and in the Citywide Panel appeals.

***Defendants extended the Mandates – and the unlawful Stricken Standards***

397. Continued animus can also be evidenced through the City's failure to rescind or repudiate the original Stricken Standards.

398. After imposing the DOE Mandate, the City issued hundreds of additional "emergency" executive orders, extending the vaccine mandates to nearly every employee in New

York City.

399. Tellingly, even after the City's own attorneys admitted in the *Kane* case that the Stricken Standards policy was likely unconstitutional (and the Second Circuit confirmed they were definitely unconstitutional), the City failed to repudiate them.

400. Instead, the City *extended the use of the Stricken Standards to more agencies* – striking deals and encouraging nearly every City agency to offer the Stricken Standards as one of two options for employees to apply for accommodation.

401. The City's failure to repudiate the Stricken Standards is yet more evidence of animus, which infects both the mandates and the religious accommodation determinations thereunder.

402. This issue was not before the Second Circuit in November 2021, when the Court of Appeals first considered whether the Mandate was itself neutral and generally applicable on interlocutory appeal.

403. Nonetheless, the Second Circuit still ruled that the religious accommodation policies were not neutral or generally applicable.

404. Perhaps the most telling sign of continued animus occurred in the context of unemployment insurance proceedings.

405. Months after the Second Circuit chastised Defendants for denying applicants because the Pope was vaccinated and made it very clear that such criteria were blatantly unconstitutional, the DOE continued to argue in appeal after appeal, that former employees denied religious accommodation must be denied benefits too, because the Pope was vaccinated and therefore their religious beliefs did not merit protection.

**The Mandates were not generally applicable**

406.    As more executive orders were issued, it also became apparent that the Mayor exercised unfettered discretion to make carve-outs, exceptions, or new requirements for secular reasons, or for any reason at all.

407.    For example, Mayor Adams issued Emergency Executive Order 62 ("EEO 62") on March 24, 2022, making a carve-out for athletes, entertainers, and their make-up artists and entourages.

408.    On its face, EEO 62 states that the exception was made due to economic reasons, and other reasons not related to stopping the spread of Covid-19.

409.    Some of Mayor Adams' top donors had lobbied for this carve-out.

410.    Mayor Adams announced the controversial carveout at Citi field, the home of the New York Mets.

411.    New York Mets owner Steve Cohen had donated at least 1.5 million dollars to a political action committee supporting Mayor Adams just months before.

412.    Other top donors to the Mayor in the entertainment industry also benefited from the carve-outs.

413.    Due to the carve outs, stars like Kyrie Irving and various entertainers and their make-up artists and entourages could return to work unvaccinated, working in person in enclosed spaces in close proximity to fans and colleagues, but the janitors and minimum wage workers at the fields or theaters, along with most other hard-working people in New York City, were being denied religious accommodation and losing their jobs if they could not take the vaccine.

414.    Significant outcry accompanied the carve outs.

415.    Harry Nespoli, chair of the Municipal Labor Committee ("MLC") said "There can't be one system for the elite and another for the elite and another for the essential workers of

our city."

416.     Not surprisingly, this favoritism also worried Jay Varma, a physician, epidemiologist, and senior advisor to Mayor Bill de Blasio for public health and COVID-19, who publicly expressed the concern that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

417.     The City was well-aware by March 2022 that there was no public health necessity for the Mandates.

418.     The majority of its fully vaccinated staff had by that time caught Covid-19 despite the Mandate.

419.     During the 2021-2022 school year, approximately sixty thousand fully vaccinated DOE employees caught Covid-19 *after the mandate was imposed* to exclude unvaccinated staff.

420.     Many more had already had Covid-19 before the mandate was imposed.

421.     But the City refused to drop the rest of the mandates or accommodate employees who could not be vaccinated due to their religious beliefs in good faith.

422.     On August 11, 2022, after over a year of verbal acknowledgments that the vaccine could not stop transmission, the CDC officially revised its guidance to stress that it was not appropriate to differentiated between vaccinated and unvaccinated due to the overwhelming scientific consensus that Covid-19 vaccines cannot stop infection and transmission.

423.     Instead of accommodating or reinstating employees who'd been denied religious accommodation, DOE sent out a letter later that August 2022, making a fresh offer to DOE employees who'd been terminated or were on leave due to their vaccine status that they could come back and be reinstated to their old positions – but only if they got vaccinated by September 2022.

424. Many employees, including Plaintiff, asked for religious accommodation again, but they were all denied.

425. Some were able to submit applications through SOLAS, but they received the same vague "undue hardship" denial they'd received before or no response at all.

426. Others sent in email requests, or mailings asking that they be able to be reinstated as offered but accommodated so that they did not have to violate their religious beliefs.

427. They were ignored and denied reinstatement.

428. Defendants also knew, when it sent the letter to each of those employees who'd been previously denied religious accommodation, that the applicants required religious accommodation.

429. They were obligated, therefore, to offer them an accommodation unless they could prove undue hardship.

430. There was absolutely no good faith basis to even argue undue hardship at that point, leave aside prove it.

431. In September 2022, religious employees denied accommodation who were still on leave were all terminated for failing to violate their faith and get vaccinated.

432. On September 20, 2022, Mayor Adams announced in a press conference that he would repeal the private sector vaccine mandates, and the mandate for students and parents participating in after-school activities but would keep in place the public sector mandates and the DOE mandate for employees.

433. When asked how he could justify keeping the public sector mandates, the Mayor admitted that there was no reason, stating: "I don't think anything dealing with COVID is [sic] makes sense and there's no logical pathway of one can do [sic]."

434. Without any logical explanation why, the City kept the DOE Mandate in place until February 2023, when the *Kane* plaintiffs were scheduled to argue their appeals over the unlawful DOE policies before the Second Circuit.

435. On the eve of those arguments, the City announced it would finally repeal the rest of the mandates, and argued to the Court that this should moot the lawsuits.

436. But despite the repeal, DOE refuses to hire back most of the fired unvaccinated workers to this day.

***Retaliation***

437. Not only did Defendants fail to accommodate employees' sincerely held religious beliefs, they also harassed and retaliated against employees with religious objections to the vaccine.

438. As a threshold matter, there was no basis to impose some of the draconian requirements that DOE imposed on employees denied religious accommodation due to alleged "undue hardship."

439. For example, employees were coerced to sign a waiver of their right to challenge the determination or face termination "for cause" and lose their good standing, paid time off credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay.

440. These benefits belonged to the Plaintiff and her colleagues pursuant to the relevant contracts.

441. Moreover, finding employees guilty of misconduct for failing to violate their religious beliefs was retaliatory.

442. Nothing in the Contract requires vaccination as a condition of employment.

443.    Vaccination was not a condition of employment when Plaintiff or other tenured teachers entered into their contracts with the DOE.

444.    Pursuant to the contract, tenured teachers cannot face any of these consequences, including loss of salary, without a 3020a hearing, which was not provided.

445.    Moreover, the Education Law prohibits imposition of a waiver for any DOE employee under such conditions.

446.    Defendants also could easily have at least allowed employees with sincere religious beliefs to work elsewhere while they were kept on leave without pay, or to return to their former positions once the mandate was lifted.

447.    Instead, they imposed a condition that they could not work anywhere while suspended from DOE.

448.    Then, DOE attached problem codes to the employee files of those who were separated for failing to get vaccinated.

449.    The problem codes were associated with employee's finger-print records, which are shared with the Federal Bureau of Investigation.

450.    These problem codes were also visible to vendors and potential employers outside of the DOE system.

451.    The problem codes continue to this day to prevent many employees fired for failing to violate their religious beliefs from getting a job at DOE or elsewhere.

452.    Even after the DOE repealed the vaccine mandate for DOE employees, DOE continues to use these problem codes and other methods to block those who were terminated for failing to get vaccinated in violation of their religious beliefs from coming back.

453.    For those that are offered employment, DOE continues to impose an arbitrary

waiver requirement on some, but not all employees as a condition of return.

454. DOE told UFT that *all* employees would need to sign a waiver of their right to sue to come back, deterring many from trying.

455. In practice DOE imposes this waiver requirement selectively, forcing some to sign as a condition of return but neglecting to even mention it for others.

456. Second, DOE refuses to reinstate Plaintiff or her similarly situated peers, instead requiring that these mostly tenured teachers and educators apply as new hires.

457. Third, DOE continues to use the problem code to thwart efforts for those denied religious accommodation to return even as a new hire.

458. For example, there is a staffing crisis at DOE.

459. In related litigation, employees with spotless employment records have submitted sworn statements that they had interviews and were offered a job, but then their job offer was rescinded after problems with their "security clearance" were reported.

460. Some employees were told point blank that the security clearance issue is that they have a problem code attached to their file.

461. Some have seen the problem code.

462. These problem codes are typically imposed on employees who are not hirable due to heinous offenses, like child abuse.

463. DOE has long been aware of this issue, as it has been repeatedly brought up in EEOC complaints and related litigation but refuses to address it.

464. There is currently a Congressional Investigation into the problem code issue, and members of the United States Congress have demanded answers from the City and DOE.

465. Neither Defendant has bothered to answer these inquiries even though they are

required to do so.

466.    There have also been hearings by the City Council, and many employees from DOE and the City have testified about the ongoing retaliation and discrimination they face.

467.    Fourth, DOE has attempted to block all efforts at receiving unemployment compensation.

468.    For example, when employees would apply, DOE would routinely object and state that they were fired for misconduct or were ineligible for a "good cause" determination because the Pope or others did not agree with the employee's religious choice.

469.    DOE routinely made these discriminatory arguments even after the Second Circuit chastised them for conditioning access to accommodation on the beliefs of a religious leader like the Pope.

## PLAINTIFF'S INDIVIDUAL FACTS

470.    In September 2021, Plaintiff was a tenured Master Teacher for Special Education, Citywide School Administrator and Transition Career and Technical Education ("CTE") leader with over twelve years of service at the DOE.

471.    Plaintiff is a devout Christian, from a devoutly religious family.

472.    They are long-time members of the historic Greater Allen A.M.E. Cathedral of New York, and Plaintiffs daughter has attended only religious schools since preschool.

473.    One of Plaintiff's core religious beliefs is that participation in abortion is a sin.

474.    When she and others in the congregation learned that aborted fetal cell lines were used in the production and development of all three Covid-19 vaccines, Plaintiff approached her pastor at the church to discuss her religious concerns.

475.    He told her to pray on it, asking her to use her strength in the Lord.

476. Plaintiff and her family prayed repeatedly, and based on these prayers, decided together that they could not participate in vaccination without violating their religious beliefs.

477. Plaintiff routinely prays, not just over medical decisions, but about all aspects of her life, and she was very clear that taking these products was not in alignment with God's will as she understands it through prayer and reflection.

478. Plaintiff timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal.

479. In her application, Plaintiff explained she has a sincerely held religious objection to the COVID-19 vaccine and needed accommodation.

480. On or about September 22, 2024, Plaintiff received the same autogenerated email sent to all other applicants, denying her request based on alleged "undue hardship" based on the de minimis standard.

481. No one from the City or the DOE individually reviewed her application before denying her.

482. Defendants never questioned Plaintiff's sincerity, or requested further information about her religious beliefs before denying her.

483. Plaintiff appealed and received confirmation that her appeal would be considered by the arbitrators under the Mandate.

484. The notice, sent from the "donotreply" autogenerated SOLAS website, and signed "HR Connect" stated: "This notification confirms the receipt of your appeal of your denial of a COVID-19 vaccine mandated related exemption or accommodation. This appeal and your application materials and documentation are being forwarded to Scheinman Arbitration and Mediation Services ("SAMS") and independent arbitrators convened by SAMS who will

consider your appeal."

485.    Without explanation, she was not offered a zoom hearing.

486.    Instead, her appeal was denied, with no further information than an "x" next to the word denied.

487.    On or about October 1, 2021, Plaintiff was involuntarily placed on leave without pay, and informed that because she had failed to comply with the Mandate, she could not report to work, receive compensation, use annual leave, CAR or sick time, enter a work site or work anywhere else to try to earn money.

488.    In other words, Plaintiff, a tenured educator, was removed from her position and placed on disciplinary leave without pay without the benefit of a hearing, as required by New York State Education Law § 3020-a, and without a pathway to grieve the action.

489.    When Plaintiff attempted to file a grievance, she received the following message: "Please note: the grievance process has been suspended for the duration of the pandemic."

490.    Plaintiff could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

491.    As a threshold matter, Plaintiff did not need to enter any classrooms to do her job.

492.    Her job was primarily administrative and could have easily been accommodated as entirely remote without any real hardship or change.

493.    Plaintiff began her career as a Special Education teacher, but by 2021, very little of her job involved teaching students.

494.    Many years before, she had been promoted to the "Master Teacher" designation, which was a citywide appointment serving the entire district.

495.    As a Master Teacher, her primary job was to assess data for schools that were

struggling or slated to be shut down by the state, make recommendations on needed professional development and teacher development, and coordinate with building administrators on a plan to support the teachers in this development.

496.    She did not need to enter any school buildings to do this work.

497.    This work typically took up about 85% of her time.

498.    In the fall of 2021, Plaintiff was asked to take on new administrative work, this time serving as a Transition Coordinator.

499.    As a Transition Coordinator, Plaintiff's job was to coordinate with the administration to ensure that the schools were in compliance with IEP plans, and to link students with disabilities who were ready to exit with agencies that could help them with independent living placements, business opportunities and other services.

500.    None of this work involved in person classroom time with students.

501.    All of it could have been handled remotely, and none of it needed to take place in a DOE classroom building with students.

502.    In addition to her administrative work, Plaintiff typically co-taught one or two classes.

503.    Defendants could have easily accommodated Plaintiff by simply having her do her administrative work 100% of the time until the temporary Mandate was rescinded.

504.    Plaintiff also could have also easily kept co-teaching the few classes she had been teaching, in or out of the building.

505.    As a Master Teacher, Plaintiff was involved in co-teaching programs and was not the primary classroom teacher. Even before the Mandate was imposed, Plaintiff routinely joined the class remotely while her co-teacher or an aid was physically present in the building with the

students.

506.    She could easily have continued to co-teach this way.

507.    Plaintiff could have also safely taught in person.

508.    She was not a danger to anyone based on her religious practices.

509.    Plaintiff had already had Covid-19 and had natural immunity.

510.    For the previous year and a half, she had been teaching, including sometimes in person, and had not exposed anyone to Covid-19.

511.    Prior to being placed on forced disciplinary leave without pay, Plaintiff participated in regular COVID testing at her own expense.

512.    Plaintiff also submitted to daily health checks, completed medical surveys, temperature checks upon entry to the building, and daily mask-wearing.

513.    Plaintiff also presented a negative COVID-19 test each day, before reporting to work.

514.    She was ready, willing and able to continue testing and symptoms check as she had been doing, and as every other school district in the state allowed teachers to do.

515.    On or about October 15, 2021, Plaintiff submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII through their discriminatory religious accommodation policy, and unlawful denial of religious accommodation.

516.    This notice complied with the notice of claim requirement governing state law claims.

517.    The Defendants failed to adjust her claims within the statutory period.

518.    After a motions and then a merits panel of the Second Circuit held that the Defendants' religious accommodation policies that Plaintiff was denied under were not neutral

or generally applicable, and likely violate the First Amendment, Plaintiff attempted to file an appeal with the Citywide Panel through SOLAS.

519.    She received an error message, telling her that she was not in compliance with the Mandate, and could not submit her request.

520.    She followed up by sending a letter to the DOE on or about November 29, 2021, asking that her application be reviewed by the Citywide Panel as the City was promising would occur.

521.    The letter also notified the DOE that Plaintiff was being discriminated against based on her religious beliefs and pointed out that the Second Circuit had found Defendants' religious accommodation policies unconstitutional.

522.    Shortly after, Plaintiff received an email confirming that the Citywide Panel would review her application and reinstate her with back pay if she was deemed qualified under lawful standards.

523.    The Citywide Panel never engaged in any cooperative dialogue or took any further action on Plaintiff's appeal.

524.    Instead, the Citywide Panel failed to issue any decision at all, leaving Plaintiff's application to pend for months, while Plaintiff became increasingly more hungry and desperate without any salary or means to support herself.

525.    Without ever receiving an answer from the Citywide Panel, Plaintiff was terminated on or about February 11, 2022, with no due process, and no 3020 hearing, due to "noncompliance with the New York City Health Commissioner's Order requiring vaccination" of all DOE staff.

526.    To date, Plaintiff still has not received a determination from the Citywide Panel.

527. She never received the "fresh consideration" that the City promised to provide to cure the acknowledged discriminatory denials under the Stricken Standards.

528. She was simply dismissed, after over a decade of exemplary service.

529. Though Plaintiff had tenure, and New York State law requires that tenured teachers be provided with a 3020 hearing before they are terminated, Plaintiff was never given a hearing before she was terminated.

530. Vaccination was not a condition of employment.

531. At least 163 unvaccinated teachers were allowed to continue to teach at the DOE and receive their salaries.

532. Moreover, neither the City, nor the DOE nor the arbitrator had the legal right to set any new condition of employment for tenured teachers outside of the contract or the legislatures' enumerated conditions.

533. In August 2022, the DOE sent a letter to Plaintiff, offering to reinstate her denied if she were to show proof of vaccination by September 6, 2022.

534. Though the DOE knew Plaintiff required religious accommodation, they did not offer Plaintiff any accommodation.

535. Plaintiff became aware of an email from Eric Amato of the DOE Human Resources department had sent an email to Beth Norton and Michael Sill of the UFT, stating that any member who requested an exemption from the Mandate would have their file and fingerprings flagged with a "problem code" placed in the DOE's Human Resources Office of Personnel Investigations.

536. A Problem Code is used when an employee has committed what the DOE considers misconduct.

537. Problem Codes are typically placed on files for teachers who have sexually

molested a student or are otherwise unhireable.

538. On or about January 15, 2023, Plaintiff learned that her fingerprints had been flagged by DOE with a "Problem Code" at its office of Personnel Investigations.

539. Plaintiff was an exemplary employee and was in good standing.

540. The only disciplinary charge she had against her was failing to violate her religious beliefs by taking a Covid-19 vaccine.

541. The "Problem Code" in Plaintiff's employment file has significantly impacted Plaintiff's ability to obtain future employment at the DOE – or even elsewhere – or to secure small business funding.

542. After the Mandate was lifted in February 2023, DOE refused to reinstate Plaintiff, despite the fact that the position remained open.

543. DOE also refused to hire Plaintiff for any other position, even though there is a staffing crisis in Plaintiff's field and Plaintiff is well-qualified to fill the position.

544. In addition to requesting reinstatement, Plaintiff attempted to apply for many jobs that she was well-qualified for.

545. She is a highly commended tenured educator with multiple graduate degrees and a record of success at DOE.

546. Yet, Defendants refuse to hire her, despite her excellent record of service. This is because of the Problem Code.

547. Plaintiff is not the only one that is facing this issue. Hundreds of other former DOE employees have seen evidence of the Problem Code and continue to be shut out of employment opportunities at DOE, despite staffing shortages and despite their ample qualifications and efforts.

548. The United States Congress wrote a letter over a year ago to the City of New York

demanding answers about the Problem Code.

549.    To date, neither the City nor the DOE have responded.

550.    The City Counsel has also held hearings and demanded answers on the Problem Code issue.

551.    To date, the City refuses to respond or remedy the issue.

552.    Multiple employees have seen proof and received notification from the DOE directly that problem codes remain on their files, even though the mandate was dropped over a year and a half ago.

553.    The Problem Code is not only visible internally at the DOE either.

554.    Many former DOE employees have been informed by private schools and even schools outside of the district that while they are excellent candidates, the Problem Code makes them unhireable.

555.    Plaintiff has been unable to find work anywhere in the City because of this Problem Code.

556.    Plaintiff's ability to do contract work through her not-for-profit was also impacted by the Problem Code.

557.    Plaintiff runs a not-for-profit business providing supporting students with disabilities and other at-risk children that was registered with the NYC Vendor Portals prior to the placement of the Problem Code in her files. These portals are used for grant and RFP proposals.

558.    Because Defendants placed the Problem Code in her files at both the City and DOE levels, Plaintiff's not-for-profit was removed from the vendor portals and she is no longer able to submit grant or RFP proposals.

559.    Plaintiff was also barred from applying for city contract work because she could no

longer access the Mayor's Office of Contract Services (MOCS) portal after the Problem Code was placed on her file. One must be registered in this portal to receive a contract from the City of New York and to bid on jobs and communicate with vendors.

560. Plaintiff had an account in good standing.

561. Since the Problem Code was attached to her file, her account no longer exists. When she searches for it, she gets a message stating: "vendor #vs0006018 is not found."

562. Before the Problem Code was placed, Plaintiff had access to all these portals.

563. Plaintiff and her not-for-profit have not committed any act that should result in their removal from the portals.

564. Upon information and belief, the fingerprints of unvaccinated teachers have been shared with the Federal Bureau of Investigation (FBI) and the New York State Division of Criminal Justice Services. *See, Declaration of Betsy Combier*, filed 6/3/2022 in *Kane v. de Blasio*, 21-CV-7863 (VEC)(SDNY), attached hereto as Exhibit 5.

565. DOE also imposed a further barrier to continue retaliating against employees who were denied religious accommodation.

566. Though DOE is aware of multiple ongoing lawsuits challenging the discriminatory religious accommodation policies, they have attached a "waiver" requirement for employees who wish to be reinstated, and some who apply as new teachers.

567. The waiver requirement forces teachers denied religious accommodation to waive their right to challenge Defendants' discriminatory conduct as a condition of getting rehired or reinstated.

568. On February 21, 2023, Plaintiff timely mailed a new Notice of Claim, by certified mail, return receipt to the City and the DOE, notifying both parties once more that she has claims

for discrimination, failure to accommodation, unlawful termination and adding that she and others were also facing retaliation from the Problem Code issue.

569.     Defendants failed to adjust the claims within the statutory period.

570.     Plaintiff also timely filed a second EEOC charge – adding claims of retaliation against both Defendants.

571.     On September 18, 2023, Plaintiff received a right to sue letter from the EEOC on this charge.

572.     Plaintiff was unable to afford or secure an attorney to help her with her case.

573.     On December 12, 2023, she timely commenced this action in federal court *pro se* before the ninety-day period elapsed from receipt of the right to sue letter.

574.     Plaintiff suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

575.     Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

576.     As and for a First Cause of Action, Plaintiff asserts that both Defendants failed to accommodate her religious beliefs in violation of Title VII.

577.     Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

578.     Plaintiff was entitled to accommodation, but was denied religious accommodation,

first by the DOE and then the City, in violation of Title VII.

579.    After the City was forced by a temporary restraining order to amend the Mandate to allow for religious exemptions, and the DOE was forced by an arbitrator to provide religious accommodations, each responded by pretending to offer it, but instead conspiring to deny as many applicants as possible, including Plaintiff.

580.    <u>First</u>, the DOE and the City conspired to get the arbitrator, who was a major donor to the Mayor, to adopt their proposed criteria for what qualified for religious accommodation, which was blatantly unconstitutional.

581.    Among other discriminatory classifications, the Stricken Standards issued by the arbitrator conditioned access to accommodation on membership in a preferred religious organization.

582.    The Stricken Standards also impermissibly required a clergy letter and that so-called religious "leaders" agreed with each employee's religious beliefs concerning Covid-19 vaccination.

583.    Under the policy, personally held views were categorically excluded, and the City and DOE admitted that they intended to exclude all Catholics and most other religions than Christian Scientists relief.

584.    The DOE then participated in the appeals to zealously argue for discriminatory reasons to deny applicants, for example, because the Pope did not share their views, resulting in the denial of over 90% of the appeals to the arbitrator.

585.    <u>Second</u>, though the arbitrator's award required accommodation without regard to undue hardship (at least for those who qualified under the discriminatory criteria), DOE denied every single applicant on the pretextual claim of "undue hardship" based on the unlawful "more

than a minimal burden" without ever assessing in good faith whether they could have accommodated any employee.

586. These determinations were pretextual.

587. These determinations were also infected with the same animus that infected the appeals and the entire religious accommodation policy adopted, enforced and implemented by the Defendants.

588. Defendants did not individually review the applications before sending out the denials.

589. The same denial was sent out to employees who already worked remotely or easily could have done so, including Plaintiff.

590. The denials stated on their face that the standard used was the "more than a minimal burden" or *de minimis* standard, which was found unlawful by the United States Supreme Court in *Groff v. de Joy,* 143 S. Ct. 2279 (2023).

591. The denials also stated on their face that they were issued in accordance with the Stricken Standards, which were found unconstitutional by the Second Circuit.

592. The DOE did not consider the required statutory factors before denying relief based on undue hardship.

593. It would not have been an undue hardship to accommodate any of the applicants, but especially Plaintiff.

594. <u>Third</u>, Defendants knew that the SOLAS system, which was the method given to DOE employees to apply for accommodation, was crashing and glitching and shutting many people out of being able to apply by DOE's arbitrary deadlines or appeal.

595. Yet, even when employees alerted supervisors and others responsible for ensuring

reasonable accommodation at DOE that they needed religious accommodation and were unable to apply through SOLAS, DOE refused to individually consider their applications.

596. The goal was never to actually assess reasonable religious objections in good faith.

597. Defendants' shared goal was to find a pretext to deny as many people as possible.

598. To that end, DOE made arbitrary distinctions to shut employees out of access to accommodation at every possible turn.

599. Those that did get a review by an arbitrator were typically denied with no explanation, just an "x" next to the word "denied."

600. After she was denied religious accommodation, Plaintiff and her similarly situated religious colleagues were placed on leave without pay for failing to violate their faith by taking a Covid-19 vaccine and eventually terminated, forced to resign, forced to go on extended unpaid leaves, and/or forced to violate their sincerely held religious beliefs.

601. Fourth, after the Second Circuit held that the DOE's religious accommodation policies were not neutral or generally applicable, and were blatantly violative of the First Amendment, Defendants failed to remediate the harm as the City had promised the Second Circuit they would.

602. Instead, the City refused to consider thousands of employees denied religious accommodation under the original admittedly unconstitutional scheme, including the Plaintiff, even though they knew that these employees were seeking religious accommodation, and the DOE aided and abetted this refusal.

603. Fifth in August 2022, the DOE offered to reinstate those employees it had terminated or forced out after failing to accommodate them to their prior positions and level of seniority. But even though the CDC had just issued guidance affirming the long known scientific

consensus that the vaccinated and unvaccinated posed the same level of risk of transmission, the DOE failed to provide accommodation to those it knew, or should have known, was seeking religious accommodation, and denied every application on pretextual "undue hardship" again based on the de minimis standard.

604. DOE was required to accommodate any employee *or prospective employee*, including Plaintiff, that they knew or should have known required accommodation.

605. DOE knew Plaintiff required accommodation and refused to accommodate her in August 2022 so that she could come back without violating her religious beliefs to the position offered by DOE.

606. To the extent that Defendants claim "undue hardship" as a defense, Plaintiff reserves the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

607. Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

608. For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

609. To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each

individual's circumstances.

610. Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual and unlawful.

611. EEOC guidance and Supreme Court precedent have clarified in recent years that denials based on the "de minimis" standard are unlawful.

612. Yet, all of Defendants undue hardship denials stated, on their face, that they were made based on the de minimis standard.

613. The denials also violate EEOC guidance from 2021.

614. Even in 2021, before the Mandate became effective, the EEOC provided guidance to employers on handling accommodations to Covid-19 vaccine mandates.

615. Among other relevant provisions, the guidance stated "Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment. In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices or observances."

616. Defendants failed to consider all possible reasonable accommodations, or any possible individualized accommodations.

617. The 2021 EEOC Guidance also stated that "If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted. An employer should consider all possible alternatives to determine whether exempting an employee from a vaccination requirement would impose an undue hardship."

618. Defendants failed to explain any alternatives considered or to consider any alternatives to full exemption.

619. Instead, Defendants denied 100% of applicants based on vague assertions of "undue hardship", even those, like Plaintiff, who had administrative jobs that could have been done remotely without issue.

620. Then they argued aggressively to deny any that appealed based on discriminatory and unlawful definitions of what constituted a valid religion.

621. Tellingly, after the appeals in the fall of 2021, the DOE *did accommodate* at least 163 employees, some of them teachers, who posed no different threat than Plaintiffs and the thousands denied.

622. DOE made this determination based on criteria having nothing to do with safety or economic differences, and only to do with impermissible criteria such as membership in a preferred religious organization.

623. As a direct and proximate result of Defendants' failure to accommodate her, Plaintiff and her colleagues denied religious accommodation suffered, and continue to suffer economic damages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

624. Plaintiff is also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

625. Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

626. And Plaintiff is entitled to reasonable attorneys' fees and costs.

627. Pursuant to the single filing rule, Plaintiff respectfully reserves the right to add more Plaintiffs and a proposed class of those similarly situated under the single filing rule to make this litigation more cost-effective for her to pursue.

628. Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

629. The claims of the administrative claimants and the rest of the proposed class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

630. Additionally, though they need not have in this action, the administrative claims and responses from Defendants provided notice that the issues were class wide.

631. Defendants and the EEOC were also on notice that the issues were class wide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class-action lawsuits referencing the widespread violation of Title VII and anticipated actions regarding same.

632. Plaintiff preserves the Single Filing Rule assertions for each of the Title VII claims made herein.

## SECOND CAUSE OF ACTION

**(Discrimination in Violation of Title VII)**

633.    Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

634.    In addition to failure accommodate claims, Plaintiff asserts straight religious discrimination claims against both Defendants – including but not limited to "pattern and practice", "disparate impact" and "as applied."

635.    Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

636.    Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

637.    Plaintiff has protected religious beliefs.

638.    She was qualified to hold her position, as evidenced by the fact that she was a DOE employee in good standing before she was denied religious accommodation.

639.    The fact that accommodation was offered shows that it was not an employment qualification to be vaccinated, since employees could receive religious accommodation and still be qualified to work at the DOE even if they were not vaccinated, and at least 163 employees did receive such accommodation to continue to work for the DOE unvaccinated.

640.    Moreover, related litigation has already held that the City lacked the authority to require vaccination as a condition of employment for DOE employees, and Defendants are

precluded from relitigating that issue here.

641. Plaintiff suffered adverse employment conditions as a result of Defendants' discrimination, including, *inter alia*, being denied religious accommodation, suspended without pay, terminated, charged with "misconduct", denied unemployment compensation, having a Problem Code attached to her record, and facing irreparable damage to her reputation and employment prospects.

642. These adverse actions occurred under circumstances giving rise to an inference of discrimination.

643. In fact, the evidence in this case raises much more than just an *inference* of discrimination, which is the most that is required under notice pleading standards.

644. Defendants' adoption, implementation, ratification and enforcement of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, or an opposition to abortion, shows discrimination as a matter of law.

645. The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic constitutes "direct evidence of discrimination," which is sufficient as a matter of law to win relief absent an affirmative defense. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

646. In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

647. Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*,

515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir.

2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

648.     The Plaintiff's case here is even stronger than *TWA*, because unlike the age

discrimination statutes, there is no affirmative defense to a policy that discriminates between

orthodox and unorthodox religious beliefs, or preferences some faiths and religious beliefs over

others.

649.     The Stricken Standard policy made express classifications based on protected

characteristics – to wit – membership in a disfavored religious group and defined all other religious

beliefs as somehow not meriting the same protection as those the policy favored.

650.     Contrary to the Stricken Standards' unlawful criteria, the term "religion" includes

all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j).

651.     Protected religious beliefs also include "moral or ethical beliefs as to what is right

and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R.

1605.1; 42 U.S.C §2000e(j).

652.     It is well-settled law, acknowledged by the Supreme Court of the United States all

the way down to the district courts and administrative agencies as well as state court systems, that

an individual seeking to demonstrate a sincerely held religious belief under New York State or

federal statutory or constitutional standards need not prove that his belief is part of the recognized

dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need

not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to

any recognized religious organization.")

653.     "The fact that the religious group to which the individual professes to belong may

not accept such belief will not determine whether the belief is a religious belief of the employee."

29 C.F.R. 1605.1.

654.    An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

655.    Employers, especially government employers, must not entangle themselves in religious questions when assessing a request for religious accommodation.

656.    Employers, especially government employers, cannot substitute judgment for the employee about whether the belief is religious in nature.

657.    Nor can employers, especially government employers, deny an applicant because her religious beliefs overlap with similar secular concerns – religious employees are entitled to have both religious and secular concerns, and this does not diminish protection of the employee's religious practices.

658.    The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of

Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

659.    It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

660.    Defendants violated each of these basic rules and more.

661.    In addition to adopting a written policy that makes express classifications and favors certain religions over others, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute further direct evidence of discrimination.

662.    As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiffs by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard than those who were favored under the unconstitutional criteria.

663.    Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

664.    But when the Citywide Panel gave supposed "fresh consideration" to the applications of some of those denied under the original Stricken Standards, they applied a blanket undue hardship ban on accommodation for any teacher and most other employees – thus imposing a less generous standard.

665.    By adopting a substantially different undue hardship standard for those who were

deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

666. Moreover, they continued to apply the same unconstitutional bar against accommodation of personally held religious beliefs and beliefs grounded in concerns about abortion.

667. Under the direct evidence standard of review, it must be presumed that the adverse employment actions were pretextual and discriminatory, and, under this framework, Defendants cannot survive summary judgment without asserting an affirmative defense.

668. No such defense is available because it is black letter law that the government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

669. In the alternative, even if this were not a direct evidence case, Plaintiff also sets forth a prima facie case under the *McDonnell Douglas* framework or any other framework that is permissible to apply.

670. Plaintiff has pleaded facts that if true lead to an inference of discriminatory intent

671. As one of many examples, Plaintiff asserts that DOE representatives and the City's representatives have repeatedly made public comments and official comments dismissing and showing animus towards religious opposition to vaccination (other than supposedly for Christian Scientists).

672. Plaintiffs also provided ample evidence that gives rise to an inference of further discrimination.

673. For example, even though they'd been ordered to make religious accommodations (by a court and by an arbitrator), Defendants denied 100% of all applicants immediately upon

receipt of their application, leading to the unavoidable conclusion that the denials were pretextual, and based on discrimination rather than a good faith undue hardship finding.

674.    The DOE's representatives then argued repeatedly that applicants should be denied for discriminatory reasons in the appeal hearings before an arbitrator provided under the Stricken Standards, claiming all Jews, Muslims, Catholics and Buddhists, should be presumptively disqualified based on their religion, among other discriminatory policies.

675.    This leads to an inference that all aspects of the religious accommodation policies were infected by the same animus.

676.    The evidence also leads to an inference that the Citywide Panel's affirmance of all denials except one were infected by the same animus and were also pretextual.

677.    This is compounded by hostile and dismissive comments made by the Mayor and Mr. Eichenholtz, who was placed in charge of the Citywide Panel process by the Mayor.

678.    It is also shown by the email sent to Mr. Eichenholtz by a trainee on the panel, who confirmed that Mr. Eichenholtz had told her that beliefs related to a concern about abortion would not be accommodated.

679.    It is also shown by the Citywide Panel's notations received in related discovery, which show that the Citywide Panel continued to reject personally held beliefs, such as guidance from prayer, unlawfully substituting judgment to find that such beliefs, while sincere, are somehow "not religious in nature" or "do not preclude the applicant from getting vaccinated."

680.    Defendants' discrimination impacted all applicants for religious accommodation, many of whom were told, point blank told that they were being denied relief because their religious "leader" allegedly did not share their beliefs, among other discriminatory reasons.

681.    Plaintiff should also prevail under a disparate impact theory of discrimination.

682. Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

683. "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

684. An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*.

685. The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

686. "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

687. Most people can take a Covid-19 vaccine without violating their religious beliefs.

688. But a recognized minority of people cannot.

689. Those who cannot were disparately impacted by the Covid-19 vaccine policy, and the draconian religious accommodation policies that were imposed as a result.

690. The employers cannot show that imposing the Mandate was consistent with business necessity, as the vaccines do not stop transmission.

691. But even if they could, the DOE could have been far less punitive with those

employees who were unable to take the vaccine.

692. DOE did not have to put a scarlet letter on people's files, or strip them of tenure, or coerce them into signing waivers, or try to prevent them from getting work anywhere – at the DOE or elsewhere, or refuse to do 3020a hearings, which by law, they were required to provide to all tenured employees before making any change to conditions or benefits.

693. And the DOE could have come up with ways to accommodate employees, like weekly testing, which was sufficient at every other school district in the state and could have worked at the DOE too.

694. And there is of course a disparate impact claim among religions, as some religions and types of religious beliefs were preferred over others during the religious accommodation process.

695. As a direct and proximate result of each Defendants' discrimination, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

696. Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

697. Plaintiff is also entitled to reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### (Retaliation and Harassment in Violation of Title VII)

698. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

699. Plaintiff sought religious accommodation from the vaccine mandate, which is protected activity pursuant to statute.

700. Defendants were aware that Plaintiff sought to protect her religious rights, as Plaintiff had applied for accommodation from each and each Defendant acknowledged receipt of her application and indicated that it would be considered.

701. Rather than accommodate Plaintiff's religious needs, Defendants denied accommodation, terminated her, attached damaging problem codes to her files at DOE and the City and continues to block her from attempts to get rehired – even as a new hire.

702. Defendants also denied Plaintiffs a 3020a hearing, even though it is illegal to take adverse action against a tenured employee or attach a finding of "misconduct" to their files without such hearing.

703. Defendants also have attached a coercive waiver that prevents those with religious objections from returning unless they waive their right to challenge the religious discrimination they faced.

704. As a direct and proximate result of each Defendants' discrimination and retaliation, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

705. Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

706. Plaintiff is also entitled to reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Violation of SHRL)

707. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

708. For the reasons set forth in the first three causes of action, *supra*, Plaintiffs asserts parallel claims under the SRHL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the SHRL.

709. At all relevant times, the SHRL has been in full force and effect, and has applied to both Defendants' conduct.

710. Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

711. The SHRL provides:

> It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

712. It is also a violation of the SHRL for any party to aid or abet another in the violation of rights guaranteed thereunder.

713. Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10(d)

714. If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether

reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

715. At all relevant times, Defendants were Plaintiff's employer, or potential employer, as defined by the SHRL.

716. The City was also the DOE's agent, in the Citywide Panel reviews, and controlled the DOE, directing, aiding and abetting the discriminatory practices at every level of review.

717. For the same reasons set forth above in the First Claim, both Defendants violated the SHRL by failing to accommodate Plaintiffs.

718. The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

719. Similar standards govern the undue hardship determination, though there is a heightened burden on employers under the SHRL to show a *significant* burden and to assess specific factors using the most current objective evidence prior to denial of relief.

720. Failure to engage in cooperative dialogue about undue hardship also leads to a strong presumption of discrimination under the state statutory requirements.

721. Accommodating Plaintiff would not have required significant expense or difficulty from DOE.

722. Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the DOE's workplaces.

723. Accommodating Plaintiff would not require the DOE to violate a bona fide seniority system.

724.    Defendants failed to engage in any interactive process with Plaintiff regarding potential accommodations or the difficulties posed by any prior to denial.

725.    Defendants violated the SHRL by denying Plaintiff's request for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

726.    Instead of accommodating Plaintiff's religious beliefs, Defendants retaliated against Plaintiffs by suspending her, and terminating her if she would not violate their religious beliefs.

727.    For the same reasons set forth in the preceding claims, and herein, Defendants also are liable under the SHRL for discrimination, harassment and retaliation based on religion.

728.    The SHRL adopts the same tests as Title VII for assessing discrimination, retaliation and harassment claims but is supposed to be even more liberally construed towards plaintiffs.

729.    Aiding and abetting discrimination is expressly also listed as a standalone violation of the SHRL even if the colluder is not the employer.

730.    Plaintiff timely notified both Defendants of her claims, through the November 29, 2021 letter, the 2021 and 2023 EEOC filings, and a follow up notice of claim in February 2023.

731.    Plaintiff also seeks relief on behalf of herself and all others similarly situated to address widespread discriminatory practices.

732.    This goal meets the public interest exception to the notice of claim requirements applicable to the DOE.

733.    There are no notice of claim requirements attaching to claims under the SHRL against the City.

734.    As a direct and proximate result of each Defendants' discrimination, retaliation

and harassment, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

735.    Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

736.    And Plaintiff is entitled to reasonable attorneys' fees and costs under the SHRL. Executive Law § 297(10).

## FIFTH CAUSE OF ACTION

### (Violation of CHRL)

737.    For the reasons set forth in the first four causes of action, *supra*, Plaintiff asserts claims under the CHRL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

738.    Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

739.    At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

740.    Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).

741.    Like the SHRL, the CHRL also provides a standalone violation if an entity is found to have encouraged, aided or abetted the violation of any rights provided therein.

742.     As set forth in Claims 1-4, Defendants colluded to deny accommodation to Plaintiff and her similarly situated class members.

743.     As a result of each Defendants' actions, Plaintiff was suspended and terminated.

744.     Both Defendants actions violated Plaintiff's rights and proximately caused her adverse employment consequences.

745.     Both Defendants also failed to engage in the required cooperative dialogue with Plaintiff before denying their accommodation requests, which is a separate and independent act of discrimination under the CHRL.

746.     The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

> The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107(28)(2).

747.     Pursuant to statute, the cooperative dialogue must include analysis and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good faith before denial.

748.     This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

749.     The legislative history of the CHRL amendment notes that the amendment was

meant to cure this holding, and to make failure to engage in cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

750.    Other important amendments are relevant too.

751.    In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

752.    "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.'" Restoration Act § 1.

753.    To bring about the change, the Act established two new rules of construction. First, it created a "one way ratchet" by which interpretations of state and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).

754.    In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug.

16, 2011.

755. Under the CHRL, undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

756. Plaintiff was able to perform the essential duties of her job with reasonable accommodation.

757. Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

758. Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

759. Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of Defendant's workplace.

760. Plaintiff asserted sincere religious objections and there was no basis to question her sincerity.

761. Defendants did not question Plaintiffs sincerity.

762. Instead, they denied her based on undue hardship.

763. Defendants did not meet their burden of proving undue hardship.

764. Defendants did not establish that Plaintiffs posed a direct threat because of her vaccine status, nor can they do so, as set forth more fully above.

765. Plaintiff also asserts discrimination, harassment, and retaliation claims pursuant

to CHRL, as more fully described in the SHRL and Title VII causes of action, which apply the same standards, though the CHRL is to be the most favorably construed towards plaintiffs.

766.     As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered and continues to suffer substantial losses, for which she is entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

767.     As a direct and proximate result of Defendants' failure to accommodate Plaintiff, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

768.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

769.     As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiff's rights, and the rights of all of her similarly situated colleagues. In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders.

770.     Plaintiff is also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).

## **SIXTH CAUSE OF ACTION**

### **(Violation of the U.S. Constitution - Equal Protection Clause)**

771.     Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

772. Plaintiffs asserts that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of the Equal Protection Clause of the United States Constitution.

773. Defendants are judicially and collaterally estopped from arguing that the Stricken Standards policy is non-discriminatory.

774. As the Second Circuit already noted: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.*

775. First, the Court held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168.

776. Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute additional direct evidence of discrimination.

777.     Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

778.     Because Defendants adopted written and de facto policies with express classifications based on which religion a person belonged to, and because of the other Direct Evidence of discrimination set forth above, Plaintiffs' denials of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment since there is no affirmative defense.

779.     As set forth more fully in the complaint, Defendants' religious animus infected every level of review and every policy choice Defendants applied to religious accommodation decisions or consequences after denial to Plaintiff.

780.     As a direct and proximate result of Defendants' discrimination, Plaintiff suffered, and continues to suffer damages and harm.

781.     Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

782.     Plaintiff also seeks declaratory relief along with nominal damages. *Id.*

**(Infringement of Free Exercise Clause – United States Constitution)**

783.    Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

784.    The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from burdening the free exercise of religion.

785.    The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

786.    The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

787.    Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

788.    Plaintiff's sincerely held religious beliefs prohibit them from taking a Covid-19 vaccine.

789.    Defendants' denials of accommodation substantially burdened Plaintiffs' free exercise of religion, in that they were forced to violate their faith if they wanted to keep her job and avoid serious consequences.

790.    Defendants' refusal to accommodate Plaintiffs' religious practices created coercive pressure on them to change or violate their sincerely held religious beliefs.

791. The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable.

792. The Mandate is not generally applicable, because the Mayor and other members of the Executive Branch is empowered to make exceptions to the Mandates in their sole discretion.

793. Since the DOE Mandate was issued, the Mayor has issued over a hundred executive orders, extending and expanding coverage of the City's vaccine mandates to various different groups, and then making carve-outs and exceptions according to secular reasons that undermine the Government's stated reason the same way that a religious carve out would.

794. The Mandate is also not generally applicable because it makes exceptions for secular reasons that defeat the purpose of the Mandate in the same manner.

795. For example, the DOE Mandate allows bus drivers to remain unvaccinated, even though they are in enclosed busses with unvaccinated children, and it allows students to remain unvaccinated and attending class in person, though they are just as able to spread Covid-19 to their peers as teachers, but it requires teachers to be vaccinated.

796. The Mandate is also not generally applicable, because, on its face, it allows employers to exercise a mechanism for individualized exception – to wit, medical or religious accommodation.

797. Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant religious or medical accommodation when an employee applies.

798. These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining

whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

799.    The DOE also adopted a policy for religious accommodations, thereby defeating any argument that the Mandates were general applicable without a mechanism for accommodation, as applied, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

800.    The religious accommodation policies implemented and enforced by the DOE and the City were also themselves government policies that burdened religion, and they were not neutral nor generally applicable either.

801.    As recognized by the Second Circuit, DOE's adoption of a discriminatory written policy defeats neutrality.

802.    Comments by decision-makers also defeat neutrality.

803.    Because the policies were not neutral, strict scrutiny applies.

804.    The Second Circuit also already held that the Defendants' religious accommodation policies were not generally applicable, because decision-makers exercised discretion about whether to grant or deny accommodation, thereby evidencing a mechanism for individualized exemption.

805.    Because the policies were not generally applicable, strict scrutiny applies.

806.    Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiff to be vaccinated.

807.    The vaccine cannot stop transmission, and there is therefore outside of the state's police powers.

808. To the extent that the Defendants could prove that any significant danger existed because of Plaintiff's vaccine status, reasonable accommodations such as weekly testing, daily symptom checks, mask use or allowing remote or off-site meetings could have been implemented without undue hardship.

809. In refusing to accommodate Plaintiff's sincerely held religious beliefs, Defendants did not use the least restrictive means of furthering any compelling state interest.

810. More importantly, as the Second Circuit pointed out, Defendants did not have a compelling interest in any event in conditioning access to accommodation on membership in a favored religious organization.

811. Nor do Defendants have a compelling interest in applying a more favorable undue hardship analysis to those found to meet the criteria for the impermissibly favored religions.

812. Defendants' actions injured and continue to injure Plaintiffs, by chilling their right to practice their religion and imposing lasting consequences and harm to their emotional, psychological, physical, and financial wellbeing, as well as their reputation.

813. As a direct result of the violation of her First Amendment rights, Plaintiff is still unlawfully removed from her jobs.

814. Plaintiff seeks, and is entitled to, declaratory relief and nominal damages stating that the denial of their religious accommodation and subsequent employment consequences are void ab initio and violated their First Amendment right to freely practice their religion.

815. Plaintiff is entitled to, and seek, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if they had never been denied religious accommodation,

along with compensatory damages, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

## EIGHTH CAUSE OF ACTION

### (Violation of the Establishment Clause of the United States Constitution)

816.   Plaintiff repeats and reallege all paragraphs of this Complaint as if fully set forth herein.

817.   The Establishment Clause of the First Amendment to the United States Constitution prohibits the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

818.   Defendants each violated the Establishment Clause by expressing a preference for certain faiths and leaders over others and by expressing animus towards religious objection to vaccination.

819.   The City went so far as to submit letters to the arbitrators, in which they impermissibly took a position on religious matters.

820.   As one of many examples, the Commissioner of Health, David Chokshi, sent an email and letter to the SAMS arbitrators, letting them know that the City did not consider abortion to be a valid religious concern, and stressing that the Pope was vaccinated.

821.   The DOE took this so far as to adopt a facially discriminatory policy, which favors Christian Scientists on its face, and requires discrimination against minority and unorthodox faiths.

822.   The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others trigger strict scrutiny of Defendants' denial of Plaintiffs' religious beliefs as a violation of the Establishment Clause.

823.     Defendants cannot meet the burden of proof to show that their denial of accommodation was narrowly tailored to further a compelling state interest.

824.     Plaintiffs seek and are entitled to declaratory relief and nominal damages, injunctive relief including reinstatement with no break in service, back and front pay and benefits, actual, compensatory and punitive damages, along with attorneys' fees, costs and expenses.

## NINTH CAUSE OF ACTION

### (Substantive Due Process Violation – United States Constitution)

825.     Plaintiff repeats and realleges each paragraph in the Complaint as if fully set forth herein.

826.     The Mandate violates Plaintiff's fundamental substantive due process rights facially and as applied.

827.     Plaintiff has a fundamental right to refuse medicine.

828.     In addition to the fundamental right to refuse even life-saving medicine, the Supreme Court has articulated multiple fundamental rights safeguarding the doctor-patient relationship, and the right to make medical decisions in accordance with one's chosen physician absent state interference.

829.     There is also a fundamental right to protect oneself against harm.

830.     This right rises to the level of a *jus cogens* right where, as here, the medical product mandated is still experimental.

831.     At the time that the Mandate was enforced, the only vaccines available against Covid-19 in the United States were those allowed under experimental use authorization ("EUA"), which, by the terms of the EUA, could not be mandated or coerced.

832.    A different Pfizer product had been licensed just before the Mandate was imposed, but Pfizer did not make it available in the United States at any time before Plaintiffs were denied accommodation and placed on unpaid leave.

833.    At the time of the Mandate, and continuing today, there were inadequate studies available to determine the risks and benefits of the vaccine for any individual, leave aside those with serious health conditions that put them at greater risk of harm.

834.    Defendants had no compelling or even legitimate reason to mandate the vaccines or to deny religious or medical accommodation.

835.    The vaccines cannot stop transmission of disease, and it is therefore not within the police powers of the state to mandate them.

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment to her containing the following relief:

A.      A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to Title VII along with nominal damages and attorneys' fees and costs; and

B.      A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York City Human Rights Law along with nominal damages and attorneys' fees and costs; and

C.      A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute

unlawful discriminatory practices pursuant to the New York State Human Rights Law along with nominal damages and attorneys' fees and costs; and

D.  A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the Equal Protection Clause of the United States Constitution along with nominal damages and attorneys' fees and costs; and

E.  A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Free Exercise Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

F.  A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Establishment Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

G.  A declaratory judgment that the Mandate, as applied, is unconstitutional because it violates Plaintiff's fundamental rights, along with nominal damages and attorneys' fees and costs; and

H.  An order that Defendants reinstate Plaintiff to her former positions with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

I.  An award of actual and compensatory damages in an amount to be determined at trial; and

J.     An award of costs in this action and any appeals, including reasonable attorney's fees; and

K.     An award to Plaintiff for punitive damages in an amount to be determined at trial; and

L.     An order for civil fines and penalties pursuant to New York Executive Law §297(9); and

M.     An award of pre- and post-judgment interest on all amounts awarded to Plaintiffs and the class at the highest rates and from the earliest dates allowed by law on all causes of action; and

N.     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
          September 20, 2024


                              Respectfully Submitted,
                              Gibson Law Firm, PLLC

                    By:     */s/ Sujata S. Gibson*
                              Sujata S. Gibson
                              120 E Buffalo Street, Suite 201
                              Ithaca, NY 14850
                              (607) 327-4125
                              sujata@gibsonfirm.law

                              **Attorneys for the Plaintiff**

EXHIBIT 1

```
-------------------------------- X
In the Matter of the Arbitration
                                 X
           between
                                 X
BOARD OF EDUCATION OF THE CITY              Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF   X
NEW YORK
                                 X
              "Department"
                                 X
           -and-
                                 X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO            X

                "Union"          X

-------------------------------- X
```

**APPEARANCES**

<u>**For the Department**</u>
Renee Campion, Commissioner of Labor Relations
Steven H. Banks, Esq., First Deputy Commissioner
and General Counsel of Labor Relations


<u>**For the Union**</u>
STROOCK & STROOCK & LAVAN, L.L.P.
    Alan M. Klinger, Esq.


Beth Norton, Esq., UFT General Counsel
Michael Mulgrew, UFT President


**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning. They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters. In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits. This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

---

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

## Opinion

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

## I.   Exemption and Accommodation Requests & Appeal Process

As an alternative to any statutory reasonable accommodation

6

process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and non-pedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)— with contraindications delineated in CDC clinical

7

considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

o Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

9

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

10

arbitrator, at his or her discretion, shall either issue a
decision on the appeal based on the documents submitted or
hold an expedited (virtual) factual hearing. If the
arbitrator requests a factual hearing, the employee may elect
to have a union representative present but neither party
shall be required to be represented by an attorney at the
hearing. The expedited hearing shall be held via Zoom
telecommunication and shall consist of brief opening
statements, questions from the arbitrator, and brief closing
statements. Cross examination shall not be permitted. Any
documentation submitted at the arbitrator's request shall be
provided to the DOE at least one (1) business day before the
hearing or the issuance of the written decision without
hearing.

H. Appeal decisions shall be issued to the employee and the DOE
no later than Saturday September 25, 2021. Appeal decisions
shall be expedited without full Opinion, and final and
binding.

I. While an appeal is pending, the exemption shall be assumed
granted and the individual shall remain on payroll consistent
with Section K below. However, if a larger number of
employees than anticipated have a pending appeal as of
September 27, 2021, as determined by SAMS, SAMS may award
different interim relief consistent with the parties' intent.
Those employees who are vaccinated and have applied for an

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II. **Leave**

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

    i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

    ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

    iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v. In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child. As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi. If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

vii. All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

## III. **Separation**

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

contained, herein, all parties retain all legal rights at all times relevant, herein.

September 10 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK      )
                       )    ss.:
COUNTY OF NASSAU       )


I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September 10 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.UFT.Impact Bargaining.awd

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Kate, et al.

        Plaintiffs,

              vs.

de Blasio, et al.

        Defendants.

**DECLARATION OF
DR. MARTIN MAKARY**

Civil Action No. 1:21-cv-07863

STATE OF               )
                      ) ss.:
COUNTY OF          )

    **Martin Makary, M.D., M.P.H.** declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1.  I was asked to provide a declaration providing my opinion, as an expert witness, on points related to a direct threat analysis in this case.

2.  Some of my background and qualifications are below.

3.  I have a master's in public health from the Harvard School of Public Health and am a licensed physician.

4.  I am a Professor at the Johns Hopkins University School of Medicine where I have been teaching and conducting research for nineteen years.

5.  In addition, I manage patients where issues of infection control are paramount, particularly among immunosuppressed patients after surgery.

6.  I have published over 250 scientific articles and served in leadership in the World Health Organization Safe Surgery Saves Lives initiative.

7. I have not and will not receive any financial or other compensation for writing this Declaration. Nor have I received compensation for preparing declarations or reports or for testifying in *any* other case related to the Covid-19 pandemic. I have no financial or other ties to the Plaintiffs or the attorneys in this suit. My participation has been motivated solely by my commitment to public health.

8. Those who choose not to get vaccinated may be making a poor health decision at their own individual risk. However, they are unlikely to pose a significant public health threat to those around them in a school setting.

9. The risk of harm to an immune person is minimal. Vaccination has been shown to be highly effective in preventing severe Covid disease and in downgrading the severity of illness.

10. Similarly, the risk to children is very low. Most children experience very mild symptoms or no symptoms. For example, the incidence of hospitalization from COVID-19 in kids ages 5 to 17 was 0.3 per million for the week ending July 24, 2021, according to the Centers for Disease Control and Prevention[1].

11. The infection fatality rate of Covid illness in Covid immune people is lower than the infection fatality rate of influenza in people who have not received the influenza vaccine.

12. Requiring the vaccine in people who are already immune with natural immunity is excessive because natural immunity is at least as effective as vaccinated immunity in several studies.  In the largest study conducted worldwide, natural

---

[1] https://gis.cdc.gov/grasp/COVIDNet/COVID19_3.html

Scanned with CamScanner

immunity was approximately 27-times more effective than vaccinated immunity in preventing symptomatic Covid infection.[2]

13. This affirmed a June Cleveland Clinic study of health-care workers (who are often exposed to the virus), in which none who had previously tested positive for the Covid got reinfected.[3] The study authors concluded that "individuals who have had SARS-CoV-2 infection are unlikely to benefit from covid-19 vaccination."

14. Similarly in May, a Washington University study reported that even a mild covid infection resulted in long-lasting immunity.[4]

15. The emerging data from these and multiple other studies suggest that natural immunity is as effective or better than vaccine-induced immunity in terms of clinical outcomes in the time studied.

16. Some public health officials cite a CDC study suggesting that vaccinated immunity is more effective than natural immunity, but the study is limited because it only examined a 2-month period in one state and did not report whether people who developed covid had any symptoms. This was the only slice of data reported by the CDC to my knowledge, despite the CDC having data on many states for a much longer period of time.

---

[2] Sivan Gazit, Roei Shlezinger, Galit Perez, Roni Lotan, Asaf Peretz, Amir BenTov, Dani Cohen, Khitam Muhsen, Gabriel Chodick, Tal Patalon. Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections. medRxiv August 24, 2021; DOI: 10.1101/2021.08.24.21262415

[3] Nabin K. Shrestha, Patrick C. Burke, Amy S. Nowacki, Paul Terpeluk, Steven M. Gordon. Necessity of COVID-19 vaccination in previously infected individuals. medRxiv. June 1, 2021. DOI: 10.1101/2021.06.01.21258176

[4] Turner JS, Kim W, Kalaidina E, Goss CW, Rauseo AM, Schmitz AJ, Hansen L, Haile A, Klebert MK, Pusic I, O'Halloran JA, Presti RM, Ellebedy AH. SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans. Nature. May 24, 2021. DOI: 10.1038/s41586-021-03647-4

Scanned with CamScanner

17. There is high population immunity in many parts of the U.S.  This stems from a combination of natural immunity[5] and vaccinated immunity.

18. Roughly a third to half of Americans who are unvaccinated have natural immunity, based on an analysis of California residents[6], and the estimate may be higher in people who worked throughout the pandemic. The prevalence of natural immunity increases with each passing day.

19. Medical exemptions to vaccine mandates should not be pre-defined to be overly narrow. There are multiple valid reasons why a clinician may not recommend a full 2-dose vaccine regimen to an individual, depending on their clinical situation and history.

20. Mandating vaccines for "every living, walking American" is, as of now, not well-supported by science. Moreover, an indiscriminate vaccination policy may result in unintended harm.

21. Clinical studies show, for example, that boys and men under the age of twenty three face a risk of myocarditis after the second vaccine dose that may be as high as 1 per 7000 males. Myocarditis may lead to death. The true incidence of this known vaccine-related complications is not fully understood with reliable population studies.

22. For any male employees under the age of 23, an exemption to avoid the second vaccine dose can be supported by the science.

---

[5] https://www.wsj.com/articles/the-power-of-natural-immunity-11623171303
[6] https://www.sfchronicle.com/health/article/More-than-a-third-of-Californians-recently-tested-16015721.php

Scanned with CamScanner

23. Currently, we do not have robust and highly-reliable system for actively tracking adverse reactions to the vaccine in young people.  As a result, the CDC may not be accurately capturing the extent of rare adverse reactions in this population.

DR. MARTIN MAKARY

M.D., M.P.H.

Scanned with CamScanner

EXHIBIT '

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FOURTH DEPARTMENT

— — — — — — — — — — — — — — — — — — — — — — — — X

MEDICAL PROFESSIONALS FOR INFORMED
CONSENT, et al.

                    *Appellees-Petitioners*

                                        **Index No. CA 23-00161**

            -against-

MARY T. BASSETT, et al,

            *Appellants-Respondents*

— — — — — — — — — — — — — — — — — — — — — — — X

STATE OF CONNECTICUT        )
                           ) ss.: TRUMBULL
COUNTY OF FAIRFIELD         )

HARVEY A. RISCH, MD, PHD, being duly sworn, deposes and says:

1.      I make this affidavit in support of Appellee-Petitioners' opposition to Appellants'
motion for stay.

2.      I am familiar with the facts set forth herein based on my review of the affidavits and
evidence submitted with Appellants' motion for a stay, hundreds of scientific studies and research
findings, on my own extensive research and on my personal knowledge and the expertise gained
through my career as a university professor, research scientist and epidemiologist.  Some of the
credentials and experience that qualify me to give this opinion are listed below.

3.      I am Professor Emeritus of Epidemiology at Yale School of Public Health, a practicing academic epidemiologist with more than 40 years of experience in epidemiologic methods, both in research and teaching.  My research has included both infectious and noninfectious factors.

4.      Over this career, I have taught introductory, intermediate, and advanced epidemiologic research methods to public health graduate students, postdoctoral fellows, hospital residents, and junior faculty members. I have also taught coursework on pharmacoepidemiology, which is the epidemiologic study of vaccines, medications, and medical devices, and their antecedent conditions and reasons for use.

5.      I have published some 400 peer-reviewed original research papers in well-regarded scientific journals and have an h-index of 105, with more than 48,000 publication citations to-date.

6.      I have served as grant reviewer or chair on two dozen grant review panels, most of which were at NIH, and served as peer reviewer for 60 scientific and medical journals.

7.       I have been Associate Editor of the *Journal of the National Cancer Institute* since 2000, Member of the Board of Editors of the *American Journal of Epidemiology* from 2014-2020, and Editor of the *International Journal of Cancer* since 2008.

8.      I am an elected member of the Connecticut Academy of Science and Engineering and, based on my strong epidemiologic methods experience and PhD work in infectious epidemic models, was selected to be a member of the Academy committee that was organized in 2020 to formulate plans for helping the reopening of the state of Connecticut after its lockdown ended.

9.      I thus began researching COVID-19 epidemiology, prevention, treatment, and vaccination with my participation in the Reopening Committee.  In the subsequent 2.5 years, I extensively studied medical and epidemiologic factors related to the COVID-19 virus, the vaccines, and the disease in the US and internationally.

10.     I base my understandings of vaccine immunity and safety from studies and data of the three genetic vaccines that have received emergency use authorization (EUA) from the US Food and Drug Administration (FDA): the two mRNA-technology vaccines (Pfizer-BioNTech and Moderna) and the adenovirus vector-based vaccine (Johnson & Johnson).

11.     In my professional opinion, Appellants' claim that a vaccine mandate will reduce the spread of COVID-19 in any meaningful way is not supported by the great weight of evidence and does not comport with the current recommendations of the Centers for Disease Control and Prevention ("CDC").

**The Current Scientific Consensus, based on the Overwhelming Weight of Available Evidence, does not Support the Assertion that Vaccination can Meaningfully Stop the Spread of COVID-19**

12.      My understanding from the papers is that Appellants assert that maintaining a vaccine mandate pending the outcome of their appeal is necessary to stop the spread of COVID-19 in hospitals and healthcare facilities and thus prevent irreparable harm.

13.     This claim is not supported by the scientific evidence, nor is it supported by the consensus of public health officials and scientists as represented by official CDC statements.

14.     In fact, in 2022, CDC specifically updated its guidance to state, "CDC's COVID-19 prevention recommendations no longer differentiate on a person's vaccination status."[1]

15.     As further discussed below, there is no reasonable scientific debate about the fact that the original primary COVID-19 vaccinations have essentially completely lost effectiveness for preventing infection transmission, nor about that currently available vaccines provide only transient

---

[1] Centers for Disease Control and Prevention. Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems — United States, August 2022.
https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm (August 19, 2022; last visited January 31, 2023)

benefit and wane in effectiveness, nor about that unvaccinated employees pose no different risk of spreading COVID-19 over those vaccinated with the two-dose primary series.

16.     Given these well-established facts, there is no scientific basis to assert that a vaccine mandate will meaningfully stop the spread of COVID-19 in healthcare facilities, or that staying the lower court's decision to strike the mandate is necessary to prevent irreparable harm.

## All Available Regular-Dose COVID-19 Vaccines Target the Original SARS-CoV-2 Virus, Rendering Them Largely Ineffective

17.     All currently available COVID-19 vaccines were designed to target the spike (S) glyco-protein of the original SARS-CoV-2 strain (Wuhan HU-1) identified in Wuhan, China, in late 2019.

18.     Since then, however, substantial mutations have occurred to that structure—at least fifteen mutations of the Spike S receptor-binding domain (RBD) have been identified in Omicron alone. (Cao et al., 2022a).[2]

19.     This dramatic evolution of the variant has resulted in substantial antibody escape, estimated at above 85% of all neutralizing antibodies tested by the same group of researchers, in another study evading neutralizing antibodies with a twelve- to 44-fold higher efficiency than the Delta variant (Hoffmann et al., 2022).[3]

20.     "Antibody escape" renders antibodies elicited against the earlier virus strains ineffective against the escaped substrains.

21.     The Omicron subvariants present an even higher capacity for antibody escape while also becoming more transmissible due to additional mutations in the spike protein.

---

[2] Cao Y, Wang J, Jian F, Xiao T, Song W, Yisimayi A, Huang W, Li Q, Wang P, An R, Wang J, Wang Y, Niu X, Yang S, Liang H, Sun H, Li T, Yu Y, Cui Q, Liu S, Yang X, Du S, Zhang Z, Hao X, Shao F, Jin R, Wang X, Xiao J, Wang Y, Xie XS. Omicron escapes the majority of existing SARS-CoV-2 neutralizing antibodies. Nature 2022a;602(7898):657-663. https://www.nature.com/articles/s41586-021-04385-3

[3] Hoffmann M, Krüger N, Schulz S, Cossmann A, Rocha C, Kempf A, Nehlmeier I, Graichen L, Moldenhauer AS, Winkler MS, Lier M, Dopfer-Jablonka A, Jäck HM, Behrens GMN, Pöhlmann S. The Omicron variant is highly resistant against antibody-mediated neutralization: Implications for control of the COVID-19 pandemic. Cell 2022;185(3):447-456.e11. https://www.cell.com/cell/fulltext/S0092-8674(21)01495-1

22.    Specifically, more recently circulating variants like BA.4 and BA.5 are some four-fold more resistant to "sera from vaccinated and boosted individuals than BA.2," which itself was already more resistant than the baseline Omicron variant (Wang et al., 2022).[4] Omicron variants in turn have been far more resistant than Delta, which was more resistant than the original virus strains to original vaccine-related immunity.

23.    In other words, vaccination with the primary series, which is what this mandate requires, has little to no effect on a person's ability to become infected and/or pass on currently circulating strains of SARS-CoV-2, and may in fact even be counterproductive.

24.    The data further show that, even for currently available vaccine boosters updated to target Omicron subvariant BA.1, the recent mutations in BA.5 render such an update largely ineffective (Cao et al., 2022b).[5]

25.    Similarly, bivalent booster vaccines targeting BA.4 and BA.5 are highly ineffective against current substrains BQ.1.1 and XBB.1 (Miller et al., 2023).[6]

26.    These substrains together comprise the overwhelming majority of virus variants presently in circulation in the US (see CDC chart, next page, dated January 28, 2023).[7]

[4] Wang Q, Guo Y, Iketani S, Nair MS, Li Z, Mohri H, Wang M, Yu J, Bowen AD, Chang JY, Shah JG, Nguyen N, Chen Z, Meyers K, Yin MT, Sobieszczyk ME, Sheng Z, Huang Y, Liu L, Ho DD.  Antibody evasion by SARS-CoV-2 Omicron subvariants BA.2.12.1, BA.4 and BA.5.  Nature 2022 Aug;608(7923):603-608. https://www.nature.com/articles/s41586-022-05053-w
[5] Cao Y, Yisimayi A, Jian F, Song W, Xiao T, Wang L, Du S, Wang J, Li Q, Chen X, Yu Y, Wang P, Zhang Z, Liu P, An R, Hao X, Wang Y, Wang J, Feng R, Sun H, Zhao L, Zhang W, Zhao D, Zheng J, Yu L, Li C, Zhang N, Wang R, Niu X, Yang S, Song X, Chai Y, Hu Y, Shi Y, Zheng L, Li Z, Gu Q, Shao F, Huang W, Jin R, Shen Z, Wang Y, Wang X, Xiao J, Xie XS.  BA.2.12.1, BA.4 and BA.5 escape antibodies elicited by Omicron infection.  Nature 2022b;608(7923):593-602. https://www.nature.com/articles/s41586-022-04980-y
[6] Miller J, Hachmann NP, Collier AY, Lasrado N, Mazurek CR, Patio RC, Powers O, Surve N, Theiler J, Korber B, Barouch DH.  Substantial neutralization escape by SARS-CoV-2 Omicron variants BQ.1.1 and XBB.1.  N Engl J Med. 2023 Jan 18.  https://www.nejm.org/doi/full/10.1056/NEJMc2214314
[7] Centers for Disease Control and Prevention.  Variant Proportions.  https://covid.cdc.gov/covid-data-tracker/#variant-proportions (2023; last visited January 28, 2023)



*   Enumerated lineages are US VOC and lineages circulating above 1% nationally in at least one week period. "Other" represents the aggregation of lineages which are circulating <1% nationall during all weeks displayed.
**  These data include Nowcast estimates, which are modeled projections that may differ from weighted estimates generated at later dates
#   BA.1, BA.3 and their sublineages (except BA.1.1 and its sublineages) are aggregated with B.1.1.529. Except BA.2.12.1, BA.2.75, XBB and their sublineages, BA.2 sublineages are aggregated with BA.2. Except BA.2.75.2, CH.1.1 and BN.1, BA.2.75 sublineages are aggregated with BA.2.75. Except BA.4.6, sublineages of BA.4 are aggregated to BA.4. Except BF.11, BA.5.2.6, BQ.1 and BQ.1.1, sublineages of BA.5 are aggregated to BA.5. Except XBB.1.5, sublineages of XBB are aggregated to XBB. For all the other lineages listed, their sublineages are aggregated to the listed parental lineages respectively. Previously, CH.1.1 was aggregated to BA.2.75. Lineages BA.2.75.2, XBB, XBB.1.5, BN.1, BA.4.6, BF.7, BF.11, BA.5.2.6 and BQ.1.1 contain the spike substitution R346T.

## Vaccine Protection Wanes More Rapidly
### than Natural Infection

27.     By four to six months after the full course of either the Pfizer or Moderna vaccines, protection against infection by the BA.1 or BA.2 subvariants is estimated to be somewhere between zero to thirty percent—in other words, almost entirely attenuated only six months after the last injection (UK Health Security Agency, 2022).[8]

---

[8] UK Health Security Agency.  COVID-19 Vaccine Surveillance Report, Week 27, Publishing reference: GOV-12727, July 7, 2022. https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1088974/Vaccine-surveillance-report-week-27.pdf (last visited January 30, 2023).



**Figure 3.** Effectiveness of Previous Infection, Vaccination, and Hybrid Immunity against Any Symptomatic Omicron Infection According to Time since Previous Infection or Vaccination.
I bars indicate 95% confidence intervals.

28.     Dozens of studies show that circulating antibodies, T-cells and B-cells reflective of SARS-CoV-2 infection last at least as long, and in most cases longer than, protection from vaccination (Alexander, 2022).[9]

---

[9] Alexander PE.  160 Plus Research Studies Affirm Naturally Acquired Immunity to Covid-19: Documented, Linked, and Quoted.  Brownstone Institute, 2022.  https://brownstone.org/articles/research-studies-affirm-naturally-acquired-immunity/ (last accessed January 30, 2023)

29.     Moreover, multiple other studies show conclusively that any protection the vaccine two-dose regimen can provide against Omicron infection wanes by six months (Kirsebom et al., 2022[10]; Tseng et al., 2022[11]; Nielsen et al., 2022[12]; Altarawneh et al., 2022[13]).  The relevant Figure 3 from the Altarawneh study is shown at the top of the previous page (2-dose vaccination circled in red).

30.     The Qatar study (Altarawneh et al., 2022) also shows in that figure that in contrast to vaccine effectiveness, previous infection effectiveness against reinfection remains stable for at least one year.

31.     One empirical study of 11,000 UK healthcare workers demonstrates strong resistance to reinfection for at least 6 months.[14]

---

[10] Kirsebom FCM, Andrews N, Stowe J, Toffa S, Sachdeva R, Gallagher E, Groves N, O'Connell A-M, Chand M, Ramsay M, Lopez Bernal J. COVID-19 vaccine effectiveness against the omicron (BA.2) variant in England.  Lancet Infect Dis 2022; published online May 24.  https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(22)00309-7/fulltext

[11] Tseng HF, Ackerson BK, Bruxvoort KJ, Sy LS, Tubert JE, Lee GS, Ku JH, Florea A, Luo Y, Qiu S, Choi SK, Takhar HS, Aragones M, Paila YD, Chavers S, Talarico CA, Qian L.  Effectiveness of mRNA-1273 against infection and COVID-19 hospitalization with SARS-CoV-2 Omicron subvariants: BA.1, BA.2, BA.2.12.1, BA.4, and BA.5.  medRxiv preprint, December 2, 2022.   https://www.medrxiv.org/content/10.1101/2022.09.30.22280573v2

[12] Nielsen KF, Moustsen-Helms IR, Schelde AB, Gram MA, Emborg HD, Nielsen J, Hansen CH, Andersen MA, Meaidi M, Wohlfahrt J, Valentiner-Branth P.  Vaccine effectiveness against SARS-CoV-2 reinfection during periods of Alpha, Delta, or Omicron dominance: A Danish nationwide study.  PLoS Med 2022;19(11):e1004037.  https://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.1004037

[13] Altarawneh HN, Chemaitelly H, Ayoub HH, Tang P, Hasan MR, Yassine HM, Al-Khatib HA, Smatti MK, Coyle P, Al-Kanaani Z, Al-Kuwari E, Jeremijenko A, Kaleeckal AH, Latif AN, Shaik RM, Abdul-Rahim HF, Nasrallah GK, Al-Kuwari MG, Butt AA, Al-Romaihi HE, Al-Thani MH, Al-Khal A, Bertollini R, Abu-Raddad LJ.  Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections.  N Engl J Med 2022;387(1):21-34.  https://www.nejm.org/doi/10.1056/NEJMoa2203965

[14] Hanrath AT, Payne BAI, Duncan CJA.  Prior SARS-CoV-2 infection is associated with protection against symptomatic reinfection.  J Infect 2021;82(4):e29-e30.  https://www.journalofinfection.com/article/S0163-4453(20)30781-7/fulltext

32. Four empirical studies demonstrate strong resistance to reinfection for at least 7 months, in Qatar,[15] Denmark,[16] UK[17] and Austria.[18]

33. One empirical study in the London, UK, metropolitan area demonstrates strong resistance to reinfection for at least 8 months.[19]

34. Three empirical studies demonstrate strong resistance to reinfection for at least 9 months, in England,[20] Israel[21] and the US,[22] and another in the US for 10 months.[23]

[15] Abu-Raddad LJ, Chemaitelly H, Coyle P, Malek JA, Ahmed AA, Mohamoud YA, Younuskunju S, Ayoub HH, Al Kanaani Z, Al Kuwari E, Butt AA, Jeremijenko A, Kaleeckal AH, Latif AN, Shaik RM, Abdul Rahim HF, Nasrallah GK, Yassine HM, Al Kuwari MG, Al Romaihi HE, Al-Thani MH, Al Khal A, Bertollini R. SARS-CoV-2 antibody-positivity protects against reinfection for at least seven months with 95% efficacy. EClinicalMedicine 2021;35:100861. https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(21)00141-3/fulltext

[16] Hansen CH, Michlmayr D, Gubbels SM, Molbak K, Ethelberg S. Assessment of protection against reinfection with SARS-CoV-2 among 4 million PCR-tested individuals in Denmark in 2020: a population-level observational study. Lancet 2021;397(10280):1204-1212. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00575-4/fulltext

[17] Lumley SF, O'Donnell D, Stoesser NE, Matthews PC, Howarth A, Hatch SB, Marsden BD, Cox S, James T, Warren F, Peck LJ, Ritter TG, de Toledo Z, Warren L, Axten D, Cornall RJ, Jones EY, Stuart DI, Screaton G, Ebner D, Hoosdally S, Chand M, Crook DW, O'Donnell AM, Conlon CP, Pouwels KB, Walker AS, Peto TEA, Hopkins S, Walker TM, Jeffery K, Eyre DW; Oxford University Hospitals Staff Testing Group. Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers. N Engl J Med 2021;384(6):533-540. https://www.nejm.org/doi/10.1056/NEJMoa2034545

[18] Pilz S, Chakeri A, Ioannidis JP, Richter L, Theiler-Schwetz V, Trummer C, Krause R, Allerberger F. SARS-CoV-2 re-infection risk in Austria. Eur J Clin Invest 2021;51(4):e13520. https://onlinelibrary.wiley.com/doi/10.1111/eci.13520

[19] Breathnach AS, Riley PA, Cotter MP, Houston AC, Habibi MS, Planche TD. Prior COVID-19 significantly reduces the risk of subsequent infection, but reinfections are seen after eight months. J Infect 2021 Apr;82(4):e11-e12. https://www.journalofinfection.com/article/S0163-4453(21)00010-4/fulltext

[20] Hall VJ, Foulkes S, Charlett A, Atti A, Monk EJM, Simmons R, Wellington E, Cole MJ, Saei A, Oguti B, Munro K, Wallace S, Kirwan PD, Shrotri M, Vusirikala A, Rokadiya S, Kall M, Zambon M, Ramsay M, Brooks T, Brown CS, Chand MA, Hopkins S; SIREN Study Group. SARS-CoV-2 infection rates of antibody-positive compared with antibody-negative health-care workers in England: a large, multicentre, prospective cohort study (SIREN). Lancet 2021;397(10283):1459-1469. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00675-9/fulltext

[21] Gazit S, Shlezinger R, Perez G, Lotan R, Peretz A, Ben-Tov A, Herzel E, Alapi H, Cohen D, Muhsen K, Chodick G, Patalon T. The Incidence of SARS-CoV-2 Reinfection in Persons With Naturally Acquired Immunity With and Without Subsequent Receipt of a Single Dose of BNT162b2 Vaccine : A Retrospective Cohort Study. Ann Intern Med 2022;175(5):674-681. https://www.acpjournals.org/doi/full/10.7326/M21-4130

[22] León TM, Dorabawila V, Nelson L, Lutterloh E, Bauer UE, Backenson B, Bassett MT, Henry H, Bregman B, Midgley CM, Myers JF, Plumb ID, Reese HE, Zhao R, Briggs-Hagen M, Hoefer D, Watt JP, Silk BJ, Jain S, Rosenberg ES. COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis - California and New York, May-November 2021. MMWR Morb Mortal Wkly Rep 2022;71(4):125-131. https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm

[23] Spicer KB, Glick C, Cavanaugh AM, Thoroughman D. Protective Immunity after Natural Infection with Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) - Kentucky, USA, 2020. Int J Infect Dis 2022;114:21-28. https://www.ijidonline.com/article/S1201-9712(21)00800-6/fulltext

35.     Finally, one empirical study in Italy demonstrates strong resistance to reinfection for at least 11 months,[24] and one at the Cleveland Clinic in the US, for at least 13 months.[25]

36.     These twelve empirical studies demonstrate that natural infection with SARS-CoV-2 generates effective immunity in dramatically reducing risk of reinfection for at least 6-13 months. Such reduced risks are comparable to or more durable than the temporary reduced infection risks lasting roughly no more than 6 months provided by vaccination, as shown above.

37.     Appellants' own data set also shows that natural immunity is superior to vaccine immunity. CDC analysis of the NYSDOH COVID-19 cumulative laboratory-confirmed incidence data for the period May through November 2021 showed that 1.82% of vaccinated people without previous COVID-19 diagnosis got COVID-19, vs 0.62% of unvaccinated people who had previously had COVID-19, an almost 3-fold higher rate for vaccinated individuals[26]. This study was co-authored by Respondent-Appellant Bassett and Appellants' Affiant Dr. Emily Lutterloh in January 2022.

38.     The same CDC report found almost identical rates in California for the same period: 1.55% of vaccinated people without previous COVID-19 diagnosis got COVID-19, vs 0.50% of unvaccinated people who had previously had COVID-19, again a 3-fold rate for vaccinated vs unvaccinated persons.

39.     Similarly, the primary study that Dr. Lutterloh relies on in the affidavit submitted with these motion papers also found that vaccine effectiveness wanes over months, whereas immunity from natural infection does not. "We … found that time since last dose of a COVID-19 vaccine (as a continuous variable) was associated with increased infectiousness of SARS Co-V2-infections. … We

---

[24] Vitale J, Mumoli N, Clerici P, De Paschale M, Evangelista I, Cei M, Mazzone A. Assessment of SARS-CoV-2 Reinfection 1 Year After Primary Infection in a Population in Lombardy, Italy. JAMA Intern Med 2021;181(10):1407-1408. https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2780557
[25] Kim P, Gordon SM, Sheehan MM, Rothberg MB. Duration of Severe Acute Respiratory Syndrome Coronavirus 2 Natural Immunity and Protection Against the Delta Variant: A Retrospective Cohort Study. Clin Infect Dis 2022;75(1):e185-e190. https://academic.oup.com/cid/article/75/1/e185/6448857
[26] *See* fn 22, *supra.*

did not observe a statistically significant relationship between time since last SARS-Co-V2 infection and risk of transmission." (NYSCEF Doc. 3 at p. 225, *Lutterloh Ex. B*) (Tan et al., 2023).[27]  This means that increasingly over months after the last vaccine dose, risk of infection significantly increased, whereas after prior infection, a significant increasing risk of reinfection was not seen.

40.     I am informed that all named Petitioners and most healthcare workers seeking reinstatement as a result of the lower court's order have natural immunity.  The science does not support an inference that their return to work will pose a direct threat to public health.

41.     Dr. Lutterloh states that natural immunity should not apply to COVID-19 mandates (NYSCEF Doc. 3, Ex. L - Lutterloh Aff. ¶ 12 fn 3).  In particular, she notes, "Serology is appropriate for diseases people typically only contract once in their lifetime, well characterized serology is reliably commercially available, and positive serology indicates essentially complete immunity. COVID-19 does not fit this profile."

42.     Respectfully, these three criteria do not represent the purpose of documenting serological evidence of having had COVID-19.  The evidence cited herein at ¶¶ 28-35 shows that prior SARS-CoV-2 infection reduces the risk of reinfection in degree comparable to and for durations longer than 2-dose vaccine-based immunity.  A serological test positive for indicators of natural immunity to SARS-CoV-2 is extremely specific for having previously had COVID-19.  There is no requirement to demonstrate complete immunity by serologic evidence; there is no requirement that the previous COVID-19 not have occurred more than once, nor that infection could not theoretically recur, as breakthrough infections certainly can after vaccination (see ¶ 43 *infra*); and commercial testing for natural COVID-19 serology is available.[28]  A positive commercial serologic test demonstrates the

---

[27] Tan ST, Kwan AT, Rodríguez-Barraquer I, Singer BJ, Park HJ, Lewnard JA, Sears D, Lo NC.  Infectiousness of SARS-CoV-2 breakthrough infections and reinfections during the Omicron wave.  Nat Med 2023 Jan 2.
https://www.nature.com/articles/s41591-022-02138-x
[28] https://www.questdiagnostics.com/patients/get-tested/conditions/infectious-disease/covid-19/antibody

fact of past COVID-19, and that fact is sufficient to assert durable immunity to reinfection by the virus, as good as or better than receipt of the primary series of vaccination required by the NYSDOH regulation at issue.

43.     As discussed herein, 2-dose COVID-19 vaccine immunity does not provide complete immunity, and it does not protect the vaccinated individual from getting or transmitting COVID-19. The criteria stated by Dr. Lutterloh at ¶ 41 are not imposed on vaccine-based immunity and are therefore not comparable between vaccine-based and natural immunity.  These criteria represent an ad hoc and arbitrarily incorrect characterization of the fact of a positive result in commercial serologic testing for past COVID-19.

### Currently Available Vaccines May Actually Increase The Risk of Infection or Transmission of SARS-CoV-2

44.     Data from a number of more recent high-powered studies show that currently available vaccines may eventually actually increase the risk of infection and transmission of COVID-19 rather than decrease it.

45.     A study performed during Qatar's Omicron wave in December 2021 to mid-January 2022 involving more than 1.6 million persons bears out this fact by demonstrating that any previous protection afforded by full primary doses of the currently available vaccines no longer exists (Altarawneh et al., 2022).[29]

46.     The Qatar national study showed that full vaccination with either BNT162b2 (Pfizer) or mRNA-1273 (Moderna) had "negligible" effectiveness to prevent infection, and that the vaccines were conferring null or negative efficacy—in other words, by six months after vaccination, **those vaccinated but not boosted were more likely to develop symptomatic infections than unvaccinated individuals.**  (Altarawneh et al., 2022)[30] (see earlier figure).

---

[29] *See* fn 13, *supra.*
[30] *Id.*

47.     The same eventual negative efficacy is seen after five months post-vaccination in the large Southern California Kaiser Permanente study by Tseng et al. (Tseng et al., 2022).[31]

48.     The same eventual negative efficacy is seen after eight months post-vaccination in the large Swedish study by Nordström et al. (Nordström et al., 2022).[32]

49.     Public Health UK data from March 2022 similarly show that boosted adults in all age groups had approximately three times the infection risk of unvaccinated adults (UK Health Security Agency, 2022).[33]

50.     Even if there were some average behavioral differences between the vaccinated and unvaccinated individuals in the UK data, these would be very unlikely to have accounted for the large observed increased infection risks in the vaccinated, let alone suggest that the vaccinated should have had lower risk. Whatever general health differences might have tended to have been present in vaccinated vs unvaccinated individuals at the beginning of the UK vaccine rollouts were largely dissipated by March 2022 to which these data pertain.

51.     Follow-up data of some 51,000 Cleveland Clinic health-care employees shows that the cumulative risk of getting COVID-19 is positively directly related to the number of previous vaccine doses (0, 1, 2, 3, >3) received (Shrestha et al., 2022)[34] (figure at top of next page).  These risk differences between doses were statistically significant, and again demonstrate that vaccination is not associated with decreased risk of SARS-CoV-2 infection but quite possibly with increased risk.

---

[31] *See* fn 8, *supra.*

[32] Nordström P, Ballin M, Nordström A.  Risk of infection, hospitalisation, and death up to 9 months after a second dose of COVID-19 vaccine: a retrospective, total population cohort study in Sweden.  Lancet 2022 (399), February 26. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(22)00089-7/fulltext

[33] UK Health Security Agency.  COVID-19 vaccine surveillance report Week 13, Publishing reference: GOV-11859, March 31, 2022. https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1066759/Vaccine-surveillance-report-week-13.pdf (last visited January 22, 2023).

[34] Shrestha NK, Burke PC, Nowacki AS, Simon JF, Hagen A, Gordon SM.  Effectiveness of the Coronavirus Disease 2019 (COVID-19) Bivalent Vaccine.  medRxiv preprint, December 19, 2022. https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1

medRxiv preprint doi: https://doi.org/10.1101/2022.12.17.22283625; this version posted December 19, 2022. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.

It is made available under a CC-BY-NC-ND 4.0 International license .



**Figure 2.** Simon-Makuch plot comparing the cumulative incidence of COVID-19 for subjects stratified by the number of COVID-19 vaccine doses previously received. Day zero was 12 September 2022, the day the bivalent vaccine began to be offered to employees. Point estimates and 95% confidence intervals are jittered along the x-axis to improve visibility.

52.     All of these data comprise definitive, large-scale evidence that the vaccines do not provide public-health benefit in reducing SARS-CoV-2 transmission, and within a few months after the last dose, may even potentially increase transmission risks.

53.     Thus, as discussed *infra* starting at ¶ 54, government and public health officials have recognized that the currently available vaccines do not protect against infection transmission.[35]

---

[35] The raw NYSDOH COVID-19 breakthrough infection tracker data cited by Dr. Lutterloh (NYSCEF Doc. 3, Ex. L - Lutterloh Aff. ¶ 8 fn 1) on infection risk in vaccinated vs unvaccinated individuals do not bear upon the risk of COVID-19 *re*infection.  According to CDC NY state data in the León et al. publication (*See* fn 22, *supra.*), unvaccinated New Yorkers who had had previous COVID-19 infection comprised 20.9% of all unvaccinated individuals by the time of the study analysis.  The breakthrough infection tracker data thus include a very large majority who have not previously had COVID-19 and are at much higher risk of infection than those previously infected.

54.     The CDC, for example, acknowledged that whatever protection against transmission or infection that the currently available vaccines might have afforded against earlier variants, transmission can occur with Omicron regardless of vaccination status.  They state, "Omicron spreads more easily than earlier variants, including the Delta variant. **Anyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others.**" (Centers for Disease Control and Prevention, 2022).[36]

55.     There are no statements on this CDC web page making any assertions that the vaccines have a benefit for preventing infection transmission.

56.     On August 11, 2022, CDC conceded that the COVID-19 vaccines do not provide sustained public health infection or transmission benefit: "Receipt of a primary series alone, in the absence of being up to date with vaccination* through receipt of all recommended booster doses, provides minimal protection against infection and transmission (3,6). Being up to date with vaccination provides a transient period of increased protection against infection and transmission after the most recent dose, although protection can wane over time." (Massetti et al., 2022).[37]

57.     The term "transient" means a short period of time, thus these vaccines do not serve an appreciable public health function in sustained reduction of infection or transmission risks.

58.     And, while Attorney Brockner asserts that the CDC recommends that healthcare workers follow COVID-19 vaccination recommendations and requirements, he fails to mention that the CDC has updated guidance for healthcare workers to specifically caution that "[c]onventional strategies were updated to advise that, in most circumstances, asymptomatic healthcare personnel with

---

[36] Centers for Disease Control and Prevention.  Omicron Variant: What You Need to Know. https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (August 11, 2021; last visited January 22, 2023)
[37] Massetti GM, Jackson BR, Brooks JT, Perrine CG, Reott E, Hall AJ, Lubar D, Williams IT, Ritchey MD, Patel P, Liburd LC, Mahon BE.  Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems - United States, August 2022.  MMWR Morb Mortal Wkly Rep 2022;71(33):1057-1064. https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm

higher-risk exposures do not require work restrictions, regardless of their vaccination status."[38] (NYSCEF Doc. 3, Ex. F at 103) as well as that "vaccination status is no longer used to inform source control, screening testing, or post-exposure recommendations."[39]

59.    Nor do Appellants mention CDC's updated generalized guidance in 2022, stating that "CDC's COVID-19 prevention recommendations no longer differentiate on a person's vaccination status.[40]

60.    **Given that the vaccines do not prevent COVID-19 infection or transmission and are officially acknowledged not to do so, clearly there can be no benefit for mandating their usage.**

61.    The regulation at issue mandated that the primary series be completed in 2021 and does not at this time appear to include any booster requirement.

62.    Given the fact that vaccine efficacy wanes substantially in a matter of a few months, there is no rational basis to exclude unvaccinated healthcare workers but allow healthcare workers to come to work who had their last dose some two years ago.

63.    Nor would the addition of a booster requirement justify the mandate from a public health perspective.

64.    The booster vaccines recently released for the fall 2022/winter 2023 season are already appearing to show failure to provide appreciable public health value.  This is because, just like the original vaccine doses, they have only transient benefit toward their targeted substrains BA.4 and BA.5, as well as that those substrains have already lost predominance in the US.  The CDC chart provided

---

[38] Centers for Disease Control and Prevention.  Strategies to Mitigate Healthcare Personnel Staffing Shortages. https://www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staff-shortages.html (September 23, 2022; last visited January 30, 2023)
[39] Centers for Disease Control and Prevention.  Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic. https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html (September 23, 2022; last visited January 30, 2023)
[40] *See* fn 1, *supra.*

earlier shows that these Omicron variants are now of negligible circulation. The current substrains, BQ.1.1 and XBB.1, largely escape neutralization by antibodies resulting from the bivalent vaccine booster (Kurhade et al., 2022[41]; Davis-Gardner et al., 2023[42]; Miller et al., 2023[43]; Uraki et al., 2023[44]).

65.    Because the COVID-19 vaccines, both the original formulations and the bivalent boosters, fail to provide any sustained suppression of population infection spread, they are inadequate as agents for pandemic control.  This officially acknowledged lack of efficacy makes mandates for them, both for the original two-dose vaccines as well as for monovalent or bivalent boosters, unwarranted.

<u>**Conclusion**</u>

66.    By a large body of evidence, as well as by official statements of the CDC, there is no difference in risk of SARS-CoV-2 transmission by vaccinated vs unvaccinated individuals.

67.    It is not a scientifically supportable position to state that maintenance of a vaccine mandate requiring the primary series of vaccines (effective 2021) is necessary to avoid irreparable harm.

68.    On the contrary, particularly in an unprecedented staffing crisis, it would instead cause irreparable harm to patients and caregivers to continue to ban, based on their failure to receive the first two doses of the COVID-19 vaccine, ready, willing and able experienced doctors, nurses and other healthcare personnel from returning to work.

---

[41] Kurhade C, Zou J, Xia H, Liu M, Chang HC, Ren P, Xie X, Shi PY.  Low neutralization of SARS-CoV-2 Omicron BA.2.75.2, BQ.1.1 and XBB.1 by parental mRNA vaccine or a BA.5 bivalent booster.  Nat Med 2022 Dec 6. https://www.nature.com/articles/s41591-022-02162-x
[42] Davis-Gardner ME, Lai L, Wali B, Samaha H, Solis D, Lee M, Porter-Morrison A, Hentenaar IT, Yamamoto F, Godbole S, Liu Y, Douek DC, Lee FE, Rouphael N, Moreno A, Pinsky BA, Suthar MS.  Neutralization against BA.2.75.2, BQ.1.1, and XBB from mRNA Bivalent Booster.  N Engl J Med 2023;388(2):183-185. https://www.nejm.org/doi/full/10.1056/NEJMc2214293
[43] *See* fn 6, *supra*
[44] Uraki R, Ito M, Furusawa Y, Yamayoshi S, Iwatsuki-Horimoto K, Adachi E, Saito M, Koga M, Tsutsumi T, Yamamoto S, Otani A, Kiso M, Sakai-Tagawa Y, Ueki H, Yotsuyanagi H, Imai M, Kawaoka Y.  Humoral immune evasion of the omicron subvariants BQ.1.1 and XBB.  Lancet Infect Dis 2023;23(1):30-32. https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(22)00816-7/fulltext

Dated: February 1, 2023

Harvey A. Risch

Affirmed before me this 1st day of February 2023.

Notary Public

SOPHIA NADHAZI
Notary Public, State of Connecticut
My Commission Expires Dec. 31, 2023

18

EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kate, et al.<br><br>          Plaintiffs,<br><br>                    vs.<br><br>de Blasio, et al.<br><br>          Defendants. | DECLARATION OF<br>DR. JAYANTA BHATTACHARYA<br><br>Civil Action No. 1:21-cv-07863 |

STATE OF CALIFORNIA          )
                                             ) ss.:
COUNTY OF SANTA CLARA   )

## DECLARATION OF DR. JAYANTA BHATTACHARYA SUPPORTING PLAINTIFFS

I, Dr. Jayanta Bhattacharya, declare as follows:

1.   I am an adult of sound mind and make this statement voluntarily, based upon my own personal knowledge, education, and experience.

2.   Based on my training and experience, I have formed an opinion on the reasonableness of the requested accommodations and on the possibility of other accommodations not listed to a reasonable degree of scientific certainty.

## EXPERIENCE & CREDENTIALS

3.   I am a former Professor of Medicine and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research. I am also Director of Stanford's Center for Demography and Economics of Health and Aging. I hold an M.D. and Ph.D. from Stanford University. I have published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. My research has been cited in the peer-reviewed scientific literature more than 11,600 times.

4.      I have dedicated my professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. I have both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). I am intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

5.      My assessment of vaccine immunity is based on studies related to the efficacy and safety of the one vaccine to receive full approval from the Food and Drug Administration (FDA) and two vaccines that the FDA has granted Emergency Use Authorization (EUA) for use in the United States. These include two mRNA-technology vaccines (manufactured by Pfizer-BioNTech and Moderna) and an adenovirus-vector vaccine technology (manufactured by Johnson & Johnson). Of those, the Pfizer vaccine, also known as Comirnaty, has full FDA approval.

6.      I have not and will not receive any financial or other compensation to prepare this Declaration or to testify in this case. Nor have I received compensation for preparing declarations or reports or for testifying in *any* other case related to the Covid-19 pandemic. Nor have I ever received any personal or research funding from any pharmaceutical company. My participation here, just as my participation in other cases, has been motivated solely by my commitment to public health.

7.      I have no prior relationship with any of the plaintiffs.

8.      I have been asked to provide my opinion on matters related to the mandatory vaccination policy for its New York City teachers and staff, including the following:

- Whether people with religious or medical exemptions to vaccination pose a significant threat of substantial harm to their vaccinated co-workers and a largely unvaccinated student body

because of their vaccine status.

- Whether, based on the current medical and scientific knowledge, natural immunity is categorically inferior to vaccine immunity to prevent reinfection and transmission of the SARS-CoV-2 virus;

- Whether, based on the existing medical and scientific understanding of SARS- CoV-2 transmission and recovery, there is any categorical distinction between natural immunity and vaccine immunity;

- An assessment of the comparative safety to recipients of administering vaccines to those who have natural immunity relative to immunologically naïve recipients with no prior history of COVID infection;

- Whether vaccines pose any risks to individuals with certain medical conditions;

- The safety of providing accommodations to (1) those who have recovered from Covid and (2) those who have religious or medical reasons for declining to be vaccinated; and

- What those accommodations could look like in practice.

9.   As a threshold matter, the protection provided by an individual being vaccinated to other people after the COVID-19 vaccination wanes within months after full vaccination. While the vaccines are each highly effective at mitigating severe disease, several studies show that vaccinated people are as infectious as unvaccinated people. Therefore, COVID-19 vaccination is primarily a matter of concern for the private health of an individual, rather than a matter of public health of concern to the public at large.

10.   Vaccination remains a vital tool for personal protection, especially in higher risk groups. It has saved many lives during this pandemic. However, it is not necessary to require that everyone receive a vaccination given the lack of effectiveness in meaningfully mitigating transmission of disease. I provide the extensive scientific evidence on this point in Section I below.

11.   My opinions are partly summarized in a recent article I published and which I reaffirm here: "the idea that everyone must be vaccinated against COVID-19 is as misguided as the anti-vax idea that no

one should. The former is more dangerous for public health."[1] This is particularly true for those who have recovered from natural infection. "[R]ecovered COVID patients have strong, long-lasting protection against severe disease if reinfected, and evidence about protective immunity after natural infection is at least as good as from the vaccines. Hence, it makes no sense to require vaccines for recovered patients. For them, it simply adds a risk, however small, without any benefit."

12. I also offer my opinion that certain individuals may face heightened risk of vaccine side effects. Though the vaccines are safe for most patients, the FDA has identified a heighted risk of myocarditis and pericarditis after vaccination with the mRNA vaccines – especially for young men. It has also identified a heighted risk of clotting abnormalities in young women taking the adenovirus vector vaccine. Even more importantly, the vaccine has not been thoroughly tested for safety and efficacy in patients with certain chronic conditions such as Multiple Sclerosis, so there is still considerable uncertainty about these heightened risks for some patients.

13. I also conclude that the New York City Department of Education ("DOE") can safely accommodate COVID-recovered workers by exempting them from vaccine requirements since they possess better immunity versus reinfection than a vaccinated worker who never had COVID.  The DOE could also safely accommodate those employees who have not recovered from Covid-19 but have religious or medical reasons for not wanting the vaccine by requiring daily symptom checking paired with rapid antigen tests to confirm if a worker is infectious. To reduce the risk from asymptomatically infected workers, the DOE can require workers to conduct weekly PCR tests, though if it adopts this accommodation, it should require it of both vaccinated and unvaccinated workers since both groups can spread the virus asymptomatically.

## OPINIONS

I. __Natural Immunity Provides Durable Protection Against Reinfection and Against Severe Outcomes If Reinfected; COVID-19 Vaccines Provide Limited Protection Against Infection but Durable Protection Against Severe Outcomes if Infected.__

---

[1] Martin Kuldorff and Jay Bhattacharya, *The ill-advised push to vaccinate the young*, THEHILL.COM (June 17, 2021), https://thehill.com/opinion/healthcare/558757-the-ill-advised-push-to-vaccinate-the-young?rl=1.

14. Both vaccine-mediated immunity and natural immunity after recovery from COVID infection provide extensive protection against severe disease from subsequent SARS-CoV-2 infection. There is no reason to presume that vaccine immunity provides a higher level of protection than natural immunity. Since vaccines arrived one year after the disease, there is stronger evidence for long lasting immunity from natural infection than from the vaccines.

15. Both types are based on the same basic immunological mechanism—stimulating the immune system to generate an antibody response. In clinical trials, the efficacy of those vaccines was initially tested by comparing the antibodies level in the blood of vaccinated individuals to those who had natural immunity. Later Phase III studies of the vaccines established 94%+ clinical efficacy of the mRNA vaccines against severe COVID illness.[2,3] A Phase III trial showed 85% efficacy for the Johnson and Johnson adenovirus-based vaccine against severe disease.[4]

16. Immunologists have identified many immunological mechanisms of immune protection after recovery from infections. Studies have demonstrated prolonged immunity with respect to memory T and B

[2] Baden LR, El Sahly HM, Essink B, Kotloff K, Frey S, Novak R, Diemert D, Spector SA, Rouphael N, Creech CB, McGettigan J, Khetan S, Segall N, Solis J, Brosz A, Fierro C, Schwartz H, Neuzil K, Corey L, Gilbert P, Janes H, Follmann D, Marovich M, Mascola J, Polakowski L, Ledgerwood J, Graham BS, Bennett H, Pajon R, Knightly C, Leav B, Deng W, Zhou H, Han S, Ivarsson M, Miller J, Zaks T., *COVE Study Group. Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine*, N ENGL J MED. (Feb. 4, 2021).

[3] Polack FP, Thomas SJ, Kitchin N, Absalon J, Gurtman A, Lockhart S, Perez JL, Pérez Marc G, Moreira ED, ZerbiniC, Bailey R, Swanson KA, Roychoudhury S, Koury K, Li P, Kalina WV, Cooper D, Frenck RW Jr, Hammitt LL, Türeci Ö, Nell H, Schaefer A, Ünal S, Tresnan DB, Mather S, Dormitzer PR, Şahin U, Jansen KU, Gruber WC, *Safety and Efficacy of the BNT162b2 mRNA Covid-19 Vaccine*, N ENGL J MED. (Dec. 31, 2020).

[4] Sadoff J, Gray G, Vandebosch A, Cárdenas V, Shukarev G, Grinsztejn B, Goepfert PA, Truyers C, Fennema H, Spiessens B, Offergeld K, Scheper G, Taylor KL, Robb ML, Treanor J, Barouch DH, Stoddard J, Ryser MF, Marovich MA, Neuzil KM, Corey L, Cauwenberghs N, Tanner T, Hardt K, Ruiz-Guiñazú J, Le Gars M, Schuitemaker H, Van Hoof J, Struyf F, Douoguih M, *Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19*, N ENGL J MED (June 10, 2021), 2187-2201.

cells[5], bone marrow plasma cells[6], spike-specific neutralizing antibodies[7],  and IgG+ memory B cells[8] following naturally acquired immunity.

17. Multiple extensive, peer-reviewed studies comparing natural and vaccine immunity have now been published. These studies overwhelmingly conclude that natural immunity provides equivalent or greater protection against severe infection than immunity generated by mRNA vaccines (Pfizer and Moderna).

---

[5] Jennifer M. Dan, et al., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection*, SCIENCE (Feb. 5, 2021) (finding that memory T and B and B cells were present up to eight months after infection, noting that "durable immunity against secondary COVID-19 disease is a possibility for most individuals").

[6] Jackson S. Turner, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, NATURE (May 24, 2021) (study analyzing bone marrow plasma cells of recovered COVID-19 patients reported durable evidence of antibodies for at least 11 months after infection, describing "robust antigen-specific, long-lived humoral immune response in humans"); Ewen Callaway, You'll Had COVID? You'll probably make antibodies for a lifetime, NATURE (May 26, 2021), https://www.nature.com/articles/d41586-021-01442-9#:~:text=Many%20people%20who%20have%20been,recovered%20from%20COVID%2D191 ("The study provides evidence that immunity triggered by SARS-CoV-2 infection will be extraordinarily long-lasting" and "people who recover from mild COVID-19 have bone-marrow cells that can churn out antibodies for decades").

[7] Tyler J. Ripperger, et al., *Orthogonal SARS-Cov-2 Serological Assays Enable Surveillance of Low-Prevalence Communities and Reveal Durable Humor Immunity*, 53 IMMUNITY, Issue 5, pp. 925-933 E4 (Nov. 17, 2020) (study finding that spike and neutralizing antibodies remained detectable 5-7 months after recovering from infection).

[8] Kristen W. Cohen, et al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells*, MEDRXIV (Apr. 27, 2021), https://www.medrxiv.org/content/10.1101/2021.04.19.21255739v1 (study of 254 recovered COVID patients over 8 months "found a predominant broad-based immune memory response" and "sustained IgG+ memory B cell response, which bodes well for rapid antibody response upon virus re-exposure." "Taken together, these results suggest that broad and effective immunity may persist long-term in recovered COVID-19 patients").

18. Specifically, studies confirm the efficacy of natural immunity against reinfection of COVID-19[9] and show that the vast majority of reinfections are less severe than first-time infections.[10] For example, an Israeli study of approximately 6.4 million individuals demonstratedthat natural immunity provided equivalent if not better protection than vaccine immunity in preventing COVID-19 infection, morbidity, and mortality.[11] Of the 187,549 unvaccinated personswith natural immunity in the study, only 894 (0.48%) were reinfected; 38 (0.02%) were hospitalized, 16 (0.008%) were hospitalized with severe disease, and only one died, an individual over 80 years of age. Another study, analyzing data from Italy that only 0.31% of

[9] Nabin K. Shrestha, et al., *Necessity of COVID-19 vaccination in previously infected individuals*, MEDRXIV (preprint), https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3 ("not one of the 1359 previously infected subjects who remained unvaccinated had a SARS-CoV-2 infection over the duration of the study "and concluded thatthose with natural immunity are "unlikely to benefit from covid-19 vaccination"); Galit Perez, et al., *A 1 to 1000 SARS-CoV-2 reinfection proporation in members of a large healthcare provider in Israel: a preliminary report*, MEDRXIV (Mar. 8, 2021), https://www.medrxiv.org/content/10.1101/2021.03.06.21253051v1 (Israeli study finding that approximately 1/1000 of participants were reinfected); Roberto Bertollini, et al,. *Associations of Vaccination and of Prior Infection With Positive PCR Test Results for SARS-CoV-2 in Airline Passengers Arriving in Qatar*, JAMA (June 9, 2021), https://jamanetwork.com/journals/jama/fullarticle/2781112?resultClick=1 (study of international airline passengers arriving in Qatar found no statistically significant difference in risk of reinfection between those who had been vaccinated and those who had previously been infected); Stefan Pilz, et al., *SARS-CoV-2 re-infection risk in Austria*, EUR. J. CLIN. INVEST. (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7988582/(previous SARS-CoV-2 infection reduced the odds of re-infection by 91% compared to first infection in the remaining generalpopulation); Aodhan Sean Breathnach, et al., *Prior COVID-19 protects against reinfection, even in the absence of detectable antibodies*, 82 J. OF INFECTION e11-e12 (2021) https://doi.org/10.1016/j.jinf.2021.05.024 (.0.86% of previously infected population in London became reinfected); Alison Tarke, *Negligible impact of SARS0CoV-2 variants on CD4 and CD8 T cell reactivity in COVID-19 exposed donors and vaccines*, BIORXIV (Mar. 1, 2021), https://www.biorxiv.org/content/10.1101/2021.02.27.433180v1 (an examination of the comparative efficacy of T cell responses to existing variants from patients with natural immunity compared to those who received an mRNA vaccine found that the T cell responses of both recovered Covid patients and vaccines were effective at neutralizing mutations found in SARS-CoV-2 variants).

[10] Laith J. Abu-Raddad, et al., *SARS-CoV-2 reinfection in a cohort of 43,000 antibody-positive individuals followed for up to 35 weeks*, MEDRXIV (Feb. 8, 2021), https://www.medrxiv.org/content/10.1101/2021.01.15.21249731v2 (finding that of 129 reinfections from a cohort of 43,044, only one reinfection was severe, two were moderate, and none were critical or fatal); Victoria Jane Hall, et al., *SARS-CoV-2 infection rates of antibody-positive compared with antibody-negative health-care workers in England: a large, multicentre, prospective cohort study*, 397 LANCET: 1459-69 (Apr. 9, 2021), https://pubmed.ncbi.nlm.nih.gov/33844963/ (finding "a 93% lower risk of COVID-19 symptomatic infection… [which] show[s] equal or higher protection from natural infection, both for symptomatic and asymptomaticinfection"); Aidan T. Hanrah, et al., *Prior SARS-CoV-2 infection is associated with protection against symptomatic reinfection*, 82 JOURNAL OF INFECTION, Issue 4, E29-E30 (Apr. 1, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7832116/ (Apr. 1, 2021) (examined reinfection rates in a cohort of healthcare workers and found "no symptomatic reinfections" among those examined and that protection lasted for at least 6 months).

[11] Yair Goldberg, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2.vaccine protection: A three-month nationwide experience from Israel*, MEDRXIV (pre-print), https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1.

COVID-recovered patients experienced a reinfection within a year after the initial infection, despite the circulation of the delta variant.[12] In summary, the overwhelming conclusion of the pertinent scientific literature is that natural immunity is at least as effective against subsequent reinfection as even the most effective vaccines.

19. Based on such evidence, many scientists have concluded that natural protection against severe disease after COVID recovery is likely to be long-lasting. A survey article published on June 30, 2021, in the *British Medical Journal* concluded, "[t]here is reason to think that immunity could last for several months *or a couple of years*, at least, given what we know about other viruses and what we have seen so far in terms of antibodies in patients with COVID-19 and in people who have been vaccinated."[13]

20. These findings of highly durable natural immunity should not be surprising, as they hold for SARS-CoV-1 and other respiratory viruses. According to a paper published in *Nature* in August 2020, 23 patients who had recovered from SARS-CoV-1 still possess CD4 and CD8 T cells, 17 years after infection during the 2003 epidemic.[14] A *Nature* paper from 2008 found that 32 people born in 1915 or earlier still retained some level of immunity against the 1918 flu strain— some 90 years later.[15]

21. In contrast to the concrete findings regarding the robust durability of natural immunity, it is yet unclear in the scientific literature how long-lasting vaccine-induced immunity will be. Notably, the researchers argue that they can best surmise the predicted durability of vaccine immunity by looking at the expected durability of natural immunity.[16]

---

[12] Vitale J, Mumoli N, Clerici P, et al. Assessment of SARS-CoV-2 Reinfection 1 Year After Primary Infection in a Population in Lombardy, Italy. *JAMA Intern Med.* Published online May 28, 2021. doi:10.1001/jamainternmed.2021.2959

[13] Chris Baranjuk, *How long does covid-19 immunity last?* 373 BMJ (2021) (emphasis added).

[14] Nina Le Bert, *SARS-CoV-2-specific T cell immunity in cases of COVID-19 and SARS, and uninfected control*, NATURE (Aug. 2020).

[15] Xiaocong Yu, et al., *Neutralizing antibodies derived form the B cells of 1918 influenze pandemic survivors*, NATURE (2008).

[16] Heidi Ledford, *Six months of COVID vaccines: what 1.7 billion doses hove taught scientists*, 594 NATURE 164 (June 10, 2021), https://www.nature.com/articles/d41586-021-01505-x (study notes that "Six months is not much time to collect data on how durable vaccine responses will be…. In the meantime some researchers are looking to natural immunity as a guide.").

17

23. The key figures from the Qatari study are reproduced immediately below. Panel A shows that vaccine mediated protection against infection peaks at 72.1% zero to four weeks after the second dose, and then declines to 0%, 20 weeks after the second dose. According to this result, vaccines only protect against infection (and therefore disease spread) for a short period of time after the second dose of the mRNA vaccines.



24. On the other hand, Panel B shows that protection versus severe disease is long lasting after vaccination—even though the person will no longer be fully protected against infection and, presumably, disease spread. At 20-24 weeks after the second dose, the vaccine remains 95.3% efficacious versus severe disease. While it appears to dip after 25 weeks to 71.5% efficacy, the confidence interval is so wide that it

---

[17] Hiam Chemaitelly et al., Waning of BNT162b2 vaccine protection against SARS-CoV-2 infection in Qatar, https://www.medrxiv.org/content/10.1101/2021.08.25.21262584v1.full.pdf.

is consistent with no decrease whatsoever even after 25 weeks. The Qtari study is no outlier. Another recent study documented declining vaccine efficacy in the first three months after vaccination against disease



transmission in the era of the delta variant.[18]

25. In July, the CDC conducted a study of an outbreak of COVID-19 in Barnstable, Massachusetts.[19] 74% of the cases occurred in fully vaccinated individuals. Analysis of asymptomatic cases showed no significant difference in infectiousness between vaccinated and unvaccinated subjects, leading the CDC to update guidance to reflect that both vaccinated and unvaccinated people can infect others.

26. Yet another study, conducted in Wisconsin, confirmed that vaccinated individuals can shed infectious SARS-CoV-2 virus.[20] The authors analyzed nasopharyngeal samples to check whether patients showed evidence of infectious viral particles. They found that vaccinated individuals were at least as likely as unvaccinated individuals to be shedding live virus. They concluded:

> Combined with other studies these data indicate that vaccinated and unvaccinated

---

[18] David W Eyre, Donald Taylor, Mark Purver, et al. The impact of SARS-CoV-2 vaccination on Alpha & Delta variant transmission. medRxiv Sept. 29, 2021. medRxiv 2021.09.28.21264260; doi: https://doi.org/10.1101/2021.09.28.21264260

[19] Brown CM, Vostok J. Johnson H, et al. Outbreak of SARS-CoV-2 infections, including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings – Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep 2021;70:1059-1062;

[20] Kasen K. Riemersma, Brittany E. Grogan, Amanda Kita-Yarbro,et al. Shedding of Infectious SARS-CoV-2 Despite Vaccination medRxiv 2021.07.31.21261387; August 24, 2021, doi: https://doi.org/10.1101/2021.07.31.21261387

individuals infected with the Delta variant might transmit infection. Importantly, we show that infectious SARS-CoV-2 is frequently found even in vaccinated persons…Vaccinated and unvaccinated persons should get tested when symptomatic or after close contact with someone with suspected or confirmed COVID-19.

27. In summary, the evidence to date strong suggests that, while vaccines—like natural immunity—provide protection versus severe disease, they, unlike natural immunity, provide only short-lasting protection against subsequent infection and disease spread. In short, there is no medical or scientific reason to believe that vaccine immunity will prove longer lasting than natural immunity, much less that all currently approved vaccines will be expected to prove more durable than natural immunity despite their different technological foundations and dosing protocols.

## II. <u>Vaccine Side Effects, Though Rare, Do Occur and Can Be Deadly.</u>

28. Though the COVID vaccines are safe by the standards of many other vaccines approved for use in the population, like all medical interventions, they have side effects. In summarizing the evidence on vaccine side effects, the CDC lists both common side effects, at least one of which occurs in over half of all people who receive the vaccines, as well as deadly side effects that occur rarely in demographic subsets of the vaccinated population.

29. The common side effects include pain and swelling at the vaccination site and fatigue, headache, muscle pain, fever, and nausea for a limited time after vaccination.[21] Less common but severe side effects also include severe and non-severe allergic (anaphylactic) reactions that can occur immediately after vaccination, which can typically be treated with an epinephrine injection if it occurs.[22] Finally, the CDC's vaccine safety committee has identified rare but deadly side effects, including a heightened risk of clotting abnormalities[23] in young women after the Johnson & Johnson (J&J) vaccination, elevated risks of

---

[21] Centers for Disease Control, *Possible Side Effects After Getting a COVID-19 Vaccine* (June 24, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html.

[22] Centers for Disease Control, *What to Do If You Have an Allergic Reaction after Getting a COVID-19 Vaccine* (June 24, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/allergic-reaction.html.

[23] Martin Kulldorff, *The Dangers of Pausing the J&J Vaccine*, THE HILL (April 17, 2021), https://thehill.com/opinion/healthcare/548817-the-dangers-of-pausing-the-jj-vaccine.

myocarditis and pericarditis[24] in young people—but especially young men—after mRNA vaccination, and higher risk of Guillane-Barre Syndrome[25] after the J&J vaccine. There is still the possibility of severe side effects that have yet to be identified as the vaccines have been in use in human populations for less than a year. Active investigation to check for safety problems is still ongoing.

30. Though the CDC[26] still recommends the vaccines for children 12 years old and up despite the evidence of elevated risk of myocarditis, other analysts[27] have objected to overly rosy assumptions made in the CDC analysis about vaccine side effects. They suggest that the recommendation is fragile to minor perturbation in their assumptions. The critical point for our analysis—undisputed in the scientific literature—is that the vaccines do have side effects, some of which are severe and not all of which are necessarily known now.

### III. The Risk Of Those Side Effects Is Heightened In Certain Groups & Clinical Data on Vaccine Safety and Efficacy are Not Available for Patients with Certain Chronic Diseases.

31. The CDC lists two primary contraindications to COVID vaccination: (1) "severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the Covid-19 vaccine"; and (2) "immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine."[28] Among the inactive ingredients of the COVID vaccines, polyethylene glycol (PEG)—which is used in other drugs and vaccines—is most likely to induce an allergic reaction. In addition to contraindications, the CDC lists several precautions to vaccination, including known allergic reactions

---

[24] Centers for Disease Control, *Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among Adolescents and Young Adults* (May 28, 2021), https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html.

[25] LaFranier and Weiland, *FDA Attaches Warning of Rare Nerve Syndrome to Johnson & Johnson Vaccine,* NEW YORK TIMES (July 12, 2021), https://www.nytimes.com/2021/07/12/us/politics/fda-warning-johnson-johnson-vaccine-nerve-syndrome.html.

[26] Walensky, *CDC Director Statement on Pfizer's Use of COVID-19 Vaccine in Adolescents Age 12 and Older* (May 12, 2021), https://www.cdc.gov/media/releases/2021/s0512-advisory-committee-signing.html.

[27] Pegden, *Weighing myocarditis cases, ACIP failed to balance the harms vs benefits of 2nd doses* (June 24, 2021), https://medium.com/@wpegden?p=d7d6b3df7cfb.

[28] CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html.

to polysorbate or to other non-COVID vaccines and injectable therapies. Patients with precautions are encouraged to consult with an allergist or immunologist before getting the vaccine.[29]

32. Some clinical evidence indicates that those who have recovered from COVID-19 could have a *heightened* risk of adverse effects compared with those who have never had the virus.[30,31] This may be because vaccine reactogenicity after the first dose is higher among those with prior immunity.[32] Despite this evidence, the CDC does not list prior immunity as a contraindication to vaccination, though it does recommend waiting 90 days after recovering before vaccination.

33. Though the CDC recommends the COVID vaccines for all adults, because they are novel—available for use in the population for only 9-10 months—there remain open questions about their use in special populations because they have not been tested in subgroups of patients with clinical conditions. For instance, in a comprehensive discussion of the biology of immune responses to vaccination (including COVID-19 vaccination) for patients with Multiple Sclerosis published in June 2021, Coyle et al. emphasize the lack of high-quality evidence available to guide recommendations for MS patients. They point out that three of six medical societies that focus on MS patients have failed to make a recommendation on whether

---

[29] CDC. *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States. Contraindications and Precautions*. Accessed Oct. 1, 2021. https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fvaccines%2Fcovid-19%2Finfo-by-product%2Fclinical-considerations.html#Contraindications

[30] Alexander G. Mathioudakis, et al., *Self-Reported Real-World Safety and Reactogenicity of COVID-19 Vaccines: A Vaccine Recipient Survey*, 11 LIFE 249 (Mar. 2021).

[31] Cristina Menni, *Vaccine side-effects and SARS-CoV-2 infection after vaccination in users of the COVID symptom study app in the UK: a prospective observational study*, 21 LANCET INFECTIOUS DISEASES 939-49 (July 2021) (finding that "Systemic side-effects were more common (1.6 times after the first dose of ChAdOx1 nCoV-19 [i.e., AstraZeneca vaccine] and 2.9 times after the first dose of BNT162b2 [i.e., Pfizer/BioNTech vaccine]) among individuals with previous SARS-CoV-2 infection than among those without known past infection. Local effects were similarly higher in individuals previously infected than in those without known past infection (1.4 times after the first dose of ChAdOx1 nCoV-19 and 1.2 times after the first dose of BNT162b2).").

[32] Florian Krammer, et al., *Robust spike antibody responses and increased reactogenitiy in seropositive individuals after a singe dose of SARS-CoV-2 mRNA vaccine*, MEDRXIV (Feb. 1, 2021), https://www.medrxiv.org/content/10.1101/2021.01.29.21250653v1 (concluding that "vaccine reactogenicity after the first dose is substantially more pronounced in individuals with pre-existing immunity." The authors note that "quantitative serological assays that measure antibodies to the spike protein could be used to screen individuals prior to vaccination," which would "limit the reactogenicity experienced by COVID-19 survivors.).

MS patients should receive the COVID-19 vaccines. They and other authorities[33] emphasize the need for personalized decision making based on the clinical condition of the MS patient:[34]

> Currently, three COVID-19 vaccines have been granted emergency use authorization in the USA on the basis of promising interim findings of ongoing trials. Because analyses of these vaccines in people with MS are not available, decisions regarding COVID-19 vaccination and DMT choice should be informed by data and expert consensus, and personalized with considerations for disease burden, risk of infection, and other factors.

34. The paucity of data on the proper use of the COVID-19 vaccine on patients with particular conditions is not limited to Multiple Sclerosis. For instance, for patients with alpha-1 antitrypsin deficiency (AATD), an inherited disorder that predisposes a patient to enzymatic tissue injuries and inflammation— especially in the lungs—there is no clinical data whatsoever regarding the safety and efficacy of the COVID-19 vaccines. Writing in *Lancet Respiratory Medicine*, Yang and Zhao hypothesize "individuals with AATD might derive limited benefit from the current COVID-19 vaccines." They note that "even though vaccination has been prioritized to more vulnerable populations (such as people with AATD), individuals with AATD are usually not included in clinical trials (as reported in ClinicalTrials.gov), and thus the effectiveness and adverse event profile of vaccination in this population are unknown."[35]  The same can be said for many other patients with chronic diseases, for whom the decision whether to vaccinate should be an individual decision made in consultation with their physicians, rather than coerced by a firm or the government.

## IV. Asymptomatic Disease Spread is Rare.

35. In this section, I discuss the evidence regarding the asymptomatic transmission of disease. This is important because if asymptomatic disease spread is rare, the DOE can keep its employees and students safe from COVID disease spread by the simple expedient of requiring workers who have not been

---

[33] Ciotti JR, Valtcheva MV, Cross AH. Effects of MS disease-modifying therapies on responses to vaccinations: A review. Mult Scler Relat Disord. 2020 Oct;45:102439. doi: 10.1016/j.msard.2020.102439. Epub 2020 Aug 1. PMID: 32769063; PMCID: PMC7395588.

[34] Coyle PK, Gocke A, Vignos M, Newsome SD. Vaccine Considerations for Multiple Sclerosis in the COVID-19 Era. Adv Ther. 2021;38(7):3550-3588. doi:10.1007/s12325-021-01761-3

[35] Yang C, Zhao H. COVID-19 vaccination in patients with α1-antitrypsin deficiency. Lancet Respir Med. 2021;9(8):818-820. doi:10.1016/S2213-2600(21)00271-X

vaccinated (and even those who have been) to report daily through an online app whether they are experiencing symptoms consistent with COVID-19. Those who are experiencing symptoms would be asked to stay at home from work and get tested; returning to work only if the test is negative.

36. The best evidence on how frequently asymptomatic disease spread occurs comes from a large meta-analysis of 54 studies from around the world of within-household spread of the virus—that is, from an infected person to someone else living in the same home (Madewell et al. 2020). This study represents the most comprehensive survey of the vast empirical literature on asymptomatic spread. At home, *of course*, none of the safeguards often recommended in public spaces outside of home (such as masking and social distancing) are typically applied. Because the study focuses on a single setting (household transmission), it is not subject to the same problems of that other studies on this topic might have. In particular, by focusing on a homogenous setting where few safeguards exist, the estimate represents an upper bound on the frequency that someone positive for the virus but with no symptoms (and hence either pre-symptomatic or asymptomatic) may spread the virus to close contacts. The primary result is that symptomatic patients passed on the disease to household members in 18% of instances. In comparison, those infected but without symptoms (asymptomatic and pre-symptomatic patients) passed on the infection to household members in only 0.7% of instances.[36]

37. There is some additional evidence. A large study of 10 million residents of Wuhan, China, all tested for the presence of the virus, found a total of 300 cases, all asymptomatic. A comprehensive contact tracing effort identified 1,174 close contacts of these patients, none of whom tested positive for the virus.[37] This is consistent with a vanishingly low level of asymptomatic spread of the disease. Given the late date of the study relative to the date of the large first wave of infections in Wuhan, it is likely that none of the

---

[36] Madewell ZJ, Yang Y, Longini IM, Halloran ME, Dean NE. Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis. *JAMA Netw Open.* 2020;3(12):e2031756. doi:10.1001/jamanetworkopen.2020.31756

[37] Cao, S., Gan, Y., Wang, C. et al. Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China. *Nat Commun* 11, 5917 (2020). https://doi.org/10.1038/s41467-020-19802-w

300 asymptomatic cases were likely ever to develop symptoms. A separate, smaller meta-analysis similarly found that asymptomatic patients are much less likely to infect others than symptomatic patients.[38]

38. By contrast with asymptomatic patients, symptomatic patients are very likely to infect others with the virus during extended interactions, especially in the initial period after they develop symptoms. A careful review of 79 studies on the infectivity of COVID-19 patients found that even symptomatic patients are infectious for only the first eight days after symptom onset, with no evidence of live virus detected beyond day nine of illness.[39]

39. Much of the support for the idea that asymptomatic disease spread is common comes from theoretical modeling work from earlier in the epidemic (including some of my own published research[40]), predicting some level of asymptomatic disease spread. However, this sort of modeling work does not represent actual evidence that asymptomatic spread is common in the real world, since they rely on many modeling assumptions that are impossible to check.

40. There is at least one prominent real-world study that some have used to argue that asymptomatic disease spread is common. A meta-analytic study by Qiu et al. (2021) distinguishes the likelihood of disease spread by a pre-symptomatic individual the likelihood of spread by an asymptomatic individual who never develops symptoms.[41] A primary finding of this study is that, while an asymptomatic individual who never develops symptoms is exceedingly unlikely to spread the disease, individuals who are not symptomatic now but will eventually develop symptoms are efficient at infecting others during their pre-symptomatic state. One problematic interpretation of this result is that the relative efficiency of disease

---

[38] Buitrago-Garcia D, Egli-Gany D, Counotte MJ, Hossmann S, Imeri H, Ipekci AM, Salanti G, Low N. Occurrence and transmission potential of asymptomatic and presymptomatic SARS-CoV-2 infections: A living systematic review and meta-analysis. PLoS Med. 2020 Sep 22;17(9):e1003346. doi: 10.1371/journal.pmed.1003346. PMID: 32960881; PMCID: PMC7508369.

[39] Cevik M, Tate M, Lloyd O et al. SARS-CoV-2, SARS-CoV, and MERS-CoV viral load dynamics, duration of viral shedding, and infectiousness: a systematic review and meta-analysis. The Lancet Microbe. Nov. 19, 2020. DOI:https://doi.org/10.1016/S2666-5247(20)30172-5

[40] Peirlinck M, Linka K, Costabal FS, Bhattacharya J, Bendavid E, Ioannidis J, Kuhl E (2020), "Visualizing the Invisible: The Effect of Asymptotic Transmission on the Outbreak Dynamics of COVID-19" Computer Methods in Applied Mechanics and Engineering. 372: 1 Dec. 2020, 113410. https://doi.org/10.1016/j.cma.2020.113410.

[41] Qiu X, Nergiz AI, Maraolo AE, Bogoch II, Low N, Cevik M. The role of asymptomatic and pre-symptomatic infection in SARS-CoV-2 transmission-a living systematic review. Clin Microbiol Infect. 2021 Apr;27(4):511-519. doi: 10.1016/j.cmi.2021.01.011. Epub 2021 Jan 21. PMID: 33484843; PMCID: PMC7825872.

spread by pre-symptomatic individuals militates in favor of lockdown policies and mass asymptomatic testing. This interpretation is incorrect.

41. Distinguishing between an infected individual who will eventually develop symptoms and an infected individual who will never develop symptoms is difficult without the passage of time. Infected individuals who will develop symptoms tend to do so within a very short interval (two to three days) after first becoming infected. Meanwhile, infected individuals who never develop symptoms may test positive with the PCR test for the virus for an extended period. These two groups of observationally identical individuals are mixed in the population in some unknown frequency that may change over time. Given this information constraint, from a policy point of view, the relevant question is how likely it is that an infected individual without symptoms (whether pre-symptomatic or purely asymptomatic) will spread the disease to close contacts. The Madewell et al. (2020) study provides an answer (less than 0.7% secondary attack rate in household settings), while the Qiu et al. (2021) study does not. Additionally, unlike the Madewell et al. (2020) study, the Qiu et al. (2021) study does not concentrate its focus on a homogenous environment (households), which makes the results it reports harder to interpret.

42. In summary, asymptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the disease in less intimate settings by asymptomatic individuals—including in the context of schools—is likely to be even less likely than in the household.

### V. There Are Multiple Safe Alternatives to Indefinite Leave That Can Be Offered to DOE teachers and staff

43. Can the DOE keep its employees and students safe if it does not mandate that all its employees be vaccinated? The answer is a definitive yes.

44. First, and most obviously, the DOE could exempt all employees who have recovered from COVID infection from a vaccine requirement. The evidence provided in this declaration shows that such

employees pose as least as little—and likely less—risk of spreading the SARS-CoV-2 virus than fully vaccinated workers who are not among the set of COVID-recovered patients.

45. Second, the DOE could adopt a robust sick policy, requiring that workers who have not been vaccinated and who show symptoms consistent with COVID-19 infection stay at home from work, returning to work only once they have had a negative COVID-19 antigen test result. This could be implemented for instance, by requiring workers to complete an online symptom self-check each day before coming to work. The DOE would provide workers with a supply of rapid antigen tests, which are easy to self-administer at home, provide results within 30 minutes, and are highly accurate for detecting whether a patient is infectious.[42, 43] Alternatively, the DOE could require that any unvaccinated workers obtain those tests themselves to keep its own costs down. If the DOE's goal is to prevent the spread of Covid-19, symptom checking should be required of all employees, whether vaccinated or not, since the evidence shows that vaccination does not eliminate the probability of infection or transmission and may provide less protection versus infection than immunity induced by prior COVID infection.

46. For this symptom checking policy to be effective in reducing the risk of disease spread, it must be the case that symptomatic workers are substantially more likely to infect others than workers who are infected (that is, have evidence of the virus in the nasopharynx), but who have no symptoms. Fortunately, as we have seen in the previous section, the best empirical evidence shows that the probability that an asymptomatic individual spreading the disease is rare.

47. Third, the DOE could implement a program of weekly PCR testing of asymptomatic workers to guard against the risk (admittedly low) of a worker coming to work with an asymptomatic infection. Many other organizations have implemented a testing regimen like this, including my home institution, Stanford University. Workers could take the test in the workplace – there are versions of the test available

[42] Surasi K, Cummings KJ, Hanson C, Morris MK, Salas M, Seftel D, et al. Effectiveness of Abbott BinaxNOW rapid antigen test for detection of SARS-CoV-2 infections in outbreak among horse racetrack workers, California, USA. Emerg Infect Dis. 2021 Nov [date cited]. https://doi.org/10.3201/eid2711.211449

[43] Homza M, Zelena H, Janosek J, et al. Covid-19 antigen testing: better than we know? A test accuracy study. *Infect Dis (Lond)*. 2021;53(9):661-668. doi:10.1080/23744235.2021.1914857

that can be self-administered. One key detail: if implemented, both vaccinated and unvaccinated workers should be required to provide a weekly test, since both can have asymptomatic SARS-CoV-2 infections.

48. In sum, as a general matter, there are multiple risk mitigation strategies short of a mandate or leave without pay that can be implemented to accommodate religious and medical exemptions safely.

## VI. Variants Do Not Alter the Conclusion that Accommodations Can Be Allowed Without Risk to Public Safety.

49. Since its spread through the human population, the SARS-CoV-2 virus—an RNA virus—has been mutating, including some forms that are likely more transmissible than the original wild-type virus that emerged from Wuhan, China, in 2019. As of the date of this declaration, the delta variant is the dominant form of the SARS-CoV-2 virus worldwide. The virus will continue to mutate as it continues to spread. However, the possibility of such a mutation does not alter the conclusion that accommodations can be allowed without risk to public safety.

50. The key point is that the mutant variants do not escape the immunity provided by prior infection with the wild-type virus or vaccination.[44,45,46] This is true of the delta variant as well. In a study of a large population of patients in Israel, vaccinated people who had not been previously infected were 13 times more likely to experience a breakthrough infection with the delta variant than patients who had recovered from COVID.[47] Although reinfection can occur, people who have been previously infected by the virus are

---

[44] Alison Tarke, A., Sidney, J., Methot, N., Zhang, Y., Dan, J. M., Goodwin, B., Rubiro, P., Sutherland, A., da Silva Antunes, R., Frazier, A., Rawlings, S. A., Smith, D. M., Peters, B., Scheuermann, R. H., Weiskopf, D., Crotty, S., Grifoni, A., & Sette, A., *Negligible impact of SARS-CoV-2 variants on CD4 + and CD8 + T cell reactivity in COVID-19 exposed donors and vaccinees*, BioRxiv, 2021.02.27.433180 (2021), https://doi.org/10.1101/2021.02.27.433180.

[45] Wu, K., Werner, A. P., Moliva, J. I., Koch, M., Choi, A., Stewart-Jones, G. B. E., Bennett, H., Boyoglu-Barnum, S., Shi, W., Graham, B. S., Carfi, A., Corbett, K. S., Seder, R. A., & Edwards, D. K., *mRNA-1273 vaccine induces neutralizing antibodies against spike mutants from global SARS-CoV-2 variants*, BioRxiv: The Preprint Server for Biology, 2021.01.25.427948 (2021), https://doi.org/10.1101/2021.01.25.427948.

[46] Redd, A. D., Nardin, A., Kared, H., Bloch, E. M., Pekosz, A., Laeyendecker, O., Abel, B., Fehlings, M., Quinn, T.C., & Tobian, A. A., *CD8+ T cell responses in COVID-19 convalescent individuals target conserved epitopes from multiple prominent SARS-CoV-2 circulating variants*, MedRxiv: The Preprint Server for Health Sciences, 2021.02.11.21251585 (2021), https://doi.org/10.1101/2021.02.11.21251585.

[47] Sivan Gazit, Roei Shlezinger, Galit Perez, et al. Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections. medRxiv. August 25, 2021. doi: https://doi.org/10.1101/2021.08.24.21262415

unlikely to have a severe outcome (hospitalization or death) after exposure to a variant virus (see section I above for citations). A variant circulating in the population thus poses little additional risk of hospital overcrowding or excess mortality due to viral infection.

51.  The dissemination of vaccines that protect against hospitalizations and deaths upon COVID-19 infection throughout the older population in the United States has partially decoupled the growth in COVID-19 cases from COVID-19 mortality. Vaccinated people can still be infected but much less commonly have severe symptoms in response to infection. Throughout last year, a rise in cases was inevitably accompanied by an increase in deaths with a two-to-three-week lag. However, during this most recent wave, in Sweden and the U.K., where vaccines have been provided to a large portion of the vulnerable elderly population and more, there have been "relatively few hospitalisations and deaths" in those countries.[48] Because of the success of the American vaccination effort among the vulnerable elderly, COVID-19 cases and COVID-19 deaths are at least partially decoupled, so the public danger from the continuing spread of COVID-19 disease is less than it was last year when the vaccine was not available.

## VII.     The Presence of Lingering Post-Viral Infection Symptoms in a Subset of Recovered COVID Patients ("Long COVID") Does Not Alter the Conclusion that Accommodations Pose No Threat to Public Safety.

52.  Some analysts and politicians have used the possibility that a fraction of patients who recover from COVID infection will experience lingering symptoms to justify unyielding vaccine mandates. Long COVID, as this phenomenon is called, includes a complex set of clinical outcomes with a poorly understood link to acute COVID infection.[49] One cross-sectional study found that about 30% of recovered COVID patients reported at least one symptom months after recovery, with fatigue and anosmia (loss of sense of smell) by far the most common.[50] A separate study with a more convincing longitudinal methodology, by

---

[48] Jay Bhattacharya, Martin Kulldorff, and Sunetra Gupta, *Sweden's Lessons for the UK's Third Wave*, THE SPECTATOR (July 12, 2021), https://www.spectator.co.uk/article/sweden-shows-that-the-uk-s-third-wave-won-t-sting.

[49] Nalbandian, A., Sehgal, K., Gupta, A. et al., *Post-acute COVID-19 syndrome*, NAT MED 27, 601–615 (2021), https://doi.org/10.1038/s41591-021-01283-z.

[50] Logue JK, Franko NM, McCulloch DJ, et al., *Sequelae in Adults at 6 Months After COVID-19 Infection*, JAMA NETW OPEN (2021);4(2):e210830, doi:10.1001/jamanetworkopen.2021.0830.

contrast, concluded that 2.3% of patients experienced such symptoms three months after recovery.[51] Patients who suffered a more severe acute course of COVID, including hospitalization, were more likely to report lingering symptoms after recovery.[52] A study of children who recovered from COVID found the same rate of long COVID symptoms as a control group of children who had no serological evidence of prior COVID infection.[53] Some analysts have noted the similarity between "long COVID" symptoms and other functional somatic syndromes that sometimes occur after other viral infections and other triggers (and sometimes with no identifiable etiology).[54]

53. To summarize, as with other viruses, long COVID symptoms occur in a minority of patients who recover from COVID and pose a real burden on patients who suffer from it. However, this fact does not alter the logic of my point about accommodations. On the contrary. After suffering through a COVID infection, with or without long COVID, such individuals should not be forced to also endure common, but mild, vaccine adverse reactions or risk rare—but serious—adverse reactions. Moreover, the successful vaccine rollout in the United States—where every teenager and adult has free access to the vaccines—addresses the problem of long COVID, just as it addresses COVID-associated mortality.

## VIII.    The CDC's Recommendation for Vaccination of Recovered COVID Patients Applies with Equal Force to Those Who Have Been Previously Vaccinated, Whose Protection Against Infection Wanes Within a Few Months After Vaccination.

54. The CDC, in a FAQ section of a website encouraging vaccination, provides the following advice to previously recovered patients:[55]

> Yes, you should be vaccinated regardless of whether you already had COVID-19. That's because experts do not yet know how long you are protected from

---

[51] Sudre, C.H., Murray, B., Varsavsky, T. et al., *Attributes and predictors of long COVID*, NAT MED 27, 626–631 (2021), https://doi.org/10.1038/s41591-021-01292-y.

[52] Arnold DT, Hamilton FW, Milne A, et al., *Patient outcomes after hospitalisation with COVID-19 and implications for follow-up: results from a prospective UK cohort*, THORAX, 76:399-401 (2021).

[53] Thomas Radtke, Agne Ulyte, Milo A Puhan, Susi Kriemler, *Long-term symptoms after SARS-CoV-2 infection in school children: population-based cohort with 6-months follow-up*, MEDRXIV (2021), https://doi.org/10.1101/2021.05.16.21257255.

[54] Ballering A, Olde Hartman T, Rosmalen J, *Long COVID-19, persistent somatic symptoms and social stigmatization*, J EPIDEMIOL COMMUNITY HEALTH (2021).

[55] US Centers for Disease Control (2021), Frequently Asked Questions About COVID-19 Vaccination. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html.

getting sick again after recovering from COVID-19. Even if you have already recovered from COVID-19, it is possible—although rare—that you could be infected with the virus that causes COVID-19 again. Studies have shown that vaccination provides a strong boost in protection in people who have recovered from COVID-19. Learn more about why getting vaccinated is a safer way to build protection than getting infected.

55. The text of this advice by the CDC does not address any of the scientific evidence included here about the lack of necessity for recovered COVID patients to be vaccinated. While it is true that I do not know how long-lasting natural immunity after recovery lasts, the immunological evidence to date suggests that protection against disease will last for years.[56] Uncertainty over the longevity of immunity after recovery is a specious reason for not exempting COVID-recovered patients from vaccination mandates, since the same can be said about vaccine mediated immunity. I do not know how long it will last either, and there is no reason to believe it provides longer lasting or more complete immunity than recovery from COVID.

56. Similarly, just as reinfections are possible though rare after COVID recovery, breakthrough infections are possible after vaccination, as the CDC's team investigating vaccine breakthrough infections itself recognizes.[57] On the same CDC FAQ webpage I cite above,[58] the CDC writes about vaccine mediated immunity, "We don't know how long protection lasts for those who are vaccinated."

57. The CDC's main concern in this FAQ seems to be to help people understand that it is safer to attain immunity against SARS-CoV-2 infection via vaccination rather than via infection. This is a point not in dispute. Rather, the question is whether someone who *already* has been infected and recovered will benefit on net from the additional protection provided by vaccination. On this point, the CDC's statement in the FAQ is non-responsive and ignores the scientific evidence. Here again, the possibility of reinfection

---

[56] Patel N (2021) Covid-19 Immunity Likely Lasts for Years. MIT Technology Review. January 6, 2021. https://www.technologyreview.com/2021/01/06/1015822/covid-19-immunity-likely-lasts-for-years/.

[57] CDC COVID-19 Vaccine Breakthrough Case Investigations Team (2021) COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021. May 28, 2021. https://www.cdc.gov/mmwr/volumes/70/wr/mm7021e3.htm.

[58] US Centers for Disease Control (2021) Frequently Asked Questions About COVID-19 Vaccination. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html.

does not alter the conclusion that, especially for those who have already recovered from COVID, accommodations can be allowed without threatening public safety.

**IX. Fetal Cell Lines Were Used to Develop the Johnson & Johnson Vaccine and Were Used to Test the Two mRNA Vaccines.**

58. Many people of religious faith have a deeply held objection to benefitting from abortion of a human fetus. At the same time, much modern biological research, development, and production employs fetal cell lines that are derived from an abortion that occurred decades ago. The fetal tissue used in biological work is not the actual tissue from the aborted baby—it is a clone of cells sampled from that tissue. Nevertheless, many religious people object to the personal use of any product that involved the use of these fetal tissue cell lines.  In the context of the COVID-19 vaccines, fetal tissue lines were used in the research and testing of both the mRNA vaccines (Pfizer and Moderna) and the adenovector vaccine (Johnson & Johnson).

59. While aborted fetal tissue is not used in the production of the mRNA vaccines, they are used in the production of the Johnson & Johnson vaccine.[59]  While some religious authorities have stated that the cell lines used in the development, production, and testing of these vaccines are remote enough from the act of abortion that it is permissible for faithful people to be vaccinated with these vaccines,[60] other religious authorities disagree[61] reflecting longstanding objections to vaccines derived using aborted tissue lines.[62] Ultimately, it is a matter of individual conscience for each person to decide whether the benefits derived from the vaccines in terms of protection against severe COVID disease should be eschewed in light of sincere moral qualms about deriving that benefit as the ultimate fruit of an action that the faithful person deems sinful. Science cannot resolve this question as a matter of law.

---

[59] Zimmerman RK. Helping patients with ethical concerns about COVID-19 vaccines in light of fetal cell lines used in some COVID-19 vaccines. *Vaccine*. 2021;39(31):4242-4244. doi:10.1016/j.vaccine.2021.06.027

[60] Giangrave C and Jenkins J. As US Bishops Reject Exemptions, Pope Francis Dubs COVID-19 Vaccine 'Act of Love'. Religious News Service. August 18, 2021. https://religionnews.com/2021/08/18/pope-francis-declares-getting-a-covid-19-vaccine-an-act-of-love/

[61] John Piper. Can I Take a Vaccine Made from Aborted Babies? Desiring God. January 4, 2021. https://www.desiringgod.org/interviews/can-i-take-a-vaccine-made-from-aborted-babies

[62] Pelčić G, Karačić S, Mikirtichan GL, et al. Religious exception for vaccination or religious excuses for avoiding vaccination. *Croat Med J*. 2016;57(5):516-521. doi:10.3325/cmj.2016.57.516

X. **Conclusion**

60.  A fundamental ethical principle guiding the practice of medicine is that any medical intervention, whether surgical, pharmacological, or a vaccine, should be recommended only if it is deemed medically necessary. Any medical procedure, including vaccination, involves risk. No medical procedure is 100% safe, especially those involving a new vaccine, which by definition has not been studied for long-term adverse side effects. For this reason, it is a fundamental principle of medical ethics that the risks of the procedure be balanced against the potential benefits.

61.  As I established earlier, based on the scientific evidence to date, those who have recovered from a SARS-CoV-2 infection possess immunity as robust and durable as that acquired through vaccination. The existing clinical literature overwhelmingly indicates that the protection afforded to the individual and community from natural immunity is as effective and durable as the efficacy levels of the most effective vaccines to date. There is no good reason for those who have such protection to be vaccinated. At the very least, the decision should be left to them, in conjunction with their doctors, and without coercion from their employers.

62. In sum, based on my analysis of the existing medical and scientific literature, any policy mandating vaccinations that does not recognize natural immunity is irrational, arbitrary, and counterproductive to community health.[63]

63. In this context, addition factors counsel against a finding that the exemptions will create a significant risk of substantial harm to co-workers and students.

64. The students, who constitute the majority of the population, are largely unvaccinated. Even if herd immunity were conceivable through vaccination against SARS-CoV-2, and all staff were vaccinated against SARS-CoV-2, the majority of the school population, the students, are unvaccinated, rendering herd immunity impossible in that setting. The reservoir of unvaccinated students already constitutes too large a

---

[63] Jay Bhattacharya, Sunetra Gupta, & Martin Kulldorff, *The Beauty of Vaccines and Natural Immunity*, SMERCONISH NEWSLETTER (June 4, 2021), https://www.smerconish.com/exclusive-content/the-beauty-of-vaccines-and-natural-immunity.

percent of the population to stop the spread of disease in the school community regardless of how many teachers and staff are immune.

65. But Children, luckily, are at very low risk of severe disease. If they are infected, either in the school or outside of school, they are not at substantial risk of developing severe symptoms. Similarly, an unvaccinated DOE employee poses little danger to co-workers, the overwhelming majority of whom are vaccinated and thus protected from severe symptoms if they have are infected.

66. Now that every American adult and teenager has free access to the vaccines, the case for a vaccine mandate is even weaker than it once was. There is no good public health case for DOE to require proof of vaccination for employees who have recovered from Covid-19. Since the successful vaccination campaign already protects the vulnerable adult population in schools, the unvaccinated—especially recovered COVID patients—pose a vanishingly small threat to their vaccinated coworkers. They are protected by an effective vaccine that dramatically reduces the likelihood of hospitalization or death after infections to near zero and natural immunity, which provides benefits that are at least as strong and may well be stronger.

67. In conclusion, the emerging evidence from the medical literature finds that COVID-recovered patients have robust and long lasting immunity against SARS-CoV-2 reinfection; that this immunity against infection is better than vaccinated patients who have never had COVID; that the vaccines—though safe for most people—do sometimes cause known severe side effects; that for patients with particular chronic conditions, including Multiple Sclerosis, the data on the safety and efficacy of the vaccine is still uncertain; that the development of the mRNA vaccines and the production of the adenovirus vector vaccines both involved the use of fetal tissue cell lines, to which some people have sincere religious objections; and finally that there exist inexpensive safe accommodations that the DOE can adopt which would protect both employees and customers against SARS-CoV-2 infection without terminating unvaccinated employees.

68. I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct this 3rd day of October, 2021, Stanford, California.

Respectfully submitted,

_____
Dr. Jay Bhattacharya, MD, Ph.D.
Professor of Health Policy
Stanford University

EXHIBIT )

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X   :
                                                           :
MICHAEL KANE, et al.,                                      :
                                                           :
                                    Plaintiffs,            :
                                                           :   Case No.  21-cv-7863 (VEC) (Lead)
                  - against -                               :
                                                           :
DE BLASIO et al.,                                          :
                                                           :
                                    Defendants.            :
-------------------------------------------------------X   :
                                                           :
MATTHEW KEIL, et al.                                       :
                                                           :
                                    Plaintiffs,            :
                                                           :   Case No.  21-cv-8773 (VEC)
                  - against -                               :
                                                           :
THE CITY OF NEW YORK et al.,                               :
                                                           :
                                    Defendants.            :
-------------------------------------------------------X

## DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.  My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a paralegal consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2.  I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.  I know the facts stated herein to be true based upon my personal knowledge and based upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except

1

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.    When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10.   I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes.  The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11.   I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12.   I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

3

13.   Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.   I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.   The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.   Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.   At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.   Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

4

19.     I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20.     In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
        June 3, 2022                        _Betsy Combier_____

                                            By: Betsy Combier


5