# EXHIBIT B

LATANYA COLLINS,

        Plaintiff,

-against-

THE CITY OF NEW YORK, and the
NEW YORK CITY DEPARTMENT OF
EDUCATION,

        Defendants.

~~SECOND~~THIRD **AMENDED COMPLAINT**

Jury Trial Demanded

23 CV 9248 (~~JAM~~RER)

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, 1784

By and through her undersigned attorneys, Plaintiff alleges as follows:

**INTRODUCTION** ~~Plaintiff Latanya Collins ("~~

This lawsuit arises because Defendants~~Ms. Collins"), through counsel, stands before this honorable court seeking justice and compensation for unlawful religious discrimination carried out by their employer, the New York City Department of Education ("DOE") in concert with the City of New York (the "City"). Plaintiffs asserts claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 4200 U.S.C. § 2000e, *et seq*; 42 U.S.C.§1983, for the deprivation of rights under the First Amendment and Fourteenth Amendment of the United States Constitution;~~

1

the New York City Human Rights Law ("CHRL"), NYC Administrative Code Title 8, and the New York State Human Rights Law ("SHRL"), NY Executive Law § 296, *et seq.* They bring this lawsuit on behalf of themselves, and others similarly situated.

## INTRODUCTION AND SUMMARY OF THE CASE

1. This case arose because the City, working in concert with its DOE, engaged in widespread religious discrimination in an attempt to evade statutory obligations to accommodate religious practices of DOE employees that conflicted with the City's when determining religious accommodation to its Covid-19 vaccine mandate.mandates.

2. Rather than engage in good faith individualized review to determine who could be safely accommodated, Defendants proposed, adopted, enforced and encouraged a policy (the "Stricken Standards") that allowed certain religious beliefs to be accommodated while other religions were categorically excluded from the possibility of accommodation.

3. After the Second Circuit held that these policies were likely unconstitutional, Defendants failed to remediate the harm for most of those denied under the policies, including Plaintiff.

4. Plaintiff alleges violations of her fundamental statutory and constitutional rights, seeking declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the actions complained of herein.

5. Plaintiff is entitled to relief under the Second Circuit's holding in *Kane v. de Blasio,* 19 F.4th 152 (2d Cir. 2021), in which the Court held that the Stricken Standards were not neutral or generally applicable and the City failed to offer any defense that could justify them under strict scrutiny.

2. Plaintiff is also entitled to relief under the Second Circuit's holding in *New Yorkers*

*for Religious Liberty, Inc. v.* ~~Through this lawsuit, Plaintiffs seek to safeguard religious freedom for herself and others and to restore justice and dignity to educators who spent their careers faithfully serving New York City's public school children.~~

6. *City of New York* ("NYFRL"), in which the Court held that NYFRL plaintiff Natasha Solon asserted constitutional claims because she was never provided with the remedial "Citywide Panel" review ordered to remedy the harm for the original *Kane* Plaintiff, and thus was only ever given an opportunity to apply for religious accommodation under the Stricken Standards policy, which had already been held unconstitutional.

7. Just like Solon, Plaintiff was not given the remedial "Citywide Panel" review and was only ever offered accommodation if they met the discriminatory criteria in the Stricken Standards.

8. This case also involves extensive evidence of religious discrimination that exceeds the scope of the prior decision in *Kane* or *NYFRL*, leading to strict scrutiny and relief under multiple causes of action, and establishing personal liability for individually named Defendants as well as municipal liability against the City and DOE.

9. Most significantly, in March 2026, emails withheld by the City for nearly five years were finally produced pursuant to a court order from the Appellate Division, Second Department. Those emails confirm what prior complaints could only allege: that the City's most senior officials — including the Commissioner of Health, the Mayor's COVID Czar, and the First Deputy Commissioner of the Office of Labor Relations, among others — personally directed the creation of guidance to help arbitrators and Citywide Panel reviewers argue that entire categories of sincere religious belief were, as they put it, "BS."

10. As instructed by Banks, Varma, Bray and other individually named high level City official

Formatted: Footer

defendants, Defendant Chokshi, the Commissioner of Health who issued the mandate, produced a letter which framed whole categories of sincere religious beliefs as "BS," and instructed adjudicators to reject religious objections grounded in concerns about aborted fetal cell lines and beliefs brought by Catholics and others whose religious leaders advised vaccination— not on scientific grounds, but by invoking the City's own interpretation of Catholic and other religious doctrine, after officials acknowledged they could not refute the objection scientifically. The emails show this was deliberate. One senior official warned the group that the guidance and categorical denial of certain faiths, and abortion-based beliefs, "will absolutely be subject to litigation." She nonetheless surmised the letter would "go far" in assisting the City with their scheme to discriminate against whole categories of religion.

11. The Commissioner and the team of high level City officials proceeded even though they knew that certain factual allegations in the letter were unverifiable, opining that the Commissioner's letter, containing that misinformation, could lend authority to shield decision-makers from liability from making these discriminatory determinations.

12. These emails, and the bad faith letter that the Commissioner issued as a result, along with other evidence uncovered in discovery in related matters these last four years, show that the religious discrimination that Plaintiff experienced was not an isolated or random occurrence, but a coordinated and intentional campaign directed by the City's top policy makers including the commissioner of health who issued the mandate.

13. In sum, this was not a neutral public health mandate but, as Defendant Varma admitted later, a tool of harassment. Animus infects all levels of implementation.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

4

Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear related claims arising under New York State law because they are so related to the federal claims that they form part of the same controversy because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964.

15. This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a).

16. Venue is proper in this districtDistrict under 28 U.S.C. § 1391(b) because it is).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17. Plaintiff filed timely charges with the district in which a substantial partEEOC and filed and/or joined this lawsuit within ninety days of receipt of their right to sue letters.

4.18. Plaintiff also timely filed actual and/or functional notices of claim and the events giving rise to Plaintiff's claims occurred. DOE and the City failed to adjust them within thirty days.

## NAMED PARTIES

5.19. **Plaintiff LATANYA COLLINS** is a resident of Queens County, New York. Prior to being denied religious accommodation, Ms. Collins was a tenured Master Teacher for Special Education, Citywide School Administrator, and Transition Career and Technical Education Leader ("CTE") in good standing. She worked in Queens with over twelve years of service at DOE. She is one of thousands harmed by Defendants discriminatory religious accommodation policies and seeks justice for herself and others similarly situated.

6.20. **Defendant CITY OF NEW YORK** is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal

agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

7.21. **Defendant New York City Department of Education ("DOE")** is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

**BACKGROUND FACTS**

*The Pandemic*

8. At some point between the fall of 2019 and spring of 2020, the Covid-19 virus began circulating in New York City and around the world.

22. **Defendant DAVE CHOKSHI** was, at all times relevant herein, the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"). In that capacity, Chokshi exercised final policymaking authority over the mandates and decisions thereunder as well as public health guidance issued by DOHMH, including guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. He is sued in his individual and official capacities.

23. **Defendant NELLIE AFSHAR** was, at all times relevant herein, the Chief of Staff of the DOHMH In that capacity, Afshar was responsible for overseeing DOHMH operations and participated in the development and approval of guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. She is sued in her individual and official capacities.

24. Defendant **JACKIE BRAY** was at all times relevant herein, the Deputy Executive Director

of the NYC COVID-19 Test & Trace Corps, operating from the Office of the Mayor of the City of New York. In that capacity, Bray coordinated City Hall's involvement in developing and approving guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. She is sued in her individual and official capacities.

25. **Defendant STEVEN BANKS** was, at all times relevant herein, the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks exercised authority on behalf of the City over the negotiation and administration of the accommodation process applicable to DOE employees under the September 2021 COVID-19 vaccine mandate, including coordinating with various high level City policy makers, arranging policy and strategy with the unions and arbitrators, advising on criteria used at all phases of the DOE religious exemption process, and directing the development of guidance used by officials adjudicating religious accommodation requests. He is sued in his individual and official capacities.

26. **Defendant ERIC EICHENHOLTZ** was, at all times relevant herein, a senior attorney at the New York City Law Department exercising policymaking authority over employment policy and litigation and religious accommodation policies related to the September 2021 COVID-19 vaccine mandate. In that capacity, Eichenholtz directed and advised on the criteria proposed to arbitrators for adjudicating DOE employee religious accommodation requests, provided advice and oversight over the initial religious accommodation process at DOE and created and supervised the Citywide Appeal Panel. He is sued in his individual and official capacities.

27. **Notice and Relation Back**: Individually Named Defendants received constructive notice of this action upon its original filing via the Office of the Corporation Counsel. They knew or

**Formatted:** Footer

should have known that, but for a mistake concerning the identity of the proper parties, this action would have been brought against him personally given the specific allegations regarding his conduct in the original Complaint [ECF No. 1].

28. **Defendants are Responsible for the Delayed Identification of Individual Liability**: Moreover, Defendants have improperly concealed documents, including the unredacted emails referenced in Paragraph 9 and knew, or should have known, that the emails would give rise to individual capacity claims for the persons referenced in the emails, and others, like Eric Eichenholtz, who was upon information and belief one of the highest level City attorneys exercising the policy choice to improperly conceal the emails and other factual discovery revealing animus by City actors.

### FACTUAL ALLEGATIONS COMMON TO PLAINTIFF

**I.      The Pandemic and the City's Vaccine Mandates**

9.29.          In March 2020, New York State declared a state disasterstatewide emergency due to the Covid-19 pandemic.

30. SchoolsContrary to Defendants' frequent assertion, New York City's vaccine mandates were *not* an "early pandemic measure" but instead were instituted at least a year and a half after the pandemic began.

31. Defendant Chokshi did not announce the DOE mandate until August 2021, two months after then-Governor Andrew Cuomo declared that the pandemic emergency over in June 2021.

32. When the mandate was implemented, DOE teachers had already been back working in person with students in DOE schools for over a year.

10.      DOE schools were closed for the remainderfrom March through June 2020. But by the fall of the Spring 2020 semester across the state.

8

~~11.    In the fall of 2020, DOE schools reopened for~~, in- person learning~~, with the option of remote instruction if families preferred that option.~~

~~12.    Teachers~~ resumed and ~~most staff~~teachers were required to ~~return to~~work in- person ~~instruction.~~

~~13.~~33.    ~~However, DOE liberally~~unless granted ~~accommodations to most DOE employees who wished to work from home or remotely.~~accommodation.

~~14.~~34.    ~~In or around December 2020, vaccines~~Vaccines became available ~~against Covid-19.~~to teachers in December 2020, almost a year before the mandate was implemented.

35. ~~But there was no vaccine mandate during the 2020-2021 school year, and DOE allowed~~ But teachers, including Plaintiff ~~to continue to work~~, were not required to take them. Instead, Plaintiff was allowed to test weekly in lieu of vaccination, as every other school district in the state allowed throughout the entire pandemic.

36. In August late 2021, Defendant Chokshi announced that the testing option would be removed effective October 2021.

~~15.~~37.    In sum, employees were allowed to teach unvaccinated ~~for the entire rest of the~~ in-person with students through the height of the pandemic during the entire 2020-2021 school year ~~and following summer~~, the summer of 2021, and the first quarter of the fall semester of 2021 before they suspended without pay on October 4, 2021, for failing to get vaccinated in violation of their sincerely held religious beliefs after the Statewide Covid-19 Pandemic Emergency was declared over.

~~16.    On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.~~

9

17. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts:

a. vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; and

b. herd immunity could not be achieved through vaccination; and

c. any vaccine protection waned significantly after a matter of weeks.

18. By August 2021, governments around the world publicly acknowledged that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

*The City's First Mandates*

19. After all of this occurred, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines.

**II.** In a press conference, the Mayor described his "Key to NYC" mandate as the "first-in-the-nation" of its kind, since it had no mechanism for **DEFENDANTS ADOPT A DISCRIMINATORY ACCOMODATION PROCESS.**

**A. Litigation and Labor Disputes Forced Defendants to Allow for Accommodation**

~~20.~~38. The DOE Mandate did not originally provide religious or medical accommodation but was amended to specifically provide such accommodation as a result of lawsuits and labor disputes.

21. Two days later, Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of Covid-19.

22. Dr. Walensky said: "what [the vaccines] can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky further stated, "that's exactly right."[1]

23. The CDC's public acknowledgment that the Covid-19 vaccines cannot stop transmission only triggered the Mayor to become more zealous about mandating them.

24. Earlier that summer, New York City had adopted a vaccination policy that allowed DOE employees to test weekly if they did not want to get vaccinated, which was supposed to go into effect in September 2021.

25. On or about August 24, 2021, Mayor Bill de Blasio and Commissioner Chokshi changed course, issuing the first version of a new "emergency" regulation *mandating* Covid-19 vaccination for most DOE employees and removing the testing option in lieu of vaccination.

26. No new emergency justified this new aggressive mandate.

27. There were told the press that the no urgent increases in hospitalizations or deaths necessitating the implementation of these policies in New York City in August or September 2021.

28. Nor did it make sense to remove the option of testing in lieu of vaccination.

29. Most DOE employees had been working in person unvaccinated for over a year.

30. Most employees, including Plaintiff, already had natural immunity.

31. By August it was well established that natural immunity provided superior immunity to Covid-19 than vaccination.

32. Children are also the least vulnerable population, when it comes to Covid-19, with

---

[1] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

few hospitalizations and essentially zero deaths.

33. Nonetheless, both the City and DOE announced that not only were they imposing this Mandate, but they would also not even consider any religious or medical accommodation requests from the vaccine Mandate for any DOE employee.

34. Meanwhile, there were carve-outs made for secular reasons that defeated the stated purpose of the Mandate in the same way and defeated any possibility of herd immunity.

35. Importantly, there was no mandate for students in the fall of 2021.

36. In or around December 2021, the City imposed an "emergency" regulation that mandated vaccines for students engaging in extracurricular activities.

37. But even then, it declined to extend the same mandate to all students, leaving most of the one million students in the New York City public schools free to attend in person unvaccinated so long as they did not attend engage in certain specified extra-curricular activities.

38. Given this fact, herd immunity would not have been possible even if the vaccines could have stopped transmission, as students would still be exposed to model the City was applying in their unvaccinated classmates even if 100% of all teachers and staff were fully vaccinated.

39. If all 100,000 plus DOE staff were vaccinated, they would still reflect less than ten percent of the population in schools.

40. It was well-established science that ten percent vaccination rates could never stop transmission of Covid-19 in a community, even for vaccines that can prevent infection and transmission in the recipient.

41. The vaccine status of one teacher in a classroom with twenty to fifty unvaccinated students could not have any impact on stopping the spread of Covid-19, even if the vaccines did

**Formatted:** Footer

stop transmission.

42. The Mandate allowed other carve-outs for secular reasons as well.

43. For example, unvaccinated bus drivers were allowed to continue driving students in enclosed buses due to staffing issues.

44. And unvaccinated members of the public could come to the schools to vote and man volunteer tables, among other reason.

45. The DOE Mandate states on its face that it relied in part on the state's healthcare worker mandate to justify its imposition of the DOE Mandate.

46. The healthcare worker mandate was later struck down as arbitrary and capricious, in part because of the New York State Department of Health's admission that the vaccines cannot stop the spread of the Covid-19 virus.

*Pfizer's Influence*

47. Upon information and belief, one reason that the City decided to pass such aggressive mandates and keep them in place so long despite the scientific consensus that they could not stop transmission was due to political and economic pressure and/or incentives from Pfizer, Inc ("Pfizer").

48. Pfizer exercises significant financial influence in New York City politics.

49. Pfizer is headquartered in New York City and was the only pharmaceutical company to gain FDA approval of their Covid-19 vaccine in 2021.

50. The DOE Mandate was timed to coincide with Pfizer's receipt of FDA approval for the first licensed Covid-19 vaccine in or around August 2021.

51. Pfizer is a major donor and employer in New York City.

52. Pfizer donated money to help elect Mayor de Blasio.

13

**Formatted:** Footer

53. Pfizer also donated money that went to help elect Mayor de Blasio's successor, Eric Adams.

54. Pfizer also donated money that was to be given to the DOE.

55. Upon information and belief, both Mayor de Blasio and Mayor Adams own stock in Pfizer.

56. Pfizer's stock prices would be significantly impacted by the amount of vaccine uptake in the first two quarters after vaccine approval (ending September 30, 2021, and December 31, 2021).

57. It has been well documented that vaccine mandates impact Pfizer's stock prices significantly too.

58. The Key to NYC and DOE Mandates were the first "no accommodation" employee vaccination mandates in the country.

59. Upon information and belief, eliminating, or at least vastly reducing, the availability of accommodations to vaccine mandates, was part of Pfizer's business model.

60. Pfizer knew, before the Mandate went into effect, that its vaccine was not effective against the new strains of Covid-19, including Delta and Omicron strains.

61. Aggressive vaccine mandates could help ensure that the vaccine would be profitable as people began to realize that the vaccinated were catching Covid-19 as readily as the unvaccinated—because they would have no choice but to keep taking the vaccines if they wanted to keep their jobs.

62.39. The City and the DOE colluded with Pfizer to achieve Pfizer's financial was a "first in the nation" approach and the goal was to make it miserable to live in New York City without being vaccinated.

63. Upon information and belief, Pfizer was in communication with the Mayor's office prior to the enactment of the Mandate and encouraged the Mayor to enact aggressive mandates on or before the end of September, 2021.

64. Upon information and belief, Pfizer and the City attempted to implement New York City's no or low accommodation mandate to serve as a model that could be adopted by other cities after it was established in New York City.

65. Pfizer agreed to give the NYC DOE over one million dollars in grants after the mandate was implemented.

*Labor Disputes and Lawsuits*

66. Whatever the motive, New York City labor unions unanimously decried the DOE Mandate from the start as reckless and unlawful and announced that they would be taking legal action.

67. Leaders from all major impacted unions, as well as the Municipal Labor Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the DOE Mandate violates basic legal rights.

68. Mass protests, lawsuits, and labor disputes ensued immediately upon the announcement of the Mandate.

69. On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

70.40. On September 14, 2021, the Supreme Court, New York County, in litigation brought by sixteen labor unions, Justice Laurence Love issued a temporary restraining orderTemporary Restraining Order ("TRO") enjoining enforcement of the City from

15

~~enforcing~~August version of the DOE Mandate ~~"solely~~ because ~~the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or~~it failed to provide for religious ~~exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup.~~ and medical exemptions.~~Ct. Sep. 22, 2021).~~

~~71.~~41. ~~The next day, on~~On or about September 15, 2021, Defendant Chokshi issued a new version of the DOE ~~Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing~~mandate which stated: "**Nothing** **in this** ~~order~~**Order** **shall be construed to prohibit any reasonable** ~~accommodation~~ **accommodations otherwise required by law** ~~."²~~**."**

42. ~~The New York State Supreme Court accordingly vacated~~Justice Love dissolved the TRO~~, stating~~ the next day ~~"solely" because~~ the City's promised that ~~it was "obviate[d]" by the Commissioner's amendment allowing~~this new version would allow for reasonable religious and medical accommodation.~~ *Mun.*~~ and they had amended the DOE Mandate to so state.

~~72.~~43. Defendant Eric Eichenholtz, then Chief Labor ~~*Committee,* 2021 WL 4502854, at *3.~~ and Employment attorney for the City, later admitted in sworn testimony as Defendants' 30(b)(6) witness that nothing in the amended DOE mandate precluded accommodation for an employee to work unvaccinated *in person or remotely* from that point on.

~~73. What was not before the Court was the Defendants' religious accommodation policies, which were clearly designed to try to evade the DOE's responsibility to consider religious accommodation in good faith.~~

**B.** ~~*DOE Implements and Ratifies the*~~ **Arbitration Compels Religious Accommodation and Allows for Use of** **"Stricken Standards"**

---

~~² The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.~~

44. In ~~a~~ parallel ~~proceeding~~labor proceedings, the United Federation of Teachers ~~("UFT"),~~, Local 2, AFT, AFL-CIO ~~("~~("UFT~~")~~") filed a Declaration of Impasse ~~on September 1, 2021, contending, among~~ against the City and the DOE. On September 10, 2021, an arbitrator, Martin F. Scheinman issued an order that required both the City and DOE to permit religious exemptions to its DOE vaccine requirements. Identical orders were issued for DOE employees covered by other ~~things, that the DOE's failure~~unions (collectively referred to as the "Impasse Order.")

45. Nothing in the Impasse Order, any of the DOE contracts or the awards waives the right of employees to file lawsuits for civil rights violations even if Defendants were ordered or encouraged by arbitration awards to engage in discrimination.

~~74.     The Impasse Orders directed the City as well as the DOE~~ to provide religious ~~and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection.~~

~~75.     On September 10, 2021, an impact arbitration decision was rendered by Arbitrator Martin Scheinman requiring that the DOE provide UFT members with reasonable religious accommodation. [Exhibit 1 - not offered for the truth of the document, but to show what the policy said].~~

~~76.     Subsequently, Arbitrator Scheinman issued materially identical awards covering Counsel of School Supervisors and Administrators ("CSA") employees and District Council ("DC37) DOE employees.~~

~~77.     The policies are collectively referred to hereafter as the "Stricken Standards" since they were later struck down as unconstitutional by the Second Circuit Court of Appeals.~~

**Formatted:** Footer

78. The arbitrator, Martin Scheinman served as a major donor and fundraiser for Mayor de Blasio and his neutrality is and was contested at the time that DOE adopted the Stricken Standards.

79. As a threshold matter, the award required *both* the DOE and the City to allow for religious accommodation.

80. It also provided that the parties could either use "any other statutory reasonable accommodation process" or the Stricken Standards set forth in the arbitration award.

81. Specifically, the arbitrator began the opinion by stating that: "As an alternative to any other statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York ('the DOE') and [the UFT] shall be subject to the following Expedited Review Process to be implemented immediately…"

82. The Stricken Standards were clearly designed to deny most applicants by unconstitutionally narrowing the definition of what beliefs could qualify for religious accommodation.

83. On their face, the Stricken Standards express denominational preferences and categorically exclude most religions from protection and access to accommodation.

46. For example, the Stricken Standards provide the following criteria for determining who could access accommodation: "religious exemptions for an employee to not adhere to the mandatory vaccination policy from the Covid-19 vaccines, regardless of any assertion of "undue hardship."

47. They provided that the City and DOE could use either the criteria and expedited process set forth in the order, or "any statutory reasonable accommodation process" to decide who to accommodate.

18

**Formatted:** Footer

48. The criteria and expedited process set forth in the Impasse Orders is referred to in this and other litigation as the "Stricken Standards."

49. On their face, the Stricken Standards singled out Christian Scientists for favor, and categorically excluded "personally held" religious beliefs, and also any religious applicant whose so called "leader" of their faith had publicly supported vaccination.

50. Moreover, the Stricken Standards imposed a clergy requirement, stating that any request "must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is . clergy)."

84.51.    The policy not only forbade accommodation for employees who followed a personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." Stricken Standards at 9 religious path but went a step further. Under the discriminatory criteria, accommodation was not available to anyone who belonged to a religion that wasn't deemed "established" and "recognized" either.

52. To the extent that DOE evaluators decided an employee belonged to a "recognized" and "established" religious organization, and the employee presented a clergy letter, the applicant would still have to be denied "if the information was available online." In other words, if the church placed a description of their ministry online, the person would be denied an exemption.

53. Additionally, if a person did happen to belong to an "established" and "recognized" religious organization that is hierarchical and provided letters from clergy in support and the Church that did not make their views known online, that person would still have to be denied if any "leader" of that person's "religious organization" had ever spoken publicly in favor of vaccination.

54. Decision-makers were given enormous discretion to define who the "leaders" of any given religion were.

**C.  The City and DOE's Implementation and Enforcement of Discriminatory Standards**

85.  ~~Both~~ The language in the above quoted paragraph was almost entirely drafted and proposed by Defendants' attorneys.

86.  Multiple problems stand out in this definition of what constitutes so-called acceptable religious beliefs.

87.  First, the policy favors Christian Scientists, predefining Christian Science as the only enumerated example of a "recognized" and "established religious organization." This gives Christian Scientists an unfair advantage.

88.  Second, the policy requires the government to decide which other religions than Christian Science are "recognized" as "established religious organizations."

89.  Pursuant to the Stricken Standards, if an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

90.  Defendants knew, or should have known, that the government cannot "establish" which religions are "recognized" and thus valid and which are not "recognized" or "established" and thus invalid.

91.  Third, the policy also provides that religious objection based on personally held or "philosophical" religious beliefs must be denied.

92.  But under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are endorsed by official church dogma.

93. In fact, even moral or philosophical beliefs are defined by the EEOC and governing law as expressly protected religious beliefs, but under the Stricken Standards, they were excluded from protection even if the beliefs were sincerely held.

94. Fourth, the Stricken Standards require that the religious objection "must be documented in writing by a religious official (e.g. clergy)."

55. Thethe City and DOE are liable for the implementation of the Stricken Standards against Plaintiff and their colleagues.

56. Since 2002, the City has exercised Mayoral control over the DOE.

57. The Impasse Orders also imposed a non-delegable duty on *both* the City and DOE to provide religious accommodation to DOE employees and stated that as "an alternative to any statutory reasonable accommodation process, the City" (and DOE) could use the criteria and process set forth in the arbitration order or any other statutory process.

58. The City and DOE could have followed the Impasse Order by implementing and endorsing lawful statutory accommodation policies, as the award stated that the City could use either the Stricken Standards or any other statutory process. Instead, each chose to adopt, endorse and enforce the "Stricken Standards" which were facially discriminatory.

59. The government cannot lawfully implement, enforce or even endorse discriminatory policies. Yet, the City and the DOE each elected to use the Stricken Standards to determine who received religious accommodation from the Covid-19 vaccine mandate.

60. Upon information and belief, Defendants Eichenholtz and/or Steven Banks, who were, at all times relevant to this Complaint, working under the direction and guidance of the City of New York as high level policy-makers and City attorneys, approved and/or proposed some or all of the

**Formatted:** Footer

discriminatory criteria adopted in the Stricken Standards and advised the City on how to implement it.

61. Eichenholtz was, at the time, a senior policy maker in the Law Department, overseeing the City's employment litigation and policy. When asked if he participated in drafting or recommending the Stricken Standards criteria to Arbitrator Scheinman, he said that was privileged and he could not answer. But he later admitted that he was at least asked for his advice during this process and advised those implementing the policy.

62. Given that the City elected to endorse and implement the unconstitutional Stricken Standard criteria and interpret it in a maximally discriminatory way, and that Eichenholtz continued to implement and direct employees to continue using many of the unconstitutional criteria when he oversaw the City's "remedial" Citywide Panel reviews after the Second Circuit found the first process unconstitutional, it is a reasonable inference that Eichenholtz' advice was supportive of using the discriminatory criteria.

63. Defendant Banks also approved and upon information and belief suggested the criteria. Banks was the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks was the City's chief policy maker and representative in the arbitration process.

64. The September 2021 emails referenced in Paragraph 9, *Supra*, originated from Banks and show that he was closely connected and involved in the discriminatory process at the DOE, including through collusion and agreement with the UFT union, DOE, and arbitrators to categorically discriminate against entire faiths and swaths of sincere religious beliefs.

**Formatted:** Footer

65. In the recently court-ordered disclosed emails, Banks expressed frank animus towards religious objectors, calling their sincerely held beliefs "BS" and attempting to concoct a strategy to ensure that as many of them as possible could be denied accommodation.

66. As described in more detail below, the emails also show Banks was working closely behind the scenes with the DOE and the unions to get buy in to implement the process in a maximally discriminatory way. A true and accurate copy of the email chain is attached hereto as Exhibit B, not for the truth of any statement made therein but to show it was said.

~~95.~~67. The City's proposed criteria for what constitutes a "valid" religious belief, which the arbitrator adopted, were facially discriminatory. Defendants knew or should have known these criteria were illegal. At the time they were imposed, this Circuit's precedent had already recognized for decades that a clergy certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have ~~different religious beliefs than their pastor or church leader~~religious beliefs that differ from those of their priest or church leadership. And the Supreme Court and this Circuit had repeatedly clarified that personally held, unorthodox, and idiosyncratic beliefs were protected, and that the government is not entitled to deny accommodations by contesting whether an adherent is correct about the factual underpinnings of her beliefs.

68. Not only did Defendants propose and choose to use the Stricken Standards instead of lawful standards, but, at every step, the City and DOE, in coordination with the individually named Defendants, arbitrators and the union, they enforced the Stricken Standards policy in a way to maximize the burden on religious applicants and deny as many applicants as possible, typically through instructions to categorically reject whole swaths of sincerely held protected faith be it due to the alleged "religious leader" publicly supporting vaccination, a bad faith argument about an

alleged lack of sufficient connection between abortion or other sinful tainting of the vaccines, or assertions about what various religions "require" of their adherents.

### III. PHASE I IMPLEMENTATION – THE AUTOGENERATED BLANKET COMPUTER DENIALS.

96. ~~Employees~~ ~~Defendants were on notice that the clergy requirement was illegal.~~

97. ~~It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected.~~were given just a few days to prepare ~~See, e.g., Sherr v. Northport E. Northport Union Free Sch. Dist., 672 F. Supp. 81, 92 (E.D.N.Y. 1987).~~

98. ~~Fifth, the Stricken Standards require that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination.~~

99. ~~"Leader" is not defined in the Stricken Standards, but in practice, the DOE repeatedly interpreted this concept broadly to deny accommodation to whole categories of religious employees based on Defendants' assumptions about who the leader of a faith might be.~~

100. ~~Pursuant to these determinations, DOE representatives repeatedly asserted that all Jews, Muslims, Hindus, Buddhists, Catholics, and even non-denominational Christians other than Christian Scientists had to be denied.~~

101. ~~In sum, the DOE conditioned access to accommodation based on membership in preferred religious organizations.~~

~~*DOE showed additional bad faith by initially denying 100% of applicants without review.*~~

102. Notwithstanding that the Stricken Standards already was designed to categorically deny most applicants, Defendants applied the Stricken Standards to exclude even more employees from protection than the discriminatory policy allowed.

103. As bad as the Stricken Standards were, the one thing that the policy did for employees was to guarantee that the DOE had to grant religious accommodation if an applicant qualified under its criteria.

104. There was no provision for undue hardship under the Stricken Standards.

105. Rather, pursuant to the arbitrators' order, at both the initial DOE review and in the appeals, any applicant who qualified "within the specific criteria identified above **shall be permitted the opportunity to remain on payroll…**"

106. The Stricken Standards applied both to the DOE's initial determinations and to the appeals to the arbitrator.

107. However, within hours or days of submitting their application, every single applicant who initially applied under the Stricken Standards received the same autogenerated email, stating:

Dear [NAME],

69. We have reviewed your application and supporting documentation for a religious exemption application, which DOE instructed had to comply with the Stricken Standards criteria and attach a clergy letter or it would be denied.

70. All applications had to be submitted through the "SOLAS" portal.

71. Widespread crashes and other issues with the system prevented many employees from applying through SOLAS on time.

72. Some employees were not alerted that there even was a deadline.

When employees were able to apply, they were (generally within 24-48 hours) denied accommodation through an autogenerated email from ~~the DOE COVID-19 vaccine mandate.~~ "solas_donotreply" stating: "Your application has failed to meet the criteria for a religious based accommodation.

73. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations. This application was reviewed in accordance with applicable law as well as the [Impasse Order]."

~~Sincerely, *HR Connect* Medical, Leaves, and Records Administration~~

~~Please do not reply to this message via e-mail. This email address is automated.~~

~~108. Those who applied on or before the deadlines set forth in their union's version of the Stricken Standards had the following additional language tacked on:~~

74. ~~This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award~~ Some autogenerated responses also stated: "Under the terms of this order, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice ~~by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal~~…" Others did not add that last line.

~~109. In addition to violating the arbitrator's award, the autogenerated denials violated~~

statutory standards in multiple ways.

75. First, the DOE did not engage in any good-faith Other than that, essentially this same email was sent to all applicants without any individualized attempts to accommodate review including employees before issuing blanket "who already worked fully remotely.

76. Multiple misstatements are contained within. For example, as Eichenholtz later testified, the Commissioner had by that date amended the mandate to clarify that it did not prevent DOE employees from working in person with students or elsewhere.

77. Moreover, pursuant to the arbitration process, the City, the Union and the DOE had set up a comprehensive plan to accommodate thousands of DOE employees if necessary at remote worksites and through various re-assignment or remote assignment positions. These worksites were largely sitting empty throughout the pandemic.

110.78. To maximize the denials, the City and the DOE did not even follow the few portions of the Impasse Orders that benefitted employees. For example, the one compromise that the Stricken Standards made in favor of religious employees was that for those lucky few who met all the unconstitutional criteria for a qualifying religious belief, those employees "shall be permitted the opportunity to remain on payroll" by utilizing the reassignment and remote worksite plans without any carve out or mechanism for denial based on undue hardship" denials to 100% of applicants.

79. No one at the DOE But, in the initial review, within hours of receiving each application, the DOE system issued autogenerated denials to every single applicant denying each application and, stating vaguely, that the applicant did not "meet criteria" and any accommodation would be an "undue hardship" or "more than a minimal burden" anyway so no accommodation would be made regardless.

80. At the bottom, the autogenerated emails each stated that the denials had been made in accordance with the Stricken Standards and other statutory accommodation laws.

81. Defendants took the most discriminatory parts of the Impasse Order (the City's discriminatory criteria) and combined them with a blanket denial because of "undue hardship" using Defendant's interpretation of an unlawful "de minimis" hardship standard that was impossible to meet.

82. But the two processes were not meant to work together. The Impasse Order stated that if it were being used, it was the "exclusive" method to be used for accommodations requesting accommodations at the remote cite locations negotiated in the arbitration proceeding for employees accommodated under that process.

83. In addition to violating the Impasse Order, the blanket undue hardship designations did not comport with the law. At all times relevant to these proceedings, Defendants were required at minimum to prove "significant hardship or expense" not de minimis hardship.

84. Defendant Eichenholtz refused to correct the undue hardship standard, even though he and the City and DOE defendants were promptly notified in 2021 that they were using the wrong standard.

85. Eichenholtz, the City and DOE instead continued to use the "de minimis" standard throughout the first reviews and even in the remedial reviews that Eichenholtz later supervised after the Second Circuit struck held the first DOE process was unlawful.

86. Eichenholtz, the City and the DOE took the position that under the "de minimis" burden they were willfully applying in error, any effort whatsoever was assumed to be too great to meet this low threshold so no analysis or evaluation was necessary.

Formatted: Footer

87. Eichenholtz conceded that neither he, DOE nor the City ever assessed any request individually or even as a whole to specifically determine cost or threat level.

88. Defendants did not meet the significant hardship or expense standard applicable under the NYSHRL and NYCHRL or the substantial hardship standard applicable under Title VII.

89. No employee, including Named Plaintiff, was ever offered any cooperative dialogue before being summarily denied. Specifically, neither DOE nor the City ever engaged in a "good faith" "written or oral dialogue" with Plaintiff concerning "the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for a covered entity" as required under the New York City Human Rights Law prior to sending the autogenerated denial of accommodation.

90. Nor did DOE or the City ever engage in an individualized analysis of the required enumerated statutory factors or any economic or safety factors under any of the controlling three accommodation statutes before denying relief.

~~111.~~91. In fact, decision-makers at DOE admitted in sworn testimony that no one even reviewed ~~any of~~ the applications before sending out the ~~autogenerated emails denying accommodation.~~blanket bad faith denials.

~~112. Applicants were not contacted by any person at DOE to discuss their applications before they were denied.~~

~~113. No cooperative dialogue was offered or took place before the denials were issued.~~

~~114.~~ The same or substantially the same email was sent to all 100% of applicants~~.~~

~~115. The DOE also sent out the same email to employees who were already approved to work remotely and~~ were thus denied, even those who ~~did not have student-facing jobs.~~

29

116. Second, the denial incorrectly states that the Mandate did not allow DOE employees to work in person.

117. It was not true that the Mandate did not allow DOE employees to work in person on the contrary, the Mandate had already been expressly amended to allow for religious accommodation, which would include in person accommodation if an employee did not constitute a direct threat that could not be mitigated through reasonable accommodation.

118. The Stricken Standards and the DOE's own policies show that DOE understood that the Mandate did not prohibit them from offering in person accommodation that would expose employees to other covered personnel.

119. For example, DOE arranged for employees to work unvaccinated around other DOE employees from one of the remote work locations that the DOE set up for those accommodated under the arbitration awards, or from an administrative building, even though the DOE's undue hardship denials stated that the Mandate prohibited employees from working around other DOE staff unvaccinated.

120. Ultimately, the DOE admits it accommodated at least 163 persons in this manner, some of them teachers.

121. And one or more unvaccinated teachers were even knowingly allowed by the DOE to go back in person to teach their class in person with students while the Mandate was in effect.

122. Nothing in the Mandate provided justification for a blanket ban on in-person accommodation without individualized analysis of the statutory factors for each employee.

123. By law, employers bear the burden of proving that an employee is a direct threat and of proving that no reasonable accommodation could be made without undue hardship.

124. Neither the DOE nor the City met this burden.

Formatted: Footer

125. Third, the denials admitted—on their face—that Defendants applied the wrong legal standard for assessing whether accommodation would pose an undue hardship.

126. The denials stated that Defendants used the "more than a minimal burden" (*de minimis*) standard.

127. Under the SHRL and CHRL, the employer bears the burden of proving that accommodation would create a "significant" burden or expense, and under Title VII, the employer must prove substantial hardship, not *de minimis* hardship.

128. Pursuant to federal, state and local law, employers also must prove that they made the undue hardship determination after assessing specific statutory criteria, using the best available evidence, on a good-faith individualized basis before denying an applicant.

129. For example, under all three statutes, if the hardship has to do with a safety concern, the employer bears the burden of proving on an individualized basis that an employee would pose a direct threat before segregating them or imposing any adverse employment consequence on them.

130. The direct threat analysis cannot be speculative or generalized. Rather, under the CHRL, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

131. Similar analysis is required under the SHRL and Title VII.

132. Defendants did not make any good faith attempt to individually analyze these or the other required statutory factors for any applicant before conclusively denying them all based

**Formatted:** Footer

on alleged undue hardship.

133. The best available objective science at the time did not support a blanket policy that in person accommodation was *per se* a direct threat.

134. The DOE did not prove or individually assess whether any employee was a direct threat due to their vaccination status before sending out the autogenerated blanket denials.

135. The DOE did not prove or individually assess whether it would be an undue hardship to provide reasonable accommodation for any employee deemed a direct threat before sending out the autogenerated blanket denials.

136. Some employees were already working remotely, or could have easily worked remotely, when they received the blanket undue hardship denials.

137. Most of those who received the email denial had already been accommodated to work remotely in the past and could have easily been accommodated to do so again.

138. And all employees could have been easily accommodated in person or remotely, as they had been for the entirety of the pandemic, without undue hardship or safety concerns.

139. DOE employees seeking religious accommodation from the Mandate did not pose a threat to anyone based on their vaccination status and could have been accommodated without undue hardship.

140. The vaccines could not stop transmission.

141. Moreover, even if Covid-19 vaccines could meaningfully stop transmission, it is illogical to mandate vaccination for only a small fraction of the school population.

142. It makes no scientific sense to say that one million students could safely come to school unvaccinated, riding in busses with unvaccinated school-district-employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with thousands

**Formatted:** Footer

of their unvaccinated peers, but that they would suddenly be in severe danger just because one or two teachers in the building were also unvaccinated.

143. If being in proximity with a few unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

144. A few extra unvaccinated people in each building could not make any difference to herd immunity when the bulk of the population in that building are unvaccinated as well.

145. By the fall of 2021, it was already well understood that the Covid-19 vaccines could not create herd immunity no matter what percentage of the population was vaccinated.

146. As one of many examples, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

147. Even in 2021, the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

148. Defendants were on notice of this fact.

149. Defendants were also on notice that the *de minimis* standard did not apply before they fired Plaintiff and most other unvaccinated employees for failing to violate their religious beliefs by getting vaccinated.

150. Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation at various relevant points from public health experts at Johns Hopkins (Exhibit 2—Dr. Makary), Yale (Exhibit 3—approved to work , Dr. Risch), and Stanford (Exhibit 4—Dr. Bhattacharya).

151. As the declarations point out, the great weight of the objective science, even at the time the Mandate was imposed and shortly thereafter, showed the vaccine could not stop transmission and did not offer robust or durable protection from infection or symptoms.

152. The declarations establish that DOE employees did not pose a direct threat and could have been accommodated in person.

153. Moreover, the vaccines were still at an experimental stage.

154. There was insufficient data available to determine what the risks and benefits were, or that a benefit overrode risks to particular people, especially those with underlying health conditions.

155. And, though Pfizer's vaccine was being rushed through for FDA approval, Pfizer did not actually offer any of the FDA approved vaccines in New York State.

156. It was not possible to obtain an FDA approved Covid-19 vaccine in New York State at any time between August 2021 through September 2022.

157. The only available vaccines that Pfizer made available in New York State during this timeframe were those authorized under Emergency Use Authorization ("EUA").

158. EUA vaccines cannot be mandated, by the terms of their authorization.

159. Additionally, children had the lowest risk from Covid-19 of any population, and their risk of severe harm from the disease was so low as to be statistically insignificant.

160. Tellingly, every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

161. These other school districts did not see any statistically significant increase in infection rates from the infection rates at the NYC DOE after the DOE's Mandate went into

**Formatted:** Footer

effect.

162. Moreover, there were numerous additional measures that could have been taken, including but not limited to weekly testing, symptom checks, or other protective measures, each of which could have mitigated any perceived or actual increased risk of transmission from unvaccinated employees.

163. Remote accommodation would not have been a significant hardship either.

164. Every Plaintiff had previously been accommodated remotely for short or long periods of time during the pandemic.

165. The Mandate was supposed to be a temporary emergency measure (and indeed, did have to be continued or renewed repeatedly throughout the year and a half it was imposed).

166. The DOE had accommodated widespread remote work for the past year and a half, and the DOE could have continued to allow those needing religious accommodation to work remotely.

167. Despite the DOE's argument that they had moved most instruction back to in person in 2021, the DOE continued to provide a parallel remote program for many students throughout the 2021-2022 school year.

168. The DOE could have accommodated eat least some classroom teachers who needed to opt out in this remote program.

169. Indeed, the DOE continued to advertise vacancies for and hire remote teachers throughout the 2021-2022 school year, even as they claimed it would be an undue hardship to accommodate any unvaccinated DOE teacher remotely.

170. There were other ways that DOE employees could have been accommodated through remote work as well without significant hardship.

**Formatted:** Footer

171.     For example, before sending out the denials, DOE set up buildings specifically for remote work for those who would be accommodated under the Stricken Standards.

172.     At all times relevant to this Complaint, those building stood largely empty and well below capacity.

173.     Teachers and paraprofessionals could have worked with a co-teacher (which many already had) and pushed in through Google Classroom (from home or the remote worksites) to work with individuals or groups or modules throughout the day.

174.     There was also plenty of work that could be done that did not require in person presence that they could have been reassigned to temporarily until the "emergency" was over.

175.     Upon information and belief, the summary blanket denials were issued to demoralize and harass religious employees, who got the message, loud and clear, that DOE was not acting in good faith.

176.     Employees had poured their hearts out into their religious accommodation letters, which is a vulnerable thing to do.

177.     They were given only a few days to commit their most sacred innermost thoughts to paper, and to gather a clergy letter if they could.

178.     Receiving an autogenerated response, almost immediately, with a boilerplate denial from a "donotreply" email address felt like a mockery of their faith and showed many employees – both the recipients and their colleagues who were considering whether to apply or litigate – that further efforts were futile.

179.     Tellingly, many who received the autogenerated undue hardship denials did not even work in student facing positions – or in person at all in some cases – in the Fall of 2021.

180.     But these remote and administrative employees still received the same autogenerated email asserting they were denied because the Mandate did not allow employees to

work unvaccinated around students.

181. DOE's initial autogenerated denials stated, on their face, that they were issued in accordance with the Stricken Standards.

182. But pursuant to the Stricken Standards, DOE was not authorized to deny *any* applicant based on undue hardship.

183. Rather, the Stricken Standards, which were supposed to apply (per the policy) to both the initial DOE review and the appeals to the arbitrators, had no mechanism for undue hardship denial.

184. According to the Stricken Standards, employees who met the defining criteria for qualifying religious beliefs "shall be" accommodated.

185. The DOE's decision to violate even the one helpful aspect of the Stricken Standards by proactively denying 100% of the applicants through an autogenerated email pretextually asserting "undue hardship" shows animus and bad faith and leads to a reasonable inference that all subsequent religious accommodation decisions and policies implemented by DOE were pretextual.

***The DOE refused to allow many employees to appeal their denials***

186. The DOE's policies made it very difficult for employees to apply for religious accommodation and even harder to appeal their denials.

187. The Stricken Standards were not widely announced, and deadlines were not clearly explained to employees.

188. Many employees were never told when the "deadline" to apply for religious accommodation was, only that they had to get vaccinated before September 27, 2021, and that this deadline was later moved to October 1, 2021, due to the Second Circuit's temporary

**Formatted:** Footer

restraining order issued in September 2021.

189. The deadlines were also irrelevant.

190. In truth, pursuant to all three accommodation statutes, an employer cannot impose an arbitrary cutoff deadline to apply for religious accommodation.

191. Rather, the statutes each specify that the employer has an affirmative obligation to accommodate an employee or prospective employee's religious practices when the employer knows, or should know, that the employee needs accommodation, whenever that may occur.

192. Each one of the various arbitration awards provided a different "deadline" to get the expedited review available under the Stricken Standards.

193. Each was circulated, if at all, only a few days before these deadlines.

194. Plaintiff and her similarly situated colleagues were in a state of emergency.

195. The start of a new school year is already a hectic time for educators.

196. This was particularly hectic, as many students were returning from a year and a half of remote instruction, and there was quite a bit to work out.

197. The DOE's sudden and aggressive announcement had DOE employees scrambling, attempting to secure loans and contingency plans in case they were suddenly out of a job, raise money to file lawsuits to challenge the blatantly unconstitutional religious accommodation policy, run around town trying to gather medical records and clergy letters, write long heart-felt letters that could explain their innermost sacred beliefs to secular and hostile strangers, and ensure that the students were taken care of and that they met their extensive job responsibilities.

198. To make matters worse, the SOLAS system, where the applications were supposed to be uploaded, froze repeatedly, especially during the deadlines to apply or appeal, leaving some

**Formatted:** Footer

unable to apply by the "due date."

199. Those that were able to get their applications in before the "due dates" then had only 24 hours to appeal their initial DOE denials.

200. These denials were sent by email, and many employees did not see them within the twenty-four hours allotted.

201. Too often, the denials were issued on the Sabbath or a holy day, leaving those with religious practices that forbid Sabbath work with no time to appeal.

202. And, once again, many employees were unable to appeal, since the SOLAS system crashed during their brief window to appeal.

203. Many others felt it was futile to appeal, after receiving DOE's insulting autogenerated generic denials in response to their good-faith and heartfelt accommodation requests and hearing from colleagues that everyone was getting the same denial, even those who already worked remotely.

204. Employees that submitted religious accommodation requests "late" were allowed to apply, and were issued formal denials through a nearly identical autogenerated email as those who applied on time, but they were not allowed to appeal.

205. And, of course, those who were shut out of appealing due to problems with the SOLAS website were also denied the right to appeal.

206. Those who did get to appeal did not fare much better.

207. Most were provided with no explanation whatsoever, just given a paper that had an "x" next to the word "Denied."

208. The decision whether to grant a hearing or not was arbitrary.

209. Employees who met the criteria in the Stricken Standards were denied the right to

Formatted: Footer

a hearing and denied with no further explanation than an "x" next to the word "denied."

210. Some applicants were allowed a zoom hearing.

211. There was no apparent reason why some were granted, and others denied.

212. Arbitrators were given unfettered discretion whether to allow a hearing.

213. Neither DOE nor the arbitrators kept any records explaining the decisions and DOE admitted in other lawsuits and position statements to the EEOC that it cannot explain the reasons why some were granted a hearing, and others denied.

214. At the zoom hearings, the arbitrators and DOE representatives engaged in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

215. For example, DOE openly and repeatedly took the position that all Jews must be denied because of a Jerusalem Post article stating that a Rabbi in Israel was vaccinated.

216. DOE representatives repeatedly referenced this article in zoom hearings to assert that all Jews must be categorically denied accommodation.

217. Jewish applicants from related lawsuits repeatedly documented that though they explained that their own Rabbi did not share the Israeli Rabbi's opinion, that Judaism is a diverse religion, and that a random Rabbi in Israel could not be deemed the "leader" of all Jews, they were still told that Jews could not qualify under the Stricken Standards because of the Jerusalem Post article.

218. Similarly, DOE also took the repeated position that all Catholics had to be denied, because Pope Francis is vaccinated.

219. There is substantial debate within the Catholic faith, like many other faiths, about whether it is religiously permissible to take a Covid-19 vaccine.

220. In fact, a whole council of Catholic Bishops set forth a document asserting that it is likely *not* permissible for Catholics to take any of the Covid-19 vaccines due to the use of aborted fetal cell lines in production and development of the vaccines.

221. Moreover, while Pope Francis is vaccinated and expressed his public opinion that vaccination might be permissible despite the connection to abortion, he also instructed Catholics that they must each consult their religious conscience to make the choice for themselves.

222. Nonetheless, DOE argued repeatedly in the zoom hearings that all Catholics should be denied because the Catholic Pope was vaccinated.

223. DOE maintained this position even if the applicant provided a letter from their own Priest or religious leader stating that they had a valid religious belief.

224. DOE representatives went so far as to argue in at least one documented case that a Buddhist applicant should be denied because his views were not shared by the Catholic Pope even though the DOE representative acknowledged that DOE found his religious beliefs sincere.

225. DOE representatives also often argued that all non-denominational Christians other than Christian Scientists should be denied due to the Pope's beliefs.

226. Even in cases where applicants submitted letters from their own religious leaders, explaining that the whole congregation opposed vaccination, DOE argued that the Pope's beliefs controlled all Christians other than Christian Scientists, and the applicant had to be denied, even if sincere.

227. **Similarly**, the DOE representatives routinely pulled out a letter purporting to be from a Seventh Day Adventist leader to assert that all Seventh Day Adventists must be denied.

228. And, DOE representatives repeatedly argued that anyone who belonged to a non-denominational Christian faith must be denied, both because the Pope is vaccinated (even though non-denominational churches do not follow the Pope) and because the nondenominational churches are allegedly not "established and recognized" religious organizations according to the

Defendants.

229. DOE also argued that all Buddhists had to be denied because the Dalai Lama was vaccinated.

230. The Dalai Lama is a spiritual leader of the Gelug ("Yellow Hat") sect, which is one of at least four sects of Tibetan Buddhism.

231. There are many other sects of Buddhism – perhaps thousands of other sects, outside of Gelug Buddhism.

232. Moreover, according to spiritual texts, Buddha told his followers not to take any leader when he was dying, but rather, that each must rely on the dharma to examine the truth for themselves.

233. But DOE still repeatedly argued that all Buddhists should be categorically denied because the Dalai Lama was vaccinated.

234. DOE also argued repeatedly that all Muslims must be denied due to the alleged discovery of an alleged "leader" of that diverse faith who was vaccinated.

235. The DOE's discriminatory statements and ignorant assumptions about faith were common and well-documented throughout the accommodation process.

236. Arbitrators often joined in in the discriminatory positions and comments, accusing applicants of being wrong about what their faith required, or essentially, of being heretics for not allegedly following Pope Francis or the Dalai Lama or the Israeli Rabbi or whoever they decided to deem the leader of the faith.

237. DOE representatives encouraged such harassment from the arbitrators, joining in and doing nothing to remediate the comments when made.

238. DOE also categorically denied several types of belief.

**Formatted:** Footer

239. Especially, DOE representatives argued that any religious objection based on concerns about the use of aborted fetal cell lines was presumptively invalid.

240. The City provided DOE with a letter from Health Commissioner David Chokshi, in which the Commissioner argued that concerns about aborted fetal cells did not merit religious protection.

241. It is well documented that aborted fetal cell lines were used in the production and development of the available Covid-19 vaccines.

242. DOE's attorneys have admitted they have no basis to contest this fact.

243. Mr. Chokshi's opinion that these concerns do not merit religious protection is impermissible governmental entanglement in religious questions and constitutes discrimination.

244. Nonetheless, the DOE repeatedly used Commissioner Chokshi's letter in zoom hearings, arguing that concerns about the use of aborted fetal cell lines did not merit religious protection.

245. After their zoom hearings, each applicant received a denial, with no explanation whatsoever, just an "x" next to the word "Denied."

246. Conversely, at least 163 other DOE employees were accommodated after the administrative appeals, some of them classroom teachers.

247. Upon information and belief, most of these employees were accommodated after a group of educators filed for an emergency injunction protecting them from the discriminatory religious accommodation policies on or about October 4, 2021.

248. Upon information and belief, DOE hoped that by accommodating some employees from various religious groups previously categorically denied, it could try to defend against their obvious and widespread discrimination.

249. But whatever the reason, DOE showed that it could accommodate employees by

accommodating these 163 who were deemed to meet the unconstitutional criteria applied by DOE and the arbitrators.

250. Some of the accommodated classroom teachers were given alternative assignments.

251. Others were assigned to teach some of the online students who remained in the remote program.

252. And many were accommodated by allowing (or hiring) a co-teacher to stay in the classroom while the accommodated teacher taught via Google Classroom.

***The City aided, abetted and colluded in DOE's discrimination.***

253. The City is jointly liable for the DOE's discriminatory religious accommodation policies and practices.

254. As a threshold matter, in 2002, the New York State Legislature granted the City "Mayoral Control" over New York City's public schools. At all times relevant to this Complaint, pursuant to this authority, as extended and amended over the years, the Mayor's office exercised control over DOE and its operations.

255. At all times relevant to this Complaint, the Mayor's office worked closely with DOE to oversee and direct the religious accommodation policies and their discriminatory implementation.

256. The City was also jointly responsible for carrying out the arbitration award, as reflected in the opening paragraphs of the opinion, which list the City as a party that was required to carry out the Stricken Standards. [Ex 1 at 6-7].

257. The City also actively participated in harassing and discriminating against DOE employees who sought religious accommodation from the Covid-19 vaccine mandate, aiding and

**Formatted:** Footer

~~abetting violations of the statutory protections for religious accommodation.~~

~~258. The Mayor's office and Mayor's legal counsel initially directed DOE not to offer any religious or medical accommodation from the Mandate.~~

~~259. The Mayor's office and/or Mayor's legal counsel participated in drafting the proposed language for what criteria to use in judging a valid religious accommodation requests, which were later adopted in the Stricken Standards.~~

~~260.~~92. ~~Upon information and belief, the criteria for religious exemption were composed~~ entirely, ~~or nearly entirely, of language and procedures proposed by the City's attorneys~~ remotely or whose jobs were remote, without any human review, leave aside cooperative dialogue.

~~261. Attorney Eric~~The highest decision-makers representing the City, including Eichenholtz, who ~~was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York, was one of the City's attorneys who drafted the proposed criteria adopted in the Stricken Standards.~~

~~262. At the time, Mr. Eichenholtz directed the labor and employment litigation group.~~

~~263. As such, he was essentially in charge of the City's legal defense to the discrimination charges.~~

~~264. After assisting Defendants with blatant, widespread religious discrimination, both in the original DOE policies and then during the pretextual Citywide Panel "reviews" (which he was in charge of), Mr. Eichenholtz was promoted to Managing Attorney for the New York City Law Department.~~

~~265. The City was also intimately involved in directing the DOE in the implementation of these policies and aiding and abetting the exclusion of as many applicants as possible from accommodation based on unconstitutional criteria.~~

266. In a press briefing held on September 23, 2021, the day before the DOE appeal hearings began, Mayor de Blasio was asked how the City intended to implement the religious exemption policies oversaw the religious accommodation processes for DOE employees, Banks, and what criteria the City would use. He responded:

> **Mayor:** Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition.** But overwhelmingly the faiths all around the world have been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific longstanding objection**.[3]

267. This statement admits an intention to categorically discriminate against most religions and only grant religious accommodation to members of certain faiths that have "a very, very specific longstanding objection" according to the Mayor.

268. It is also an admission that the City was involved in and directing DOE to discriminate against most faiths in the appeals.

269. If the City had no involvement, the Mayor would have stated that the City was not involved, in response to questions about how it was going to decide which teachers to accommodate.

270. Moreover, the Mayor would not have said "we are saying, very clearly" that a person has to be "a member of a faith that has a very, very specific longstanding objection" but rather would say the DOE was taking that position.

---

[3] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcriptmayor-de-blasio-holds-media-availability

**Formatted:** Footer

271. "We" indicates the Mayor's participation and collusion with this discriminatory policy.

272. There is additional evidence that the City was intimately involved in and aided and abetted the DOE's discriminatory policies.

273. The Mayor's office and/or City's legal counsel provided the letter from the Jerusalem Post to DOE and advised DOE to deny Jewish applicants based upon that article.

274. The Mayor's office and/or City's legal counsel also directed DOE to categorically exclude Buddhists, because of the Dalai Lama.

275. The Mayor's office and/or City's legal counsel also directed DOE to deny Muslims, because of a random City-defined "leader" of Muslims who the City believed was vaccinated.

276. The Mayor's office and/or City's legal counsel directed the DOE to deny Catholics, because Pope Francis was vaccinated.

277. The Mayor's office and/or City's legal counsel directed the DOE to deny Seventh Day Adventists, because of an alleged leader's position statement which they provided to the DOE.

278. The Mayor also took an official City position on religious questions, announcing to the press that "Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated" when explaining that the City would not allow people with personally held religious beliefs that differed from the leaders of their faith to get accommodation.

279. The City also provided a letter from Commissioner Chokshi to DOE and the arbitrators and instructed them to use it to deny those with religious objections based on the use

**Formatted:** Footer

of aborted fetal cell lines.

280. The Mayor and/or City's legal counsel also directed DOE to deny all personally held religious beliefs.

***DOE's religious accommodation policies declared unconstitutional.***

281. On or about September 21, 2021, a group of educators brought a proposed class action lawsuit against the City and DOE, titled *Kane v.* then-Mayor de Blasio *et al*, in the Southern District of New York arguing, among other things, that the DOE's religious accommodation policies, were unconstitutional.

282. This verified complaint, which was served on the Board of the DOE and the City, notified both Defendants that the Stricken Standards were discriminatory and violated the rights of all DOE employees seeking religious accommodation,

283. Both Defendants acknowledged receipt of the notice by entering the *Kane v. de Blasio* case.

284. The Complaint was timely served on the Department of Education and the City of New York.

285. Multiple other employees also served notices of claim, alerting the City and the DOE of classwide claims that needed to be adjusted, and fatal problems with their discriminatory religious accommodation policies.

286. Plaintiff also served an EEOC claim on Defendants in or around October 2021, which serves as functional notice of her claims against DOE and the City.

287. Neither Defendant adjusted the class wide claims or Plaintiff's individual claims within the statutory period.

288. In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and

deserved injunctive relief.

289. As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

290. First, the Court held that DOE's policies were not neutral, pointing out that it violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

291. The Court particularly chastised the Defendants for denying Catholics and other Christians just because the Pope was vaccinated.

292. Second, the Court held that the policies were not generally applicable, as Defendants had discretion whether to grant accommodation.

293. The Court rejected Defendants attempts to pin the illegality on the arbitrators or to argue that *Kane* plaintiffs had to sue the union, not the DOE and the City.

294. Nothing in the arbitration award, or in the governing collective bargaining agreement waived employees' rights to challenge the religious discrimination inflicted by DOE or the City in Court.

295. Both Defendants knew or should have known, that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make or enforce unconstitutional policies, nor can it encourage, aid or abet discrimination.

296. Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate and the City participated in and was complicit in these discriminatory denials.

297. In *Kane*, in the proceedings before the Second Circuit, Defendants' attorneys

Formatted: Footer

admitted that the religious accommodation policies adopted by DOE were likely unconstitutional.

298. The City asked the Court to let them try to mitigate the harm by providing a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, particularly, Mr. Eichenholtz.

299. The City promised that any employee whose religious beliefs qualified under lawful standards would be reinstated with back pay.

300. The DOE agreed to this plan.

301. In November 2021, first a motion panel and then a merits panel of the Second Circuit Court of Appeals issued an order requiring the City to give fresh consideration through a new "Citywide Panel" and reinstate those who qualified with backpay.

302. Though the Second Circuit's order did not apply to non-named plaintiffs in the *Kane* lawsuit, the orders acknowledged that the Court's decision to limit relief to named plaintiffs in the preliminary injunction order was impacted by the fact that the City promised to make the Citywide Panel review and reinstatement available more broadly on a voluntary basis.

303. However, the Citywide Panel did not review the vast majority of employees denied under the Stricken Standards.

304. According to later representations by Defendants counsel in related litigation, the Citywide Panel only reviewed about 500 of an estimated 5,000 to 7,000 applicants denied religious accommodation from the DOE Mandate.

305. According to DOE, only employees who had been able to submit an appeal within 24 hours of their initial denial were reviewed by the Citywide Panel.

306. But those who were deprived of an appeal suffered from the discriminatory and pretextual policies too and had no recourse even after Defendants admitted that their original

**Formatted:** Footer

policies were unconstitutional.

307. Many applicants, like Plaintiff, who did appeal under the original Stricken Standards, and were informed after the *Kane* decision that their applications were under review by the Citywide Panel, never even got a decision before being terminated.

***The Citywide Panel denials were also pretextual and showed ongoing animus***

308. The Citywide Panel reviews did not comply with the statutory standards and created further equal protection problems.

309. The reviews were not carried out in good faith.

310. Out of an estimated five hundred reviewed, only one applicant's denial was reversed by the Citywide Panel.

311. This reversal was done *sub judice* and was only granted so Defendants could argue to the Court that the Citywide Panel was a valid remedial measure to the initial acknowledged discrimination.

312. The Citywide Panel did not engage in cooperative dialogue about possible accommodations.

313. Between February 2022 and August 2022, the Citywide Panel sent out autogenerated emails from an email address called "noreply@salesforce.com" which stated that the denial was the final denial, and that employees had to get vaccinated within three days.

314. The reasoning was generic, typically stating in generic language that DOE had demonstrated that it would be an undue hardship given the need for safe in-person learning and sometimes tacking on a statement indicating that the applicant had failed to establish that their religious beliefs preclude vaccination.

315. Some employees never received a decision at all.

51

**Formatted:** Footer

316. Most employees were then terminated a few weeks or a few months later.

317. The Citywide Panel reviews were also infected by the same animus that plagued the initial denials of accommodation.

318. First, the Citywide Panel imposed a different undue hardship standard on those given fresh review than had been imposed on those accepted under the discriminatory policy.

319. Specifically, the Citywide Panel applied a complete blanket undue hardship ban on accommodation for all teachers and most administrators, even those with sincere religious beliefs, claiming that DOE "had demonstrated" it would be an undue hardship to accommodate anyone who worked in a building with children.

320. By contrast, under the Stricken Standards, if an employee's religion met the discriminatory definition for determining they had a qualifying religious belief, they had to be accommodated without regard to undue hardship.

321. Under the discriminatory Stricken Standards policy, at least 163 employees were therefore accommodated, some of them classroom teachers.

322. The rest of the applicants were denied the same accommodation, not because they would somehow be harder to accommodate than the 163 who were granted accommodation under the discriminatory policy, but because DOE disfavored their religions and particular religious objections.

323. In sum, the Citywide Panel's more rigorous blanket undue hardship bar for those who qualified under "lawful" standards versus those that qualified under the openly discriminatory standards, constituted a fresh incident of discrimination (since it was not applied to those who were impermissibly favored under the old policy).

324. Second, the Citywide Panel's blanket undue hardship determinations violated

**Formatted:** Footer

statutory factors.

325. In related litigation, the City offered Mr. Eichenholtz, who created and was in charge of supervising the Citywide Panel, to be deposed for the purpose of addressing the Citywide Panel's policies.

326. Mr. Eichenholtz was the "architect" of the Citywide Panel and oversaw it and had veto power over determinations.

327. He admitted in his sworn deposition that neither the City nor the DOE analyzed any of the statutory factors before denying applicants.

328. He further admitted that neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be accommodated before issuing the undue hardship denials.

329. He further admitted that the Citywide Panel did not know or assess whether the vaccine could stop transmission of disease or whether unvaccinated employees were more dangerous than vaccinated ones.

330. Mr. Eichenholtz further admitted under penalty of perjury that DOE never provided information to the Citywide Panel "as to the number of employees it could afford to employ without causing undue hardship."

331. He also swore that the "inability to pay employees" who were not able to work in person "has not come up" nor had DOE submitted any information about increased costs that could present an undue hardship if employees were accommodated.

332. Mr. Eichenholtz said the Citywide Panel did not ask the DOE to explain whether the remote worksites it set up were at capacity (they were not).

333. He also said that he was not aware of any direct threat analysis conducted for any

53

Formatted: Footer

employee.

334. Mr. Eichenholtz could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19.

335. He finally conceded that the Panel had not imposed "no evidentiary requirement" from any agency on the undue hardship issue. When pressed, Mr. Eichenholtz stated that he did not think analysis of any statutory factors was necessary for an appellate body like the Citywide Panel, and he had made sure there was no requirement that the DOE or any other agency "provide that kind of data."

336. Bizarrely, Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated.

337. He confirmed that the Citywide Panel did not assess the duration of any risk or any of the other statutory factors on direct threat either.

338. From this testimony alone, it is patently clear that the Citywide Panel, like the DOE before it, failed to meet its burden of proof on undue hardship.

339.93. Outrageously, throughout the winter of 2021-2022, when the Citywide Panel was making its undue hardship decisions, the that DOE was sending actively infected and infectious vaccinated teachers with Covid 19 back into the classroomsautogenerated denials and failing to apply lawful standards.

94. The City, through their senior policymakers including Defendants Eichenholtz, Banks, Bray, Varma, Ashfar and Chokshi, as well as Mayor de Blasio, were also aware that DOE was not providing statutorily compliant reviews.

54

95. Despite the City's concurrent responsibility to ensure that lawful religious accommodation was provided to DOE employees, the Mayor and others including but not limited to Banks and Eichenholtz encouraged and condoned this breach of duty and failed to intervene to correct it or train DOE employees to correct the breaches.

### IV.   PHASE II – THE ARBITRATION HEARINGS UNDER THE STRICKEN STANDARDS.

96. After receiving their autogenerated denials, DOE applicants were given one business day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Stricken Standards.

97. The system crashed repeatedly and hundreds were unable to file appeals despite diligent effort.

98. Some felt it was futile, since the arbitration appeals were expressly governed by the facially discriminatory Stricken Standards, which required denial of Catholics and many other faiths.

99. Others, who did appeal, were given another round of discriminatory and cursory denials, proving that there was validity to the belief that appeal was futile under the Stricken Standards.

100. Arbitrators had complete discretion whether to grant a zoom hearing or just automatically deny an applicant, and either way, they did not have to document any reasons for their decisions other than writing an "x" next to the word "denied."

101. No records were kept to notate the reason that any particular employee was provided with a hearing or denied or accepted.

102. Employees that got a hearing were subjected to even more discriminatory treatment.

103. As detailed in this and the next section, the City adopted an official policy, passed on to the arbitrators and DOE, that Jews, Catholics, Muslims, Buddhists, most Christian sects (other

than Christian Scientists and Jehovah's Witnesses), and many other faiths were categorically barred from accommodation under the Stricken Standards.

104. During the arbitration reviews, the DOE zealously argued for these discriminatory policies. For example:

    a. DOE representatives repeatedly admitted that they took the official position, in accordance with the City's instruction, that all Jews, Catholics, Muslims, Buddhists and most Christians were per se ineligible for accommodation based on the (often erroneous) assertion that the leaders of these faiths were vaccinated.

    b. In the hearings, DOE representatives and arbitrators repeatedly accused applicants of, essentially, being heretics or wrong because the Pope was vaccinated and he was, in their view, the authority for most Christians. This argument was levied at Catholics, but also at non-Catholics. DOE even asserted that a Buddhist with sincerely held religious beliefs had to be denied because his views allegedly were out of accord with Pope Francis.

    c. City officials, DOE representatives and arbitrators also stated openly that people with personally held religious beliefs, or who did not have a clergy letter, *had* to be denied even if they were sincere.

    d. Those who expressed concerns about abortion were told to their face that their beliefs, even if sincere, were wrong and were in any event categorically ineligible.

105. **After the arbitration process, at least 169 DOE employees were granted accommodation,** and some of these were classroom teachers. These improperly preferenced employees were allowed to keep their job and remain accommodated throughout the entire period of the mandates

**Formatted:** Footer

340. ~~Sometimes arbitrators deviated from the Defendants' unlawful criteria. Kane plaintiff Ruiz-Torres was told by her arbitrator during her arbitration hearing that most arbitrations applied the position that non-denominational Christians were not eligible.~~ Ms. ~~Meanwhile, thousands of uninfected teachers with natural immunity were kept on leave without pay, and even terminated on the unsupported claim that it would be an "undue hardship" to allow them to be around the students unvaccinated.~~

341. ~~Third, the Citywide Panel applied the wrong legal standard to determine undue hardship.~~

342. ~~In his deposition and in many sworn pleadings, Mr. Eichenholtz repeatedly admitted under oath that the City and DOE used the same unlawful "*de minimis*" standard for undue hardship rather than the significant or substantial standard required by the three controlling statutes even though they had been repeatedly put on notice that the statutes required more.~~

343. ~~Using the unlawful *de minimis* standard, the City and DOE made blanket assumptions that any accommodation would be "more than a minimal burden" and justified denial of all classroom teachers on that basis.~~

344. ~~Citywide Panel members under Mr. Eichenholtz' direction routinely went even further and continued to recommend that even applicants who already worked remotely should be denied based on unsupported "undue hardship" assumptions.~~

345. ~~Fourth, the Citywide Panel failed to engage in cooperative dialogue with any applicant about possible accommodations and challenges thereto before denying their applications.~~

346. ~~This leads to an inference that the undue hardship determinations were pretextual and discriminatory, especially because some of those denied under these blanket bans already~~

**Formatted:** Footer

worked remotely or in buildings without students.

347. Fifth, nothing in the Mandate specified that DOE employees could not be given religious accommodation that would allow them to work in person.

348. On the contrary, the Mandate specified that nothing in it prevented reasonable accommodation as required by law.

349. Pursuant to statute, employers must grant religious accommodation unless they can show that there is a safety concern.

350. Defendants' own decisions show that safety concerns were pretextual.

351. For example, shortly after all unvaccinated employees were excluded, thousands of fully vaccinated DOE employees were infected with Covid-19.

352. In or around January 2022, before the Citywide Panel undue hardship denials were issued and before most unvaccinated employees were terminated, DOE adopted an open policy of encouraging and cajoling *actively infected* teachers to come back to the classroom within five days of onset of infection due to staffing shortages.

353. It was well-understood at the time that Covid-19 was still transmissible five days after onset in most cases.

354. But, while DOE allowed actively infected teachers to teach children in person, they excluded Plaintiff and her religiously opposed colleagues, who were not infected and were willing to test and take other precautions to protect themselves and the students.

355. Moreover, DOE did not enforce the Mandate equally.

356. For example, DOE allowed thousands of employees to remain only partially vaccinated in violation of the Mandate.

357. DOE did this even though the Mandate required that employees get their second

**Formatted:** Footer

dose within 45 days and even though it was well-understood that one dose provided no protection against transmission or even personal progression of disease.

358. Yet, these teachers were allowed to keep teaching in person unvaccinated in violation of the Mandate.

359. The City was aware of this fact and did nothing to require compliance.

360. But the City and DOE were totally inflexible when it came to religious accommodation, refusing to even consider reasonable accommodation as required by the Mandate itself.

361. Sixth, the Citywide Panel failed to assess individual circumstances, claiming it would be an undue hardship to accommodate employees even when those employees already had remote non-student facing jobs.

362. Seventh, by the time the Citywide Panel began issuing undue hardship denials, the vast majority of its vaccinated workforce had gotten Covid-19.

363. When the undue hardship denials were issued, there was no good faith basis to assert that unvaccinated employees posed a direct threat due to their religious practices.

364. The objective scientific consensus overwhelmingly showed that vaccination could not stop transmission of Covid-19.

***The City continued to discriminate***

365. The Citywide Panel also continued to apply discriminatory criteria to determine whether an applicant had, so called, qualifying religious beliefs.

366. First, the Citywide Panel continued to apply a blanket ban on anyone whose religious belief included objection to the connection between the vaccines and abortion.

367. All three of the available Covid-19 vaccines at the time used aborted fetal cell

**Formatted:** Footer

lines in production or development of the product.

368. Emails exchanged between a Panelist and Mr. Eichenholtz provide evidence that Mr. Eichenholtz instructed the panel that such beliefs do not merit religious protection and should be rejected as invalid.

106. Mr. Eichenholtz's own sworn testimony and statements show that he and the Citywide Panel improperly denied accommodation to applicants with religious objections to the use Ruiz-Torres' arbitrator said he was deviating from that position because as a Southerner, he knew that some non-denominational churches were valid.

107. DOE and the City knew that arbitrators were categorically denying applicants from non-denominational religions and encouraged and condoned this and other widespread abuses.

108. After the hearings, the vast majority of appellants were denied, again, with no explanation other than an "x" next to the word denied.

V. THE CITY PARTICIPATED EXTENSIVELY IN THE RELIGIOUS DISCRIMINATION DURING PHASE I AND II AT DOE.

109. What was not yet known with enough specificity for the Second Circuit to hold that the Mandate was facially non-neutral in *Kane,* was that the City was jointly responsible for the accommodation process at DOE, and not only failed to train or intervene but participated and directed some of the discrimination occurring during Phase I and II of the DOE's original accommodation process. Some examples follow:

A. The Chokshi Letter

110. A significant fact unknown when the Kane and NYFRL complaints assessed on appeal were filed, was that Commissioner Chokshi himself wrote and disseminated a letter instructing the DOE and arbitrators to deny religious objections related to abortion and other improper advice.

Formatted: Footer

111. In the letter, Commissioner Chokshi particularly instructed decision-makers to deny religious beliefs based on an objection to the vaccines' connection to abortion.

112. Though he stated it in a manner that was intentionally confusing, and led many decision-makers to beliefs there was no connection between abortion and the vaccines, Commissioner Chokshi admitted in the letter that cell lines from aborted fetuses were technically used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure.

113. Nonetheless, Chokshi asserted in his letter that religious objection was still unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

114. Commissioner Chokshi also claimed that other products, like Tylenol, used aborted fetal cell lines the same way and suggested that no one could therefore have sincerely held objections to the vaccines because these products were so widespread.

369. The Chokshi letter contains several material misrepresentations, as set forth in more detail in the next section, not least of aborted fetal cell lines, on the arrogant assumption that they are "wrong."

370. When deposed, Mr. Eichenholtz admitted that he which is that Tylenol and other products listed in the Chokshi letter did not know whether aborted fetal cell lines were used in the development and production of the Covid-19 vaccines and had not researched this issue.

371. But shortly before this testimony, he wrote to various applicants to the Citywide Panel who had this concern and told them, flat out, that they were wrong, and there was no

61

Formatted: Footer

connection.

372. Mr. Eichenholtz has also filed numerous sworn pleadings in related cases which admit that the Citywide Panel substitutes judgment about whether abortion related concerns are "religious in nature" and deny sincere applicants who assert this religious concern.

373. Multiple employees with this religious objection received a notation in the spreadsheet kept by the Citywide Panel indicating that their beliefs do not actually preclude vaccination.

374. The City has later explained that regardless of what the applicant sincerely believes, the City routinely substituted judgment to decide whether the applicant was wrong about their beliefs and whether the applicants' religious beliefs truly prohibit vaccination even if the applicant believes that they do.

375. The Citywide Panel also continued to deny beliefs grounded in prayer or consultation with the moral conscience, on the mistaken theory that such beliefs are somehow personal and not "religious."

376. Beliefs derived from prayer and conscience are religious in nature and are protected as such.

377. As one of many examples, it is a foundational catechism of Catholicism that the Holy Spirit, and ultimately God, speaks to us and reveals truth through the conscience.

378. Many Catholics believe they are required to consult their conscience and follow the guidance of the Holy Spirit when it is provided, regardless of what any other person may believe.

379. Many other religious people have similar beliefs.

380. But the Citywide Panel routinely decided that such beliefs are not religious

**Formatted:** Footer

because they allegedly allow a person to pick and choose what they believe they should do.

381. This is ignorant, as many religious people would say that instructions from God or the Holy Spirit *do not* allow a person to pick and choose what they want to do, since religious people believe they are required to follow such guidance even over black letter law handed down by man.

382. But in any event, the rejection of these beliefs is also discriminatory.

383. In a nutshell, the Citywide Panel continued the same discrimination against unorthodox faiths that had been codified in the Stricken Standards, that is, requiring that a person's religious objection come from dogma or instruction from church leaders, rather than from guidance from God or other personally held sources of religious belief.

384. The Citywide Panel also entangled itself to an unconstitutional degree with religious questions, denying applicants because their beliefs were allegedly not logical or articulated in a sufficiently coherent manner.

385.115. The Citywide Panel also denied employees if they'd taken other vaccines, even if the employee explained that they took the previous vaccine before they converted to their current beliefs system, or that their religious objection did not apply to that vaccine (for example, if the other vaccine did not usecome to market by using aborted fetal cell lines in production or development).as Chokshi asserted.

386. The Citywide Panel also refused to credit applicants' own interpretation of their faiths, instead adopting a policy that the City was tasked with the job of determining what their faith required of them.

387. These are just some of the discriminatory policies applied by the City to uphold all but one of the original denials.

**Formatted:** List Paragraph, Indent: Left:  0", First line: 0.13", Right:  0", Space Before:  0 pt, Don't add space between paragraphs of the same style, Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.19" + Tab after:  0.44" + Indent at:  0.44"

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Footer

388. Ultimately, the fact that the Citywide Panel arrived at nearly the same result as the original admittedly discriminatory process leads to an inference that the City's reasons were pretextual.

389. The goal of the Citywide Panel was to try to get out of liability for the acknowledged original discrimination by upholding nearly all the original discriminatory denials, rather than review them in good faith to remediate the discrimination, as promised.

390. The history of Defendants' religious accommodation policies also supports the inference that the Citywide Panel's denials were pretextual.

391. Before the Mandate was implemented, Defendants' religious accommodation policy was to assume that an applicant had sincerely held religious beliefs and focus on whether a request would present an undue hardship.

392. Denials based on sincerity or adequacy of religious beliefs were rare before the Mandate, both at DOE and at other City agencies.

393. In all other contexts, the DOE did not require extensive recitation of a person's religious basis for a religious accommodation request, and routinely granted religious accommodation requests where a person did not specify the specific religious tenants that guided their need for accommodation.

394. After the Mandate was implemented, Defendants changed the policy and attempted to circumvent accommodation requirements by issuing blanket undue hardship denials, without individualized analysis, categorically excluding whole categories of religious belief as invalid, and aggressively denying beliefs as somehow "not religious in nature" or not valid or sincere without any good faith basis to do so.

**Formatted:** Footer

116. ~~Even if there had been a legitimate interest in limiting the number of exemptions given~~Regardless, the government ~~cannot lawfully winnow the number down by~~ is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

117. Commissioner Chokshi sent this letter to the DOE and to the arbitrators hearing the appeals. The same letter was then later sent to the Citywide Panel, which also relied on it, as evidenced by the denial of Sarah Buzaglo, who was denied by the Citywide Panel on the ground that her concerns about abortion conflicted with guidance from Commissioner Chokshi.

118. DOE representatives and arbitrators cited Commissioner Chokshi's letter as authority for denying accommodation to employees who had concerns about the use of aborted fetal cell lines in production or development of the vaccines, even in cases where they found the employee's religious objections sincere.

### B. Emails Showing High Level City Policy Makers Concocted and Coordinated the Promulgation of the Chokshi Letter

~~395.~~119. The emails disclosed in March, referenced in Paragraph 9, *supra*, show that Chokshi's letter was concocted by high level City policy makers and intentionally disseminated to advise and assist arbitrators in discriminating against ~~certain faiths or beliefs it disfavors~~sincerely held religious beliefs that included tainted blood or abortion concerns.

120. ~~But this is precisely what~~ Steven Banks, First Deputy Commissioner & General Counsel for the NYC Office of Labor Relations ("OLR") represented the Mayor and the City in all labor relations with unions.

121. Banks has expressed open disdain for religious objections to vaccination and actively worked to try to suppress accommodation.

122. On September 20, 2021, Banks wrote an email to a number of high-level policy makers at City Hall, and the DOHMH. Exhibit B – attached to show what was said not for the truth of the matter stated.

123. In Banks' September 20, 2021 email, he noted that 2/3 of appeals from the initial DOE blanket denials were religious, and many cited religious objections to abortion or certain animal products. He said "since many of these claims are going to labor arbitrators" for appeal "it would be very very helpful if we could get a document signed off on by a City Doctor that essentially makes the argument as to why this is BS."

124. In case there was any confusion about what this letter was to be used for, Banks asserted that the purpose would be to give the arbitrators something they could use to justify denying religious accommodation requests, which leads to a reasonable inference that the arbitration firm shared Banks' goal of denying accommodation requests and looking for ways to shield those decisions from later challenges.

125. Jackie Bray, the Deputy Executive Director of the City's NYC Covid-19 Test & Trace Corps, and a high-level policy maker at the time for the City's Covid Policy and interagency coordination agreed to try to pull together a letter by the next day.

126. Ms. Bray was promoted after this work for the City by Governor Kathy Hochul serve as Commissioner of the New York State Division of Homeland Security.

127. Prior to the promulgation of the mandates and religious discrimination at DOE, Kathy Hochul met with Mayor de Blasio to discuss her goal of coercing vaccination once Pfizer received approval by the FDA. The New York City mandate was coordinated with and referenced the New York State healthcare mandate which was later struck down as unconstitutional and arbitrary and capricious after the new York State Department of Health admitted that Covid-19 vaccines cannot

**Formatted:** Footer

stop transmission of Covid-19.

128. Ms. Bray found a North Dakota Department of Health handout claiming religious objections were invalid (which was, on its face, clearly unconstitutional for a government to weigh in on) and an unverified blog that was hostile to religion and falsely asserted that aborted fetal cell lines were also used to bring Tylenol and a host of other common over the counter medications to market so objectors could not be sincere. She conveyed that these would be great resources and they could use them to create something similar to provide to arbitrators from the City.

129. Bray stated "the MD's were also batting around the idea of making someone attest to rejecting all the medications on this list and look for proof that they have rejected all of these 'sincerely' for some time."

130. Bray asked Banks to send her some of the DOE employee religious accommodation letters so she could craft a response that would be tailored to deny them, stating "we clearly have very good material here (citing the blog) and we also want to give you the best product we can because this will absolutely be subject to litigation and will go far."

131. Banks then brought in other high level policy makers and administrators from the DOE, OLR, and City Hall, asking them for help to provide some examples of DOE employee applications objecting to fetal cell lines used in the development of Covid-19 vaccines with the unmistakable message that these were to be used as models for arguments to proactively categorically refute.

132. He admitted, "The first page of the North Dakota document is a little bit more neutral than I was thinking…We can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated." He meant by

**Formatted:** Footer

having the Commissioner state that it was religiously acceptable to get the vaccines regardless of the connection to abortion.

133. Banks also approved Bray's idea of creating a sincerity test that resulted in disqualification if an employee did not also state that they avoided Tylenol and other products listed in the blog, stating, "Yes, the list is good. Because to the extent that there are hearings in these cases, the employees can be asked about whether they use or have used those medications."

134. Banks noted that he was coordinating with the UFT teachers union on this plan to endorse denial of certain disfavored beliefs and promised to get them the document before the arbitration hearings started later that week.

135. Once a draft was created, Dave Chokshi and Jay Varma were cc'd. Bray stated – "Attached is a memo Annie drafted. Obviously need Dave [Chokshi], Jane and Jay [Varma] to review and then need to know from OLR if this works."

136. Jay Varma said the memo was "okay with me."

137. Bray noted that she added a line to the draft "about pork, beef and animal products" which she needed DOHMH to confirm. She suggested that DOHMH should sign off and send to OLR, stating "We are moving fast here on negotiations and hearings on exemptions so wanting to wrap this up today." She noted that OLR also had a draft circulating.

138. Nellie Afshar, then Chief of Staff at DOHMH said she had edits. She sent a draft to Dave Chokshi, asserting that it was okay "on our side" and asking if he had "any issues with this coming from you."

139. On September 21, 2021, Defendant Chokshi wrote that he had no issues with it coming from him. His primary question was "We had to remove the section about pork and animal products? Seemed they wanted it specifically." Ms. Ashfar agreed to add those back in and also

Formatted: Footer

said she went further by "adding a line about Tylenol, advil etc" even though she knew this list was not accurate. She said, "For awareness, we have not been able to verify the list of meds, I asked Jack if she could track it down with Jay."

140. Dave Chokshi thanked her with several exclamation points. Chokshi then signed off and the letter was sent to the arbitrators and DOE representatives despite the fact that the list was never verified.

141. Chokshi's letter was repeatedly cited for the line in the letter stating "the Pfizer and Moderna vaccines do not use any fetal cell lines for vaccine production." However, in the same letter, he buried the admission that all three vaccines did use aborted fetal cell lines to bring the products to market. Many arbitrators and decision-makers misunderstood the letter as saying that there was no connection.

142. As advised by Banks, the letter then takes the position that even if fetal cell lines were used, this is not a religious problem because an "array" of religious leaders advise taking the vaccine. Chokshi claimed the Catholic Church had clearly taken the position that Roman Catholics were able to take the vaccine without issue though this was not true. Even the facially unconstitutional North Dakota public health handout itself did not go that far, acknowledging that the Church advised that some Catholics would not be able to take it due to guidance from their religious conscience.

143. The letter also falsely stated that Tylenol and certain other over the counter medications used aborted fetal cells to bring their products to market in a similar way.

144. The statements about Tylenol and other drugs is false and as the emails show, was knowingly unverifiable at the time.

145. Neither Bray nor Varma nor Chokshi nor Afshar ever managed to verify the list.

69

**Formatted:** Footer

146. Assuming arguendo that there was any truth to Chokshi's assertion that Tylenol and other listed over the counter medications used aborted fetal cell lines the same way the Covid-19 vaccines did, it was not common knowledge that any alleged connection existed sufficient to put most religious people on notice to look into it. By contrast, it was widely discussed that the Covid-19 vaccines all made use of aborted fetal cell lines to bring the products to market.

147. In fact, Tylenol, Advil and other products on the list were not brought to market using aborted fetal cell lines and Chokshi and the others on the email participating in the drafting of the letter had no good-faith basis to assert they did.

148. Because of Chokshi's misinformation, and the City's use of it, thousands of employees at DOE and the City level were denied for failing to state that they avoided Tylenol as part of their religious practice.

### C.  Other City Instruction to Discriminate

149. Another significant fact not before the Second Circuit was that the City, acting through its attorneys, Banks and the OLR, the Law Department (supervised by Eichenholtz) and the Department of Citywide Administrative Services ("DCAS"), provided arbitrators and DOE representatives with instructions and articles supporting their official policy to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists, most Christians and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination or the viewpoint that religious opposition to Covid-19 vaccines was not real.

150. During the arbitrations, DOE representatives and arbitrators admitted that these articles from the City and/or the Chokshi letter were a reason why applicants of those faiths were being denied accommodation.

**Formatted:** Footer

151. For example, multiple Jewish applicants were told that they could not be accommodated, even though they had sincerely held religious beliefs, because Jews were not allowed to be accommodated under the governing policies. The adjudicators pointed to an article (sent to them by attorneys and agents for the City including DCAS) about a rabbi in Israel who was vaccinated. Even when applicants had a letter from their own rabbi and explained that Judaism is diverse and they are not bound by the views of a different random rabbi, they were told that they could not qualify because the "leader" of their faith as Defendants saw it, was the rabbi in Israel.

152. Hundreds of Christians, even non-denominational Christians, were told that they were per se ineligible because Pope Francis was vaccinated, even if the pastor of their own church submitted a letter explaining that their congregation was opposed to the Covid-19 vaccines.

153. An arbitrator told Jerrian Jaloza, a plaintiff in another matter, that her religious objections, especially to abortion, were unquestionably sincere, but the City's policies did not allow him to accommodate Catholics.

154. Similar categorical denials were issued to Muslims, based on the City's provision of an article about a so-called "leader" of the Muslim faith who was vaccinated, Buddhists, based on a similar article about the Dalai Lama (even though there are thousands of sects of Buddhism and the central tenet of Buddhism for any sect is that the religion is not hierarchical), and so forth.

### VI.     Mayoral Statements Confirming Discriminatory Intent

155. DOE and the City's widespread, acknowledged policies reflected ex-Mayor de Blasio's specific guidance and admission of how the City intended to handle the applications for religious accommodation.

156. Mayor de Blasio openly endorsed the Stricken Standards policies.

**Formatted:** Footer

157. For example, in a press briefing held on September 23, 2021, the night before the arbitration hearings began, ex-Mayor de Blasio was asked how the City would decide which DOE employees would be accommodated or not. He replied that the arbitration award "rules" were "very, very clear about what constituted the types of criteria for these exemptions." He acknowledged the City was involved in coming up with the Stricken Standards and further stated: "the ground rules were 100 percent set through an arbitration process that involved the city..." He then noted that he was "struck at how few people applied for these exemptions" after hearing about the criteria the City set as if that was a very good thing.

158. When the reporter followed up at the same September 23, 2021 press conference, asking if he could go into some of the criteria the City would use to determine who got religious exemptions at DOE, Mayor de Blasio said:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. ~~and DOE did.~~And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So**, we are saying** very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.

159. When the Second Circuit held in *Kane* that the record in that early case did not have enough facts to establish the City was involved in the DOE's accommodation process sufficient to find that the Mayor's comments were relevant on a preliminary injunction motion, the Second Circuit did not have before it the first part of the Mayor's statement to the press in which he stated: "the ground rules [Stricken Standards] were 100 percent set through an arbitration process that involved the city..."

**Formatted:** Footer

160. Nor did the Second Circuit know that the arbitration award, on its face, ordered the City as well as the DOE to adopt and implement a religious accommodation policy, meaning the City was jointly liable and responsible for what process was chosen and how it was implemented.

161. Nor did the Second Circuit have Commissioner Chokshi's letter, the emails from high level City and Mayoral office policymakers and the Commissioner who issued the mandate himself, articles provided by DCAS (Department of Citywide Administrative Services) encouraging the DOE and the arbitrators to categorically deny most religions, or the many other facts in this complaint that show City involvement and encouragement of the discriminatory policies originally in place at DOE.

162. Banks was the Mayor's liaison and primary representative in the arbitration negotiations and implementation of the DOE religious accommodation process. The Mayor made these statements the very day after Banks finished getting the Chokshi letter drafted.

163. As set forth in the individual and general fact sections of this complaint, the City was well-aware of the discrimination going on at DOE, it had a legal responsibility through the arbitration award to make sure it did not occur and correct it when it did, and instead of doing that it encouraged, directed and endorsed the discriminatory policies at DOE.

164. This presents a fresh record that requires a fresh determination of whether the mandates can be considered "neutral" on these facts and also whether the mayor's comments can truly be deemed "merely personal" rather than an endorsement and/or admission and/or instruction.

**VII.  Defendants Exercised Discretion to Accommodate Some Religions and Similarly Situated Individuals but Deny Others.**

165. The discretionary system resulted in unequal results.

**Formatted:** Footer

166. After the arbitration appeals, most applicants were provided denials with no further explanation than an "x" next to the word "denied."

167. At least 165 employees whose beliefs were deemed to fit within the discriminatory criteria, were accommodated and remained accommodated throughout the DOE Mandate.

168. The 165 employees accommodated under the Stricken Standards included classroom teachers as well as many others whose jobs typically involved in-person work with students as well as administrators who worked in and outside of buildings with students.

169. Defendants accommodated some teachers by providing them with co-teachers and then allowing them to teach virtually from home or one of the remote sites set up by DOE for that purpose while their co-teacher was present in the classroom with students. Others were provided with more administrative work or other shifts in job responsibility.

170. As one of many examples, an art teacher whose religious beliefs were deemed to qualify under the Stricken Standards was allowed to work from home and join her class by Google Classroom, while the DOE hired a new long-term substitute to be physically present in her classroom with the students so she could teach from afar. This art teacher was able to continue working throughout the entire mandate through this accommodation and was never terminated and thus still has her job today.

171. Special education teachers and certain other teachers typically already had co-teachers.

172. Special education students were also the first to return, most over a year before the mandate was implemented. It was common during the pandemic for the entire class of special education students and a co-teacher to be present in the building and the other co-teacher to be accommodated and allowed to teach break out groups and other subjects remotely.

**Formatted:** Footer

173. But Defendants did not bother to individually assess how much it would cost or provide any reason why special education, art or other teachers couldn't also be accommodated this way.

## VIII.   JUDICIAL RESPONSE AND SHAM REMEDIATION

### A.  The Second Circuit's Holdings in *Kane* Regarding DOE Employees

174. On November 28, 2021, on a far sparser record than here, the Second Circuit Court of Appeals held that DOE Plaintiffs were likely to succeed against the City and the DOE on free exercise claims. Specifically, the Court held that the religious accommodation policies used to implement the DOE Mandate were neither neutral nor generally applicable and that Defendants were unlikely to survive strict scrutiny, as they offered no compelling reason to engage in religious discrimination. *Kane,* 19 F4th at 167-169 (Kane I).

175. In the opinion and oral arguments, the Second Circuit particularly remonstrated Defendants for discriminating against personally held religious beliefs, conditioning access to accommodation on whether the belief was shared by so called leaders and second guessing an applicant's interpretation of what her own faith required of them.

176. Even the City's own defense attorneys, who worked under the direction of Defendant Eichenholtz, admitted in oral arguments that their religious accommodation policy was "constitutionally suspect."

177. In the Decision and Order, the Second Circuit "confirmed the suspicion" was accurate - and pointed out that Defendants had offered no excuse for the unconstitutional and discriminatory policy.

178. The Second Circuit held that all the *Kane* Plaintiffs, including Trinidad Smith, who had not applied under the Stricken Standards because she felt it was futile, were likely to succeed on their free exercise claims.

**Formatted:** Footer

179. After vacating the denial of preliminary injunctive relief, the Court ordered the City to provide "fresh consideration" of all the *Kane* Plaintiffs' requests for religious accommodation by a central citywide panel (the "Citywide Panel") which was to reinstate applicants with back pay if they qualified under lawful state and federal religious accommodation statutes (in accordance with the standards required by the First Amendment).

180. To avoid an order requiring broader relief, the City agreed to provide the same review to other DOE employees denied under the Stricken Standards.

**B.  PHASE III - Second Failure to Accommodate – Failure to Provide Remedial Review**

181. Despite the admission that their initial reviews were unconstitutional and the City's promise to step in and remediate, neither the City nor the DOE ever provided Plaintiff any remedial review.

182. The remedial reviews were handled by a newly created "Citywide Panel." At all times, the Citywide Panel was wholly under the control of the Mayor's office and was an arm of the City of New York.

183. The Citywide Panel was designed and overseen by Defendant Eichenholtz, who had by that time been promoted to Chief Assistant Corporation Counsel for Employment Policy and Litigation. As such, he was simultaneously responsible for defending the City from the *Kane* and other religious discrimination lawsuits and also for determining policy, both ~~in~~ for how the Citywide Panel "remedial" reviews would be conducted and which employees would get remediation.

~~396.~~184.    The City was jointly responsible for the original ~~denials and in the Citywide Panel appeals.~~discriminatory process. Faced with the claims of thousands of DOE employees who had

been denied under the Stricken Standards, a policy which the City (and upon information and belief Eichenholtz) had submitted or approved, these parties were not neutral "remedial" actors.

**Formatted:** Font: 12 pt

*Defendants extended the Mandates – and the unlawful Stricken Standards*

397. Continued animus can also be evidenced through the City's failure to rescind or repudiate the original Stricken Standards.

398. After imposing the DOE Mandate, the City issued hundreds of additional "emergency" executive orders, extending the vaccine mandates to nearly every employee in New York City.

399. Tellingly, even after the City's own attorneys admitted in the *Kane* case that the Stricken Standards policy was likely unconstitutional (and the Second Circuit confirmed they were definitely unconstitutional), the City failed to repudiate them.

400. Instead, the City *extended the use of the Stricken Standards to more agencies* – striking deals and encouraging nearly every City agency to offer the Stricken Standards as one of two options for employees to apply for accommodation.

401. The City's failure to repudiate the Stricken Standards is yet more evidence of animus, which infects both the mandates and the religious accommodation determinations thereunder.

402. This issue was not before the Second Circuit in November 2021, when the Court of Appeals first considered whether the Mandate was itself neutral and generally applicable on interlocutory appeal.

185. Eichenholtz had a motivation to try to mitigate the damage to his client by upholding as many denials as possible in the "fresh review" process. The case was, after all, as the City refers to it still "sub-judice" and the outcome could have massive financial consequences to the City and

**Formatted:** Footer

potentially employment consequences to Eichenholtz and others that gave the City unconstitutional advice or helped craft the unconstitutional policies.

186. Though the City promised to remediate the harm from the Stricken Standards, under Eichenholtz's direction the Citywide Panel only reviewed about 500 out of the 5,000-7,000 DOE employees who'd been denied accommodation under Stricken Standards.

187. Eichenholtz, who had decision-making authority over the Panel's policies and approach, knew that thousands more DOE employees, like Plaintiff, were denied religious accommodation under the Stricken Standards and required remediation. He and the City exercised discretion *not* to review Plaintiff and the thousands of others who were denied under the original Stricken Standards.

188. First, the Citywide Panel adopted a policy under Eichenholtz of not remediating denials unless an employee had appealed under the original facially discriminatory policy - even though the Second Circuit had already found that Plaintiffs who did not apply for appeal, like Trinidad Smith, were still likely to succeed – and even though the facially discriminatory policy was admittedly unconstitutional and no other process had been offered.

189. Second, the Citywide Panel failed to issue decisions to most of the Plaintiffs who did try to appeal under the facially unconstitutional process and who the Citywide Panel was supposed to be reviewing but did not.

190. Plaintiff here also took the extra step of sending notices of claim to the City, Commissioner Chokshi, the Chancellor of Education, the Law Department and all major decision makers at the DOE and City level on or about November 30, 2021, explaining that they required religious accommodation, had been unlawfully denied under the Stricken Standards, and

**Formatted:** Footer

required a Citywide Panel review to remedy the harms that were done to their statutory and constitutional rights.

191. Nonetheless, the ~~Second Circuit still ruled that the religious accommodation policies were~~ Citywide Panel never engaged in a Citywide Panel review or issued either Plaintiffs a decision prior to their terminations.

**C. Defendants' Animus Further Shown by City's Failure to Renounce Prior Standards**

~~403.~~192. Plaintiff did not receive a remedial Citywide Panel review and should therefore be entitled to strict scrutiny as the Second Circuit already held that the process Plaintiff was judged under and which was the only option made available to them was not neutral or generally applicable.

193. ~~Perhaps~~However, the ~~most telling sign~~evidence that has emerged from discovery in other cases about the Citywide Panel reviews shows further evidence that taints all levels of review.

194. Out of about five hundred applicants the Citywide Panel claims to have reviewed, Eichenholtz admitted in depositions that the Citywide Panel only reversed and reinstated one DOE employee -- *Kane* plaintiff William Castro.

195. Upon information and belief, one other employee was also reinstated after the Citywide Panel process began. She was a classroom teacher who was allowed to go back and teach in person while the mandate was still in effect.

196. Mr. Castro's job involved work in school buildings with students. His office was in a school building. Yet, the Citywide Panel did not claim "undue hardship" for Castro but reinstated him with back pay and allowed him to be accommodated for the remainder of the Mandate, and he is still employed today as a result.

197. Notably, Castro clarified in his materials to the Citywide Panel that he did NOT rest his religious objection on the aborted fetal cell line issue, which likely helped him as he had mentioned the abortion issue as one of his reasons for religious objection below.

198. Emails between Eichenholtz and Citywide Panel reviewers reveal that Eichenholtz had instructed the Citywide Panel that religious objections to abortion were not eligible and personally held religious beliefs were not eligible.

199. All DOE employees other than Castro received an autogenerated denial stating "does not meet criteria" without further explanation.

200. However, internal notes and emailed explanations sent to the *Kane* Plaintiffs show that the Citywide Panel continued ~~animus occurred in the context of~~ to apply many of the same discriminatory criteria.

**Formatted:** Font: 12 pt

201. In NYFRL, the Second Circuit reinstated the First Amendment claims of *Kane* plaintiff Heather Clark, who was denied by the Citywide Panel because her concerns about abortion and guidance from prayer were deemed sincere but ineligible under the Citywide Panel's policies. The Second Circuit held that such reasoning violates the First Amendment.

202. Discovery has revealed that the discrimination that Heather Clark faced was not unique. The Citywide Panel continued, as instructed by Eichenholtz, to reject so called "personally held" religious beliefs, including those, like Clark's, that are derived from guidance from prayer, and continued to reject applicants with religious objections to the use of aborted fetal cells, stating in internal notation that such beliefs, while sincere, do not qualify.

203. Defendant Chokshi also failed to repudiate his prior advice after the Second Circuit held that the original policies were unlawful. His standing instructions, which were to deny religious

**Formatted:** Footer

objections to abortion because the Pope and other leaders seemed okay with the connection, were relied upon and cited by the Citywide Panelists as well as the arbitrators.

204. Not only did the City and Eichenholtz fail to repudiate most of the discriminatory criteria in the Stricken Standards, but after the Second Circuit held they were unconstitutional in *Kane*, the City started offering the Stricken Standards as an option in nearly every City department.

205. So, at most City Departments, not just DOE, a two tiered system was adopted: those that met the discriminatory criteria were entitled to accommodation under a process that allowed for accommodation without regard to undue hardship, but was facially discriminatory, whereas those that did not qualify under the discriminatory criteria had to go before the Citywide Panel, which applied a more difficult undue hardship standard.

206. Under the Stricken Standards, the criteria limited who could be accommodated. But, if an employee was lucky enough to meet the discriminatory criteria, the award stated that they "shall" be allowed to remain on the payroll.

207. Thus at least 165 employees whose beliefs qualified, were accommodated and allowed to remain on payroll regardless of whether they were classroom teachers, worked in buildings with students or held any other type of position.

208. The Citywide Panel, on the other hand, allowed DOE to categorically deny those who otherwise qualified under statutory standards based on a blanket assumption that any accommodation of teachers (even those who were already remote or who had co-teachers who could handle the classroom component) was somehow enough of an effort to exceed the unlawful "de minimis" standard that the City unlawfully applied.

209. Various Plaintiffs in the various lawsuits repeatedly alerted Eichenholtz and the City that the "de minimis" standard was not lawful, and they had to justify the denials under the

Formatted: Footer

individualized "significant" hardship or expense standard required by the NYSHRL and NYCHRL. The City ignored these warnings, which started as early as September 2021.

210. Eichenholtz was directing the religious accommodation policies and continued to apply only the "de minimis" standard throughout 2021-2023, knowing it was not the legal standard and violated employees' rights.

211. Rather than discipline him or reign him in, the City continued to champion Eichenholtz's approach, promoting him from the Division Chief for Labor and Employment, to Executive Staff as Chief Assistant Corporation Counsel for Employment Policy and Litigation in late 2021, and finally to Managing Attorney of the entire New York City Law Department, where he is in charge of this litigation and all other litigation, overseeing the entire 850+ attorneys at the Law Department.

212. Defendant Eichenholtz was thus the final policymaker for the religious accommodation process instituted at DOE and by the City as its remediation throughout all relevant periods.

213. He also controls the litigation strategy because as Managing Attorney, he is ultimately in charge of it.

214. The City's litigation approach reveals that they continue to argue for much of the criteria from the Stricken Standards without consequence. As recently as 2025, Defendant Eichenholtz still allowed Law Department attorneys to submit briefs and other pleadings to federal courts which assert that Christians and Catholics should have their cases dismissed because Pope Francis is vaccinated and thus they are presumptively ineligible since the leader of their faith disagrees.

404.215. These same arguments were submitted by the Law Department throughout the unemployment process to deny Plaintiff and others any possibility of receiving unemployment insurance proceedings.

## IX. THE "UNDUE HARDSHIP" RATIONAL WAS PRETEXTUAL AND UNSUPPORTED

### A. Similarly Situated Employees Were Accommodated Without Regard to Undue Hardship

216. A major problem with maintaining the dual track (one for those who qualify under the discriminatory Stricken Standards and the Citywide Panel process for those who don't) is that the undue hardship burden is far heavier under the Citywide Panel approach.

217. As an alternative basis for denial, the City asserted in NYFRL that it would have denied all the *Kane* Plaintiffs anyway because it was an undue hardship to accommodate employees who worked in buildings with students. This reasoning was pretextual as set forth below.

218. The Citywide Panel denials did not explain why 165 or more DOE employees who had been accommodated under the Stricken Standards, some of them classroom teachers, and most of whom worked in buildings with students, were accommodated and could continue to be accommodated while teachers with disfavored beliefs who had to go through remedial Citywide Panel review could not be. Operating from much earlier complaints, before anything was known about the Citywide Panel or its processes and outcomes, the Second Circuit did not know or consider that this two-tiered system had been created.

219. Nor did the Second Circuit review the fact that the City later admitted in depositions that the Citywide Panel never actually assessed undue hardship for DOE employees, but rather, allowed DOE to make this determination without any support, analysis or cooperative dialogue on the assumption that any hardship must be "more than a minimal burden."

220. Defendant Eichenholtz admitted in sworn testimony that the Citywide Panel was fully aware that at least 165 similarly situated DOE employees remained accommodated under the discriminatory "Stricken Standards." Crucially, he failed to proffer any non-discriminatory

justification for why the DOE could sustain the burden of accommodating those 165 favored employees while claiming that accommodating Plaintiff—who work in the same roles—constituted an "undue hardship."

221. Defendants' only defense—that the initial grant of 165 exemptions exhausted the DOE's capacity—is a confession of liability, not a defense. There was no quota and it is well-established that the government cannot rely on the "fruits" of its own discrimination to justify further denials. Just as an employer could not justify refusing to hire Black applicants by arguing that all available positions were already filled by White applicants pursuant to a discriminatory hiring policy in effect before court intervention, Defendants cannot claim "undue hardship" simply because they filled their available accommodation capacity with members of preferred faiths and did not want to extend the same offer to any more employees when ordered to remediate the harm.

222. By allowing this capricious double standard, the City and DOE created a two-tiered system that only further entrenched the discrimination that they promised the Second Circuit they'd remediate.

223. 165 of those who were found to qualify under the discriminatory criteria were accommodated without regard to any alleged undue hardship. Those who appealed to the Citywide Panel were issued blanket undue hardship denials even if they already worked remotely or outside of classrooms and could easily be accommodated in person or remotely.

224. When offered as a 30(b)(6) witness, Mr. Eichenholtz admitted that neither the City nor the DOE assessed any economic factors or data to determine what it would cost in the overall budget to accommodate any employee either in the original DOE denials or at the Citywide Panel appeal level.

**Formatted:** Footer

225. He also admitted that the City and DOE did not assess any statutory factors on safety or any objective science before issuing undue hardship denials at any level of review.

226. He claimed that the Citywide Panel relied on DOE to just tell them if there was an undue hardship, and no details or data was required by the Citywide Panel to assess if this was reasonable.

**B. Safety Rational Was Unsupported**

227. Eichenholtz also admitted that nothing in the DOE Mandate or the Municipal Mandate precluded in person or remote accommodation and at least one DOE classroom teacher was allowed to go back into the classroom and teach in person unvaccinated while the DOE Mandate was in effect. He offered no reason the same could not have been allowed for other DOE employees.

228. To the extent that Defendants argue that they had to deny Plaintiff based on "undue hardship" related to safety that is pretextual. It was well-understood before they were terminated in 2022 that multiple safe routes of accommodation were available.

229. By the summer and fall of 2021, prior to when Defendant Chokshi began issuing vaccine mandates, the City had already seen a substantial reduction in Covid-19 related hospitalizations and deaths compared to earlier in the pandemic. For instance, in its' own executive orders, on June 2, 2021, the City reported zero new Covid-19 deaths and a test positivity rate of 0.83%, the lowest since testing began.

230. By August 2021, even with the Delta variant surpassing prior variants, hospitalizations did not surge. A December 2021 statement from NYC Health Commissioner Dr. Dave Chokshi stated that while cases and test positivity had increased, "we have not seen the same thing with respect to the markers of severe disease, particularly hospitalizations."

**Formatted:** Footer

231. When Defendant Chokshi announced the Mandate shortly after that statement in August 2021, it was clear from the scientific data available that vaccination could not meaningfully stop transmission or community spread. *See, e.g.,* Exhibit D, Declaration of Dr. Risch, Yale, incorporated by reference herein.

232. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were at least equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with Covid-19 vaccines; (3) vaccine protection wanes significantly after a short period of time.

233. On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."

234. After the Mandate was announced, but before Plaintiff was suspended without pay for failing to get vaccinated in violation of their sincerely held religious beliefs, two of the nation's top public health experts wrote sworn declarations that were submitted by the *Kane* Plaintiff to all the Defendants. These Declarations were submitted by Dr. Jay Bhattacharya, then at Standford and now head of the Centers for Disease Control and Prevention ("CDC") (incorporated herein by reference and attached as Exhibit C) and Dr. Marty Makary, then at Johns Hopkins and now Commissioner of the Food and Drug Administration ("FDA) (incorporated herein by reference and attached as Exhibit E).

235. The Declarations of Drs. Bhattacharya and Makary, citing the most up to date data and representing the best available objective science available at the time, explained to Defendants why they could safely allow DOE employees, including Plaintiff, to keep working in person unvaccinated. They offered many alternatives to exclusion, including weekly testing, rapid tests, daily symptom checks, social distancing and other measures, and stressed that natural immunity was repeatedly shown to be far superior and more durable than the immunity conferred by the primary vaccine series.

236. Defendant Chokshi ignored these submissions and refused to issue any updated advice to the City or DOE.

237. Defendant Varma - who was widely referred to at the time as the Mayor's "COVID Czar" – later admitted he *knew* that the vaccines were not necessary.

238. Notwithstanding his role throughout 2021 as the City's principal public health spokesperson and lead architect of the vaccine mandate, Varma admitted on video recording that while he was "running the entire COVID response for the city," he personally attended large underground dance parties and sex parties with sometimes hundreds of participants, many of them unvaccinated, during the period the mandates were promulgated and in effect.

239. Varma asserts he was the one who directed Chokshi to issue the mandates.

240. This is consistent with how the Chokshi letter was issued – where Varma was asked to give final approval and Chokshi appeared to be taking directions.

241. Varma further admitted on video that the vaccine mandates were a policy of "harassment" designed to make life difficult for those who objected, and that natural immunity and testing were as effective or more effective than the mandates — facts he was aware of while simultaneously

Formatted: Footer

advancing the mandates and approving guidance designed to categorically deny religious accommodation requests.

242. The DOE, the City and Eichenholtz also ignored these submissions and the objective scientific consensus available at the time and continued to advise DOE to deny accommodation to those whose religious beliefs did not fit the discriminatory criteria.

243. As a 30(b)(6) witness, Eichenholtz admitted that neither the City nor the DOE *ever* assessed a single study or any data to determine if they could (or could not) safely accommodate employees in person or remotely even though the Mandate allowed for either and did not possess or review any data to refute the Declarations of Dr. Makary and Dr. Bhattacharya.

244. All other school districts in the state allowed teachers to test weekly in lieu of vaccination if they wanted to work in person with students. This included neighboring Long Island and other school districts with overlapping populations and similar safety profiles.

245. DOE was on notice that their policies were substantially underinclusive. By January of 2022, before Plaintiff was terminated, it was undeniable that the Covid-19 vaccine was not stopping transmission. DOE had a daily tracker noting how many active employees had Covid-19 on any given day. Prior to the exclusion of all unvaccinated DOE employees, the numbers averaged around 40 or 50 infected teachers at any one time. After DOE employees were excluded, the numbers did not decrease but rather increased among the fully vaccinated staff. By January 2022, the fully vaccinated staff had some days where there were thousands of infected teachers on a given day. Defendants were well aware that vaccination was not stopping teachers from getting infected and passing Covid-19 on to others.

246. In or around January 2022, due to the staffing crisis caused by the exclusion of Plaintiff and other religious objectors, DOE exercised its discretion by asking *actively infected* teachers to return

**Formatted:** Footer

to classrooms but still refused to allow employees with religious objections to the vaccine to return to work even though they had natural immunity and were not infected. Allowing actively infected teachers to teach the largely unvaccinated student body undermines the government's interest in stopping the spread of Covid-19 to a far greater degree than allowing uninfected teachers with religious objections to teach in person unvaccinated.

247. Moreover, under the Defendants' policies, over one million students were allowed to go to school unvaccinated every day. Even if the Covid-19 vaccine mandate could have created herd immunity (which it could not, since it did not stop infection and transmission), only mandating staff and teachers could not create herd immunity when one million students were allowed to come into the classroom unvaccinated.

248. According to Anthony Fauci, who was largely directing Covid-19 policy at the time, between 70-90% of a given population (depending on what he thought the population would accept as the number) needed to be vaccinated to create herd immunity. The DOE mandate only covered less than 10% of the school building population.

249. Moreover, not only were 90% of the population (students) largely unvaccinated, but they rode to school each day with bus drivers who had no mandate whatsoever, and could freely transmit Covid-19 to them in enclosed busses on the way in.

250. Even if Defendants were able to show that they could not safely allow uninfected teachers with natural immunity in classrooms while their actively infected colleagues taught students in person, and over a million students were unvaccinated and driven to school by unvaccinated bus drivers, there were many accommodations short of termination available including but not limited to those suggested by Drs. Makary and Bhattacharya in the declarations that were provided to Defendants.

**Formatted:** Footer

251. In person learning had not just started in the fall of 2021, as Defendants now try to assert, but rather had been in effect since the fall of 2020. Many teachers had been working in person with students for a year and a half when they were terminated for undue hardship. They could have remained teaching in person and continued weekly testing, submitted daily symptom checks or the host of other accommodations suggested by the Declarations.

252. Or they could have worked remotely. Contrary to DOE's assertions, throughout the 2021-2022 school year, the DOE continued to offer remote education as an option to some students and was actively recruiting fully remote teachers throughout the school year rather than reassigning qualified teachers like Plaintiff who needed religious accommodation to do these jobs.

253. Remote work centers were set up after the arbitration award was issued, which were supposed to house any employees whose religious beliefs merited protection. However, these centers sat well-below capacity for the entirety of the mandate.

254. And, prior to the Mandate, employees had been liberally granted leave to work remotely, particularly special education employees who had co-teachers, and could also be reassigned to handle administrative tasks like writing and overseeing IEP implementation.

255. Importantly, the Mandates were always "emergency" and "temporary" in nature, and the state of emergency had to be reviewed and renewed every thirty days to justify their existence. There was no reason the same temporary accommodations could not have been granted after the vaccine mandate was in place.

256. At the very least, Defendants could have provided paid leave until employees could return, or allow employees who were on unpaid leave to pursue work outside of DOE until they could safely return, and return with seniority and tenure intact without signing a waiver of their right to challenge their denials of accommodation.

**Formatted:** Footer

**X.** **THE CITY ENCOURAGED RELIGIOUS DISCRIMINATION DESPITE MOUNTING EVIDENCE AGAINST MANDATES AND UNFETTERED DISCRETION.**

257. At all relevant times, Defendant Chokshi and the Mayor had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates or repeal them altogether. Yet despite mounting evidence that the Mandates were unnecessary, and knowledge that Plaintiff and thousands of others needed religious accommodation, they did not amend their temporary "emergency" policies to provide relief.

258. Instead, Defendant Chokshi and Mayor de Blasio exercised their discretion to continue to renew the "emergency" mandate every 30 days well beyond when there was any rational justification for it.

259. On March 7, 2022, Mayor Adams and Commissioner Chokshi held a press conference, each noting how low the transmission rate was in the City. Commissioner Chokshi said: "According to our data, we are currently at a low alert level" and Mayor Adams clarified the City was experiencing historically low infection rates. The Mayor stated "I'm glad to say that the rates are low enough that the mandatory program is no longer needed." On this basis, he removed a "Key to NYC" Mandate that had required patrons to show they were vaccinated at restaurants and certain other facilities. He also stated: "As of this week, the schools' positivity rate is 0.18 percent. So I'm announcing today that we are lifting the indoor mask requirements for DOE schools between K-12 starting Monday, March 7." Defendant Chokshi and the Mayor refused to resume the weekly testing option for the DOE Mandate, despite this progress.

260. The Mayor also announced in March 2022 that he intended to lift all restrictions over parades, festivals and parties, stating: "We have become so boring as a city. I want all my parades back. Every one of them. It is time for us to enjoy our city again. All of these noes, noes, noes

91

[sic]. We've become a city of noes. I want to become a city of excitement. We're going to look to reinstate every parade, every festival, every block party…So if you received a no that we're not doing a parade, I need to find out why."

261. When asked by a reporter to explain how it was fair that "an unvaccinated tourist from Indiana" could go to whatever restaurant they wanted starting Monday, but an unvaccinated teacher, firefighter or EMS worker who lost their job could not, Mayor Adams did not state any public health reason, but instead said "you know, this went to court, this was the rule. How we determined fair and unfairness is in the court of law." With that, the City washed its' hands of any attempt to accommodate DOE employees unless mandated to do so.

262. When asked at a March 2022 press conference if he would repeal the employee mandates and reinstate those who were denied religious accommodation and lost their jobs now that the emergency was over, Mayor Adams again admitted the reason was not about public health, but rather animus to those who refused to comply:

> "The overwhelming number of New Yorkers, city employees did the right thing – the overwhelming number. It sends the wrong message to those New Yorkers who stated, even if i was reluctant, I'm going to follow the rules. That is what we are doing. We can't send the wrong message that when we say something, we're going to change and vacillate. That is what was stated people understood, particularly those who took the job with that understanding, we are people who took the job with the understanding and refused to comply. And so the information was clear. People have to follow the rules." https://www.nyc.gov/office-of-themayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covidmandates (last accessed June 20, 2025).

405. Neither DOE nor the Months after the Second Circuit chastised Defendants for denying applicants because the Pope was vaccinated and made it very clear that such criteria were blatantly unconstitutional, the DOE continued to argue in appeal after appeal, that former employees denied religious accommodation must be denied benefits too, because the Pope was

vaccinated and therefore their religious beliefs did not merit protection.

***The Mandates were not generally applicable***

406. As more executive orders were issued, it also became apparent that the Mayor exercised unfettered discretion to make carve-outs, exceptions, or new requirements for secular reasons, or for any reason at all.

263. For example, Mayor Adams issued Emergency Executive Order 62 ("EEO 62") on City revisited any of the pending denials based on the low rates of Covid in schools in March 2022.

407.264. On March 24, 2022, making a carve-out for Mayor Adams issued "Executive Order No. 62" (EEO 62) [ECF No. 60-2]. It amended the employee mandates with blanket exemptions for professional athletes, entertainers, and performers and other artists along with their make-up artists and entourages.

408. On its face, EEO 62 states that the exception was made due to economic reasons, and other reasons not related to stopping the spread of Covid-19.

409. Some of Mayor Adams' top donors had lobbied for this carve-out.

410. Mayor Adams announced the controversial carveout at Citi field, the home of the New York Mets.

411. New York Mets owner Steve Cohen had donated at least 1.5 million dollars to a political action committee supporting Mayor Adams just months before.

412. Other top donors to the Mayor in the entertainment industry also benefited from the carve-outs.

413. Due to the carve-outs, stars like Kyrie Irving and various entertainers and their make-up artists and entourages could return to work unvaccinated, working in person in enclosed spaces in close proximity to fans and colleagues, but the janitors and minimum wage workers at

the fields or theaters, along with most other hard-working people in New York City, were being denied religious accommodation and losing their jobs if they could not take the vaccine.

414. Significant outcry accompanied the carve outs.

415. Harry Nespoli, chair of the Municipal Labor Committee ("MLC") said "There can't be one system for the elite and another for the elite and another for the essential workers of our city."

265. Not surprisingly, this favoritism also worried Jay Varma, a physician, epidemiologist, and senior advisor to Mayor Bill de Blasio for public health and COVID 19, who publicly expressed the concernEEO 62 was entirely justified on economic rather than public health goals. The order states that these workers benefit the "City's economic recovery from the pandemic, often attracting large numbers of visitors to the City." He stated that it put athletic teams at a competitive disadvantage to bar unvaccinated players which in turn hurt the City's morale as well as economy.

266. But despite similar crushing and well-documented teacher shortages directly attributed to the Mandate, the City would not make any similar carve outs for teachers.

416.267. Defendant Varma, no longer employed by the City, admitted to the press that he was concerned that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

268. Furthermore, Mayor Adams knowingly allowed various City agencies to let thousands of unvaccinated employees work in person due to staffing shortages, administrative backlog, and mutual aid agreements until the Mandates were repealed in 2023, while their similarly situated colleagues were being denied religious accommodation and fired without any explanation of why they were possibly more dangerous than those allowed to keep working in person. For example,

the City allowed two lifeguards, who gave mouth-to-mouth resuscitation, to work in person unvaccinated while Plaintiff, and even remote DOE employees were denied any accommodation.

417. In *DePaola v. City of New York,* Index No. 85265/2022 (Sup. Ct. The City was well-aware by March 2022 that there was no public health necessity for the Mandates.

418. The majority of its fully vaccinated staff had by that time caught Covid-19 despite the Mandate.

419. During the 2021-2022 school year, approximately sixty thousand fully vaccinated DOE employees caught Covid-19 *after the mandate was imposed* to exclude unvaccinated staff.

420. Many more had already had Covid-19 before the mandate was imposed.

421. But the City refused to drop the rest of the mandates or accommodate employees who could not be vaccinated due to their religious beliefs in good faith.

269. OnRichmond County), which is a related litigation on behalf of a New York City municipal worker who was denied religious accommodation in November 2022, but was granted medical accommodation in May 2022, NYPD submitted a sworn affirmation from Don Nguyen, the Assistant Commissioner of the Equal Employment Opportunity ("EEO") Office admitting that by May of 2022, Covid-19 vases and deaths were extremely low, and there was no safety issue preventing accommodation (for medical or religious reasons) in person with weekly testing so the City did not feel that there was a safety issue in accommodating employees.

422.270. In August 11, 2022, after over a year of verbal acknowledgments that the vaccine could not stop transmission2022, the CDC officially revised itsissued written guidance to stressstating that itwasworkplaces should not appropriate to differentiateddifferentiate between vaccinated and unvaccinated due toemployees, and that receipt of the overwhelming scientific consensus that Covid

95

19 vaccines cannot stopprimary series (all that was required by any of the Mandates) "provides minimal protection against infection and transmission.."

423. Instead of accommodating or reinstating employees who'd been denied religious accommodation, DOE sent out a letter later that August 2022, making a fresh offer to DOE employees who'd been terminated or were on leave due to their vaccine status that they could come back and be reinstated to their old positions—but only if they got vaccinated by September 2022.

424. Many employees, including Plaintiff, asked for religious accommodation again, but they were all denied.

425. Some were able to submit applications through SOLAS, but they received the same vague "undue hardship" denial they'd received before or no response at all.

426. Others sent in email requests, or mailings asking that they be able to be reinstated as offered but accommodated so that they did not have to violate their religious beliefs.

427. They were ignored and denied reinstatement.

428. Defendants also knew, when it sent the letter to each of those employees who'd been previously denied religious accommodation, that the applicants required religious accommodation.

429. They were obligated, therefore, to offer them an accommodation unless they could prove undue hardship.

430. There was absolutely no good faith basis to even argue undue hardship at that point, leave aside prove it.

431. In September 2022, religious employees denied accommodation who were still on leave were all terminated for failing to violate their faith and get vaccinated.

432. On September 20, 2022, ~~Mayor Adams~~the City announced ~~in a press conference that he would repeal~~ the private sector ~~vaccine mandates, and the mandate for students and parents participating in after-school activities but would keep in place the public sector mandates and the DOE mandate for employees.~~

433. ~~When asked how he could justify keeping the public sector mandates, the Mayor admitted that there was no reason, stating: "I don't think anything dealing with COVID is [sic] makes sense and there's no logical pathway of one can do [sic]."~~

434. ~~Without any logical explanation why, the City kept the DOE Mandate in place until February 2023, when the *Kane* plaintiffs were scheduled to argue their appeals over the unlawful DOE policies before the Second Circuit.~~

435. ~~On the eve of those arguments, the City announced it would finally repeal the rest of the mandates, and argued to the Court that this should moot the lawsuits.~~

436. ~~But despite the repeal, DOE refuses to hire back most of the fired unvaccinated workers to this day.~~

***~~Retaliation~~***

437. ~~Not only did Defendants fail to accommodate employees' sincerely held religious beliefs, they also harassed and retaliated against employees with religious objections to the vaccine.~~

438. ~~As a threshold matter, there was no basis to impose some of the draconian requirements that DOE imposed on employees denied religious accommodation due to alleged "undue hardship."~~

439. ~~For example, employees were coerced to sign a waiver of their right to challenge the determination or face termination "for cause" and lose their good standing, paid time off~~

**Formatted:** Footer

credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay.

440. These benefits belonged to the Plaintiff and her colleagues pursuant to the relevant contracts.

441. Moreover, finding employees guilty of misconduct for failing to violate their religious beliefs was retaliatory.

442. Nothing in the Contract requires vaccination as a condition of employment.

443. Vaccination was not a condition of employment when Plaintiff or other tenured teachers entered into their contracts with the DOE.

444. Pursuant to the contract, tenured teachers cannot face any of these consequences, including loss of salary, without a 3020a hearing, which was not provided.

445. Moreover, the Education Law prohibits imposition of a waiver for any DOE employee under such conditions.

446. Defendants also could easily have at least allowed employees with sincere religious beliefs to work elsewhere while they were kept on leave without pay, or to return to their former positions once the mandate was lifted.

447. Instead, they imposed a condition that they could not work anywhere while suspended from DOE.

448. Then, DOE attached problem codes to the employee files of those who were separated for failing to get vaccinated.

449. The problem codes were associated with employee's finger print records, which are shared with the Federal Bureau of Investigation.

450. These problem codes were also visible to vendors and potential employers outside

98

of the DOE system.

451. The problem codes continue to this day to prevent many employees fired for failing to violate their religious beliefs from getting a job at DOE or elsewhere.

452.271. Even after the DOE mandate would be repealed the vaccine mandate for DOE employees, DOE continues to use these problem codes and other methods to block those who were terminated for failing to get vaccinated in violation of their religious beliefs from coming back.

272. For those When asked at that are offered employment, time why the Municipal and DOE continuesmandates would not also be repealed despite CDC guidance to impose an arbitrary waiver requirement on some, treat all workers the same, Mayor Adams told the press, "I don't think anything in general with COVID makes sense and there's no logical pathway one can do." [sic].

273. Shortly thereafter, the Mayor admitted the City had never enforced the private sector Mandate for most (but not all) employers.

274. The Municipal and DOE Mandates were not repealed until February 2023, and then, only in an open attempt to moot the request for preliminary injunctive relief before the Second Circuit in NYFRL.

## XI. FALL 2022 OFFER OF REINSTATEMENT AND THIRD FAILURE TO ACCOMMODATE.

453.275. In August 2022, around the same time that the CDC issued written guidance stressing that vaccinated and unvaccinated employees aspresented a conditioncomparable risk of returnspread, DOE sent letters to Plaintiff and other terminated or suspended unvaccinated employees, offering them their same jobs back with no break in service if they would simply get vaccinated by September 5, 2022.

454. DOE told UFT that *all* employees would need to sign a waiver of their right to sue

to come back, deterring many from trying.

455. In practice DOE imposes this waiver requirement selectively, forcing some to sign as a condition of return but neglecting to even mention it for others.

456. Second, DOE refuses to reinstate Plaintiff or her similarly situated peers, instead requiring that these mostly tenured teachers and educators apply as new hires.

457. Third, DOE continues to use the problem code to thwart efforts for those denied religious accommodation to return even as a new hire.

458. For example, there is a staffing crisis at DOE.

459. In related litigation, employees with spotless employment records have submitted sworn statements that they had interviews and were offered a job, but then their job offer was rescinded after problems with their "security clearance" were reported.

460. Some employees were told point blank that the security clearance issue is that they have a problem code attached to their file.

461. Some have seen the problem code.

462. These problem codes are typically imposed on employees who are not hirable due to heinous offenses, like child abuse.

463. DOE has long been aware of this issue, as it has been repeatedly brought up in EEOC complaints and related litigation but refuses to address it.

464. There is currently a Congressional Investigation into the problem code issue, and members of the United States Congress have demanded answers from the City and DOE.

465. Neither Defendant has bothered to answer these inquiries even though they are required to do so.

466. There have also been hearings by the City Council, and many employees from

**Formatted:** Footer

DOE and the City have testified about the ongoing retaliation and discrimination they face.

467. Fourth, DOE has attempted to block all efforts at receiving unemployment compensation.

468. For example, when employees would apply, DOE would routinely object and state that they were fired for misconduct or were ineligible for a "good cause" determination because the Pope or others did not agree with the employee's religious choice.

469. DOE routinely made these discriminatory arguments even after the Second Circuit chastised them for conditioning access to accommodation on the beliefs of a religious leader like the Pope.

276. In August and September 2022, Defendants were fully aware that Plaintiff needed religious accommodation to return to work under the new offer but despite all the evidence and guidance explaining that there was no safety barrier, DOE, acting under the direction of Eichenholtz and other City policymakers, did not grant any religious accommodation to Plaintiff.

277. Most DOE employees who were denied religious accommodation and fired are still barred from returning to work due to coercive and retaliatory problem codes attached to their files, hostility and refusal to rehire, or the imposition of coercive "waivers" that they are required which would waive their right to seek redress for religious discrimination or back pay.

**XII. SUMMARY OF MUNICIPAL LIABILITY UNDER MONELL (42 U.S.C. § 1983)**

278. Plaintiff incorporates by reference all paragraphs in this section as if fully set forth herein.

279. As the complaint details, the constitutional deprivations described in this Complaint were not the result of isolated incidents or rogue employees, but were caused by official municipal policies, customs, or practices of the City and the DOE and their high level policy makers.

**Formatted:** Footer

280. Specifically, without limiting other facts referenced or which are permissibly inferenced in this complaint, the municipal Defendants are liable based on the following few examples out of many set forth here in and many more to be developed through discovery and trial:

- Express Policy (The Stricken Standards): the Impasse Order provided DOE and the City were jointly ordered to provide an accommodation process for DOE employees and to choose which policy to use to administer it. They are each liable for choosing to use and enforce the facially discriminatory "Stricken Standards" which facially discriminate amongst religions and religious beliefs. This is direct evidence of discrimination.

- Direct evidence claim: widespread statements by DOE attorneys in arbitration hearings stating that whole categories of religion and belief were ineligible and essentially wrong or heretical even if sincere. DOE and the City's failure to remediate or address despite repeated notice.

- Evidence that City agencies, the Law Department and other high level policy making entities and persons instructed DOE to discriminate against whole categories of sincere belief.

- Failure to remediate and continued use of policy after court order: the City and DOE are each also jointly liable for failing to remediate the discrimination after the parties own attorneys admitted in open court that the original process they chose was likely unconstitutional. Though the City promised the Court it would remediate this harm, it did not for Plaintiff herein and thousands of others denied under the original policy.

**Formatted:** Footer

- Direct evidence claim: Emails from the City's highest policymakers, including the Commissioner of Health himself, show that the City colluded with the DOE, the unions, and the arbitrators to further discriminate against employees with sincerely held religious objections to abortion, Catholics, and those with objections based on purity of the blood. See Section VI. B.

- Direct evidence claim: The Commissioner of Health, who is undoubtedly the policy maker for the entire City, responded to Defendant Banks' request to craft a letter to try to categorically establish for arbitrators that these beliefs were "BS" by complying and issuing a letter that facially discriminates and has known misinformation about the connection between aborted fetal cell lines and other common medications.

- Direct evidence claim: Defendant Varma, who had policy making authority over the City's Covid-19 policies and directed the mandate participated in this decision to issue the Chokshi letter and "Ok"d the scheme. Varma also admitted that the mandates that he had been responsible for getting issued – including the DOE mandate – were not based on public health but rather a desire to harass unvaccinated people including those who could not get vaccinated for religious reasons.

- Ratification, endorsement and direct evidence claim: Mayor de Blasio, who was a final policy maker for the City, endorsed and confirmed that the City intended to deny all applications from those with personally held religious beliefs, all Catholics, and most other religions other than Christian Scientists and Jehovah's Witnesses. He bragged that this policy was "100%" set by the city and the unions.

**Formatted:** Footer

- High level policy makers, such as Eichenholtz, continued to instruct reviewers during the "remediation" to reject beliefs tied to abortion or that were personally held and other criteria held unconstitutional from the original policies. DOE also applied the wrong undue hardship standard and Eichenholtz continued the use of that improper de minimis standard on appeal despite frequent notice that it was improper.

- The Joint Venture: The legal mandate of the September 10, 2021 Arbitrator's Award, which created a "joint venture" between the City and DOE, imposing a non-delegable duty on both entities to provide religious accommodation to DOE employees is binding and the failure to train or properly oversee the process to avoid widespread documented abuses from occurring or going unremediated.

- Failure to Train or Supervise: The City's deliberate indifference in failing to train or supervise DOE personnel to ensure constitutional neutrality, despite the City's direct role as a party to the joint Arbitrator's Award and repeated notice through the *Kane v. de Blasio* matter and related lawsuits, emails, and notices of claim.

### PLAINTIFF'S INDIVIDUAL FACTS

470.281. In September 2021, Plaintiff was a tenured Master Teacher for Special Education, Citywide School Administrator and Transition Career and Technical Education ("CTE") leader with over twelve years of service at the DOE.

471. Plaintiff is a devout Christian, from a devoutly religious family.

472.282. They are long-time members of the historic Greater Allen A.M.E. Cathedral of New York, and PlaintiffsPlaintiff's daughter has attended only religious schools since preschool.

473.283. One of Plaintiff's core religious beliefs is that participation in abortion is a sin.

474. When she and others in the congregation learned that aborted fetal cell lines were used in the production and development of all three Covid-19 vaccines, Plaintiff approached her pastor at the church to discuss her religious concerns.

475. He told her to pray on it, asking her to use her strength in the Lord.

476.284. Plaintiff and her family prayed repeatedly, and based on these prayers, decided together that they could not participate in vaccination without violating their religious beliefs.

477.285. Plaintiff routinely prays, not just over medical decisions, but about all aspects of her life, and she was very clear that taking these products was not in alignment with God's will as she understands it through prayer and reflection.

478.286. Plaintiff timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal.

479. In her application, Plaintiff explained she has a sincerely held religious objection to the COVID-19 vaccine and needed accommodation.

480.287. On or about September 22, 2024, Plaintiff received the same autogenerated email sent to all other applicants, denying her request based on alleged "undue hardship" based on the de minimis standard.

481.288. No one from the City or the DOE individually reviewed her application before denying her.

482.289. Defendants never questioned Plaintiff's sincerity, or requested further information about her religious beliefs before denying her.

483.290.    Plaintiff appealed and received confirmation that her appeal would be considered by the arbitrators under the Mandate.

484.291.    The notice, sent from the "donotreply" autogenerated SOLAS website, and signed "HR Connect" stated: "This notification confirms the receipt of your appeal of your denial of a COVID-19 vaccine mandated related exemption or accommodation. This appeal and your application materials and documentation are being forwarded to Scheinman Arbitration and Mediation Services ("SAMS") and independent arbitrators convened by SAMS who will consider your appeal."

485.    Without explanation, sheshortly after the Chokshi letter was not offeredsent to the arbitrators, Plaintiff was denied without a zoom hearing.

486.292.    Instead, her appeal was denied, with no further informationexplanation other than an "x" next to the word "denied.."

487.293.    On or about October 1, 2021, Plaintiff was involuntarily placed on leave without pay, and informed that because she had failed to comply with the Mandate, she could not report to work, receive compensation, use annual leave, CAR or sick time, enter a work site or work anywhere else to try to earn money.

488.294.    In other words, Plaintiff, a tenured educator, was removed from her position and placed on disciplinary leave without pay without the benefit of a hearing, as required by New York State Education Law § 3020-a, and without a pathway to grieve the action.

489.295.    When Plaintiff attempted to file a grievance, she received the following message: "Please note: the grievance process has been suspended for the duration of the pandemic."

490.296.    Plaintiff could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

491.297.    As a threshold matter, Plaintiff did not need to enter any classrooms to do her job.

492.298.    Her job was primarily administrative and could have easily been accommodated as entirely remote without any real hardship or change.

493.299.    Plaintiff began her career as a Special Education teacher, but by 2021, very little of her job involved teaching students.

494.300.    Many years before, she had been promoted to the "Master Teacher" designation, which was a citywide appointment serving the entire district.

495.301.    As a Master Teacher, her primary job was to assess data for schools that were struggling or slated to be shut down by the state, make recommendations on needed professional development and teacher development, and coordinate with building administrators on a plan to support the teachers in this development.

496.302.    She did not need to enter any school buildings to do this work.

497.303.    This work typically took up about 85% of her time.

498.304.    In the fall of 2021, Plaintiff was asked to take on new administrative work, this time serving as a Transition Coordinator.

499.305.    As a Transition Coordinator, Plaintiff's job was to coordinate with the administration to ensure that the schools were in compliance with IEP plans, and to link students with disabilities who were ready to exit with agencies that could help them with independent living placements, business opportunities and other services.

500.306.    None of this work involved in person classroom time with students.

Formatted: Footer

501.307.    All of it could have been handled remotely, and none of it needed to take place in a DOE classroom building with students.

502.308.    In addition to her administrative work, Plaintiff typically co-taught one or two classes.

503.309.    Defendants could have easily accommodated Plaintiff by simply having her do her administrative work 100% of the time until the temporary Mandate was rescinded.

504.310.    Plaintiff also could have also easily kept co-teaching the few classes she had been teaching, in or out of the building.

505.311.    As a Master Teacher, Plaintiff was involved in co-teaching programs and was not the primary classroom teacher. Even before the Mandate was imposed, Plaintiff routinely joined the class remotely while her co-teacher or an aid was physically present in the building with the students. She could easily have continued to co-teach this way.

506.    She could easily have continued to co-teach this way.

507.    Plaintiff could have also safely taught in person.

508.    She was not a danger to anyone based on her religious practices.

509.    Plaintiff had already had Covid-19 and had natural immunity.

510.312.    For the previous year and a half, she had been teaching, including sometimes in person, and had not exposed anyone to Covid-19.

511.313.    Prior to being placed on forced disciplinary leave without pay, Plaintiff participated in regular COVID testing at her own expense.

512.314.    Plaintiff also submitted to daily health checks, completed medical surveys, temperature checks upon entry to the building, and daily mask-wearing.

513.315.    Plaintiff also presented a negative COVID-19 test each day, before

reporting to work.

514.316. She was ready, willing and able to continue testing and symptoms check as she had been doing, and as every other school district in the state allowed teachers to do.

515.1. On or about October 15, 2021, Plaintiff submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII through their discriminatory religious accommodation policy, and unlawful denial of religious accommodation.

516.1. This notice complied with the notice of claim requirement governing state law claims.

517.1. The Defendants failed to adjust her claims within the statutory period.

518.317. After a motions and then a merits panel of the Second Circuit held that the Defendants' religious accommodation policies that Plaintiff was denied under were not neutral or generally applicable, and likely violate the First Amendment, Plaintiff attempted to file an appeal with the Citywide Panel through SOLAS.

519.318. She received an error message, telling her that she was not in compliance with the Mandate, and could not submit her request.

520.319. She followed up by sending a letter to the DOE on or about November 29, 2021, asking that her application be reviewed by the Citywide Panel as the City was promising would occur. This letter presented a notice of her claims to the Chancellor of the DOE, and the Law Department and high level City actors, which neither the City nor the DOE adjusted within thirty days.

521.320. The letter also notified the DOE that Plaintiff was being discriminated against based on her religious beliefs and pointed out that the Second Circuit had found Defendants' religious accommodation policies unconstitutional.

**Formatted:** Footer

522.321. Shortly after, Plaintiff received an email confirming that the Citywide Panel would review her application and reinstate her with back pay if she was deemed qualified under lawful standards.

523.322. The Citywide Panel never engaged in any cooperative dialogue or took any further action on Plaintiff's appeal.

524.323. Instead, the Citywide Panel failed to issue any decision at all, leaving Plaintiff's application to pend for months, while Plaintiff became increasingly more hungry and desperate without any salary or means to support herself.

525.324. Without ever receiving an answer from the Citywide Panel, Plaintiff was terminated on or about February 11April 29, 2022, with no due process, and no 3020 hearing, due to "noncompliance with the New York City Health Commissioner's Order requiring vaccination" of all DOE staff.

325. On May 16, 2022, Plaintiff submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII through their discriminatory religious accommodation policy, and unlawful denial of religious accommodation.

326. This notice complied with the notice of claim requirement governing state law claims.

327. The Defendants failed to adjust her claims within the statutory period.

526.328. To date, Plaintiff still has not received a determination from the Citywide Panel.

527.329. ShePlaintiff continued to wait for a Citywide Panel determination. But to date, she never received the "fresh consideration" that the City promised to provide to cure the acknowledged discriminatory denials under the Stricken Standards.

**Formatted:** Footer

528.330. She was simply dismissed, after over a decade of exemplary service.

529.331. Though Plaintiff had tenure, and New York State law requires that tenured teachers be provided with a 3020 hearing before they are terminated, Plaintiff was never given a hearing before she was terminated.

530.332. Vaccination was not a condition of employment.

531.333. At least 163165 unvaccinated teachers were allowed to continue to teach at the DOE and receive their salaries.

532.334. Moreover, neither the City, nor the DOE nor the arbitrator had the legal right to set any new condition of employment for tenured teachers outside of the contract or the legislatures' enumerated conditions.

533.335. In August 2022, the DOE sent a letter to Plaintiff, offering to reinstate her denied if she were to show proof of vaccination by September 6, 2022.

534.336. Though the DOE knew Plaintiff required religious accommodation, they did not offer Plaintiff any accommodation.

337. Plaintiff attempted to get accommodation and continue to apply for employment with the DOE all throughout the 2022-2023 school year.

535.338. Plaintiff became aware of an email from Eric Amato of the DOE Human Resources department had sent an email to Beth Norton and Michael Sill of the UFT, stating that any member who requested an exemption from the Mandate would have their file and fingerprings flagged with a "problem code" placed in the DOE's Human Resources Office of Personnel Investigations.

536.339. A Problem Code is used when an employee has committed what the DOE considers misconduct.

537.340. Problem Codes are typically placed on files for teachers who have sexually molested a student or are otherwise unhireable.

538.341. On or about January 15, 2023, Plaintiff learned that her fingerprints had been flagged by DOE with a "Problem Code" at its office of Personnel Investigations.

539.342. Plaintiff was an exemplary employee and was in good standing.

540.343. The only disciplinary charge she had against her was failing to violate her religious beliefs by taking a Covid-19 vaccine.

541.344. The "Problem Code" in Plaintiff's employment file has significantly impacted Plaintiff's ability to obtain future employment at the DOE – or even elsewhere – or to secure small business funding.

542.345. After the Mandate was lifted in February 2023, DOE refused to reinstate Plaintiff, despite the fact that the position remained open.

543.346. DOE also refused to hire Plaintiff for any other position, even though there is a staffing crisis in Plaintiff's field and Plaintiff is well-qualified to fill the position.

544.347. In addition to requesting reinstatement, Plaintiff attempted to apply for many jobs that she was well-qualified for.

545.348. She is a highly commended tenured educator with multiple graduate degrees and a record of success at DOE.

546.349. Yet, Defendants refuse to hire her, despite her excellent record of service. This is because of the Problem Code.

547.350. Plaintiff is not the only one that is facing this issue. Hundreds of other former DOE employees have seen evidence of the Problem Code and continue to be shut out of employment opportunities at DOE, despite staffing shortages and despite their ample

Formatted: Footer

qualifications and efforts.

548.351. The United States Congress wrote a letter over a year ago to the City of New York demanding answers about the Problem Code.

549.352. To date, neither the City nor the DOE have responded.

550.353. The City Counsel has also held hearings and demanded answers on the Problem Code issue.

551.354. To date, the City refuses to respond or remedy the issue.

552.355. Multiple employees have seen proof and received notification from the DOE directly that problem codes remain on their files, even though the mandate was dropped over a year and a half ago.

553.356. The Problem Code is not only visible internally at the DOE either.

554.357. Many former DOE employees have been informed by private schools and even schools outside of the district that while they are excellent candidates, the Problem Code makes them unhireable.

555.358. Plaintiff has been unable to find work anywhere in the City because of this Problem Code.

556.359. Plaintiff's ability to do contract work through her not-for-profit was also impacted by the Problem Code.

557.360. Plaintiff runs a not-for-profit business providing supporting students with disabilities and other at-risk children that was registered with the NYC Vendor Portals prior to the placement of the Problem Code in her files. These portals are used for grant and RFP proposals.

558.361. Because Defendants placed the Problem Code in her files at both the City and DOE levels, Plaintiff's not-for-profit was removed from the vendor portals and she is no longer

**Formatted:** Footer

able to submit grant or RFP proposals.

362. Plaintiff was also barred from applying for city contract work because she could no longer access the Mayor's Office of Contract Services (MOCS) portal after the Problem Code was placed on her file. One must be registered in this portal to receive a contract from the City of New York and to bid on jobs and communicate with vendors.

363. Plaintiff had an account in good standing.

364. Since the Problem Code was attached to her file, her account no longer exists. When she searches for it, she gets a message stating: "vendor #vs0006018 is not found."

365. Before the Problem Code was placed, Plaintiff had access to all these portals.

366. Plaintiff and her not-for-profit have not committed any act that should result in their removal from the portals.

367. Upon information and belief, the fingerprints of unvaccinated teachers have been shared with the Federal Bureau of Investigation (FBI) and the New York State Division of Criminal Justice Services. *See, Declaration of Betsy Combier*, filed 6/3/2022 in *Kane v. de Blasio*, 21-CV-7863 (VEC)(SDNY), attached hereto as Exhibit 5.

368. DOE also imposed a further barrier to continue retaliating against employees who were denied religious accommodation.

369. Though DOE is aware of multiple ongoing lawsuits challenging the discriminatory religious accommodation policies, they have attached a "waiver" requirement for employees who wish to be reinstated, and some who apply as new teachers.

370. The waiver requirement forces teachers denied religious accommodation to waive their right to challenge Defendants' discriminatory conduct as a condition of getting rehired

114

**Formatted:** Footer

or reinstated.

568.371. On February 21, 2023, Plaintiff timely mailed a new Notice of Claim, by certified mail, return receipt to the City and the DOE, notifying both parties once more that she has claims for discrimination, failure to accommodation, unlawful termination and adding that she and others were also facing retaliation from the Problem Code issue.

569.372. Defendants failed to adjust the claims within the statutory period.

570.373. Plaintiff also timely filed a second EEOC charge in February 2023 – adding claims of retaliation against both Defendants.

571.374. On September 18, 2023, Plaintiff received a right to sue letter from the EEOC on this charge.

572. Plaintiff was unable to afford or secure an attorney to help her with her case.

573.375. On December 12, 2023, she timely commenced this action in federal court *pro se* before the ninety-day period elapsed from receipt of the right to sue letter.

574.376. Plaintiff suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

575.1. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

As and for a First Cause of Action, *Against Municipal Defendants*

377. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

576. Plaintiff asserts that both Defendants failed to accommodate her religious beliefs in

violation of Title VII.

577. Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

578. Plaintiff was entitled to accommodation, but was denied religious accommodation, first by the DOE and then the City, in violation of Title VII.

579. After the City was forced by a temporary restraining order to amend the Mandate to allow for religious exemptions, and the DOE was forced by an arbitrator to provide religious accommodations, each responded by pretending to offer it, but instead conspiring to deny as many applicants as possible, including Plaintiff.

580. First, the DOE and the City conspired to get the arbitrator, who was a major donor to the Mayor, to adopt their proposed criteria for what qualified for religious accommodation, which was blatantly unconstitutional.

581. Among other discriminatory classifications, the Stricken Standards issued by the arbitrator conditioned access to accommodation on membership in a preferred religious organization.

582. The Stricken Standards also impermissibly required a clergy letter and that so-called religious "leaders" agreed with each employee's religious beliefs concerning Covid-19 vaccination.

583. Under the policy, personally held views were categorically excluded, and the City and DOE admitted that they intended to exclude all Catholics and most other religions than Christian Scientists relief.

584. The DOE then participated in the appeals to zealously argue for discriminatory

116

**Formatted:** Footer

reasons to deny applicants, for example, because the Pope did not share their views, resulting in the denial of over 90% of the appeals to the arbitrator.

585. Second, though the arbitrator's award required accommodation without regard to undue hardship (at least for those who qualified under the discriminatory criteria), DOE denied every single applicant on the pretextual claim of "undue hardship" based on the unlawful "more than a minimal burden" without ever assessing in good faith whether they could have accommodated any employee.

586. These determinations were pretextual.

587. These determinations were also infected with the same animus that infected the appeals and the entire religious accommodation policy adopted, enforced and implemented by themunicipal Defendants.

588. Defendants did not individually review the applications before sending out the denials.

589. The same denial was sent out to employees who already worked remotely or easily could have done so, including Plaintiff.

590. The denials stated on their face that the standard used was the "more than a minimal burden" or *de minimis* standard, which was found unlawful by the United States Supreme Court in *Groff v. de Joy,* 143 S. Ct. 2279 (2023).

591. The denials also stated on their face that they were issued in accordance with the Stricken Standards, which were found unconstitutional by the Second Circuit.

592. The DOE did not consider the required statutory factors before denying relief based on undue hardship.

593. It would not have been an undue hardship to accommodate any of the applicants,

117

**Formatted:** Footer

but especially Plaintiff.

594. Third, Defendants knew that the SOLAS system, which was the method given to DOE employees to apply for accommodation, was crashing and glitching and shutting many people out of being able to apply by DOE's arbitrary deadlines or appeal.

595. Yet, even when employees alerted supervisors and others responsible for ensuring reasonable accommodation at DOE that they needed religious accommodation and were unable to apply through SOLAS, DOE refused to individually consider their applications.

596. The goal was never to actually assess reasonable religious objections in good faith.

597. Defendants' shared goal was to find a pretext to deny as many people as possible.

598. To that end, DOE made arbitrary distinctions to shut employees out of access to accommodation at every possible turn.

599. Those that did get a review by an arbitrator were typically denied with no explanation, just an "x" next to the word "denied."

600.378. After she was denied religious accommodation, Plaintiff and her similarly situated religious colleagues were placed on leave without pay for violated Title VII by failing to violate their faith by taking a Covid 19 vaccine and eventually terminated, forced to resign, forced to go on extended unpaid leaves, and/or forced to violate accommodate their sincerely held religious beliefs.

379. Fourth, after the Second Circuit held that the DOE's religious accommodation policies were not neutral or generally applicable, and were blatantly violative of the First AmendmentDefendants subjected Plaintiff to four distinct failures to accommodate:

- Initial Denial and Termination: Defendants denied Plaintiff's initial requests using the "Stricken Standards" which as set forth above and in the Second Circuit

decisions in Kane and NYFRL applied unconstitutional criteria. Plaintiff also only ever offered an appeal that was governed under the same facially discriminatory stricken standards so it was futile to appeal even for those who were able. Many were not even able due to well-documented SOLAS system crashes and other issues.

~~601.~~ Failure to Provide Remedial Review: Following the Second Circuit's holding in *Kane*, Defendants failed to ~~remediate~~provide Plaintiff with the ~~harm as the City had~~ promised ~~the Second Circuit they would.~~

~~602.~~ • ~~Instead, the City refused to consider thousands of employees denied religious accommodation under~~remedial "Citywide Panel" review, thereby maintaining the original ~~admittedly unconstitutional scheme, including the Plaintiff, even though they knew that these employees were seeking religious accommodation, and the DOE aided and abetted this refusal~~unconstitutional denials.

• ~~Fifth in~~ Failure to Accommodate Prospective Employees: In August 2022, ~~the DOE~~Defendants offered ~~to reinstate those~~ reinstatement but again refused to provide religious accommodation to those wishing to return, violating their duty to accommodate both current and prospective employees ~~it had terminated or forced out after~~.

• Failure to accommodate after the mandate was lifted in February 2023 both in access to DOE jobs and the vendor portal.

380. Defendants' "undue hardship" defense is pretextual; Defendants accommodated at least 165 similarly situated employees whose beliefs were favored under the discriminatory criteria, while failing to ~~accommodate~~ perform any individualized assessment or consider

alternatives for Plaintiff. As set forth in detail in the factual allegations of this complaint, Plaintiff could have been safely accommodated without substantially burdening DOE's budget in multiple ways, and Defendants did not assess any evidence (safety or economic) to deny them ~~to their prior positions and level of seniority. But even though the CDC had just issued guidance affirming the long known scientific consensus~~. Jay Varma, who was the City's "Covid Czar" responsible for the mandate, admitted that ~~the~~there was no public health necessity for the mandates, they were just meant to harass people who could not get vaccinated ~~and~~. Jay Varma admitted natural immunity was sufficient to protect public health. Eric Eichenholtz admitted that neither the City nor the DOE ever reviewed any data or evidence to determine that any employee presented a safety or economic burden, each used the wrong "de minimis" burden test, and the Mandate itself did not preclude unvaccinated ~~posed the same level~~persons from working in person.

~~603.~~381. Single Filing Rule: Pursuant to the "single filing" or "piggybacking" rule, Plaintiff and other similarly situated individuals in this and other related matters are entitled to Title VII relief for all phases ~~of risk of transmission, the DOE failed to provide accommodation to those it knew, or should have known, was seeking religious accommodation, and denied every application on pretextual "undue hardship" again~~ the DOE and City's failure to accommodate based on the ~~de minimis standard~~timely EEOC charges filed by themselves or their colleagues, as these claims arise from the same discriminatory policies and time frame.

~~604. DOE was required to accommodate any employee *or prospective employee*, including Plaintiff, that they knew or should have known required accommodation.~~

~~605. DOE knew Plaintiff required accommodation and refused to accommodate her in August 2022 so that she could come back without violating her religious beliefs to the position~~

offered by DOE.

606. To the extent that Defendants claim "undue hardship" as a defense, Plaintiff reserves the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

607. Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

608. For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

609. To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

610. Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual and unlawful.

611. EEOC guidance and Supreme Court precedent have clarified in recent years that denials based on the "de minimis" standard are unlawful.

612. Yet, all of Defendants undue hardship denials stated, on their face, that they were made based on the de minimis standard.

613. The denials also violate EEOC guidance from 2021.

**Formatted:** Footer

614. Even in 2021, before the Mandate became effective, the EEOC provided guidance to employers on handling accommodations to Covid-19 vaccine mandates.

615. Among other relevant provisions, the guidance stated "Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment. In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices or observances."

616. Defendants failed to consider all possible reasonable accommodations, or any possible individualized accommodations.

617. The 2021 EEOC Guidance also stated that "If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted. An employer should consider all possible alternatives to determine whether exempting an employee from a vaccination requirement would impose an undue hardship."

618. Defendants failed to explain any alternatives considered or to consider any alternatives to full exemption.

619. Instead, Defendants denied 100% of applicants based on vague assertions of "undue hardship", even those, like Plaintiff, who had administrative jobs that could have been done remotely without issue.

620. Then they argued aggressively to deny any that appealed based on discriminatory and unlawful definitions of what constituted a valid religion.

621. Tellingly, after the appeals in the fall of 2021, the DOE *did accommodate* at least 163 employees, some of them teachers, who posed no different threat than Plaintiffs and the thousands denied.

**Formatted:** Footer

622. DOE made this determination based on criteria having nothing to do with safety or economic differences, and only to do with impermissible criteria such as membership in a preferred religious organization.

623. As a direct and proximate result of Defendants' failure to accommodate her, Plaintiff and her colleagues denied religious accommodation suffered, and continue to suffer economic damages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

624. Plaintiff is also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

625. Plaintiff is also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

626. And Plaintiff is entitled to reasonable attorneys' fees and costs.

627. Pursuant to the single filing rule, Plaintiff respectfully reserves the right to add more Plaintiffs and a proposed class of those similarly situated under the single filing rule to make this litigation more cost-effective for her to pursue.

Formatted: Footer

628. Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052 (2d Cir. 1990).

629. The claims of the administrative claimants and the rest of the proposed class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

630. Additionally, though they need not have in this action, the administrative claims and responses from Defendants provided notice that the issues were class wide.

631. Defendants and the EEOC were also on notice that the issues were class wide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class action lawsuits referencing the widespread violation of Title VII and anticipated actions regarding same.

632. Plaintiff preserves the Single Filing Rule assertions for each of the Title VII claims made herein.

### SECOND CAUSE OF ACTION

**(Discrimination in Violation of Title VII)**

*Against Municipal Defendants*

633.382. Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

634.383. In addition to failure accommodate claims, Plaintiff asserts straight religious discrimination claims against boththe municipal Defendants—, including but not limited to ""pattern and practice", "disparate impact"", and "as applied.""disparate treatment" theories.

635. Title VII was enacted with the purposeDirect Evidence of prohibiting employment

discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq.

71.

636. Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

637. Plaintiff has protected religious beliefs.

638. She was qualified to hold her position, as evidenced by the fact that she was a DOE employee in good standing before she was denied religious accommodation.

639. The fact that accommodation was offered shows that it was not an employment qualification to be vaccinated, since employees could receive religious accommodation and still be qualified to work at the DOE even if they were not vaccinated, and at least 163 employees did receive such accommodation to continue to work for the DOE unvaccinated.

640. Moreover, related litigation has already held that the City lacked the authority to require vaccination as a condition of employment for DOE employees, and Defendants are precluded from relitigating that issue here.

641. Plaintiff suffered adverse employment conditions as a result of **Discrimination;** Defendants' discrimination, including, *inter alia*, being denied religious accommodation, suspended without pay, terminated, charged with "misconduct", denied unemployment compensation, having a Problem Code attached to her record, and facing irreparable damage to

her reputation and employment prospects.

642. These adverse actions occurred under circumstances giving rise to an inference of discrimination.

643. In fact, the evidence in this case raises much more than just an *inference* of discrimination, which is the most that is required under notice pleading standards.

644. Defendants' adoption, implementation, ratification and enforcement of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, or an opposition to abortion, shows discrimination as a matter of law.

645. The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic constitutes "the "Stricken Standards" constitutes direct evidence of discrimination," which is sufficient as a matter of law to win relief absent an affirmative defense. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

646. In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

647. Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

648. The Plaintiff's case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between orthodox and unorthodox religious beliefs, or preferences some faiths and religious beliefs over

others.

649. The Stricken Standard because the policy made express classifications based on protected characteristics – to wit – membership in a disfavored religious group and defined all other religious beliefs as somehow not meriting the same protection as those the policy favored.

650. Contrary to the Stricken Standards' unlawful criteria, the term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j).

651. Protected religious beliefs also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1; 42 U.S.C §2000e(j).

652. It is well-settled law, acknowledged by the Supreme Court of the United States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

653. "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

654. An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged

did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

655. Employers, especially government employers, must not entangle themselves in religious questions when assessing a request for religious accommodation.

656. Employers, especially government employers, cannot substitute judgment for the employee about whether the belief is religious in nature.

657. Nor can employers, especially government employers, deny an applicant because her religious beliefs overlap with similar secular concerns—religious employees are entitled to have both religious and secular concerns, and this does not diminish protection of the employee's religious practices.

658. The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

659. It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

Formatted: Footer

660. Defendants violated each of these basic rules and more.

384. In addition to adopting a written policy that makes express classifications and favorsreligious characteristics, favoring certain religions over others, "established" sects while categorically excluding unorthodox or "personally held" beliefs.

661. **Discriminatory Animus:** The discrimination is further evidenced by hostile comments byfrom high-level City actors' and DOE agents aboutregarding the invalidityvalidity, of sincere religiousprayer-based beliefs and objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute further direct evidence of discrimination.

662. As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiffs by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard than those who were favored under the unconstitutional criteria.

663. Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

664. But when the Citywide Panel gave supposed "fresh consideration" to the applications of some of those denied under the original Stricken Standards, they applied a blanket undue hardship ban on accommodation for any teacher and most other employees—thus imposing a less generous standard.

665. By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

666. Moreover, they continued to apply the same unconstitutional bar against accommodation of personally held religious beliefs and beliefs grounded in concerns about abortion.

667. Under the direct evidence standard of review, it must be presumed that the adverse employment actions were pretextual and discriminatory, and, under this framework, Defendants cannot survive summary judgment without asserting an affirmative defense.

668. No such defense is available because it is black letter law that the government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

669. In the alternative, even if this were not a direct evidence case, Plaintiff also sets forth a prima facie case under the *McDonnell Douglas* framework or any other framework that is permissible to apply.

670. Plaintiff has pleaded facts that if true lead to an inference of discriminatory intent

671. As one of many examples, Plaintiff asserts that DOE representatives and the City's representatives have repeatedly made public comments and official comments dismissing and showing animus towards religious opposition to vaccination (other than supposedly for Christian Scientists).

672. Plaintiffs also provided ample evidence that gives rise to an inference of further discrimination.

673. For example, even though they'd been ordered to make religious accommodations (by a court and by an arbitrator), Defendants denied 100% of all applicants immediately upon receipt of their application, leading to the unavoidable conclusion that the denials were pretextual, and based on discrimination rather than a good faith undue hardship finding.

**Formatted:** Footer

674. The DOE's representatives then argued repeatedly that applicants should be denied for discriminatory reasons in the appeal hearings before an arbitrator provided under the Stricken Standards, claiming all Jews, Muslims, Catholics and Buddhists, should be presumptively disqualified based on their religion, among other discriminatory policies.

675. This leads to an inference that all aspects of the religious accommodation policies were infected by the same animus.

676. The evidence also leads to an inference that the Citywide Panel's affirmance of all denials except one were infected by the same animus and were also pretextual.

677. This is compounded by hostile and dismissive comments made by the Mayor and Mr. Eichenholtz, who was placed in charge of the Citywide Panel process by the Mayor.

678. It is also shown by the email sent to Mr. Eichenholtz by a trainee on the panel, who confirmed that Mr. Eichenholtz had told her that beliefs related to a concern about abortion would not be accommodated.

679. It is also shown by the Citywide Panel's notations received in related discovery, which show that the Citywide Panel continued to reject personally held beliefs, such as guidance from prayer, unlawfully substituting judgment to find that such beliefs, while sincere, are somehow "not religious in nature" or "do not preclude the applicant from getting vaccinated."

680. Defendants' discrimination impacted all applicants for religious accommodation, many of whom were told, point blank told that they were being denied relief because their religious "leader" allegedly did not share their beliefs, among other discriminatory reasons.

681. Plaintiff should also prevail under a disparate impact theory of discrimination.

682. Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect

Formatted: Footer

on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

683. "Disparate impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

684. An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id.*

685. The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id.* (citing §§ 2000e-2(k)(1)(A)(ii) and (C)).

686. "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

385. Most people can take a to fetal cell lines, and refusal to reinstate employees after Covid-19 vaccine without vaccination was clearly no longer required explicitly because they failed to "follow the rules" by violating their religious beliefs. faith.

688. But a recognized minority of people cannot.

689. Those who cannot were disparately impacted by the Covid-19 vaccine policy, and the draconian religious accommodation policies that were imposed as a result.

690. The employers cannot show that imposing the Mandate was consistent with business necessity, as the vaccines do not stop transmission.

691. But even if they could, the DOE could have been far less punitive with those

employees who were unable to take the vaccine.

692. DOE did not have to put a scarlet letter on people's files, or strip them of tenure, or coerce them into signing waivers, or try to prevent them from getting work anywhere—at the DOE or elsewhere, or refuse to do 3020a hearings, which by law, they were required to provide to all tenured employees before making any change to conditions or benefits.

693. And the DOE could have come up with ways to accommodate employees, like weekly testing, which was sufficient at every other school district in the state and could have worked at the DOE too.

694. And there is of course a disparate impact claim among religions, as some religions and types of religious beliefs were preferred over others during the religious accommodation process.

695. As a direct and proximate result of each Defendants' discrimination, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

696. Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

697. Plaintiff is also entitled to reasonable attorneys' fees and costs.

<u>**THIRD CAUSE OF ACTION**</u>

**(Retaliation and Harassment in Violation of Title VII)**

*Against Municipal Defendants*

386. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

698. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

699.387. Plaintiff ~~sought~~ <u>engaged in protected activity by seeking</u> religious accommodation from the vaccine mandate~~, which is protected activity~~ <u>pursuant to statute.</u>

388. Defendants were aware <u>of this protected activity and responded with a series of adverse and retaliatory actions, including:</u>

- **Denial and Termination:** <u>Summary denial of accommodation followed by termination of employment without any state-mandated process</u> that <u>tenured teachers and educators are supposed to receive.</u>

- 700. **Hostile workplace:** <u>the Chokshi letter and facially discriminatory standards created a hostile workplace for</u> Plaintiff ~~sought to protect her religious rights,~~<u>with sincerely held religious objections to vaccination. Their beliefs were openly described</u> as ~~Plaintiff had applied for accommodation from each and each~~ <u>invalid and heretical, and "BS" and</u> Defendant ~~acknowledged receipt of her application and indicated that it~~<u>Varma admits that the mandate itself was only ever promulgated to harass them and coerce them into violating their beliefs. The Mayor was also telling the press that Plaintiff beliefs were invalid and illegitimate</u> would <u>not</u> be considered. <u>DOE employees and arbitrators were holding "heresy" inquisitions and clarifying in no uncertain terms that whole categories of religious objection were invalid in the opinion of the DOE and the City. Defendant Banks specifically referred to the beliefs as "BS" and sought to get them categorically denied.</u>

~~701. Rather than accommodate Plaintiff's religious needs, Defendants denied accommodation, terminated her, attached damaging problem codes to her files at DOE and the City and continues to block her from attempts to get rehired — even as a new hire.~~

- ~~Defendants also denied Plaintiffs~~**Deprivation of Due Process:** Denying tenured Plaintiff a 3020a hearing~~, even though it is illegal to take~~ before taking adverse action ~~against a tenured employee~~ or ~~attach a finding~~attaching findings of ~~"~~"misconduct~~" to their files~~".

- ~~702.~~ **Oppressive Leave** without ~~such~~**Pay and obstruction of benefits:** Plaintiff was terminated without a decision on remedial review, forced onto an involuntary leave without pay that did not allow them to earn income from any source, thwarted in their attempts to collect unemployment benefits through the City's aggressive and unconstitutional efforts to prevent them from getting benefits by claiming they had committed "misconduct" (a charge that would have required a contractual hearing they did not receive) and later asserting that they were terminated for cause because their beliefs differed from the Pope.

- ~~Defendants also have attached a coercive~~ **Retaliatory Problem Codes:** Attaching damaging and coercive "problem codes" to Plaintiff's employment files to hinder future employment, for some to this day.

- **Admission of continued discrimination and retaliation:** Mayor Adams told the press that those who'd been fired for failing to get the Covid-19 vaccine would not be re-hired despite massive staffing shortages because they were, essentially, insubordinate for failing to violate their beliefs. Mayor Mamdani said essentially the same thing when asked in a press interview prior to his inauguration.

~~703.~~ **Coercive Waivers:** Implementing a waiver requirement that prevents ~~those~~employees with religious objections from returning unless they waive their right to ~~challenge the religious~~seek redress for discrimination ~~they faced~~.

704. As a direct and proximate result of each Defendants' discrimination and retaliation, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

705. Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

706. Plaintiff is also entitled to reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Violation of New York State Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation and Aiding and Abetting)

*Against All Defendants*

389. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

390. At all relevant times, the New York State Human Rights Law ("SHRL") has applied to Defendants' conduct, and Defendants worked in concert to deprive Plaintiff of reasonable accommodation.

391. Under the SHRL, it is an unlawful discriminatory practice to require an employee to violate a sincerely held religious practice as a condition of employment unless the employer demonstrates an inability to accommodate without undue hardship, defined as "significant expense or difficulty".

392. Unlike Title VII, individual Defendants are personally liable under the SHRL because the statute expressly prohibits any person from aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden thereunder. Some but not all of the relevant facts for each individually named plaintiff are set forth below:

- **Individual Liability of Defendant Chokshi:** Defendant Chokshi aided and abetted the discriminatory denials by issuing a letter to decision-makers and arbitrators that used his official authority to take sides in a religious dispute, arguing that religious objections to abortion were invalid. This letter was specifically requested so that it could be used to establish that whole categories of sincere religious belief were "BS." Chokshi agreed to this scheme and leant the imprimatur of "science" and the City's highest public health office to this discriminatory task. He also added improper instructions about what "Roman Catholics" were allowed to do and knowingly included misinformation, such as the knowingly unverified assertion that aborted fetal cells were used to bring Tylenol and other products to market. Chokshi also used his discretion to continue renewing the DOE mandate long after it was abundantly clear it was unnecessary and even though he knew that thousands of DOE employees were being denied religious accommodation and were at imminent risk of termination for failure to violate their faith by complying. In fact, according to Varma, he only issued the mandate in an effort to harass those who would not get vaccinated, not because of public health. Defendant Chokshi also allowed carve-outs for secular reasons, like the Mayor's economic goals and favors owed to his donors.

- **Individual Liability of Defendant Eichenholtz:** Defendant Eichenholtz aided and abetted the discrimination as a high-level policymaker who oversaw the entire religious accommodation scheme at DOE and the Citywide Panel levels, provided advice and upon information and belief approved the discriminatory "Stricken Standards," oversaw the flawed Citywide Panel, and directed the exclusion of

137

**Formatted:** Footer

Plaintiff from remedial review. He refused to remediate the harm, even though he had assumed authority to do so, continued to use an unlawful "de minimis" hardship standard even though he knew that he was bound to apply the significant hardship standard required under the NYSHRL, instructed reviewers to continue discriminating against personally held and other beliefs, and was in charge of the Law Department for the years that the smoking gun email leading to the Chokshi letter was improperly withheld and redacted from the public record.

- **Individual Liability of Jay Varma:** Jay Varma was the "Covid Czar" in charge of the City's Covid-19 policies. He admits he caused the mandate to be issued not based on public health but rather as part of a coordinated effort to harass those who would not comply. He admits he knew that natural immunity was sufficient and the mandate was not necessary, and generous accommodations could have been made in any event. He has expressed hostility to religious objections, joining zealously in the effort and failing to repudiate the scheme to devise and disseminate the Chokshi letter, which he "Ok'd". He was supposed to verify that aborted fetal cell lines were used to bring Tylenol and other medications to market but did not, instead agreeing that the Chokshi letter should be disseminated though this misinformation could not be verified.

- **Individual Liability of Steven Banks:** Steven Banks was a high level decision maker and the Mayor's right hand running the OLR, which he also served as General Counsel for. He expressed severe religious animus, calling beliefs "BS" and colluding with the unions, arbitrators and DOE to ensure that whole categories of sincere religious beliefs were denied unlawfully regardless of whether

**Formatted:** Footer

applicants had sincerely held protected religious beliefs. He was the driving force behind the Chokshi letter, which he described as a tool to further that discriminatory scheme. Banks suggested and others enthusiastically assisted him with this task, that the Commissioner not only lend his imprimatur of authority on questions of "science" to pre-emptively assist reviewers with their denials, but also add in conclusions about what people's faith required of them and what religion requires of various groups, such as the assertion that Roman Catholics could take the vaccine.

- **Individual Liability of Jackie Bray:** Jackie Bray led the City's Covid track and trace program and was also a high-level policy maker for the City. At Steven Bray's request, she spearheaded the effort to draft and have promulgated the "Chokshi" letter which was admittedly generated to use as a tool to suppress and deny religious exemption requests on a categorical basis. She coordinated among the DOHMH and various City offices, led the effort and came up with additional ideas for how to discriminate, including creating a litmus test that if employees did not mention that they avoid Tylenol they could be reflexively denied.

- **Individual Liability of Nellie Afshar:** Nellie Afshar was the chief of staff of the DOHMH and upon information and belief, participated and multiple aspects of the collusion to harass and discriminate against religious objectors to the vaccine. She spearheaded the Commissioner's finalization of the discriminatory letter. On her own initiative, she put the unverified list of medications like Tylenol back in the letter as a sword to use against people with sincere religious objections to vaccines even though she admitted she could not verify these facts and they were

**Formatted:** Footer

not verified or in fact true.

393. Monell liability is also asserted in this complaint, including but not limited to the facts set forth in the Monell section above.

394. **Failure to Accommodate - Municipal Defendants** also collectively violated the SHRL's accommodation requirements as set forth in the Title VII claim and failed to engage in cooperative dialogue or meet their burden of proof that Plaintiff could not be accommodated as 165 other teachers and educators were allowed to be under the first discriminatory phase of the accommodation process.

395. **Disparate treatment.** Defendants each also engaged in straight discrimination and harassment and retaliation as set forth in the three counts above and through the factual allegations of this complaint and subjected Plaintiff to different treatment based on their disfavored beliefs.

### FIFTH CAUSE OF ACTION

### (Violation of SHRL)

### (Violation of the New York City Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation, Aiding and Abetting)

*Against All Defendants*

707. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

708.396. For the reasons set forth in the first threefour causes of action, *supra*, PlaintiffsPlaintiff asserts parallel claims under the SRHLCHRL against bothall defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the SHRLCHRL.

397. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

709.398. At all relevant times, the SHRLNew York City Human Rights Law ("CHRL") has been in full force and effect, and has appliedapplies to both Defendants' conduct.

710. Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

711. The SHRL provides:

It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion…unless, after engaging in a bona fide effort, the employer demonstrates that itCHRL is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

712. It is also a violation of the SHRL for any party to aid or abet another in the violation of rights guaranteed thereunder.

713. Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10(d)

714. If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

715. At all relevant times, Defendants were Plaintiff's employer, or potential employer, as defined by the SHRL.

716. The City was also the DOE's agent, in the Citywide Panel reviews, and controlled the DOE, directing, aiding and abetting the discriminatory practices at every level of review.

717. For the same reasons set forth above in the First Claim, both Defendants violated the SHRL by failing to accommodate Plaintiffs.

718. The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

719. Similar standards govern the undue hardship determination, though there is a heightened burden on employers under the SHRL to show a *significant* burden and to assess specific factors using the most current objective evidence prior to denial of relief.

720. Failure to engage in cooperative dialogue about undue hardship also leads to a strong presumption of discrimination under the state statutory requirements.

721. Accommodating Plaintiff would not have required significant expense or difficulty from DOE.

722. Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the DOE's workplaces.

723. Accommodating Plaintiff would not require the DOE to violate a bona fide seniority system.

724. Defendants failed to engage in any interactive process with Plaintiff regarding potential accommodations or the difficulties posed by any prior to denial.

725. Defendants violated the SHRL by denying Plaintiff's request for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

726. Instead of accommodating Plaintiff's religious beliefs, Defendants retaliated against Plaintiffs by suspending her, and terminating her if she would not violate their religious beliefs.

**Formatted:** Footer

727. For the same reasons set forth in the preceding claims, and herein, Defendants also are liable under the SHRL for discrimination, harassment and retaliation based on religion.

728. The SHRL adopts the same tests as Title VII for assessing discrimination, retaliation and harassment claims but is supposed to be even more liberally construed towards plaintiffs.

729. Aiding and abetting discrimination is expressly also listed as a standalone violation of the SHRL even if the colluder is not the employer.

730. Plaintiff timely notified both Defendants of her claims, through the November 29, 2021 letter, the 2021 and 2023 EEOC filings, and a follow up notice of claim in February 2023.

731. Plaintiff also seeks relief on behalf of herself and all others similarly situated to address widespread discriminatory practices.

732. This goal meets the public interest exception to the notice of claim requirements applicable to the DOE.

733. There are no notice of claim requirements attaching to claims under the SHRL against the City.

734. As a direct and proximate result of each Defendants' discrimination, retaliation and harassment, Plaintiff suffered harms, including but not limited to those set forth in the first cause of action.

735. Plaintiff seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

736. And Plaintiff is entitled to reasonable attorneys' fees and costs under the SHRL. Executive Law § 297(10).

**Formatted:** Footer

## FIFTH CAUSE OF ACTION

### (Violation of CHRL)

737. For the reasons set forth in the first four causes of action, *supra*, Plaintiff asserts claims under the CHRL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

738.1. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

739. At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

740. Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).

741. Like the SHRL, the CHRL also provides a standalone violation if an entity is found to have encouraged, aided or abetted the violation of any rights provided therein.

742. As set forth in Claims 1-4, Defendants colluded to deny accommodation to Plaintiff and her similarly situated class members.

743. As a result of each Defendants' actions, Plaintiff was suspended and terminated.

744. Both Defendants actions violated Plaintiff's rights and proximately caused her adverse employment consequences.

745. Both Defendants also failed to engage in the required cooperative dialogue with Plaintiff before denying their accommodation requests, which is a separate and independent act of discrimination under the CHRL.

746. The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107(28)(2).

747. Pursuant to statute, the cooperative dialogue must include analysis and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good faith before denial.

748. This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

749. The legislative history of the CHRL amendment notes that the amendment was meant to cure this holding, and to make failure to engage in cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

750. Other important amendments are relevant too.

751. In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

752. "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York

Formatted: Footer

~~City's Human Rights Law are~~ to be construed independently from ~~similar or identical provisions of New York~~ state ~~or~~and federal statutes~~.'" Restoration Act § 1.~~

~~753.~~399. ~~To bring about the change, the Act established two new rules of construction. First, it created a "one-way ratchet" by which interpretations of state and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed~~ and must be interpreted "liberally for the accomplishment of the uniquely broad and remedial purposes thereof~~, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).~~"

~~754. In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011.~~

400. ~~Under the CHRL,~~ Defendants collectively violated the CHRL through the same three separate and distinct failures to accommodate set forth above.

401. Failure to Engage in Cooperative Dialogue: Under the CHRL, the failure to engage in a "good faith" cooperative dialogue—including analysis and good faith discussion of the person's accommodation needs and potential alternatives—is an independent basis for finding liability, even if undue hardship could have ultimately been proven. Defendants

failed to engage in this process with Plaintiff at any stage of review.

402. Individual Liability of Personally named Defendants: Pursuant to N.Y.C. Admin Code § 8-107(6), individual Defendants are personally liable for aiding and abetting the discriminatory and retaliatory acts described herein for the same reasons set forth in the NYSHRL claim and throughout the complaint.

403. Monell liability is also asserted in this complaint, including but not limited to the facts in the Monell section above.

755. Strict Undue Hardship Standard: like the SHRL, the CHRL imposes a "stiffer standard" for undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodationthan Title VII, requiring the employer to prove "significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

756. Plaintiff was able to perform the essential duties of her job with". All accommodations are deemed reasonable accommodation.

757. Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

758. Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

759. Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of Defendant's workplace.

760. Plaintiff asserted sincere religious objections and there was no basis to question

147

her sincerity.

761. Defendants did not question Plaintiffs sincerity.

762. Instead, they denied her based on undue hardship.

763. Defendants did not meet their burden of proving undue hardship.

764. absent employer proof. Defendants did not establish that Plaintiffs posed a direct threat because of her vaccine status, nor can they do so, as set forth more fully above.

765. Plaintiff also asserts discrimination, harassment, and retaliation claims pursuant to CHRL, as more fully described in the SHRL and Title VII causes of action, which apply the same standards, though the CHRL is to be the most favorably construed towards plaintiffs.

766. As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered and continues to suffer substantial losses, for which she is entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

767. As a direct and proximate result of Defendants' failure to accommodate Plaintiff, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

768. As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

769.404. As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiff's rights, and the rights of all of herhave not and cannot meet this

burden, particularly as they successfully accommodated 165 similarly situated ~~colleagues.~~

~~In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders~~employees.

~~770. Plaintiff is also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).~~

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

~~Plaintiffs reincorporate~~*Against All Defendants*

~~771.~~405. Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

~~772.~~406. ~~Plaintiffs~~Plaintiff asserts that ~~DOE's adoption of~~Defendants, acting under color of state law, violated the Equal Protection Clause of the Fourteenth Amendment by adopting and enforcing a facially discriminatory religious accommodation policy~~, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of the Equal Protection Clause of the United States Constitution.~~.

~~773. Defendants are judicially and collaterally estopped from arguing that the Stricken Standards policy is non-discriminatory.~~

~~774. As the Second Circuit already noted: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.*~~

~~775. First, the Court held that the written policy is not neutral, because on its face, it~~

149

singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ⸺ U.S. ⸺ , 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168.

776. Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute additional direct evidence of discrimination.

777. Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

778. Because Defendants adopted written and de facto policies with express classifications based on which religion a person belonged to, and because of the other Direct Evidence of discrimination set forth above, Plaintiffs' denials of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment since there is no affirmative defense.

**Formatted:** Footer

~~779. As set forth more fully in the complaint, Defendants' religious animus infected every level of review and every policy choice Defendants applied to religious accommodation decisions or consequences after denial to Plaintiff.~~

~~780. As a direct and proximate result of Defendants' discrimination, Plaintiff suffered, and continues to suffer damages and harm.~~

~~781. Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).~~

~~782. Plaintiff also seeks declaratory relief along with nominal damages. *Id*.~~

407. **Direct Evidence of Discrimination:** The "Stricken Standards" created express classifications and denominational preferences based on protected characteristics by singling out unorthodox beliefs and minority faiths for disparate treatment while specifically favoring "established" religions such as Christian Science.

408. **Lack of Neutrality:** The policy and its enforcement were not neutral or generally applicable, as City and DOE high level policy makers and administrators endorsed them and "passed judgment upon" the legitimacy of Plaintiff's religious beliefs, particularly those derived from personal prayer or concerns regarding the use of aborted fetal cell lines, or held by a religion other than Christian Science or Jehovah's Witness, all the while concocting various plans to try to ensure that certain religions and beliefs were subjected to disparate treatment and special disability.

409. **Individual Liability of Personally Named Defendants.** Pursuant to 42 U.S.C. § 1983,

**Formatted:** Footer

individual are personally liable for their personal involvement in these constitutional deprivations as set forth in the individual liability paragraphs of this complaint and other causes of action assessing individual liability.

410. Monell liability is also asserted in this complaint, including but not limited to the Monell section of the complaint.

411. **Direct Discrimination – Disparate Treatment Through the The Two-Tiered System:** Defendants also violated Equal Protection by subjecting Plaintiff and others denied under the original scheme to a more onerous "undue hardship" standard than the 165 favored employees who were accommodated without such a burden, solely because Plaintiff's beliefs did not fit Defendants' preferred religious classifications.

412. **Underinclusivity:** Defendants mandate was substantially underinclusive and allowed secular carve outs but not religious. The City's mandates were meant to function as one overall policy. The City carved out athletes, entertainers, and their makeup artists and entourages, and accommodated City life guards who give mouth to mouth resuscitation but declined to accommodate Plaintiff. Over one million students, equally able to catch and spread Covid-19, were allowed to attend school unvaccinated while Plaintiff was denied based on vague and unsupported boiler plate "undue hardship" assertions even though the Mandate did not require it and no Defendant assessed whether there was a safety issue or economic issue that prevented accommodation. If one million students are able to remain unvaccinated, it would not matter if 100% of the staff was vaccinated – herd immunity is impossible under those circumstances even if the vaccines could stop transmission.

**Formatted:** Footer

413. **Strict Scrutiny:** Because the policy makes express classifications based on religion and exhibits animus, it must be subjected to strict scrutiny. Defendants cannot demonstrate that their denial of accommodation to Plaintiff was the least restrictive means of furthering a compelling state interest.

## SEVENTH CAUSE OF ACTION

**(Infringement of Free Exercise Clause – United States Constitution)**

*Against All Defendants*

783.414. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

784. The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from burdening the free exercise of religion.

785. The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

786. The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

787. Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

788.415. Plaintiff'sPlaintiff's sincerely held religious beliefs prohibit them from takingreceiving a Covid-19 vaccine.

789. Defendants' denials of accommodationDefendants, acting under color of state law, substantially burdened Plaintiffs'Plaintiff's free exercise of religion, in that they were forced by forcing them to violatechoose between their faith if they wanted to keep her job and avoid serious consequences.

790.416. Defendants' refusal to accommodate Plaintiffs' religious practices created coercive pressure on them to change or violate and their sincerely held religious beliefscareers.

791. The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable.

792. The Mandate is not generally applicable, because the Mayor and other members of the Executive Branch is empowered to make exceptions to the Mandates in their sole discretion.

793. Since the DOE Mandate was issued, the Mayor has issued over a hundred executive orders, extending and expanding coverage of the City's vaccine mandates to various different groups, and then making carve-outs and exceptions according to secular reasons that undermine the Government's stated reason the same way that a religious carve out would.

794. The Mandate is also not generally applicable because it makes exceptions for secular reasons that defeat the purpose of the Mandate in the same manner.

795. For example, the DOE Mandate allows bus drivers to remain unvaccinated, even though they are in enclosed busses with unvaccinated children, and it allows students to remain unvaccinated and attending class in person, though they are just as able to spread Covid-19 to their peers as teachers, but it requires teachers to be vaccinated.

796. The Mandate is also not generally applicable, because, on its face, it allows employers to exercise a mechanism for individualized exception—to wit, medical or religious accommodation.

797. Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant religious or medical accommodation when an employee applies.

798. These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

799. The DOE also adopted a policy for religious accommodations, thereby defeating any argument that the Mandates were general applicable without a mechanism for accommodation, as applied, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

800. Lack of Neutrality and General Applicability: The religious accommodation policies implemented and enforcedwere neither neutral nor generally applicable because they were governed by the DOE and the City a discretionary, individualized exemption mechanism and were also themselves government policies that burdened religion, and they were not neutral nor generally applicable either.

801.417. As recognizedinfected by the Second Circuit, DOE's adoption of aa facially discriminatory written policy defeats neutralitythat favored specific religious dogmas.

802. Comments by decision-makers also defeat neutrality.

418. Individual Liability: Pursuant to 42 U.S.C. § 1983, Individually named defendants are personally liable for their direct involvement in this constitutional infringements as set forth above.

419. Monell liability is also asserted in this complaint, including but not limited to in the Monell section above.

803. Strict Scrutiny: Because the policies were not neutral, or generally applicable, and were motivated by religious animus, Defendants must meet the burden of strict scrutiny applies.

804. The Second Circuit also already held that the Defendants' religious accommodation policies were not generally applicable, because decision makers exercised discretion about whether to grant or deny accommodation, thereby evidencing a mechanism for individualized exemption.

805. Because the policies were not generally applicable, strict scrutiny applies.

806. . Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiff to be vaccinated.

807. The vaccine cannot stop transmission, and there is therefore outside of the state's police powers.

808. To the extent that the Defendants could prove that any significant danger existed because of Plaintiff's vaccine status, reasonable accommodations such as demonstrate that the summary denial of Plaintiff's requests—without considering weekly testing, daily symptom checks, mask use or allowing or remote or off-site meetings could have been implemented without undue hardship.

809. 420. In refusing to accommodate Plaintiff's sincerely held religious beliefs, Defendants did not use work—was the least restrictive means of furthering any a compelling state interest

156

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.19" + Tab after: 0.44" + Indent at: 0.44"

Formatted: Footer

particularly where they accommodated 165 other employees whose religious exemptions were granted and who were similarly situated.

810. More importantly, as the Second Circuit pointed out, Defendants did not have a compelling interest in any event in conditioning access to accommodation on membership in a favored religious organization.

811. Nor do Defendants have a compelling interest in applying a more favorable undue hardship analysis to those found to meet the criteria for the impermissibly favored religions.

812. Defendants' actions injured and continue to injure Plaintiffs, by chilling their right to practice their religion and imposing lasting consequences and harm to their emotional, psychological, physical, and financial wellbeing, as well as their reputation.

813. As a direct result of the violation of her First Amendment rights, Plaintiff is still unlawfully removed from her jobs.

814. Plaintiff seeks, and is entitled to, declaratory relief and nominal damages stating that the denial of their religious accommodation and subsequent employment consequences are void ab initio and violated their First Amendment right to freely practice their religion.

815. Plaintiff is entitled to, and seek, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if they had never been denied religious accommodation, along with compensatory damages, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

## **EIGHTH CAUSE OF ACTION**

**(Violation of the Establishment Clause of the United States Constitution)**

*Against All Defendants*

Formatted: Footer

816.421. Plaintiff repeats and ~~reallege~~realleges all paragraphs of this Complaint as if fully set forth herein.

422. Plaintiff repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

817.423. The Establishment Clause of the First Amendment ~~to the United States Constitution~~ prohibits the State from preferencing any particular religion or religious dogma ~~or belief~~, or abridging ~~Plaintiffs'~~ rights to the free exercise of religion.

818.424. Defendants ~~each~~ violated the Establishment Clause by expressing a preference for ~~certain~~specific faiths and leaders ~~over others and by~~while expressing animus ~~towards~~toward those with unorthodox religious ~~objection~~objections to vaccination.

425. Impermissible Entanglement: Defendant Chokshi and high level City policy makers colluded with the union, DOE and arbitrators to categorically deny sincerely held religious beliefs and provided instructions and letters to decision-makers and arbitrators that impermissibly took positions on religious matters, imposed special disability on certain faiths and beliefs, tried to resolve religious questions and expressed denominational preferences.

~~819. Denominational Preference: The City went so far as to submit letters to the arbitrators, in which they impermissibly took a position on religious matters.~~

~~820. As one of many examples, the Commissioner of Health, David Chokshi, sent an email and letter to the SAMS arbitrators, letting them know that~~ DOE and the City ~~did not consider abortion to be a valid religious concern, and stressing that the Pope was vaccinated.~~

821.426. ~~The DOE took this so far as to adopt~~adopted a facially discriminatory policy, ~~which favors~~ that favored Christian Scientists and Jehovah's Witnesses on its face~~, and requires~~

158

while requiring discrimination against minority and unorthodox faiths. All defendants upheld and defended and endorsed that policy and some helped promulgate it.

427. The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others Individual Liability: Pursuant to 42 U.S.C. § 1983, individual Defendants are personally liable for their direct involvement in this constitutional violation.

428. Monell liability is also asserted in this complaint, including but not limited to the facts set forth in the Monell section.

822. These preferences trigger strict scrutiny of Defendants' denial of Plaintiffs' religious beliefs as a violation of the Establishment Clause.

823.429. , and Defendants cannot meet the burden of proof to showprove that their denial of accommodation wasactions were narrowly tailored to further a compelling state interest.

824. Plaintiffs seek and are entitled to declaratory relief and nominal damages, injunctive relief including reinstatement with no break in service, back and front pay and benefits, actual, compensatory and punitive damages, along with attorneys' fees, costs and expenses.

### NINTH CAUSE OF ACTION

**(Substantive Due Process Violation – United States Constitution)**

825. Plaintiff repeats and realleges each paragraph in the Complaint as if fully set forth herein.

826. The Mandate violates Plaintiff's fundamental substantive due process rights facially and as applied.

827. Plaintiff has a fundamental right to refuse medicine.

828. ~~In addition to the fundamental right to refuse even life-saving medicine, the Supreme Court has articulated multiple fundamental rights safeguarding the doctor-patient relationship, and the right to make medical decisions in accordance with one's chosen physician absent state interference.~~

829. ~~There is also a fundamental right to protect oneself against harm.~~

830. ~~This right rises to the level of a *jus cogens* right where, as here, the medical product mandated is still experimental.~~

831. ~~At the time that the Mandate was enforced, the only vaccines available against Covid-19 in the United States were those allowed under experimental use authorization ("EUA"), which, by the terms of the EUA, could not be mandated or coerced.~~

832. ~~A different Pfizer product had been licensed just before the Mandate was imposed, but Pfizer did not make it available in the United States at any time before Plaintiffs were denied accommodation and placed on unpaid leave.~~

833. ~~At the time of the Mandate, and continuing today, there were inadequate studies available to determine the risks and benefits of the vaccine for any individual, leave aside those with serious health conditions that put them at greater risk of harm.~~

834. ~~Defendants had no compelling or even legitimate reason to mandate the vaccines or to deny religious or medical accommodation.~~

835. ~~The vaccines cannot stop transmission of disease, and it is therefore not within the police powers of the state to mandate them.~~

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment ~~to her~~ containing the following relief:

Formatted: Footer

A. ~~Declaratory~~ Declaratory Judgments: A ~~declaratory~~ judgment <u>declaring</u> that <u>each of</u> the <u>municipal</u> Defendants' ~~failure~~<u>three distinct failures</u> to accommodate ~~Plaintiff's sincerely held religious beliefs~~<u>Plaintiff</u>—<u>the initial denial/termination, the failure to provide remedial review,</u> and ~~all actions arising therefrom~~ <u>the failure to accommodate at the time of the September 2022 reinstatement offer</u>—are void ab initio and ~~constitute unlawful discriminatory practices pursuant to~~<u>violate</u> Title VII ~~along with nominal damages and attorneys' fees and costs; and~~

B. ~~A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York City~~, <u>the NYS</u> Human Rights Law ~~along with nominal damages and attorneys' fees and costs; and~~

C. ~~A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York State~~, <u>the NYC</u> Human Rights Law ~~along with nominal damages~~, and ~~attorneys' fees and costs; and~~

D. ~~A declaratory judgment that~~ the ~~Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the Equal Protection Clause of the~~ United States Constitution ~~along with nominal damages and attorneys' fees and costs; and~~

E.~~•~~ ~~A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate~~ <u>under</u> the ~~Free Exercise Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and~~<u>enumerated provisions.</u>

**Formatted:** Add space between paragraphs of the same style, Bulleted + Level: 1 + Aligned at:  0.75" + Indent at:  1", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** Footer

F.    A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Establishment Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

G.    A declaratory judgment that the Mandate, as applied, is unconstitutional because it violates Plaintiff's fundamental rights, along with nominal damages and attorneys' fees and costs; and

H.• Injunctive Relief: An order that Defendants reinstate Plaintiff to herfor immediate reinstatement to former positions with full seniority, no break in service, and restoration of all status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; andalong with lost salary, back pay and front pay.

I.•  Damages: An award of actual, nominal, and compensatory damages (including back pay, front pay, and pain and suffering) in an amount to be determined at trial; and.

J.     Punitive Damages: An award of costs in this action and any appeals, including reasonable attorney's fees; and

K.• An award to Plaintiff for punitive damages in an amount to be determined at trial; andagainst the individual Defendants for their malice or reckless indifference to Plaintiff's state and federally protected rights.

•   Interest, Costs, and Fees: An award of pre- and post-judgment interest, reasonable attorneys' fees, expert fees, and costs.

L.• Civil Penalties: An order for civil fines and penalties pursuant to New York

Executive Law § 297(9~~); and~~).

~~M.      An award of pre- and post-judgment interest on all amounts awarded to Plaintiffs and the class at the highest rates and from the earliest dates allowed by law on all causes of action; and~~

~~N.•~~ ~~Such~~For such other ~~and~~ further or different relief as this Court may deem just ~~and proper~~.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
~~September 20, 2024~~ April 10, 2026

Respectfully Submitted,
Gibson Law Firm, PLLC

By:    */s/ Sujata S. Gibson*
Sujata S. Gibson
120 E Buffalo Street, Suite 201
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

**Attorneys for the Plaintiff**

163