# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

LATANYA COLLINS,

        Plaintiff,

-against-

THE CITY OF NEW YORK, DAVE CHOKSHI, in his individual and official capacity; NELLIE AFSHAR in her individual and official capacity; STEVEN BANKS, in his individual and official capacity; JACKIE BRAY in her individual and official capacity; JAY VARMA in his individual and official capacity; ERIC EICHENHOLTZ in his individual and official capacity, and the NEW YORK CITY DEPARTMENT OF EDUCATION,

        Defendants.

## THIRD AMENDED COMPLAINT

Jury Trial Demanded

23 CV 9248 (RER)(CHK)

> *"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

>         — James Madison, 1784

By and through her undersigned attorneys, Plaintiff alleges as follows:

## INTRODUCTION

1. This lawsuit arises because Defendants engaged in widespread religious discrimination when determining religious accommodation to its Covid-19 vaccine mandates.

2. Rather than engage in good faith individualized review to determine who could be safely

1

accommodated, Defendants proposed, adopted, enforced and encouraged a policy (the "Stricken Standards") that allowed certain religious beliefs to be accommodated while other religions were categorically excluded from the possibility of accommodation.

3. After the Second Circuit held that these policies were likely unconstitutional, Defendants failed to remediate the harm for most of those denied under the policies, including Plaintiff.

4. Plaintiff alleges violations of her fundamental statutory and constitutional rights, seeking declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the actions complained of herein.

5. Plaintiff is entitled to relief under the Second Circuit's holding in *Kane v. de Blasio,* 19 F.4th 152 (2d Cir. 2021), in which the Court held that the Stricken Standards were not neutral or generally applicable and the City failed to offer any defense that could justify them under strict scrutiny.

6. Plaintiff is also entitled to relief under the Second Circuit's holding in *New Yorkers for Religious Liberty, Inc. v. City of New York* ("NYFRL"), in which the Court held that NYFRL plaintiff Natasha Solon asserted constitutional claims because she was never provided with the remedial "Citywide Panel" review ordered to remedy the harm for the original *Kane* Plaintiff, and thus was only ever given an opportunity to apply for religious accommodation under the Stricken Standards policy, which had already been held unconstitutional.

7. Just like Solon, Plaintiff was not given the remedial "Citywide Panel" review and was only ever offered accommodation if they met the discriminatory criteria in the Stricken Standards.

8. This case also involves extensive evidence of religious discrimination that exceeds the scope

2

of the prior decision in *Kane* or *NYFRL*, leading to strict scrutiny and relief under multiple causes of action, and establishing personal liability for individually named Defendants as well as municipal liability against the City and DOE.

9. Most significantly, in March 2026, emails withheld by the City for nearly five years were finally produced pursuant to a court order from the Appellate Division, Second Department. Those emails confirm what prior complaints could only allege: that the City's most senior officials — including the Commissioner of Health, the Mayor's COVID Czar, and the First Deputy Commissioner of the Office of Labor Relations, among others — personally directed the creation of guidance to help arbitrators and Citywide Panel reviewers argue that entire categories of sincere religious belief were, as they put it, "BS."

10. As instructed by Banks, Varma, Bray and other individually named high level City official defendants, Defendant Chokshi, the Commissioner of Health who issued the mandate, produced a letter which framed whole categories of sincere religious beliefs as "BS," and instructed adjudicators to reject religious objections grounded in concerns about aborted fetal cell lines and beliefs brought by Catholics and others whose religious leaders advised vaccination— not on scientific grounds, but by invoking the City's own interpretation of Catholic and other religious doctrine, after officials acknowledged they could not refute the objection scientifically. The emails show this was deliberate. One senior official warned the group that the guidance and categorical denial of certain faiths, and abortion-based beliefs, "will absolutely be subject to litigation." She nonetheless surmised the letter would "go far" in assisting the City with their scheme to discriminate against whole categories of religion.

11. The Commissioner and the team of high level City officials proceeded even though they knew that certain factual allegations in the letter were unverifiable, opining that the

Commissioner's letter, containing that misinformation, could lend authority to shield decision-makers from liability from making these discriminatory determinations.

12. These emails, and the bad faith letter that the Commissioner issued as a result, along with other evidence uncovered in discovery in related matters these last four years, show that the religious discrimination that Plaintiff experienced was not an isolated or random occurrence, but a coordinated and intentional campaign directed by the City's top policy makers including the commissioner of health who issued the mandate.

13. In sum, this was not a neutral public health mandate but, as Defendant Varma admitted later, a tool of harassment. Animus infects all levels of implementation.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964.

15. This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a).

16. Venue is proper in this District under 28 U.S.C. § 1391(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17. Plaintiff filed timely charges with the EEOC and filed and/or joined this lawsuit within ninety days of receipt of their right to sue letters.

18. Plaintiff also timely filed actual and/or functional notices of claim and the DOE and the City failed to adjust them within thirty days.

## NAMED PARTIES

19. **Plaintiff LATANYA COLLINS** is a resident of Queens County, New York. Prior to being

4

denied religious accommodation, Ms. Collins was a tenured Master Teacher for Special Education, Citywide School Administrator, and Transition Career and Technical Education Leader ("CTE") in good standing. She worked in Queens with over twelve years of service at DOE. She is one of thousands harmed by Defendants discriminatory religious accommodation policies and seeks justice for herself and others similarly situated.

20. **Defendant CITY OF NEW YORK** is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

21. **Defendant New York City Department of Education ("DOE")** is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

22. **Defendant DAVE CHOKSHI** was, at all times relevant herein, the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"). In that capacity, Chokshi exercised final policymaking authority over the mandates and decisions thereunder as well as public health guidance issued by DOHMH, including guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. He is sued in his individual and official capacities.

23. **Defendant NELLIE AFSHAR** was, at all times relevant herein, the Chief of Staff of the DOHMH In that capacity, Afshar was responsible for overseeing DOHMH operations and participated in the development and approval of guidance directed at officials adjudicating DOE

employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. She is sued in her individual and official capacities.

24. Defendant **JACKIE BRAY** was at all times relevant herein, the Deputy Executive Director of the NYC COVID-19 Test & Trace Corps, operating from the Office of the Mayor of the City of New York. In that capacity, Bray coordinated City Hall's involvement in developing and approving guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. She is sued in her individual and official capacities.

25. **Defendant STEVEN BANKS** was, at all times relevant herein, the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks exercised authority on behalf of the City over the negotiation and administration of the accommodation process applicable to DOE employees under the September 2021 COVID-19 vaccine mandate, including coordinating with various high level City policy makers, arranging policy and strategy with the unions and arbitrators, advising on criteria used at all phases of the DOE religious exemption process, and directing the development of guidance used by officials adjudicating religious accommodation requests. He is sued in his individual and official capacities.

26. **Defendant ERIC EICHENHOLTZ** was, at all times relevant herein, a senior attorney at the New York City Law Department exercising policymaking authority over employment policy and litigation and religious accommodation policies related to the September 2021 COVID-19 vaccine mandate. In that capacity, Eichenholtz directed and advised on the criteria proposed to arbitrators for adjudicating DOE employee religious accommodation requests, provided advice and oversight over the initial religious accommodation process at DOE and created and supervised

6

the Citywide Appeal Panel. He is sued in his individual and official capacities.

27. **Defendant JAY VARMA** was, at all relevant times, a senior public health official for the City of New York, including serving as Senior Advisor for Public Health in the Office of the Mayor. In that role, Dr. Varma was a key architect of the City's COVID-19 response and played a central role in the development, implementation, and oversight of the vaccination mandate and related policies governing religious exemption requests. Acting under color of state law, Dr. Varma participated in, coordinated, and/or approved policies and practices that directed how such requests were evaluated and denied, including the standardized framework challenged in this action.

28. **Notice and Relation Back**: Individually Named Defendants received constructive notice of this action upon its original filing via the Office of the Corporation Counsel. They knew or should have known that, but for a mistake concerning the identity of the proper parties, this action would have been brought against him personally given the specific allegations regarding his conduct in the original Complaint [ECF No. 1].

29. **Defendants are Responsible for the Delayed Identification of Individual Liability**: Moreover, Defendants have improperly concealed documents, including the unredacted emails referenced in Paragraph 9 and knew, or should have known, that the emails would give rise to individual capacity claims for the persons referenced in the emails, and others, like Eric Eichenholtz, who was upon information and belief one of the highest level City attorneys exercising the policy choice to improperly conceal the emails and other factual discovery revealing animus by City actors.

<u>**FACTUAL ALLEGATIONS COMMON TO PLAINTIFF**</u>

I.      **The Pandemic and the City's Vaccine Mandates**

7

30. In March 2020, New York State declared a statewide emergency due to the Covid-19 pandemic.

31. Contrary to Defendants' frequent assertion, New York City's vaccine mandates were *not* an "early pandemic measure" but instead were instituted at least a year and a half after the pandemic began.

32. Defendant Chokshi did not announce the DOE mandate until August 2021, two months after then-Governor Andrew Cuomo declared that the pandemic emergency over in June 2021.

33. When the mandate was implemented, DOE teachers had already been back working in person with students in DOE schools for over a year.

34. DOE schools were closed from March through June 2020. But by the fall of 2020, in person learning resumed and teachers were required to work in person unless granted accommodation.

35. Vaccines became available to teachers in December 2020, almost a year before the mandate was implemented.

36. But teachers, including Plaintiff, were not required to take them. Instead, Plaintiff was allowed to test weekly in lieu of vaccination, as every other school district in the state allowed throughout the entire pandemic.

37. In August late 2021, Defendant Chokshi announced that the testing option would be removed effective October 2021.

38. In sum, employees were allowed to teach unvaccinated in person with students through the height of the pandemic during the entire 2020-2021 school year, the summer of 2021, and the first quarter of the fall semester of 2021 before they suspended without pay on October 4, 2021, for failing to get vaccinated in violation of their sincerely held religious beliefs after the Statewide Covid-19 Pandemic Emergency was declared over.

## II.    DEFENDANTS ADOPT A DISCRIMINATORY ACCOMODATION PROCESS.

**A.   Litigation and Labor Disputes Forced Defendants to Allow for Accommodation**

39. The DOE Mandate did not originally provide religious or medical accommodation but was amended to specifically provide such accommodation as a result of lawsuits and labor disputes.

40. Mayor de Blasio told the press that the no-accommodation model the City was applying in their mandates was a "first in the nation" approach and the goal was to make it miserable to live in New York City without being vaccinated.

41. On September 14, 2021, in litigation brought by sixteen labor unions, Justice Laurence Love issued a Temporary Restraining Order ("TRO") enjoining enforcement of the August version of the DOE Mandate because it failed to provide for religious and medical exemptions.

42. On or about September 15, 2021, Defendant Chokshi issued a new version of the DOE mandate which stated: "**Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law**."

43. Justice Love dissolved the TRO the next day "solely" because the City's promised that this new version would allow for reasonable religious and medical accommodation and they had amended the DOE Mandate to so state.

44. Defendant Eric Eichenholtz, then Chief Labor and Employment attorney for the City, later admitted in sworn testimony as Defendants' 30(b)(6) witness that nothing in the amended DOE mandate precluded accommodation for an employee to work unvaccinated *in person or remotely* from that point on.

**B. Arbitration Compels Religious Accommodation and Allows for Use of "Stricken Standards"**

45. In parallel labor proceedings, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse against the City and the DOE. On September 10, 2021, an

9

arbitrator, Martin F. Scheinman issued an order that required both the City and DOE to permit religious exemptions to its DOE vaccine requirements. Identical orders were issued for DOE employees covered by other unions (collectively referred to as the "Impasse Order.")

46. Nothing in the Impasse Order, any of the DOE contracts or the awards waives the right of employees to file lawsuits for civil rights violations even if Defendants were ordered or encouraged by arbitration awards to engage in discrimination.

47. The Impasse Orders directed the City as well as the DOE to provide religious accommodation from the Covid-19 vaccines, regardless of any assertion of "undue hardship."

48. They provided that the City and DOE could use either the criteria and expedited process set forth in the order, or "any statutory reasonable accommodation process" to decide who to accommodate.

49. The criteria and expedited process set forth in the Impasse Orders is referred to in this and other litigation as the "Stricken Standards."

50. On their face, the Stricken Standards singled out Christian Scientists for favor, and categorically excluded "personally held" religious beliefs, and also any religious applicant whose so called "leader" of their faith had publicly supported vaccination.

51. Moreover, the Stricken Standards imposed a clergy requirement, stating that any request "must be documented in writing by a religious official (e.g. clergy)."

52. The policy not only forbade accommodation for employees who followed a personal religious path but went a step further. Under the discriminatory criteria, accommodation was not available to anyone who belonged to a religion that wasn't deemed "established" and "recognized" either.

53. To the extent that DOE evaluators decided an employee belonged to a "recognized" and "established" religious organization, and the employee presented a clergy letter, the applicant would still have to be denied "if the information was available online." In other words, if the church placed a description of their ministry online, the person would be denied an exemption.

54. Additionally, if a person did happen to belong to an "established" and "recognized" religious organization that is hierarchical and provided letters from clergy in support and the Church that did not make their views known online, that person would still have to be denied if any "leader" of that person's "religious organization" had ever spoken publicly in favor of vaccination.

55. Decision-makers were given enormous discretion to define who the "leaders" of any given religion were.

**C.  The City and DOE's Implementation and Enforcement of Discriminatory Standards**

56. Both the City and DOE are liable for the implementation of the Stricken Standards against Plaintiff and their colleagues.

57. Since 2002, the City has exercised Mayoral control over the DOE.

58. The Impasse Orders also imposed a non-delegable duty on *both* the City and DOE to provide religious accommodation to DOE employees and stated that as "an alternative to any statutory reasonable accommodation process, the City" (and DOE) could use the criteria and process set forth in the arbitration order or any other statutory process.

59. The City and DOE could have followed the Impasse Order by implementing and endorsing lawful statutory accommodation policies, as the award stated that the City could use either the Stricken Standards or any other statutory process. Instead, each chose to adopt, endorse and enforce the "Stricken Standards" which were facially discriminatory.

11

60. The government cannot lawfully implement, enforce or even endorse discriminatory policies. Yet, the City and the DOE each elected to use the Stricken Standards to determine who received religious accommodation from the Covid-19 vaccine mandate.

61. Upon information and belief, Defendants Eichenholtz and/or Steven Banks, who were, at all times relevant to this Complaint, working under the direction and guidance of the City of New York as high level policy-makers and City attorneys, approved and/or proposed some or all of the discriminatory criteria adopted in the Stricken Standards and advised the City on how to implement it.

62. Eichenholtz was, at the time, a senior policy maker in the Law Department, overseeing the City's employment litigation and policy. When asked if he participated in drafting or recommending the Stricken Standards criteria to Arbitrator Scheinman, he said that was privileged and he could not answer. But he later admitted that he was at least asked for his advice during this process and advised those implementing the policy.

63. Given that the City elected to endorse and implement the unconstitutional Stricken Standard criteria and interpret it in a maximally discriminatory way, and that Eichenholtz continued to implement and direct employees to continue using many of the unconstitutional criteria when he oversaw the City's "remedial" Citywide Panel reviews after the Second Circuit found the first process unconstitutional, it is a reasonable inference that Eichenholtz' advice was supportive of using the discriminatory criteria.

64. Defendant Banks also approved and upon information and belief suggested the criteria. Banks was the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks was the City's chief policy maker and representative in the arbitration process.

12

65. The September 2021 emails referenced in Paragraph 9, *Supra*, originated from Banks and show that he was closely connected and involved in the discriminatory process at the DOE, including through collusion and agreement with the UFT union, DOE, and arbitrators to categorically discriminate against entire faiths and swaths of sincere religious beliefs.

66. In the recently court-ordered disclosed emails, Banks expressed frank animus towards religious objectors, calling their sincerely held beliefs "BS" and attempting to concoct a strategy to ensure that as many of them as possible could be denied accommodation.

67. As described in more detail below, the emails also show Banks was working closely behind the scenes with the DOE and the unions to get buy in to implement the process in a maximally discriminatory way. A true and accurate copy of the email chain is attached hereto as Exhibit 1, not for the truth of any statement made therein but to show it was said.

68. The City's proposed criteria for what constitutes a "valid" religious belief, which the arbitrator adopted, were facially discriminatory. Defendants knew or should have known these criteria were illegal. At the time they were imposed, this Circuit's precedent had already recognized for decades that a clergy certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have religious beliefs that differ from those of their priest or church leadership. And the Supreme Court and this Circuit had repeatedly clarified that personally held, unorthodox, and idiosyncratic beliefs were protected, and that the government is not entitled to deny accommodations by contesting whether an adherent is correct about the factual underpinnings of her beliefs.

69. Not only did Defendants propose and choose to use the Stricken Standards instead of lawful standards, but, at every step, the City and DOE, in coordination with the individually named Defendants, arbitrators and the union, they enforced the Stricken Standards policy in a way to

13

maximize the burden on religious applicants and deny as many applicants as possible, typically through instructions to categorically reject whole swaths of sincerely held protected faith be it due to the alleged "religious leader" publicly supporting vaccination, a bad faith argument about an alleged lack of sufficient connection between abortion or other sinful tainting of the vaccines, or assertions about what various religions "require" of their adherents.

### III.    PHASE I IMPLEMENTATION – THE AUTOGENERATED BLANKET COMPUTER DENIALS.

70. Employees were given just a few days to prepare a religious exemption application, which DOE instructed had to comply with the Stricken Standards criteria and attach a clergy letter or it would be denied.

71. All applications had to be submitted through the "SOLAS" portal.

72. Widespread crashes and other issues with the system prevented many employees from applying through SOLAS on time.

73. Some employees were not alerted that there even was a deadline.

74. When employees were able to apply, they were (generally within 24-48 hours) denied accommodation through an autogenerated email from "solas_donotreply" stating: "Your application has failed to meet the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations. This application was reviewed in accordance with applicable law as well as the [Impasse Order]."

14

75. Some autogenerated responses also stated: "Under the terms of this order, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice…" Others did not add that last line.

76. Other than that, essentially this same email was sent to all applicants without any individualized review including employees who already worked fully remotely.

77. Multiple misstatements are contained within. For example, as Eichenholtz later testified, the Commissioner had by that date amended the mandate to clarify that it did not prevent DOE employees from working in person with students or elsewhere.

78. Moreover, pursuant to the arbitration process, the City, the Union and the DOE had set up a comprehensive plan to accommodate thousands of DOE employees if necessary at remote worksites and through various re-assignment or remote assignment positions. These worksites were largely sitting empty throughout the pandemic.

79. To maximize the denials, the City and the DOE did not even follow the few portions of the Impasse Orders that benefitted employees. For example, the one compromise that the Stricken Standards made in favor of religious employees was that for those lucky few who met all the unconstitutional criteria for a qualifying religious belief, those employees "shall be permitted the opportunity to remain on payroll" by utilizing the reassignment and remote worksite plans without any carve out or mechanism for denial based on undue hardship.

80. But, in the initial review, within hours of receiving each application, the DOE system issued autogenerated denials to every single applicant denying each application and, stating vaguely, that the applicant did not "meet criteria" and any accommodation would be an "undue hardship" or "more than a minimal burden" anyway so no accommodation would be made regardless.

15

81. At the bottom, the autogenerated emails each stated that the denials had been made in accordance with the Stricken Standards and other statutory accommodation laws.

82. Defendants took the most discriminatory parts of the Impasse Order (the City's discriminatory criteria) and combined them with a blanket denial because of "undue hardship" using Defendant's interpretation of an unlawful "de minimis" hardship standard that was impossible to meet.

83. But the two processes were not meant to work together. The Impasse Order stated that if it were being used, it was the "exclusive" method to be used for accommodations requesting accommodations at the remote cite locations negotiated in the arbitration proceeding for employees accommodated under that process.

84. In addition to violating the Impasse Order, the blanket undue hardship designations did not comport with the law. At all times relevant to these proceedings, Defendants were required at minimum to prove "significant hardship or expense" not de minimis hardship.

85. Defendant Eichenholtz refused to correct the undue hardship standard, even though he and the City and DOE defendants were promptly notified in 2021 that they were using the wrong standard.

86. Eichenholtz, the City and DOE instead continued to use the "de minimis" standard throughout the first reviews and even in the remedial reviews that Eichenholtz later supervised after the Second Circuit struck held the first DOE process was unlawful.

87. Eichenholtz, the City and the DOE took the position that under the "de minimis" burden they were willfully applying in error, any effort whatsoever was assumed to be too great to meet this low threshold so no analysis or evaluation was necessary.

16

88. Eichenholtz conceded that neither he, DOE nor the City ever assessed any request individually or even as a whole to specifically determine cost or threat level.

89. Defendants did not meet the significant hardship or expense standard applicable under the NYSHRL and NYCHRL or the substantial hardship standard applicable under Title VII.

90. No employee, including Named Plaintiff, was ever offered any cooperative dialogue before being summarily denied. Specifically, neither DOE nor the City ever engaged in a "good faith" "written or oral dialogue" with Plaintiff concerning "the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for a covered entity" as required under the New York City Human Rights Law prior to sending the autogenerated denial of accommodation.

91. Nor did DOE or the City ever engage in an individualized analysis of the required enumerated statutory factors or any economic or safety factors under any of the controlling three accommodation statutes before denying relief.

92. In fact, decision-makers at DOE admitted in sworn testimony that no one even reviewed the applications before sending out the blanket bad faith denials.

93. 100% of applicants were thus denied, even those who had already been approved to work entirely remotely or whose jobs were remote, without any human review, leave aside cooperative dialogue.

94. The highest decision-makers representing the City, including Eichenholtz, who oversaw the religious accommodation processes for DOE employees, Banks, and then-Mayor de Blasio, were aware of that DOE was sending autogenerated denials and failing to apply lawful standards.

17

95. The City, through their senior policymakers including Defendants Eichenholtz, Banks, Bray, Varma, Ashfar and Chokshi, as well as Mayor de Blasio, were also aware that DOE was not providing statutorily compliant reviews.

96. Despite the City's concurrent responsibility to ensure that lawful religious accommodation was provided to DOE employees, the Mayor and others including but not limited to Banks and Eichenholtz encouraged and condoned this breach of duty and failed to intervene to correct it or train DOE employees to correct the breaches.

## IV.    PHASE II – THE ARBITRATION HEARINGS UNDER THE STRICKEN STANDARDS.

97. After receiving their autogenerated denials, DOE applicants were given one business day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Stricken Standards.

98. The system crashed repeatedly and hundreds were unable to file appeals despite diligent effort.

99. Some felt it was futile, since the arbitration appeals were expressly governed by the facially discriminatory Stricken Standards, which required denial of Catholics and many other faiths.

100. Others, who did appeal, were given another round of discriminatory and cursory denials, proving that there was validity to the belief that appeal was futile under the Stricken Standards.

101. Arbitrators had complete discretion whether to grant a zoom hearing or just automatically deny an applicant, and either way, they did not have to document any reasons for their decisions other than writing an "x" next to the word "denied."

102. No records were kept to notate the reason that any particular employee was provided with a hearing or denied or accepted.

103. Employees that got a hearing were subjected to even more discriminatory treatment.

18

104. As detailed in this and the next section, the City adopted an official policy, passed on to the arbitrators and DOE, that Jews, Catholics, Muslims, Buddhists, most Christian sects (other than Christian Scientists and Jehovah's Witnesses), and many other faiths were categorically barred from accommodation under the Stricken Standards.

105. During the arbitration reviews, the DOE zealously argued for these discriminatory policies. For example:

   a. DOE representatives repeatedly admitted that they took the official position, in accordance with the City's instruction, that all Jews, Catholics, Muslims, Buddhists and most Christians were per se ineligible for accommodation based on the (often erroneous) assertion that the leaders of these faiths were vaccinated.

   b. In the hearings, DOE representatives and arbitrators repeatedly accused applicants of, essentially, being heretics or wrong because the Pope was vaccinated and he was, in their view, the authority for most Christians. This argument was levied at Catholics, but also at non-Catholics. DOE even asserted that a Buddhist with sincerely held religious beliefs had to be denied because his views allegedly were out of accord with Pope Francis.

   c. City officials, DOE representatives and arbitrators also stated openly that people with personally held religious beliefs, or who did not have a clergy letter, *had* to be denied even if they were sincere.

   d. Those who expressed concerns about abortion were told to their face that their beliefs, even if sincere, were wrong and were in any event categorically ineligible.

106. **After the arbitration process, at least 169 DOE employees were granted accommodation,** and some of these were classroom teachers. These improperly

19

preferenced employees were allowed to keep their job and remain accommodated throughout the entire period of the mandates

107. Sometimes arbitrators deviated from the Defendants' unlawful criteria. Kane plaintiff Ruiz-Torres was told by her arbitrator during her arbitration hearing that most arbitrations applied the position that non-denominational Christians were not eligible. Ms. Ruiz-Torres' arbitrator said he was deviating from that position because as a Southerner, he knew that some non-denominational churches were valid.

108. DOE and the City knew that arbitrators were categorically denying applicants from non-denominational religions and encouraged and condoned this and other widespread abuses.

109. After the hearings, the vast majority of appellants were denied, again, with no explanation other than an "x" next to the word denied.

## V.   THE CITY PARTICIPATED EXTENSIVELY IN THE RELIGIOUS DISCRIMINATION DURING PHASE I AND II AT DOE.

110. What was not yet known with enough specificity for the Second Circuit to hold that the Mandate was facially non-neutral in *Kane,* was that the City was jointly responsible for the accommodation process at DOE, and not only failed to train or intervene but participated and directed some of the discrimination occurring during Phase I and II of the DOE's original accommodation process. Some examples follow:

### A.  The Chokshi Letter

111. A significant fact unknown when the Kane and NYFRL complaints assessed on appeal were filed, was that Commissioner Chokshi himself wrote and disseminated a letter instructing the DOE and arbitrators to deny religious objections related to abortion and other improper advice.

112. In the letter, Commissioner Chokshi particularly instructed decision-makers to deny religious beliefs based on an objection to the vaccines' connection to abortion.

20

113. Though he stated it in a manner that was intentionally confusing, and led many decision-makers to beliefs there was no connection between abortion and the vaccines, Commissioner Chokshi admitted in the letter that cell lines from aborted fetuses were technically used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure.

114. Nonetheless, Chokshi asserted in his letter that religious objection was still unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

115. Commissioner Chokshi also claimed that other products, like Tylenol, used aborted fetal cell lines the same way and suggested that no one could therefore have sincerely held objections to the vaccines because these products were so widespread.

116. The Chokshi letter contains several material misrepresentations, as set forth in more detail in the next section, not least of which is that Tylenol and other products listed in the Chokshi letter did not actually come to market by using aborted fetal cell lines as Chokshi asserted.

117. Regardless, the government is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

118. Commissioner Chokshi sent this letter to the DOE and to the arbitrators hearing the appeals. The same letter was then later sent to the Citywide Panel, which also relied on it, as evidenced by the denial of Sarah Buzaglo, who was denied by the Citywide Panel on the ground that her concerns about abortion conflicted with guidance from Commissioner Chokshi.

21

119. DOE representatives and arbitrators cited Commissioner Chokshi's letter as authority for denying accommodation to employees who had concerns about the use of aborted fetal cell lines in production or development of the vaccines, even in cases where they found the employee's religious objections sincere.

**B. Emails Showing High Level City Policy Makers Concocted and Coordinated the Promulgation of the Chokshi Letter**

120. The emails disclosed in March, referenced in Paragraph 9, *supra*, show that Chokshi's letter was concocted by high level City policy makers and intentionally disseminated to advise and assist arbitrators in discriminating against sincerely held religious beliefs that included tainted blood or abortion concerns.

121. Steven Banks, First Deputy Commissioner & General Counsel for the NYC Office of Labor Relations ("OLR") represented the Mayor and the City in all labor relations with unions.

122. Banks has expressed open disdain for religious objections to vaccination and actively worked to try to suppress accommodation.

123. On September 20, 2021, Banks wrote an email to a number of high-level policy makers at City Hall, and the DOHMH.

124. In Banks' September 20, 2021 email, he noted that 2/3 of appeals from the initial DOE blanket denials were religious, and many cited religious objections to abortion or certain animal products. He said "since many of these claims are going to labor arbitrators" for appeal "it would be very very helpful if we could get a document signed off on by a City Doctor that essentially makes the argument as to why this is BS."

125. In case there was any confusion about what this letter was to be used for, Banks asserted that the purpose would be to give the arbitrators something they could use to justify denying religious accommodation requests, which leads to a reasonable inference that the arbitration firm

22

shared Banks' goal of denying accommodation requests and looking for ways to shield those decisions from later challenges.

126. Jackie Bray, the Deputy Executive Director of the City's NYC Covid-19 Test & Trace Corps, and a high-level policy maker at the time for the City's Covid Policy and interagency coordination agreed to try to pull together a letter by the next day.

127. Ms. Bray was promoted after this work for the City by Governor Kathy Hochul serve as Commissioner of the New York State Division of Homeland Security.

128. Prior to the promulgation of the mandates and religious discrimination at DOE, Kathy Hochul met with Mayor de Blasio to discuss her goal of coercing vaccination once Pfizer received approval by the FDA. The New York City mandate was coordinated with and referenced the New York State healthcare mandate which was later struck down as unconstitutional and arbitrary and capricious after the new York State Department of Health admitted that Covid-19 vaccines cannot stop transmission of Covid-19.

129. Ms. Bray found a North Dakota Department of Health handout claiming religious objections were invalid (which was, on its face, clearly unconstitutional for a government to weigh in on) and an unverified blog that was hostile to religion and falsely asserted that aborted fetal cell lines were also used to bring Tylenol and a host of other common over the counter medications to market so objectors could not be sincere. She conveyed that these would be great resources and they could use them to create something similar to provide to arbitrators from the City.

130. Bray stated "the MD's were also batting around the idea of making someone attest to rejecting all the medications on this list and look for proof that they have rejected all of these 'sincerely' for some time."

23

131. Bray asked Banks to send her some of the DOE employee religious accommodation letters so she could craft a response that would be tailored to deny them, stating "we clearly have very good material here (citing the blog) and we also want to give you the best product we can because this will absolutely be subject to litigation and will go far."

132. Banks then brought in other high level policy makers and administrators from the DOE, OLR, and City Hall, asking them for help to provide some examples of DOE employee applications objecting to fetal cell lines used in the development of Covid-19 vaccines with the unmistakable message that these were to be used as models for arguments to proactively categorically refute.

133. He admitted, "The first page of the North Dakota document is a little bit more neutral than I was thinking…We can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated." He meant by having the Commissioner state that it was religiously acceptable to get the vaccines regardless of the connection to abortion.

134. Banks also approved Bray's idea of creating a sincerity test that resulted in disqualification if an employee did not also state that they avoided Tylenol and other products listed in the blog, stating, "Yes, the list is good. Because to the extent that there are hearings in these cases, the employees can be asked about whether they use or have used those medications."

135. Banks noted that he was coordinating with the UFT teachers union on this plan to endorse denial of certain disfavored beliefs and promised to get them the document before the arbitration hearings started later that week.

136. Once a draft was created, Dave Chokshi and Jay Varma were cc'd. Bray stated – "Attached is a memo Annie drafted. Obviously need Dave [Chokshi], Jane and Jay [Varma] to

24

review and then need to know from OLR if this works."

137. Jay Varma said the memo was "okay with me."

138. Bray noted that she added a line to the draft "about pork, beef and animal products" which she needed DOHMH to confirm. She suggested that DOHMH should sign off and send to OLR, stating "We are moving fast here on negotiations and hearings on exemptions so wanting to wrap this up today." She noted that OLR also had a draft circulating.

139. Nellie Afshar, then Chief of Staff at DOHMH said she had edits. She sent a draft to Dave Chokshi, asserting that it was okay "on our side" and asking if he had "any issues with this coming from you."

140. On September 21, 2021, Defendant Chokshi wrote that he had no issues with it coming from him. His primary question was "We had to remove the section about pork and animal products? Seemed they wanted it specifically." Ms. Ashfar agreed to add those back in and also said she went further by "adding a line about Tylenol, advil etc" even though she knew this list was not accurate. She said, "For awareness, we have not been able to verify the list of meds, I asked Jack if she could track it down with Jay."

141. Dave Chokshi thanked her with several exclamation points. Chokshi then signed off and the letter was sent to the arbitrators and DOE representatives despite the fact that the list was never verified.

142. Chokshi's letter was repeatedly cited for the line in the letter stating "the Pfizer and Moderna vaccines do not use any fetal cell lines for vaccine production." However, in the same letter, he buried the admission that all three vaccines did use aborted fetal cell lines to bring the products to market. Many arbitrators and decision-makers misunderstood the letter as saying that there was no connection.

143. As advised by Banks, the letter then takes the position that even if fetal cell lines were used, this is not a religious problem because an "array" of religious leaders advise taking the vaccine. Chokshi claimed the Catholic Church had clearly taken the position that Roman Catholics were able to take the vaccine without issue though this was not true. Even the facially unconstitutional North Dakota public health handout itself did not go that far, acknowledging that the Church advised that some Catholics would not be able to take it due to guidance from their religious conscience.

144. The letter also falsely stated that Tylenol and certain other over the counter medications used aborted fetal cells to bring their products to market in a similar way.

145. The statements about Tylenol and other drugs is false and as the emails show, was knowingly unverifiable at the time.

146. Neither Bray nor Varma nor Chokshi nor Afshar ever managed to verify the list.

147. Assuming arguendo that there was any truth to Chokshi's assertion that Tylenol and other listed over the counter medications used aborted fetal cell lines the same way the Covid-19 vaccines did, it was not common knowledge that any alleged connection existed sufficient to put most religious people on notice to look into it. By contrast, it was widely discussed that the Covid-19 vaccines all made use of aborted fetal cell lines to bring the products to market.

148. In fact, Tylenol, Advil and other products on the list were not brought to market using aborted fetal cell lines and Chokshi and the others on the email participating in the drafting of the letter had no good-faith basis to assert they did.

149. Because of Chokshi's misinformation, and the City's use of it, thousands of employees at DOE and the City level were denied for failing to state that they avoided Tylenol as part of their religious practice.

26

## C.  Other City Instruction to Discriminate

150. Another significant fact not before the Second Circuit was that the City, acting through its attorneys, Banks and the OLR, the Law Department (supervised by Eichenholtz) and the Department of Citywide Administrative Services ("DCAS"), provided arbitrators and DOE representatives with instructions and articles supporting their official policy to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists, most Christians and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination or the viewpoint that religious opposition to Covid-19 vaccines was not real.

151. During the arbitrations, DOE representatives and arbitrators admitted that these articles from the City and/or the Chokshi letter were a reason why applicants of those faiths were being denied accommodation.

152. For example, multiple Jewish applicants were told that they could not be accommodated, even though they had sincerely held religious beliefs, because Jews were not allowed to be accommodated under the governing policies. The adjudicators pointed to an article (sent to them by attorneys and agents for the City including DCAS) about a rabbi in Israel who was vaccinated. Even when applicants had a letter from their own rabbi and explained that Judaism is diverse and they are not bound by the views of a different random rabbi, they were told that they could not qualify because the "leader" of their faith as Defendants saw it, was the rabbi in Israel.

153. Hundreds of Christians, even non-denominational Christians, were told that they were per se ineligible because Pope Francis was vaccinated, even if the pastor of their own church submitted a letter explaining that their congregation was opposed to the Covid-19 vaccines.

27

154. An arbitrator told Jerrian Jaloza, a plaintiff in another matter, that her religious objections, especially to abortion, were unquestionably sincere, but the City's policies did not allow him to accommodate Catholics.

155. Similar categorical denials were issued to Muslims, based on the City's provision of an article about a so-called "leader" of the Muslim faith who was vaccinated, Buddhists, based on a similar article about the Dalai Lama (even though there are thousands of sects of Buddhism and the central tenet of Buddhism for any sect is that the religion is not hierarchical), and so forth.

## VI.  Mayoral Statements Confirming Discriminatory Intent

156. DOE and the City's widespread, acknowledged policies reflected ex-Mayor de Blasio's specific guidance and admission of how the City intended to handle the applications for religious accommodation.

157. Mayor de Blasio openly endorsed the Stricken Standards policies.

158. For example, in a press briefing held on September 23, 2021, the night before the arbitration hearings began, ex-Mayor de Blasio was asked how the City would decide which DOE employees would be accommodated or not. He replied that the arbitration award "rules" were "very, very clear about what constituted the types of criteria for these exemptions." He acknowledged the City was involved in coming up with the Stricken Standards and further stated: "the ground rules were 100 percent set through an arbitration process that involved the city..." He then noted that he was "struck at how few people applied for these exemptions" after hearing about the criteria the City set as if that was a very good thing.

159. When the reporter followed up at the same September 23, 2021 press conference, asking if he could go into some of the criteria the City would use to determine who got religious exemptions at DOE, Mayor de Blasio said:

28

**Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So**, we are saying** very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.

160. When the Second Circuit held in *Kane* that the record in that early case did not have enough facts to establish the City was involved in the DOE's accommodation process sufficient to find that the Mayor's comments were relevant on a preliminary injunction motion, the Second Circuit did not have before it the first part of the Mayor's statement to the press in which he stated: "the ground rules [Stricken Standards] were 100 percent set through an arbitration process that involved the city..."

161. Nor did the Second Circuit know that the arbitration award, on its face, ordered the City as well as the DOE to adopt and implement a religious accommodation policy, meaning the City was jointly liable and responsible for what process was chosen and how it was implemented.

162. Nor did the Second Circuit have Commissioner Chokshi's letter, the emails from high level City and Mayoral office policymakers and the Commissioner who issued the mandate himself, articles provided by DCAS (Department of Citywide Administrative Services) encouraging the DOE and the arbitrators to categorically deny most religions, or the many other facts in this complaint that show City involvement and encouragement of the discriminatory policies originally in place at DOE.

163. Banks was the Mayor's liaison and primary representative in the arbitration negotiations and implementation of the DOE religious accommodation process. The Mayor made these statements the very day after Banks finished getting the Chokshi letter drafted.

29

164. As set forth in the individual and general fact sections of this complaint, the City was well-aware of the discrimination going on at DOE, it had a legal responsibility through the arbitration award to make sure it did not occur and correct it when it did, and instead of doing that it encouraged, directed and endorsed the discriminatory policies at DOE.

165. This presents a fresh record that requires a fresh determination of whether the mandates can be considered "neutral" on these facts and also whether the mayor's comments can truly be deemed "merely personal" rather than an endorsement and/or admission and/or instruction.

**VII.   Defendants Exercised Discretion to Accommodate Some Religions and Similarly Situated Individuals but Deny Others.**

166. The discretionary system resulted in unequal results.

167. After the arbitration appeals, most applicants were provided denials with no further explanation than an "x" next to the word "denied."

168. At least 165 employees whose beliefs were deemed to fit within the discriminatory criteria, were accommodated and remained accommodated throughout the DOE Mandate.

169. The 165 employees accommodated under the Stricken Standards included classroom teachers as well as many others whose jobs typically involved in-person work with students as well as administrators who worked in and outside of buildings with students.

170. Defendants accommodated some teachers by providing them with co-teachers and then allowing them to teach virtually from home or one of the remote sites set up by DOE for that purpose while their co-teacher was present in the classroom with students. Others were provided with more administrative work or other shifts in job responsibility.

171. As one of many examples, an art teacher whose religious beliefs were deemed to qualify under the Stricken Standards was allowed to work from home and join her class by Google Classroom, while the DOE hired a new long-term substitute to be physically present in her

classroom with the students so she could teach from afar. This art teacher was able to continue working throughout the entire mandate through this accommodation and was never terminated and thus still has her job today.

172. Special education teachers and certain other teachers typically already had co-teachers.

173. Special education students were also the first to return, most over a year before the mandate was implemented. It was common during the pandemic for the entire class of special education students and a co-teacher to be present in the building and the other co-teacher to be accommodated and allowed to teach break out groups and other subjects remotely.

174. But Defendants did not bother to individually assess how much it would cost or provide any reason why special education, art or other teachers couldn't also be accommodated this way.

## VIII.   JUDICIAL RESPONSE AND SHAM REMEDIATION

### A.  The Second Circuit's Holdings in *Kane* Regarding DOE Employees

175. On November 28, 2021, on a far sparser record than here, the Second Circuit Court of Appeals held that DOE Plaintiffs were likely to succeed against the City and the DOE on free exercise claims. Specifically, the Court held that the religious accommodation policies used to implement the DOE Mandate were neither neutral nor generally applicable and that Defendants were unlikely to survive strict scrutiny, as they offered no compelling reason to engage in religious discrimination. *Kane,* 19 F4th at 167-169 (Kane I).

176. In the opinion and oral arguments, the Second Circuit particularly remonstrated Defendants for discriminating against personally held religious beliefs, conditioning access to accommodation on whether the belief was shared by so called leaders and second guessing an applicant's interpretation of what her own faith required of them.

31

177. Even the City's own defense attorneys, who worked under the direction of Defendant Eichenholtz, admitted in oral arguments that their religious accommodation policy was "constitutionally suspect."

178. In the Decision and Order, the Second Circuit "confirmed the suspicion" was accurate - and pointed out that Defendants had offered no excuse for the unconstitutional and discriminatory policy.

179. The Second Circuit held that all the *Kane* Plaintiffs, including Trinidad Smith, who had not applied under the Stricken Standards because she felt it was futile, were likely to succeed on their free exercise claims.

180. After vacating the denial of preliminary injunctive relief, the Court ordered the City to provide "fresh consideration" of all the *Kane* Plaintiffs' requests for religious accommodation by a central citywide panel (the "Citywide Panel") which was to reinstate applicants with back pay if they qualified under lawful state and federal religious accommodation statutes (in accordance with the standards required by the First Amendment).

181. To avoid an order requiring broader relief, the City agreed to provide the same review to other DOE employees denied under the Stricken Standards.

## B.  PHASE III - Second Failure to Accommodate – Failure to Provide Remedial Review

182. Despite the admission that their initial reviews were unconstitutional and the City's promise to step in and remediate, neither the City nor the DOE ever provided Plaintiff any remedial review.

183. The remedial reviews were handled by a newly created "Citywide Panel." At all times, the Citywide Panel was wholly under the control of the Mayor's office and was an arm of the City of New York.

32

184. The Citywide Panel was designed and overseen by Defendant Eichenholtz, who had by that time been promoted to Chief Assistant Corporation Counsel for Employment Policy and Litigation. As such, he was simultaneously responsible for defending the City from the *Kane* and other religious discrimination lawsuits and also for determining policy both for how the Citywide Panel "remedial" reviews would be conducted and which employees would get remediation.

185. The City was jointly responsible for the original discriminatory process. Faced with the claims of thousands of DOE employees who had been denied under the Stricken Standards, a policy which the City (and upon information and belief Eichenholtz) had submitted or approved, these parties were not neutral "remedial" actors.

186. Eichenholtz had a motivation to try to mitigate the damage to his client by upholding as many denials as possible in the "fresh review" process. The case was, after all, as the City refers to it still "sub-judice" and the outcome could have massive financial consequences to the City and potentially employment consequences to Eichenholtz and others that gave the City unconstitutional advice or helped craft the unconstitutional policies.

187. Though the City promised to remediate the harm from the Stricken Standards, under Eichenholtz's direction the Citywide Panel only reviewed about 500 out of the 5,000-7,000 DOE employees who'd been denied accommodation under Stricken Standards.

188. Eichenholtz, who had decision-making authority over the Panel's policies and approach, knew that thousands more DOE employees, like Plaintiff, were denied religious accommodation under the Stricken Standards and required remediation. He and the City exercised discretion *not* to review Plaintiff and the thousands of others who were denied under the original Stricken Standards.

33

189. First, the Citywide Panel adopted a policy under Eichenholtz of not remediating denials unless an employee had appealed under the original facially discriminatory policy - even though the Second Circuit had already found that Plaintiffs who did not apply for appeal, like Trinidad Smith, were still likely to succeed – and even though the facially discriminatory policy was admittedly unconstitutional and no other process had been offered.

190. Second, the Citywide Panel failed to issue decisions to most of the Plaintiffs who did try to appeal under the facially unconstitutional process and who the Citywide Panel was supposed to be reviewing but did not.

191. Plaintiff here also took the extra step of sending notices of claim to the City, Commissioner Chokshi, the Chancellor of Education, the Law Department and all major decision makers at the DOE and City level on or about November 30, 2021, explaining that they required religious accommodation, had been unlawfully denied under the Stricken Standards, and required a Citywide Panel review to remedy the harms that were done to their statutory and constitutional rights.

192. Nonetheless, the Citywide Panel never engaged in a Citywide Panel review or issued either Plaintiffs a decision prior to their terminations.

**C. Defendants' Animus Further Shown by City's Failure to Renounce Prior Standards**

193. Plaintiff did not receive a remedial Citywide Panel review and should therefore be entitled to strict scrutiny as the Second Circuit already held that the process Plaintiff was judged under and which was the only option made available to them was not neutral or generally applicable.

194. However, the evidence that has emerged from discovery in other cases about the Citywide Panel reviews shows further evidence that taints all levels of review.

34

195. Out of about five hundred applicants the Citywide Panel claims to have reviewed, Eichenholtz admitted in depositions that the Citywide Panel only reversed and reinstated one DOE employee -- *Kane* plaintiff William Castro.

196. Upon information and belief, one other employee was also reinstated after the Citywide Panel process began. She was a classroom teacher who was allowed to go back and teach in person while the mandate was still in effect.

197. Mr. Castro's job involved work in school buildings with students. His office was in a school building. Yet, the Citywide Panel did not claim "undue hardship" for Castro but reinstated him with back pay and allowed him to be accommodated for the remainder of the Mandate, and he is still employed today as a result.

198. Notably, Castro clarified in his materials to the Citywide Panel that he did NOT rest his religious objection on the aborted fetal cell line issue, which likely helped him as he had mentioned the abortion issue as one of his reasons for religious objection below.

199. Emails between Eichenholtz and Citywide Panel reviewers reveal that Eichenholtz had instructed the Citywide Panel that religious objections to abortion were not eligible and personally held religious beliefs were not eligible.

200. All DOE employees other than Castro received an autogenerated denial stating "does not meet criteria" without further explanation.

201. However, internal notes and emailed explanations sent to the *Kane* Plaintiffs show that the Citywide Panel continued to apply many of the same discriminatory criteria.

202. In NYFRL, the Second Circuit reinstated the First Amendment claims of *Kane* plaintiff Heather Clark, who was denied by the Citywide Panel because her concerns about abortion and

guidance from prayer were deemed sincere but ineligible under the Citywide Panel's policies. The Second Circuit held that such reasoning violates the First Amendment.

203. Discovery has revealed that the discrimination that Heather Clark faced was not unique. The Citywide Panel continued, as instructed by Eichenholtz, to reject so called "personally held" religious beliefs, including those, like Clark's, that are derived from guidance from prayer, and continued to reject applicants with religious objections to the use of aborted fetal cells, stating in internal notation that such beliefs, while sincere, do not qualify.

204. Defendant Chokshi also failed to repudiate his prior advice after the Second Circuit held that the original policies were unlawful. His standing instructions, which were to deny religious objections to abortion because the Pope and other leaders seemed okay with the connection, were relied upon and cited by the Citywide Panelists as well as the arbitrators.

205. Not only did the City and Eichenholtz fail to repudiate most of the discriminatory criteria in the Stricken Standards, but after the Second Circuit held they were unconstitutional in *Kane*, the City started offering the Stricken Standards as an option in nearly every City department.

206. So, at most City Departments, not just DOE, a two tiered system was adopted: those that met the discriminatory criteria were entitled to accommodation under a process that allowed for accommodation without regard to undue hardship, but was facially discriminatory, whereas those that did not qualify under the discriminatory criteria had to go before the Citywide Panel, which applied a more difficult undue hardship standard.

207. Under the Stricken Standards, the criteria limited who could be accommodated. But, if an employee was lucky enough to meet the discriminatory criteria, the award stated that they "shall" be allowed to remain on the payroll.

36

208. Thus at least 165 employees whose beliefs qualified, were accommodated and allowed to remain on payroll regardless of whether they were classroom teachers, worked in buildings with students or held any other type of position.

209. The Citywide Panel, on the other hand, allowed DOE to categorically deny those who otherwise qualified under statutory standards based on a blanket assumption that any accommodation of teachers (even those who were already remote or who had co-teachers who could handle the classroom component) was somehow enough of an effort to exceed the unlawful "de minimis" standard that the City unlawfully applied.

210. Various Plaintiffs in the various lawsuits repeatedly alerted Eichenholtz and the City that the "de minimis" standard was not lawful, and they had to justify the denials under the individualized "significant" hardship or expense standard required by the NYSHRL and NYCHRL. The City ignored these warnings, which started as early as September 2021.

211. Eichenholtz was directing the religious accommodation policies and continued to apply only the "de minimis" standard throughout 2021-2023, knowing it was not the legal standard and violated employees' rights.

212. Rather than discipline him or reign him in, the City continued to champion Eichenholtz's approach, promoting him from the Division Chief for Labor and Employment, to Executive Staff as Chief Assistant Corporation Counsel for Employment Policy and Litigation in late 2021, and finally to Managing Attorney of the entire New York City Law Department, where he is in charge of this litigation and all other litigation, overseeing the entire 850+ attorneys at the Law Department.

213. Defendant Eichenholtz was thus the final policymaker for the religious accommodation process instituted at DOE and by the City as its remediation throughout all relevant periods.

214. He also controls the litigation strategy because as Managing Attorney, he is ultimately in charge of it.

215. The City's litigation approach reveals that they continue to argue for much of the criteria from the Stricken Standards without consequence. As recently as 2025, Defendant Eichenholtz still allowed Law Department attorneys to submit briefs and other pleadings to federal courts which assert that Christians and Catholics should have their cases dismissed because Pope Francis is vaccinated and thus they are presumptively ineligible since the leader of their faith disagrees.

216. These same arguments were submitted by the Law Department throughout the unemployment process to deny Plaintiff and others any possibility of receiving unemployment insurance.

## IX.   THE "UNDUE HARDSHIP" RATIONAL WAS PRETEXTUAL AND UNSUPPORTED

### A.  Similarly Situated Employees Were Accommodated Without Regard to Undue Hardship

217. A major problem with maintaining the dual track (one for those who qualify under the discriminatory Stricken Standards and the Citywide Panel process for those who don't) is that the undue hardship burden is far heavier under the Citywide Panel approach.

218. As an alternative basis for denial, the City asserted in NYFRL that it would have denied all the *Kane* Plaintiffs anyway because it was an undue hardship to accommodate employees who worked in buildings with students. This reasoning was pretextual as set forth below.

219. The Citywide Panel denials did not explain why 165 or more DOE employees who had been accommodated under the Stricken Standards, some of them classroom teachers, and most of whom worked in buildings with students, were accommodated and could continue to be accommodated while teachers with disfavored beliefs who had to go through remedial Citywide Panel review could not be. Operating from much earlier complaints, before anything was known about the

38

Citywide Panel or its processes and outcomes, the Second Circuit did not know or consider that this two-tiered system had been created.

220. Nor did the Second Circuit review the fact that the City later admitted in depositions that the Citywide Panel never actually assessed undue hardship for DOE employees, but rather, allowed DOE to make this determination without any support, analysis or cooperative dialogue on the assumption that any hardship must be "more than a minimal burden."

221. Defendant Eichenholtz admitted in sworn testimony that the Citywide Panel was fully aware that at least 165 similarly situated DOE employees remained accommodated under the discriminatory "Stricken Standards." Crucially, he failed to proffer any non-discriminatory justification for why the DOE could sustain the burden of accommodating those 165 favored employees while claiming that accommodating Plaintiff—who work in the same roles— constituted an "undue hardship."

222. Defendants' only defense—that the initial grant of 165 exemptions exhausted the DOE's capacity—is a confession of liability, not a defense. There was no quota and it is well-established that the government cannot rely on the "fruits" of its own discrimination to justify further denials. Just as an employer could not justify refusing to hire Black applicants by arguing that all available positions were already filled by White applicants pursuant to a discriminatory hiring policy in effect before court intervention, Defendants cannot claim "undue hardship" simply because they filled their available accommodation capacity with members of preferred faiths and did not want to extend the same offer to any more employees when ordered to remediate the harm.

223. By allowing this capricious double standard, the City and DOE created a two-tiered system that only further entrenched the discrimination that they promised the Second Circuit they'd remediate.

39

224. 165 of those who were found to qualify under the discriminatory criteria were accommodated without regard to any alleged undue hardship. Those who appealed to the Citywide Panel were issued blanket undue hardship denials even if they already worked remotely or outside of classrooms and could easily be accommodated in person or remotely.

225. When offered as a 30(b)(6) witness, Mr. Eichenholtz admitted that neither the City nor the DOE assessed any economic factors or data to determine what it would cost in the overall budget to accommodate any employee either in the original DOE denials or at the Citywide Panel appeal level.

226. He also admitted that the City and DOE did not assess any statutory factors on safety or any objective science before issuing undue hardship denials at any level of review.

227. He claimed that the Citywide Panel relied on DOE to just tell them if there was an undue hardship, and no details or data was required by the Citywide Panel to assess if this was reasonable.

**B. Safety Rational Was Unsupported**

228. Eichenholtz also admitted that nothing in the DOE Mandate or the Municipal Mandate precluded in person or remote accommodation and at least one DOE classroom teacher was allowed to go back into the classroom and teach in person unvaccinated while the DOE Mandate was in effect. He offered no reason the same could not have been allowed for other DOE employees.

229. To the extent that Defendants argue that they had to deny Plaintiff based on "undue hardship" related to safety that is pretextual. It was well-understood before they were terminated in 2022 that multiple safe routes of accommodation were available.

230. By the summer and fall of 2021, prior to when Defendant Chokshi began issuing vaccine mandates, the City had already seen a substantial reduction in Covid-19 related hospitalizations

40

and deaths compared to earlier in the pandemic. For instance, in its' own executive orders, on June 2, 2021, the City reported zero new Covid-19 deaths and a test positivity rate of 0.83%, the lowest since testing began.

231. By August 2021, even with the Delta variant surpassing prior variants, hospitalizations did not surge. A December 2021 statement from NYC Health Commissioner Dr. Dave Chokshi stated that while cases and test positivity had increased, "we have not seen the same thing with respect to the markers of severe disease, particularly hospitalizations."

232. When Defendant Chokshi announced the Mandate shortly after that statement in August 2021, it was clear from the scientific data available that vaccination could not meaningfully stop transmission or community spread. *See, e.g.,* Exhibit 3, Declaration of Dr. Risch, Yale, incorporated by reference herein.

233. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were at least equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with Covid-19 vaccines; (3) vaccine protection wanes significantly after a short period of time.

234. On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."

41

235. After the Mandate was announced, but before Plaintiff was suspended without pay for failing to get vaccinated in violation of their sincerely held religious beliefs, two of the nation's top public health experts wrote sworn declarations that were submitted by the *Kane* Plaintiff to all the Defendants. These Declarations were submitted by Dr. Jay Bhattacharya, then at Standford and now head of the Centers for Disease Control and Prevention ("CDC") (incorporated herein by reference and attached as Exhibit 4) and Dr. Marty Makary, then at Johns Hopkins and now Commissioner of the Food and Drug Administration ("FDA) (incorporated herein by reference and attached as Exhibit 2).

236. The Declarations of Drs. Bhattacharya and Makary, citing the most up to date data and representing the best available objective science available at the time, explained to Defendants why they could safely allow DOE employees, including Plaintiff, to keep working in person unvaccinated. They offered many alternatives to exclusion, including weekly testing, rapid tests, daily symptom checks, social distancing and other measures, and stressed that natural immunity was repeatedly shown to be far superior and more durable than the immunity conferred by the primary vaccine series.

237. Defendant Chokshi ignored these submissions and refused to issue any updated advice to the City or DOE.

238. Defendant Varma - who was widely referred to at the time as the Mayor's "COVID Czar" – later admitted he *knew* that the vaccines were not necessary.

239. Notwithstanding his role throughout 2021 as the City's principal public health spokesperson and lead architect of the vaccine mandate, Varma admitted on video recording that while he was "running the entire COVID response for the city," he personally attended large underground dance

42

parties and sex parties with sometimes hundreds of participants, many of them unvaccinated, during the period the mandates were promulgated and in effect.

240. Varma asserts he was the one who directed Chokshi to issue the mandates.

241. This is consistent with how the Chokshi letter was issued – where Varma was asked to give final approval and Chokshi appeared to be taking directions.

242. Varma further admitted on video that the vaccine mandates were a policy of "harassment" designed to make life difficult for those who objected, and that natural immunity and testing were as effective or more effective than the mandates — facts he was aware of while simultaneously advancing the mandates and approving guidance designed to categorically deny religious accommodation requests.

243. The DOE, the City and Eichenholtz also ignored these submissions and the objective scientific consensus available at the time and continued to advise DOE to deny accommodation to those whose religious beliefs did not fit the discriminatory criteria.

244. As a 30(b)(6) witness, Eichenholtz admitted that neither the City nor the DOE *ever* assessed a single study or any data to determine if they could (or could not) safely accommodate employees in person or remotely even though the Mandate allowed for either and did not possess or review any data to refute the Declarations of Dr. Makary and Dr. Bhattacharya.

245. All other school districts in the state allowed teachers to test weekly in lieu of vaccination if they wanted to work in person with students. This included neighboring Long Island and other school districts with overlapping populations and similar safety profiles.

246. DOE was on notice that their policies were substantially underinclusive. By January of 2022, before Plaintiff was terminated, it was undeniable that the Covid-19 vaccine was not stopping transmission. DOE had a daily tracker noting how many active employees had Covid-19

43

on any given day. Prior to the exclusion of all unvaccinated DOE employees, the numbers averaged around 40 or 50 infected teachers at any one time. After DOE employees were excluded, the numbers did not decrease but rather increased among the fully vaccinated staff. By January 2022, the fully vaccinated staff had some days where there were thousands of infected teachers on a given day. Defendants were well aware that vaccination was not stopping teachers from getting infected and passing Covid-19 on to others.

247. In or around January 2022, due to the staffing crisis caused by the exclusion of Plaintiff and other religious objectors, DOE exercised its discretion by asking *actively infected* teachers to return to classrooms but still refused to allow employees with religious objections to the vaccine to return to work even though they had natural immunity and were not infected. Allowing actively infected teachers to teach the largely unvaccinated student body undermines the government's interest in stopping the spread of Covid-19 to a far greater degree than allowing uninfected teachers with religious objections to teach in person unvaccinated.

248. Moreover, under the Defendants' policies, over one million students were allowed to go to school unvaccinated every day. Even if the Covid-19 vaccine mandate could have created herd immunity (which it could not, since it did not stop infection and transmission), only mandating staff and teachers could not create herd immunity when one million students were allowed to come into the classroom unvaccinated.

249. According to Anthony Fauci, who was largely directing Covid-19 policy at the time, between 70-90% of a given population (depending on what he thought the population would accept as the number) needed to be vaccinated to create herd immunity. The DOE mandate only covered less than 10% of the school building population.

44

250. Moreover, not only were 90% of the population (students) largely unvaccinated, but they rode to school each day with bus drivers who had no mandate whatsoever, and could freely transmit Covid-19 to them in enclosed busses on the way in.

251. Even if Defendants were able to show that they could not safely allow uninfected teachers with natural immunity in classrooms while their actively infected colleagues taught students in person, and over a million students were unvaccinated and driven to school by unvaccinated bus drivers, there were many accommodations short of termination available including but not limited to those suggested by Drs. Makary and Bhattacharya in the declarations that were provided to Defendants.

252. In person learning had not just started in the fall of 2021, as Defendants now try to assert, but rather had been in effect since the fall of 2020. Many teachers had been working in person with students for a year and a half when they were terminated for undue hardship. They could have remained teaching in person and continued weekly testing, submitted daily symptom checks or the host of other accommodations suggested by the Declarations.

253. Or they could have worked remotely. Contrary to DOE's assertions, throughout the 2021-2022 school year, the DOE continued to offer remote education as an option to some students and was actively recruiting fully remote teachers throughout the school year rather than reassigning qualified teachers like Plaintiff who needed religious accommodation to do these jobs.

254. Remote work centers were set up after the arbitration award was issued, which were supposed to house any employees whose religious beliefs merited protection. However, these centers sat well-below capacity for the entirety of the mandate.

45

255. And, prior to the Mandate, employees had been liberally granted leave to work remotely, particularly special education employees who had co-teachers, and could also be reassigned to handle administrative tasks like writing and overseeing IEP implementation.

256. Importantly, the Mandates were always "emergency" and "temporary" in nature, and the state of emergency had to be reviewed and renewed every thirty days to justify their existence. There was no reason the same temporary accommodations could not have been granted after the vaccine mandate was in place.

257. At the very least, Defendants could have provided paid leave until employees could return, or allow employees who were on unpaid leave to pursue work outside of DOE until they could safely return, and return with seniority and tenure intact without signing a waiver of their right to challenge their denials of accommodation.

## X.   THE CITY ENCOURAGED RELIGIOUS DISCRIMINATION DESPITE MOUNTING EVIDENCE AGAINST MANDATES AND UNFETTERED DISCRETION.

258. At all relevant times, Defendant Chokshi and the Mayor had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates or repeal them altogether. Yet despite mounting evidence that the Mandates were unnecessary, and knowledge that Plaintiff and thousands of others needed religious accommodation, they did not amend their temporary "emergency" policies to provide relief.

259. Instead, Defendant Chokshi and Mayor de Blasio exercised their discretion to continue to renew the "emergency" mandate every 30 days well beyond when there was any rational justification for it.

260. On March 7, 2022, Mayor Adams and Commissioner Chokshi held a press conference, each noting how low the transmission rate was in the City. Commissioner Chokshi said: "According to

46

our data, we are currently at a low alert level" and Mayor Adams clarified the City was experiencing historically low infection rates.  The Mayor stated "I'm glad to say that the rates are low enough that the mandatory program is no longer needed." On this basis, he removed a "Key to NYC" Mandate that had required patrons to show they were vaccinated at restaurants and certain other facilities. He also stated: "As of this week, the schools' positivity rate is 0.18 percent. So I'm announcing today that we are lifting the indoor mask requirements for DOE schools between K-12 starting Monday, March 7." Defendant Chokshi and the Mayor refused to resume the weekly testing option for the DOE Mandate, despite this progress.

261. The Mayor also announced in March 2022 that he intended to lift all restrictions over parades, festivals and parties, stating: "We have become so boring as a city. I want all my parades back. Every one of them. It is time for us to enjoy our city again. All of these noes, noes, noes [sic]. We've become a city of noes. I want to become a city of excitement. We're going to look to reinstate every parade, every festival, every block party…So if you received a no that we're not doing a parade, I need to find out why."

262. When asked by a reporter to explain how it was fair that "an unvaccinated tourist from Indiana" could go to whatever restaurant they wanted starting Monday, but an unvaccinated teacher, firefighter or EMS worker who lost their job could not, Mayor Adams did not state any public health reason, but instead said "you know, this went to court, this was the rule. How we determined fair and unfairness is in the court of law." With that, the City washed its' hands of any attempt to accommodate DOE employees unless mandated to do so.

263. When asked at a March 2022 press conference if he would repeal the employee mandates and reinstate those who were denied religious accommodation and lost their jobs now that the

47

emergency was over, Mayor Adams again admitted the reason was not about public health, but rather animus to those who refused to comply:

> "The overwhelming number of New Yorkers, city employees did the right thing – the overwhelming number. It sends the wrong message to those New Yorkers who stated, even if i was reluctant, I'm going to follow the rules. That is what we are doing. We can't send the wrong message that when we say something, we're going to change and vacillate. That is what was stated people understood, particularly those who took the job with that understanding, we are people who took the job with the understanding and refused to comply. And so the information was clear. People have to follow the rules." https://www.nyc.gov/office-of-themayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covidmandates (last accessed June 20, 2025).

264. Neither DOE nor the City revisited any of the pending denials based on the low rates of Covid in schools in March 2022.

265. On March 24, 2022, Mayor Adams issued "Executive Order No. 62" (EEO 62) [ECF No. 60-2]. It amended the employee mandates with blanket exemptions for professional athletes, performers and other artists along with their make-up artists and entourages.

266. EEO 62 was entirely justified on economic rather than public health goals. The order states that these workers benefit the "City's economic recovery from the pandemic, often attracting large numbers of visitors to the City." He stated that it put athletic teams at a competitive disadvantage to bar unvaccinated players which in turn hurt the City's morale as well as economy.

267. But despite similar crushing and well-documented teacher shortages directly attributed to the Mandate, the City would not make any similar carve outs for teachers.

268. Defendant Varma, no longer employed by the City, admitted to the press that he was concerned that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

269. Furthermore, Mayor Adams knowingly allowed various City agencies to let thousands of unvaccinated employees work in person due to staffing shortages, administrative backlog, and

48

mutual aid agreements until the Mandates were repealed in 2023, while their similarly situated colleagues were being denied religious accommodation and fired without any explanation of why they were possibly more dangerous than those allowed to keep working in person. For example, the City allowed two lifeguards, who gave mouth-to-mouth resuscitation, to work in person unvaccinated while Plaintiff, and even remote DOE employees were denied any accommodation.

270. In *DePaola v. City of New York,* Index No. 85265/2022 (Sup. Ct. Richmond County), which is a related litigation on behalf of a New York City municipal worker who was denied religious accommodation in November 2022, but was granted medical accommodation in May 2022, NYPD submitted a sworn affirmation from Don Nguyen, the Assistant Commissioner of the Equal Employment Opportunity ("EEO") Office admitting that by May of 2022, Covid-19 vases and deaths were extremely low, and there was no safety issue preventing accommodation (for medical or religious reasons) in person with weekly testing so the City did not feel that there was a safety issue in accommodating employees.

271. In August 2022, the CDC issued written guidance stating that workplaces should not differentiate between vaccinated and unvaccinated employees, and that receipt of the primary series (all that was required by any of the Mandates) "provides minimal protection against infection and transmission."

272. On September 20, 2022, the City announced the private sector employee mandate would be repealed.

273. When asked at that time why the Municipal and DOE mandates would not also be repealed despite CDC guidance to treat all workers the same, Mayor Adams told the press, "I don't think anything in general with COVID makes sense and there's no logical pathway one can do." [sic].

49

274. Shortly thereafter, the Mayor admitted the City had never enforced the private sector Mandate for most (but not all) employers.

275. The Municipal and DOE Mandates were not repealed until February 2023, and then, only in an open attempt to moot the request for preliminary injunctive relief before the Second Circuit in NYFRL.

**XI.    FALL 2022 OFFER OF REINSTATEMENT AND THIRD FAILURE TO ACCOMMODATE.**

276. In August 2022, around the same time that the CDC issued written guidance stressing that vaccinated and unvaccinated employees presented a comparable risk of spread, DOE sent letters to Plaintiff and other terminated or suspended unvaccinated employees, offering them their same jobs back with no break in service if they would simply get vaccinated by September 5, 2022.

277. In August and September 2022, Defendants were fully aware that Plaintiff needed religious accommodation to return to work under the new offer but despite all the evidence and guidance explaining that there was no safety barrier, DOE, acting under the direction of Eichenholtz and other City policymakers, did not grant any religious accommodation to Plaintiff.

278. Most DOE employees who were denied religious accommodation and fired are still barred from returning to work due to coercive and retaliatory problem codes attached to their files, hostility and refusal to rehire, or the imposition of coercive "waivers" that they are required which would waive their right to seek redress for religious discrimination or back pay.

**XII.    SUMMARY OF MUNICIPAL LIABILITY UNDER MONELL (42 U.S.C. § 1983)**

279. Plaintiff incorporates by reference all paragraphs in this section as if fully set forth herein.

280.   As the complaint details, the constitutional deprivations described in this Complaint were not the result of isolated incidents or rogue employees, but were caused by official municipal policies, customs, or practices of the City and the DOE and their high level policy makers.

50

281.    Specifically, without limiting other facts referenced or which are permissibly inferenced in this complaint, the municipal Defendants are liable based on the following few examples out of many set forth here in and many more to be developed through discovery and trial:

- Express Policy (The Stricken Standards): the Impasse Order provided DOE and the City were jointly ordered to provide an accommodation process for DOE employees and to choose which policy to use to administer it. They are each liable for choosing to use and enforce the facially discriminatory "Stricken Standards" which facially discriminate amongst religions and religious beliefs. This is direct evidence of discrimination.

- Direct evidence claim: widespread statements by DOE attorneys in arbitration hearings stating that whole categories of religion and belief were ineligible and essentially wrong or heretical even if sincere. DOE and the City's failure to remediate or address despite repeated notice.

- Evidence that City agencies, the Law Department and other high level policy making entities and persons instructed DOE to discriminate against whole categories of sincere belief.

- Failure to remediate and continued use of policy after court order: the City and DOE are each also jointly liable for failing to remediate the discrimination after the parties own attorneys admitted in open court that the original process they chose was likely unconstitutional. Though the City promised the Court it would remediate this harm, it did not for Plaintiff herein and thousands of others denied under the original policy.

- Direct evidence claim: Emails from the City's highest policymakers, including the Commissioner of Health himself, show that the City colluded with the DOE, the unions, and the arbitrators to further discriminate against employees with sincerely held religious objections to abortion, Catholics, and those with objections based on purity of the blood. See Section VI. B.

- Direct evidence claim: The Commissioner of Health, who is undoubtedly the policy maker for the entire City, responded to Defendant Banks' request to craft a letter to try to categorically establish for arbitrators that these beliefs were "BS" by complying and issuing a letter that facially discriminates and has known misinformation about the connection between aborted fetal cell lines and other common medications.

- Direct evidence claim: Defendant Varma, who had policy making authority over the City's Covid-19 policies and directed the mandate participated in this decision to issue the Chokshi letter and "Ok"d the scheme. Varma also admitted that the mandates that he had been responsible for getting issued – including the DOE mandate – were not based on public health but rather a desire to harass unvaccinated people including those who could not get vaccinated for religious reasons.

- Ratification, endorsement and direct evidence claim: Mayor de Blasio, who was a final policy maker for the City, endorsed and confirmed that the City intended to deny all applications from those with personally held religious beliefs, all Catholics, and most other religions other than Christian Scientists and Jehovah's Witnesses. He bragged that this policy was "100%" set by the city and the unions.

52

- High level policy makers, such as Eichenholtz, continued to instruct reviewers during the "remediation" to reject beliefs tied to abortion or that were personally held and other criteria held unconstitutional from the original policies. DOE also applied the wrong undue hardship standard and Eichenholtz continued the use of that improper de minimis standard on appeal despite frequent notice that it was improper.

- The Joint Venture: The legal mandate of the September 10, 2021 Arbitrator's Award, which created a "joint venture" between the City and DOE, imposing a non-delegable duty on both entities to provide religious accommodation to DOE employees is binding and the failure to train or properly oversee the process to avoid widespread documented abuses from occurring or going unremediated.

- Failure to Train or Supervise: The City's deliberate indifference in failing to train or supervise DOE personnel to ensure constitutional neutrality, despite the City's direct role as a party to the joint Arbitrator's Award and repeated notice through the *Kane v. de Blasio* matter and related lawsuits, emails, and notices of claim.

## PLAINTIFF'S INDIVIDUAL FACTS

282.    In September 2021, Plaintiff was a tenured Master Teacher for Special Education, Citywide School Administrator and Transition Career and Technical Education ("CTE") leader with over twelve years of service at the DOE.

283.    Plaintiff is a devout Christian, from a devoutly religious family. They are long-time members of the historic Greater Allen A.M.E. Cathedral of New York, and Plaintiff's daughter has attended only religious schools since preschool.

284.    One of Plaintiff's core religious beliefs is that participation in abortion is a sin.

53

285. When she and others in the congregation learned that aborted fetal cell lines were used in the production and development of all three Covid-19 vaccines, Plaintiff approached her pastor at the church to discuss her religious concerns. He told her to pray on it, asking her to use her strength in the Lord. Plaintiff and her family prayed repeatedly, and based on these prayers, decided together that they could not participate in vaccination without violating their religious beliefs.

286. Plaintiff routinely prays, not just over medical decisions, but about all aspects of her life, and she was very clear that taking these products was not in alignment with God's will as she understands it through prayer and reflection.

287. Plaintiff timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal.

288. On or about September 22, 2024, Plaintiff received the same autogenerated email sent to all other applicants.

289. No one from the City or the DOE individually reviewed her application before denying her.

290. Defendants never questioned Plaintiff's sincerity or requested further information about her religious beliefs before denying her.

291. Plaintiff appealed and received confirmation that her appeal would be considered by the arbitrators under the Mandate.

292. The notice, sent from the "donotreply" autogenerated SOLAS website, and signed "HR Connect" stated: "This notification confirms the receipt of your appeal of your denial of a COVID-19 vaccine mandated related exemption or accommodation. This appeal and your application materials and documentation are being forwarded to Scheinman Arbitration and

54

Mediation Services ("SAMS") and independent arbitrators convened by SAMS who will consider your appeal."

293. Without explanation, shortly after the Chokshi letter was sent to the arbitrators, Plaintiff was denied without a zoom hearing, with no explanation other than an "x" next to the word "denied."

294. On or about October 1, 2021, Plaintiff was involuntarily placed on leave without pay, and informed that because she had failed to comply with the Mandate, she could not report to work, receive compensation, use annual leave, CAR or sick time, enter a work site or work anywhere else to try to earn money.

295. In other words, Plaintiff, a tenured educator, was removed from her position and placed on disciplinary leave without pay without the benefit of a hearing, as required by New York State Education Law § 3020-a, and without a pathway to grieve the action.

296. When Plaintiff attempted to file a grievance, she received the following message: "Please note: the grievance process has been suspended for the duration of the pandemic."

297. Plaintiff could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

298. As a threshold matter, Plaintiff did not need to enter any classrooms to do her job.

299. Her job was primarily administrative and could have easily been accommodated as entirely remote without any real hardship or change.

300. Plaintiff began her career as a Special Education teacher, but by 2021, very little of her job involved teaching students.

301. Many years before, she had been promoted to the "Master Teacher" designation, which was a citywide appointment serving the entire district.

55

302. As a Master Teacher, her primary job was to assess data for schools that were struggling or slated to be shut down by the state, make recommendations on needed professional development and teacher development, and coordinate with building administrators on a plan to support the teachers in this development.

303. She did not need to enter any school buildings to do this work.

304. This work typically took up about 85% of her time.

305. In the fall of 2021, Plaintiff was asked to take on new administrative work, this time serving as a Transition Coordinator.

306. As a Transition Coordinator, Plaintiff's job was to coordinate with the administration to ensure that the schools were in compliance with IEP plans, and to link students with disabilities who were ready to exit with agencies that could help them with independent living placements, business opportunities and other services.

307. None of this work involved in person classroom time with students.

308. All of it could have been handled remotely, and none of it needed to take place in a DOE classroom building with students.

309. In addition to her administrative work, Plaintiff typically co-taught one or two classes.

310. Defendants could have easily accommodated Plaintiff by simply having her do her administrative work 100% of the time until the temporary Mandate was rescinded.

311. Plaintiff also could have also easily kept co-teaching the few classes she had been teaching, in or out of the building.

312. As a Master Teacher, Plaintiff was involved in co-teaching programs and was not the primary classroom teacher. Even before the Mandate was imposed, Plaintiff routinely joined

the class remotely while her co-teacher or an aid was physically present in the building with the students. She could easily have continued to co-teach this way.

313. Plaintiff could have also safely taught in person. She was not a danger to anyone based on her religious practices. Plaintiff had already had Covid-19 and had natural immunity. For the previous year and a half, she had been teaching, including sometimes in person, and had not exposed anyone to Covid-19.

314. Prior to being placed on forced disciplinary leave without pay, Plaintiff participated in regular COVID testing at her own expense.

315. Plaintiff also submitted to daily health checks, completed medical surveys, temperature checks upon entry to the building, and daily mask-wearing.

316. Plaintiff also presented a negative COVID-19 test each day, before reporting to work.

317. She was ready, willing and able to continue testing and symptoms check as she had been doing, and as every other school district in the state allowed teachers to do.

318. After a motions and then a merits panel of the Second Circuit held that the Defendants' religious accommodation policies that Plaintiff was denied under were not neutral or generally applicable, and likely violate the First Amendment, Plaintiff attempted to file an appeal with the Citywide Panel through SOLAS.

319. She received an error message, telling her that she was not in compliance with the Mandate, and could not submit her request.

320. She followed up by sending a letter to the DOE on or about November 29, 2021, asking that her application be reviewed by the Citywide Panel as the City was promising would occur. This letter presented a notice of her claims to the Chancellor of the DOE, and the Law

57

Department and high level City actors, which neither the City nor the DOE adjusted within thirty days.

321. The letter also notified the DOE that Plaintiff was being discriminated against based on her religious beliefs and pointed out that the Second Circuit had found Defendants' religious accommodation policies unconstitutional.

322. Shortly after, Plaintiff received an email confirming that the Citywide Panel would review her application and reinstate her with back pay if she was deemed qualified under lawful standards.

323. The Citywide Panel never engaged in any cooperative dialogue or took any further action on Plaintiff's appeal.

324. Instead, the Citywide Panel failed to issue any decision at all, leaving Plaintiff's application to pend for months, while Plaintiff became increasingly more hungry and desperate without any salary or means to support herself.

325. Without ever receiving an answer from the Citywide Panel, Plaintiff was terminated on or about April 29, 2022, with no due process, and no 3020 hearing, due to "noncompliance with the New York City Health Commissioner's Order requiring vaccination" of all DOE staff.

326. On May 16, 2022, Plaintiff submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII through their discriminatory religious accommodation policy, and unlawful denial of religious accommodation.

327. This notice complied with the notice of claim requirement governing state law claims.

328. The Defendants failed to adjust her claims within the statutory period.

58

329. To date, Plaintiff still has not received a determination from the Citywide Panel.

330. Plaintiff continued to wait for a Citywide Panel determination. But to date, she never received the "fresh consideration" that the City promised to provide to cure the acknowledged discriminatory denials under the Stricken Standards.

331. She was simply dismissed, after over a decade of exemplary service.

332. Though Plaintiff had tenure, and New York State law requires that tenured teachers be provided with a 3020 hearing before they are terminated, Plaintiff was never given a hearing before she was terminated.

333. Vaccination was not a condition of employment.

334. At least 165 unvaccinated teachers were allowed to continue to teach at the DOE and receive their salaries.

335. Moreover, neither the City, nor the DOE nor the arbitrator had the legal right to set any new condition of employment for tenured teachers outside of the contract or the legislatures' enumerated conditions.

336. In August 2022, the DOE sent a letter to Plaintiff, offering to reinstate her if she were to show proof of vaccination by September 6, 2022.

337. Though the DOE knew Plaintiff required religious accommodation, they did not offer Plaintiff any accommodation.

338. Plaintiff attempted to get accommodation and continue to apply for employment with the DOE all throughout the 2022-2023 school year.

339. Plaintiff became aware of an email from Eric Amato of the DOE Human Resources department had sent an email to Beth Norton and Michael Sill of the UFT, stating that any member who requested an exemption from the Mandate would have their file and fingerprings flagged with

59

a "problem code" placed in the DOE's Human Resources Office of Personnel Investigations.

340. A Problem Code is used when an employee has committed what the DOE considers misconduct.

341. Problem Codes are typically placed on files for teachers who have sexually molested a student or are otherwise unhireable.

342. On or about January 15, 2023, Plaintiff learned that her fingerprints had been flagged by DOE with a "Problem Code" at its office of Personnel Investigations.

343. Plaintiff was an exemplary employee and was in good standing.

344. The only disciplinary charge she had against her was failing to violate her religious beliefs by taking a Covid-19 vaccine.

345. The "Problem Code" in Plaintiff's employment file has significantly impacted Plaintiff's ability to obtain future employment at the DOE – or even elsewhere – or to secure small business funding.

346. After the Mandate was lifted in February 2023, DOE refused to reinstate Plaintiff, despite the fact that the position remained open.

347. DOE also refused to hire Plaintiff for any other position, even though there is a staffing crisis in Plaintiff's field and Plaintiff is well-qualified to fill the position.

348. In addition to requesting reinstatement, Plaintiff attempted to apply for many jobs that she was well-qualified for.

349. She is a highly commended tenured educator with multiple graduate degrees and a record of success at DOE.

350. Yet, Defendants refuse to hire her, despite her excellent record of service. This is because of the Problem Code.

60

351. Plaintiff is not the only one that is facing this issue. Hundreds of other former DOE employees have seen evidence of the Problem Code and continue to be shut out of employment opportunities at DOE, despite staffing shortages and despite their ample qualifications and efforts.

352. The United States Congress wrote a letter over a year ago to the City of New York demanding answers about the Problem Code.

353. To date, neither the City nor the DOE have responded.

354. The City Counsel has also held hearings and demanded answers on the Problem Code issue.

355. To date, the City refuses to respond or remedy the issue.

356. Multiple employees have seen proof and received notification from the DOE directly that problem codes remain on their files, even though the mandate was dropped over a year and a half ago.

357. The Problem Code is not only visible internally at the DOE either.

358. Many former DOE employees have been informed by private schools and even schools outside of the district that while they are excellent candidates, the Problem Code makes them unhireable.

359. Plaintiff has been unable to find work anywhere in the City because of this Problem Code.

360. Plaintiff's ability to do contract work through her not-for-profit was also impacted by the Problem Code.

361. Plaintiff runs a not-for-profit business providing supporting students with disabilities and other at-risk children that was registered with the NYC Vendor Portals prior to the placement of the Problem Code in her files. These portals are used for grant and RFP proposals.

362.    Because Defendants placed the Problem Code in her files at both the City and DOE levels, Plaintiff's not-for-profit was removed from the vendor portals and she is no longer able to submit grant or RFP proposals.

363.    Plaintiff was also barred from applying for city contract work because she could no longer access the Mayor's Office of Contract Services (MOCS) portal after the Problem Code was placed on her file. One must be registered in this portal to receive a contract from the City of New York and to bid on jobs and communicate with vendors.

364.    Plaintiff had an account in good standing.

365.    Since the Problem Code was attached to her file, her account no longer exists. When she searches for it, she gets a message stating: "vendor #vs0006018 is not found."

366.    Before the Problem Code was placed, Plaintiff had access to all these portals.

367.    Plaintiff and her not-for-profit have not committed any act that should result in their removal from the portals.

368.    Upon information and belief, the fingerprints of unvaccinated teachers have been shared with the Federal Bureau of Investigation (FBI) and the New York State Division of Criminal Justice Services.

369.    DOE also imposed a further barrier to continue retaliating against employees who were denied religious accommodation.

370.    Though DOE is aware of multiple ongoing lawsuits challenging the discriminatory religious accommodation policies, they have attached a "waiver" requirement for employees who wish to be reinstated, and some who apply as new teachers.

371.    The waiver requirement forces teachers denied religious accommodation to waive their right to challenge Defendants' discriminatory conduct as a condition of getting rehired or

62

reinstated.

372.    On February 21, 2023, Plaintiff timely mailed a new Notice of Claim, by certified mail, return receipt to the City and the DOE, notifying both parties once more that she has claims for discrimination, failure to accommodation, unlawful termination and adding that she and others were also facing retaliation from the Problem Code issue.

373.    Defendants failed to adjust the claims within the statutory period.

374.    Plaintiff also timely filed a second EEOC charge in February 2023 – adding claims of retaliation against both Defendants.

375.    On September 18, 2023, Plaintiff received a right to sue letter from the EEOC on this charge.

376.    On December 12, 2023, she timely commenced this action in federal court *pro se* before the ninety-day period elapsed from receipt of the right to sue letter.

377.    Plaintiff suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

*Against Municipal Defendants*

378. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

379. Plaintiff asserts that municipal Defendants violated Title VII by failing to accommodate their sincerely held religious beliefs.

380. Defendants subjected Plaintiff to four distinct failures to accommodate:

- Initial Denial and Termination: Defendants denied Plaintiff's initial requests using

63

the "Stricken Standards" which as set forth above and in the Second Circuit decisions in Kane and NYFRL applied unconstitutional criteria. Plaintiff also only ever offered an appeal that was governed under the same facially discriminatory stricken standards so it was futile to appeal even for those who were able. Many were not even able due to well-documented SOLAS system crashes and other issues.

- Failure to Provide Remedial Review: Following the Second Circuit's holding in *Kane*, Defendants failed to provide Plaintiff with the promised remedial "Citywide Panel" review, thereby maintaining the original unconstitutional denials.

- Failure to Accommodate Prospective Employees: In August 2022, Defendants offered reinstatement but again refused to provide religious accommodation to those wishing to return, violating their duty to accommodate both current and prospective employees.

- Failure to accommodate after the mandate was lifted in February 2023 both in access to DOE jobs and the vendor portal.

381. Defendants' "undue hardship" defense is pretextual; Defendants accommodated at least 165 similarly situated employees whose beliefs were favored under the discriminatory criteria, while failing to perform any individualized assessment or consider alternatives for Plaintiff. As set forth in detail in the factual allegations of this complaint, Plaintiff could have been safely accommodated without substantially burdening DOE's budget in multiple ways, and Defendants did not assess any evidence (safety or economic) to deny them. Jay Varma, who was the City's "Covid Czar" responsible for the mandate, admitted that there was no public health necessity for the mandates, they were just meant to harass people who

64

could not get vaccinated. Jay Varma admitted natural immunity was sufficient to protect public health. Eric Eichenholtz admitted that neither the City nor the DOE ever reviewed any data or evidence to determine that any employee presented a safety or economic burden, each used the wrong "de minimis" burden test, and the Mandate itself did not preclude unvaccinated persons from working in person.

382. Single Filing Rule: Pursuant to the "single filing" or "piggybacking" rule, Plaintiff and other similarly situated individuals in this and other related matters are entitled to Title VII relief for all phases of the DOE and City's failure to accommodate based on the timely EEOC charges filed by themselves or their colleagues, as these claims arise from the same discriminatory policies and time frame.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

*Against Municipal Defendants*

383. Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

384. Plaintiff asserts straight religious discrimination claims against the municipal Defendants, including but not limited to "pattern and practice" and "disparate treatment" theories.

385. **Direct Evidence of Discrimination:** Defendants' adoption and enforcement of the "Stricken Standards" constitutes direct evidence of discrimination because the policy made express classifications based on protected religious characteristics, favoring certain "established" sects while categorically excluding unorthodox or "personally held" beliefs.

386. **Discriminatory Animus:** The discrimination is further evidenced by hostile comments from high-level City and DOE agents regarding the validity of prayer-based beliefs and objections to fetal cell lines, and refusal to reinstate employees after Covid-19 vaccination

65

was clearly no longer required explicitly because they failed to "follow the rules" by violating their faith.

## THIRD CAUSE OF ACTION

### (Retaliation and Harassment in Violation of Title VII)

*Against Municipal Defendants*

387. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

388. Plaintiff engaged in protected activity by seeking religious accommodation from the vaccine mandate pursuant to statute.

389. Defendants were aware of this protected activity and responded with a series of adverse and retaliatory actions, including:

- **Denial and Termination:** Summary denial of accommodation followed by termination of employment without any state-mandated process that tenured teachers and educators are supposed to receive.

- **Hostile workplace:** the Chokshi letter and facially discriminatory standards created a hostile workplace for Plaintiff with sincerely held religious objections to vaccination. Their beliefs were openly described as invalid and heretical, and "BS" and Defendant Varma admits that the mandate itself was only ever promulgated to harass them and coerce them into violating their beliefs. The Mayor was also telling the press that Plaintiff beliefs were invalid and illegitimate would not be considered. DOE employees and arbitrators were holding "heresy" inquisitions and clarifying in no uncertain terms that whole categories of religious objection were invalid in the opinion of the DOE and the City. Defendant Banks specifically referred to the beliefs as "BS" and sought to get them categorically

66

denied.

- **Deprivation of Due Process:** Denying tenured Plaintiff a 3020a hearing before taking adverse action or attaching findings of "misconduct".

- **Oppressive Leave without Pay and obstruction of benefits:** Plaintiff was terminated without a decision on remedial review, forced onto an involuntary leave without pay that did not allow them to earn income from any source, thwarted in their attempts to collect unemployment benefits through the City's aggressive and unconstitutional efforts to prevent them from getting benefits by claiming they had committed "misconduct" (a charge that would have required a contractual hearing they did not receive) and later asserting that they were terminated for cause because their beliefs differed from the Pope.

- **Retaliatory Problem Codes:** Attaching damaging and coercive "problem codes" to Plaintiff's employment files to hinder future employment, for some to this day.

- **Admission of continued discrimination and retaliation:** Mayor Adams told the press that those who'd been fired for failing to get the Covid-19 vaccine would not be re-hired despite massive staffing shortages because they were, essentially, insubordinate for failing to violate their beliefs. Mayor Mamdani said essentially the same thing when asked in a press interview prior to his inauguration.

- **Coercive Waivers:** Implementing a waiver requirement that prevents employees with religious objections from returning unless they waive their right to seek redress for discrimination.

### FOURTH CAUSE OF ACTION

**(Violation of New York State Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation and Aiding and Abetting)**

67

*Against All Defendants*

390. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

391. At all relevant times, the New York State Human Rights Law ("SHRL") has applied to Defendants' conduct, and Defendants worked in concert to deprive Plaintiff of reasonable accommodation.

392. Under the SHRL, it is an unlawful discriminatory practice to require an employee to violate a sincerely held religious practice as a condition of employment unless the employer demonstrates an inability to accommodate without undue hardship, defined as "significant expense or difficulty".

393. Unlike Title VII, individual Defendants are personally liable under the SHRL because the statute expressly prohibits any person from aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden thereunder. Some but not all of the relevant facts for each individually named plaintiff are set forth below:

- **Individual Liability of Defendant Chokshi:** Defendant Chokshi aided and abetted the discriminatory denials by issuing a letter to decision-makers and arbitrators that used his official authority to take sides in a religious dispute, arguing that religious objections to abortion were invalid. This letter was specifically requested so that it could be used to establish that whole categories of sincere religious belief were "BS." Chokshi agreed to this scheme and leant the imprimatur of "science" and the City's highest public health office to this discriminatory task. He also added improper instructions about what "Roman Catholics" were allowed to do and knowingly included misinformation, such as the knowingly unverified assertion that aborted fetal cells were used to bring

68

Tylenol and other products to market. Chokshi also used his discretion to continue renewing the DOE mandate long after it was abundantly clear it was unnecessary and even though he knew that thousands of DOE employees were being denied religious accommodation and were at imminent risk of termination for failure to violate their faith by complying. In fact, according to Varma, he only issued the mandate in an effort to harass those who would not get vaccinated, not because of public health. Defendant Chokshi also allowed carve-outs for secular reasons, like the Mayor's economic goals and favors owed to his donors.

- **Individual Liability of Defendant Eichenholtz:** Defendant Eichenholtz aided and abetted the discrimination as a high-level policymaker who oversaw the entire religious accommodation scheme at DOE and the Citywide Panel levels, provided advice and upon information and belief approved the discriminatory "Stricken Standards," oversaw the flawed Citywide Panel, and directed the exclusion of Plaintiff from remedial review. He refused to remediate the harm, even though he had assumed authority to do so, continued to use an unlawful "de minimis" hardship standard even though he knew that he was bound to apply the significant hardship standard required under the NYSHRL, instructed reviewers to continue discriminating against personally held and other beliefs, and was in charge of the Law Department for the years that the smoking gun email leading to the Chokshi letter was improperly withheld and redacted from the public record.

- **Individual Liability of Jay Varma:** Jay Varma was the "Covid Czar" in charge of the City's Covid-19 policies. He admits he caused the mandate to be issued not based on public health but rather as part of a coordinated effort to harass those

69

who would not comply. He admits he knew that natural immunity was sufficient and the mandate was not necessary, and generous accommodations could have been made in any event. He has expressed hostility to religious objections, joining zealously in the effort and failing to repudiate the scheme to devise and disseminate the Chokshi letter, which he "Ok'd". He was supposed to verify that aborted fetal cell lines were used to bring Tylenol and other medications to market but did not, instead agreeing that the Chokshi letter should be disseminated though this misinformation could not be verified.

- **Individual Liability of Steven Banks:** Steven Banks was a high level decision maker and the Mayor's right hand running the OLR, which he also served as General Counsel for. He expressed severe religious animus, calling beliefs "BS" and colluding with the unions, arbitrators and DOE to ensure that whole categories of sincere religious beliefs were denied unlawfully regardless of whether applicants had sincerely held protected religious beliefs. He was the driving force behind the Chokshi letter, which he described as a tool to further that discriminatory scheme. Banks suggested and others enthusiastically assisted him with this task, that the Commissioner not only lend his imprimatur of authority on questions of "science" to pre-emptively assist reviewers with their denials, but also add in conclusions about what people's faith required of them and what religion requires of various groups, such as the assertion that Roman Catholics could take the vaccine.

- **Individual Liability of Jackie Bray:** Jackie Bray led the City's Covid track and trace program and was also a high-level policy maker for the City. At Steven

70

Bray's request, she spearheaded the effort to draft and have promulgated the "Chokshi" letter which was admittedly generated to use as a tool to suppress and deny religious exemption requests on a categorical basis. She coordinated among the DOHMH and various City offices, led the effort and came up with additional ideas for how to discriminate, including creating a litmus test that if employees did not mention that they avoid Tylenol they could be reflexively denied.

- **Individual Liability of Nellie Afshar:** Nellie Afshar was the chief of staff of the DOHMH and upon information and belief, participated and multiple aspects of the collusion to harass and discriminate against religious objectors to the vaccine. She spearheaded the Commissioner's finalization of the discriminatory letter. On her own initiative, she put the unverified list of medications like Tylenol back in the letter as a sword to use against people with sincere religious objections to vaccines even though she admitted she could not verify these facts and they were not verified or in fact true.

394. Monell liability is also asserted in this complaint, including but not limited to the facts set forth in the Monell section above.

395. **Failure to Accommodate - Municipal Defendants** also collectively violated the SHRL's accommodation requirements as set forth in the Title VII claim and failed to engage in cooperative dialogue or meet their burden of proof that Plaintiff could not be accommodated as 165 other teachers and educators were allowed to be under the first discriminatory phase of the accommodation process.

396. **Disparate treatment.** Defendants each also engaged in straight discrimination and harassment and retaliation as set forth in the three counts above and through the factual

71

allegations of this complaint and subjected Plaintiff to different treatment based on their disfavored beliefs.

## FIFTH CAUSE OF ACTION

**(Violation of the New York City Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation, Aiding and Abetting)**

*Against All Defendants*

397. For the reasons set forth in the first four causes of action, *supra*, Plaintiff asserts claims under the CHRL against all defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

398. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

399. At all relevant times, the New York City Human Rights Law ("CHRL") has been in full force and effect and applies to Defendants' conduct.

400. The CHRL is to be construed independently from state and federal statutes and must be interpreted "liberally for the accomplishment of the uniquely broad and remedial purposes thereof".

401. Defendants collectively violated the CHRL through the same three separate and distinct failures to accommodate set forth above.

402. Failure to Engage in Cooperative Dialogue: Under the CHRL, the failure to engage in a "good faith" cooperative dialogue—including analysis and good faith discussion of the person's accommodation needs and potential alternatives—is an independent basis for finding liability, even if undue hardship could have ultimately been proven. Defendants failed to engage in this process with Plaintiff at any stage of review.

403. Individual Liability of Personally named Defendants: Pursuant to N.Y.C. Admin Code §

72

8-107(6), individual Defendants are personally liable for aiding and abetting the discriminatory and retaliatory acts described herein for the same reasons set forth in the NYSHRL claim and throughout the complaint.

404. Monell liability is also asserted in this complaint, including but not limited to the facts in the Monell section above.

405. Strict Undue Hardship Standard: like the SHRL, the CHRL imposes a "stiffer standard" for undue hardship than Title VII, requiring the employer to prove "significant expense or difficulty". All accommodations are deemed reasonable absent employer proof. Defendants have not and cannot meet this burden, particularly as they successfully accommodated 165 similarly situated employees.

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

*Against All Defendants*

406. Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

407. Plaintiff asserts that Defendants, acting under color of state law, violated the Equal Protection Clause of the Fourteenth Amendment by adopting and enforcing a facially discriminatory religious accommodation policy.

408. **Direct Evidence of Discrimination:** The "Stricken Standards" created express classifications and denominational preferences based on protected characteristics by singling out unorthodox beliefs and minority faiths for disparate treatment while specifically favoring "established" religions such as Christian Science.

409. **Lack of Neutrality:** The policy and its enforcement were not neutral or generally applicable, as City and DOE high level policy makers and administrators endorsed them

and "passed judgment upon" the legitimacy of Plaintiff's religious beliefs, particularly those derived from personal prayer or concerns regarding the use of aborted fetal cell lines, or held by a religion other than Christian Science or Jehovah's Witness, all the while concocting various plans to try to ensure that certain religions and beliefs were subjected to disparate treatment and special disability.

410. **Individual Liability of Personally Named Defendants.** Pursuant to 42 U.S.C. § 1983, individual are personally liable for their personal involvement in these constitutional deprivations as set forth in the individual liability paragraphs of this complaint and other causes of action assessing individual liability.

411. Monell liability is also asserted in this complaint, including but not limited to the Monell section of the complaint.

412. **Direct Discrimination – Disparate Treatment Through the The Two-Tiered System:** Defendants also violated Equal Protection by subjecting Plaintiff and others denied under the original scheme to a more onerous "undue hardship" standard than the 165 favored employees who were accommodated without such a burden, solely because Plaintiff's beliefs did not fit Defendants' preferred religious classifications.

413. **Underinclusivity:** Defendants mandate was substantially underinclusive and allowed secular carve outs but not religious. The City's mandates were meant to function as one overall policy. The City carved out athletes, entertainers, and their makeup artists and entourages, and accommodated City life guards who give mouth to mouth resuscitation but declined to accommodate Plaintiff. Over one million students, equally able to catch and spread Covid-19, were allowed to attend school unvaccinated while Plaintiff was denied based on vague and unsupported boiler plate "undue hardship" assertions even

74

though the Mandate did not require it and no Defendant assessed whether there was a safety issue or economic issue that prevented accommodation. If one million students are able to remain unvaccinated, it would not matter if 100% of the staff was vaccinated – herd immunity is impossible under those circumstances even if the vaccines could stop transmission.

414. **Strict Scrutiny:** Because the policy makes express classifications based on religion and exhibits animus, it must be subjected to strict scrutiny. Defendants cannot demonstrate that their denial of accommodation to Plaintiff was the least restrictive means of furthering a compelling state interest.

## SEVENTH CAUSE OF ACTION

### (Infringement of Free Exercise Clause – United States Constitution)

*Against All Defendants*

415. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

416. Plaintiff's sincerely held religious beliefs prohibit them from receiving a Covid-19 vaccine.

417. Defendants, acting under color of state law, substantially burdened Plaintiff's free exercise of religion by forcing them to choose between their faith and their careers.

418. Lack of Neutrality and General Applicability: The religious accommodation policies were neither neutral nor generally applicable because they were governed by a discretionary, individualized exemption mechanism and were infected by a facially discriminatory policy that favored specific religious dogmas.

419. Individual Liability: Pursuant to 42 U.S.C. § 1983, Individually named defendants are personally liable for their direct involvement in this constitutional infringements as set forth above.

75

420. Monell liability is also asserted in this complaint, including but not limited to in the Monell section above.

421. Strict Scrutiny: Because the policies were not neutral or generally applicable, and were motivated by religious animus, Defendants must meet the burden of strict scrutiny. Defendants cannot demonstrate that the summary denial of Plaintiff's requests—without considering weekly testing or remote work—was the least restrictive means of furthering a compelling state interest particularly where they accommodated 165 other employees whose religious exemptions were granted and who were similarly situated.

## EIGHTH CAUSE OF ACTION

### (Violation of the Establishment Clause of the United States Constitution)

*Against All Defendants*

422. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

423. Plaintiff repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

424. The Establishment Clause of the First Amendment prohibits the State from preferencing any particular religion or religious dogma, or abridging rights to the free exercise of religion.

425. Defendants violated the Establishment Clause by expressing a preference for specific faiths and leaders while expressing animus toward those with unorthodox religious objections to vaccination.

426. Impermissible Entanglement: Defendant Chokshi and high level City policy makers colluded with the union, DOE and arbitrators to categorically deny sincerely held religious beliefs and provided instructions and letters to decision-makers and arbitrators that impermissibly took positions on religious matters, imposed special disability on certain

faiths and beliefs, tried to resolve religious questions and expressed denominational preferences.

427. Denominational Preference: The DOE and the City adopted a facially discriminatory policy that favored Christian Scientists and Jehovah's Witnesses on its face while requiring discrimination against minority and unorthodox faiths. All defendants upheld and defended and endorsed that policy and some helped promulgate it.

428. Individual Liability: Pursuant to 42 U.S.C. § 1983, individual Defendants are personally liable for their direct involvement in this constitutional violation.

429. Monell liability is also asserted in this complaint, including but not limited to the facts set forth in the Monell section.

430. These preferences trigger strict scrutiny, and Defendants cannot prove that their actions were narrowly tailored to further a compelling state interest.

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment containing the following relief:

- Declaratory Judgments: A judgment declaring that each of the municipal Defendants' three distinct failures to accommodate Plaintiff—the initial denial/termination, the failure to provide remedial review, and the failure to accommodate at the time of the September 2022 reinstatement offer—are void ab initio and violate Title VII, the NYS Human Rights Law, the NYC Human Rights Law, and the United States Constitution under the enumerated provisions.

- Injunctive Relief: An order for immediate reinstatement to former positions with full seniority, no break in service, and restoration of all status, retirement credits, and benefits along with lost salary, back pay and front pay.

77

- Damages: An award of actual, nominal, and compensatory damages (including back pay, front pay, and pain and suffering) in an amount to be determined at trial.

- Punitive Damages: An award of punitive damages against the individual Defendants for their malice or reckless indifference to Plaintiff's state and federally protected rights.

- Interest, Costs, and Fees: An award of pre- and post-judgment interest, reasonable attorneys' fees, expert fees, and costs.

- Civil Penalties: An order for civil fines and penalties pursuant to New York Executive Law § 297(9).

- For such other further or different relief as this Court may deem just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
     April 21, 2026

<div style="margin-left: 50%;">

Respectfully Submitted,
Gibson Law Firm, PLLC

By:   */s/ Sujata S. Gibson*
      Sujata S. Gibson
      120 E Buffalo Street, Suite 201
      Ithaca, NY 14850
      (607) 327-4125
      sujata@gibsonfirm.law

      **Attorneys for the Plaintiff**

</div>

78