# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LATANYA COLLINS, and all others similarly situated,<br><br>Plaintiffs,<br><br>-against –<br><br>THE CITY OF NEW YORK, DAVE CHOKSHI, in his individual and official capacity; NELLIE AFSHAR in her individual and official capacity; STEVEN BANKS, in his individual and official capacity; JACKIE BRAY in her individual and official capacity; JAY VARMA in his individual and official capacity; ERIC EICHENHOLTZ in his individual and official capacity, and the NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>Defendants.<br><br><br>Defendants. | CASE 23-cv-9248 (RER) (CHK) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

**GIBSON LAW FIRM, PLLC**
*Attorneys for Plaintiff*
Sujata S. Gibson, Esq., Of Counsel
120 E. Buffalo St, Suite 2
Ithaca, New York 14850
(607) 327-4125

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 1

STANDARD OF REVIEW .............................................................................................. 6

ARGUMENT ..................................................................................................................... 7

POINT I — THE CITY IS A PROPER PARTY TO THIS ACTION .......................................... 7

    A.  The City imposed the employment condition and helped create the discriminatory accommodation regime ..................................................................................................... 7

    B.  City officials directly implemented and intensified the discriminatory criteria ................ 8

    C.  The City controlled the post-Kane remedy and knowingly perpetuated the discrimination ...................................................................................................................... 10

POINT II — CLAIMS AGAINST INDIVIDUAL DEFENDANTS ARE TIMELY OR RELATE BACK ............................................................................................................................. 12

POINT III — PLAINTIFF PLEADED VIABLE CONSTITUTIONAL CLAIMS ..................... 16

    A.  Plaintiff states Free Exercise claims under Kane and NYFRL ......................................... 16

    B.  Plaintiff states an independent Establishment Clause claim ............................................ 21

    C.  Plaintiff states an Equal Protection claim ....................................................................... 27

    D.  The challenged policies cannot survive strict scrutiny .................................................... 28

    E.  The individual Defendants personally participated and qualified immunity does not support dismissal ............................................................................................................... 29

POINT IV — PLAINTIFF STATES VIABLE TITLE VII CLAIMS .......................................... 31

    A.  Exhaustion ..................................................................................................................... 31

    B.  The surviving claims are adequately pleaded .................................................................. 34

POINT V — PLAINTIFF'S STATE AND LOCAL CLAIMS SURVIVE DEFENDANTS' PROCEDURAL ARGUMENTS .......................................................................................... 42

POINT VI — THE THIRD AMENDED COMPLAINT COMPLIES WITH RULE 8 ............... 47

CONCLUSION ................................................................................................................. 49

## TABLE OF AUTHORITIES

**Cases**

*Abdell v. City of New York*,
    759 F. Supp. 2d 540 (S.D.N.Y. 2010 ................................................................15

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974) ..............................................................................................33

*Annicelli v. New York City Police Department*,
    2026 WL 871393 (S.D.N.Y. Jan. 9, 2026)..........................................................17

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009) ......................................................................................7

*Bergin v. New York State Unified Court System*,
    No. 25-721, (2d Cir. July 15, 2026) ....................................................................34

*Broecker v. N.Y.C. Dep't of Educ.*,
    585 F. Supp. 3d 299 (E.D.N.Y. 2022) .................................................................49

*Burlington Northern & Santa Fe Railway Co. v. White*,
    548 U.S. 53, 68 (2006).........................................................................................41

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*,
    605 U.S. 238 (2025) .......................................................................................21, 24

*Chinchilla v. New York City Police Dep't.*,
    No. 23 Civ. 8986 (DEH), 2024 WL 3400526 (S.D.N.Y. July 12, 2024) ............38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520, 533 (1993) ...............................................................................17, 29

*City of New Orleans v. Dukes*,
    427 U.S. 297, 303 (1976) .....................................................................................27

*City of St. Louis v. Praprotnik*,
    485 U.S. 112, 123 (1988) ..................................................................................7, 12

*DaCosta v. City of New York*,
    296 F. Supp. 3d 569 (E.D.N.Y. 2017)..................................................................15

*D'Cunha v. Northwell Health Sys.*,
    No. 23-476-cv, 2023 U.S. App. LEXIS 30612 (2d Cir. Nov. 17, 2023) .............37

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) ...................................................................................34, 35

*Employment Div., Dept. of Human Resources of Oregon v. Smith*,
494 U.S. 872, 877 (1990) ............................................................................6, 7, 8

*Feingold v. New York*,
366 F.3d 138, 157–58 (2d Cir. 2004) ...................................................................46

*Felder v. Casey*,
487 U.S. 131, 138, 153 (1988) .............................................................................46

*Felder v. United States Tennis Ass'n*,
27 F.4th 834 (2d Cir. 2022) ............................................................................9, 37

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ......................................................................................16

*Frazee v. Illinois Department of Employment Security*,
489 U.S. 829 (1989) ..................................................................................27, 29

*Griffin v. Sirva, Inc.*,
29 N.Y.3d 174 (2017).....................................................................................49

*Groff v. DeJoy*,
600 U.S. 447 (2023) ....................................................................................28, 32

*Hardaway v. Hartford Public Works Department*,
879 F.3d 486, 491 (2d Cir. 2018) .........................................................................37

*Hogan v. Fischer*,
738 F.3d 509 (2d Cir. 2013) ...............................................................................11

*International Union, UAW v. Johnson Controls, Inc.*,
499 U.S. 187, 199 (1991) ..................................................................................32

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
438 F.3d 195 (2d Cir. 2006).................................................................................24

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996).................................................................................23

*Kane v. de Blasio,*
19 F.4th 152, (2d Cir. 2021) ......................................................................... *passim*

*Keating v. Carey*,

706 F.2d 377, 382 (2d Cir. 1983) ....................................................................................12

*Krupski v. Costa Crociere S.p.A.*,
    560 U.S. 538, 548–50 (2010).................................................................................10, 11

*Larson v. Valente,*
    456 U.S. 228 (1982)................................................................................................18, 19

*Lee v. New York City Fire Department,*
    2025 WL 2772855 (E.D.N.Y. Sept. 29, 2025)...............................................................17

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015).........................................................................................4, 31

*Lynch v. City of New York*,
    952 F.3d 67, 74 (2d Cir. 2020) ..........................................................................................4

*Maita v. City of New York*,
    No. 24-cv-6559, ECF No. 29 (E.D.N.Y. Feb. 2, 2026).........................................................17

*Maiorino v. City of New York*,
    No. 25-cv-0097, ECF No. 75 (S.D.N.Y. July 6, 2026) ........................................................17

*Margerum v. City of Buffalo*,
    24 N.Y.3d 721, 730 (2015).........................................................................................43, 46

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
    715 F.3d 102 (2d Cir. 2013) ..........................................................................................47

*Miller v. Johnson*,
    515 U.S. 900, 904-05 (1995) ........................................................................................24

*Monell v. Department of Social Services*,
    436 U.S. 658, 691–94 (1978).......................................................................................5, 50

*Mumin v. City of New York*,
    No. 23-cv-3932 (S.D.N.Y. Sept. 25, 2025) ....................................................................17

*Nat'l Org. for Women v. State Division of Human Rights*,
    34 N.Y.2d 416 (1974)..................................................................................................49

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656, 666 (1993) .............................................................................................25

*New Yorkers for Religious Liberty, Inc. v. City of New York*,
    121 F.4th 448 (2d Cir. 2024)................................................................................ *passim*

v

*Patsy v. Bd. of Regents of State of Fla.,*
    457 U.S. 496, 516 (1982) .......................................................................................42

*Pearl v. City of Long Beach*,
    296 F.3d 76, 82 (2d Cir. 2002) ............................................................................12

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ...............................................................................................5

*Rasmy v. Marriott International, Inc.*,
    952 F.3d 379 (2d Cir. 2020) ................................................................................36

*Scott v Vil. of Spring Val.,*
    577 F App'x 81, 82 (2d Cir 2014).........................................................................12

*Sotomayor v. City of New York*,
    862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012)...........................................................4

*Thorne-Long v. City of New York,*
    No. 14-CV-0835 (E.D.N.Y. 2014) .........................................................................9

*Town of Oyster Bay v. Kirkland*,
    19 N.Y.3d 1035, 1038 (2012)...............................................................................42

*TWA v. Thurston,*
    469 U.S. 111, 121 (1985) ......................................................................................35

*Whitfield v. City of New York,*
    96 F.4th 504 (2d Cir. 2024).............................................................................13, 46

*Zapantis-Dalamakis v. City of New York,*
    No. 24-cv-4631, ECF No. 34 (E.D.N.Y. July 2, 2026) ........................................17

**Statutes**

Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000 et seq.............................................*passim*

Fed. R. Civ. P. ..................................................................................................... 10

Fed. R. Civ. P, Rule 8(a)(2) ................................................................................. 15

NYCHRL ....................................................................................................*passim*

NYSHRL ......................................................................................................*passim*

New York Education Law § 3813(1).............................................................. 37, 38, 40

New York Executive Law § 296(10(a) ........................................................................ 14

N.Y.C. Admin. Code § 8-102. ................................................................................... 22

N.Y.C. Admin. Code § 8-107(3)(a). ......................................................................... 14

N.Y.C. Admin. Code § 8-107(28)(2). ....................................................................... 21

20 C.F.R. §1605.2(b) ............................................................................................... 14

U.S. Constitution Amend, I. ..............................................................................*passim*

U.S. Constitution Amend. XIV, § 1 ....................................................................*passim*

28 U.S.C. §§ 1331 and 1343 .................................................................................... 33

42 U.S.C. § 1983 ................................................................................................ 33, 34

## PRELIMINARY STATEMENT

Plaintiff Latanya Collins was a tenured New York City public school teacher with over twelve years of service. She was placed on leave without pay, terminated, offered reinstatement if she would violate her beliefs and then flagged in Defendants' personnel systems with a "Problem Code"—a designation reserved for employees suspected of serious misconduct—for one reason: she asked for a religious accommodation and would not abandon her faith to keep her job.[1] The Third Amended Complaint ("TAC") alleges violations of the First Amendment, Title VII, the New York State Human Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL").

The Second Circuit has twice addressed the religious accommodation policies Collins was denied under. In *Kane v. De Blasio*, 19 F.4th 152, 168-69 (2d Cir. 2021), the Court held they were likely unconstitutional and required fresh Citywide Panel review, with reinstatement and back pay for employees who met statutory standards. *New Yorkers for Religious Liberty, Inc. v. City of New York*, 121 F.4th 448, 463-64 (2d Cir. 2024) ("NYFRL"), reversed dismissal where an employee received no such review. Plaintiff alleges the same dispositive facts here.

Defendants largely rely on procedural objections, erroneous facts, the wrong religious animus and undue-hardship standards, and a defense of the mandate itself that does not answer Plaintiffs' claims. The motion should be denied except as expressly conceded.

## STATEMENT OF FACTS

On August 24, 2021, Defendants required DOE employees to show proof of vaccination by September 27, although employees had worked in person throughout the prior school year

---

[1] Defendants move only on behalf of the City, DOE, and individual defendants Chokshi and Eichenholtz. Contrary to their assumption, Defendants Afshar, Banks, Varma and Bray were each timely served and are each in default. Plaintiffs object to any relief given to them especially when they have not moved.

1

without vaccination with weekly testing options. TAC ¶¶ 39-42. The original order provided no religious or medical accommodation. Id. ¶ 39. After sixteen labor unions obtained a temporary restraining order from Justice Love on September 14, 2021, Defendants amended the order to state that nothing in it barred reasonable accommodations required by law, and the TRO was dissolved "solely" on the strength of that representation. Id. ¶¶ 41-43.

An Impasse Award issued by Arbitrator Scheinman on September 10, 2021 further obligated both the City and DOE to provide accommodation and permitted them to use either statutory standards or the Award's own criteria. TAC ¶ 45. Defendants chose the latter—the criteria the TAC calls the "Stricken Standards."

On their face, those standards favored Christian Scientists, excluded beliefs derived from personal prayer, authorized denial based on a religious leader's public support for vaccination, and required membership in an "established" religious organization with a documented, clergy-verified history of opposition to vaccination. TAC ¶¶ 74-307.

As instructed by high level City official defendants, Defendant Chokshi, then Commissioner of Health who issued the mandate, also wrote a letter which framed whole categories of sincere religious beliefs as "BS," and instructed adjudicators to reject religious objections grounded in concerns about aborted fetal cell lines and beliefs brought by Catholics and others whose religious leaders advised vaccination— not on scientific grounds, but by invoking the City's own interpretation of Catholic and other religious doctrine, after officials acknowledged they could not refute the objection scientifically. TAC ¶ 9. The emails show this was deliberate. One senior official warned the group that the guidance and categorical denial of certain faiths, and abortion-based beliefs, "will absolutely be subject to litigation." She nonetheless surmised the letter would "go far" in assisting the City with their scheme to discriminate against whole categories of religion. Id. at 10.

The Commissioner and the team of high level City officials proceeded even though they knew that

2

certain factual allegations in the letter were unverifiable, opining that the Commissioner's letter, containing that misinformation, could lend authority to shield decision-makers from liability from making these discriminatory determinations. TAC ¶ 10.

**Collins's Application, Denial, and Administrative Appeal**

In September 2021, Plaintiff was a tenured Master Teacher for Special Education, Citywide School Administrator and Transition Career and Technical Education ("CTE") leader with over twelve years of service at the DOE. TAC ¶ 282. Plaintiff is a devout Christian, from a devoutly religious family. They are long-time members of the historic Greater Allen A.M.E. Cathedral of New York, and Plaintiff's daughter has attended only religious schools since preschool. Id. ¶ 283. One of Plaintiff's core religious beliefs is that participation in abortion is a sin. Id ¶ 284. When she and others in the congregation learned that aborted fetal cell lines were used in the production and development of all three Covid-19 vaccines, Plaintiff approached her pastor at the church to discuss her religious concerns. He told her to pray on it, asking her to use her strength in the Lord. Plaintiff and her family prayed repeatedly, and based on these prayers, decided together that they could not participate in vaccination without violating their religious beliefs. Id. ¶¶ 285-86.

Plaintiff routinely prays, not just over medical decisions, but about all aspects of her life, and she was very clear that taking these products was not in alignment with God's will as she understands it through prayer and reflection. She timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal and was promptly denied through an autogenerated email sent to all applicants with no human review. TAC ¶¶ 287-89. Plaintiff appealed within the one day allotted and received confirmation that her appeal would be considered by the arbitrators under the Mandate. ¶ 291.

On or about the same day, Chokshi sent his letter to the arbitrators and DOE representatives handling the appeals. Without explanation, shortly after the Chokshi letter was sent to the

3

arbitrators, Plaintiff was denied without a zoom hearing, with no explanation other than an "x" next to the word "denied." TAC ¶ 293.

**Collins Could Have Been Accommodated**

Plaintiff could have been accommodated in person or remotely without posing a direct threat or causing undue hardship. TAC ¶ 297. As a threshold matter, Plaintiff did not need to enter any classrooms to do her job. Her job was primarily administrative and could have easily been accommodated as entirely remote without any real hardship or change. ¶¶ 298-99. Plaintiff began her career as a Special Education teacher, but by 2021, very little of her job involved teaching students. Many years before, she had been promoted to the "Master Teacher" designation, which was a citywide appointment serving the entire district. ¶¶ 300-301. As a Master Teacher, her primary job was to assess data for schools that were struggling or slated to be shut down by the state, make recommendations on needed professional development and teacher development, and coordinate with building administrators on a plan to support the teachers in this development. She did not need to enter any school buildings to do this work. ¶ 302-303. This work typically took up about 85% of her time. She also worked as a Transition Coordinator, which tracked compliance and also did not involve in person classroom time with students. ¶¶ 304-307. Both jobs could easily be done remotely. Defendants could have easily accommodated Plaintiff by simply having her do her administrative work 100% of the time until the temporary Mandate was rescinded.

**Failure to Remediate**

After a motions and then a merits panel of the Second Circuit held that the Defendants' religious accommodation policies that Plaintiff was denied under were not neutral or generally applicable, and likely violate the First Amendment, Plaintiff attempted to file an appeal with the Citywide Panel through SOLAS. She received an error message, telling her that she was not in

4

compliance with the Mandate, and could not submit her request. She followed up by sending a letter to the DOE on or about November 29, 2021, asking that her application be reviewed by the Citywide Panel as the City was promising would occur. TAC ¶¶ 319-320. Shortly after, Plaintiff received an email confirming that the Citywide Panel would review her application and reinstate her with back pay if she was deemed qualified under lawful standards. ¶ 322. But, the Citywide Panel never engaged in any cooperative dialogue or took any further action on Plaintiff's appeal. Instead, the Citywide Panel failed to issue any decision at all, leaving Plaintiff's application to pend for months, while Plaintiff became increasingly more hungry and desperate without any salary or means to support herself. ¶¶ 333-334.

Without ever receiving an answer from the Citywide Panel, Plaintiff was terminated on or about April 29, 2022. ¶ 335. On May 16, 2022, Plaintiff submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII through their discriminatory religious accommodation policy, and unlawful denial of religious accommodation. This notice complied with the notice of claim requirement governing state law claims. The Defendants failed to adjust her claims within the statutory period. ¶¶ 336-338. To date, Plaintiff still has not received a determination from the Citywide Panel. ¶ 339.

**The August 2022 Offer and Second Failure to Accommodate**

In August 2022—the same month the CDC advised that workplaces should not differentiate between vaccinated and unvaccinated employees, and that the primary series provided minimal protection against infection and transmission—DOE wrote to Collins offering her job back with no break in service if she would show proof of vaccination by September 6, 2022. TAC ¶¶ 271, 276, 336. Defendants knew Collins required religious accommodation. They offered none. Id. ¶¶ 277, 337. Collins continued seeking accommodation and applying for DOE positions

throughout the 2022-2023 school year. Id. ¶ 338.

### D. The Problem Code and the Refusal to Rehire

Collins learned on or about January 15, 2023 that her file and fingerprints had been flagged with a "Problem Code" at DOE's Office of Personnel Investigations. TAC ¶ 342. Problem Codes denote conduct DOE treats as serious misconduct and are typically applied to employees who are unhireable. Id. ¶¶ 340-41. Collins was an exemplary employee in good standing; the only charge against her was declining to violate her religious beliefs. Id. ¶¶ 343-44.

The Problem Code has foreclosed employment inside and outside DOE. TAC ¶¶ 345, 358-59. It also removed Collins's not-for-profit—which serves students with disabilities and at-risk children—from the City's vendor portals, and eliminated her Mayor's Office of Contract Services account, which now returns "vendor #vs0006018 is not found." Id. ¶¶ 360-66.

After the Mandate was repealed in February 2023, DOE refused to reinstate Collins although her position remained open, and refused to hire her for any other position despite a staffing shortage in her field. TAC ¶¶ 346-47. Defendants have also imposed a "waiver" requirement compelling employees denied religious accommodation to surrender their right to challenge the discrimination as a condition of rehire. Id. ¶¶ 370-71.

### Administrative Filings

Collins filed her first EEOC charge on May 16, 2022, charge no. 520-2022-00788. Smith Decl. Ex. C. She received a right-to-sue notice from the Department of Justice dated July 1, 2022. Smith Decl. Ex. E.

She filed a second charge on February 21, 2023, charge no. 520-2023-02132, alleging religion and retaliation, identifying a continuing action, and specifying discrimination dates accruing after her termination through February 14, 2023. Smith Decl. Ex. D. The EEOC issued a

6

right-to-sue notice on September 18, 2023. Smith Decl. Ex. F. Collins served a notice of claim on February 21, 2023, Smith Decl. Ex. G, and timely commenced this action on December 14, 2023.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the Court accepts well-pleaded facts as true and draws reasonable inferences for Plaintiffs. *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020). The TAC need only state a facially plausible clai*m*, not prove it. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). An employment-discrimination complaint need provide only "plausible support to a minimal inference of discriminatory motivation." *Littlejohn* v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015).

## ARGUMENT

### POINT I
### THE CITY IS A PROPER PARTY TO THIS ACTION

Plaintiff does not seek to hold the City vicariously liable for DOE employees. She alleges the City's own participation in designing, implementing, intensifying, and perpetuating the challenged policies.

*Sotomayor v. City of New York* found the City could not answer for DOE conduct "[i]n the absence of any allegations demonstrating participation by the City." 862 F. Supp. 2d 226, 248-49 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013). Here, the TAC alleges extensive City participation: imposing the employment condition, selecting and formulating the accommodation regime, directing categorical exclusions, and controlling the promised remedy. Those allegations support municipal liability through formal policy, final-policymaker decisions, and knowing ratification. *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

7

**A.  The City imposed the employment condition and helped create the discriminatory accommodation regime**

The City created the employment condition requiring accommodation: Health Commissioner Chokshi's August 24, 2021 Order eliminated testing and required DOE employees to vaccinate. TAC ¶¶ 39-43. Defendants concede that "[t]he City and DOE" made vaccination a condition of employment. Defs.' Mem. at 22.

The TAC also supports an inference of deliberate City policymaking. Testing had permitted in-person work through more severe periods, the state emergency had ended, and CDC Director Walensky had publicly acknowledged that vaccination no longer prevented transmission. TAC ¶¶ 38-40. Before suspending Plaintiff, Defendants received declarations identifying testing, natural immunity, screening, and related alternatives, yet Eichenholtz admitted he, the City, and DOE reviewed no data evaluating them. Id. ¶¶ 235-36, 243-44 & Exs. 2, 4. Varma later allegedly acknowledged those alternatives could protect public health and described the mandates as intentional "harassment" of the unvaccinated. TAC ¶¶ 238-42. These allegations bear on policymaking, notice, and motive—not adjudication of disputed science.

The City also assumed responsibility for accommodations. The Impasse Award identifies "City/DOE" as co-obligated to provide accommodation and provides that, as an alternative to statutory accommodation procedures, the City and DOE could choose the Stricken Standards. TAC ¶¶ 45-49; Smith Decl. Ex. B. They allegedly selected that process, and City policymakers helped formulate its criteria. *Kane* called the regime "the City's process for implementing the Vaccine Mandate via the Arbitration Award." Id. at 174; TAC ¶¶ 74-87. Because the alleged defect was embedded in the City-selected criteria, causation does not require a City official's signature on each autogenerated denial to create liability.

**B.  City officials directly implemented and intensified the discriminatory criteria**

8

The TAC alleges near-immediate, autogenerated denials stating both that Plaintiff failed the Award's criteria and that accommodation imposed "undue hardship" under a *de minimis* test. TAC ¶¶ 88-93. City policymakers allegedly knew those denials lacked individual review or hardship analysis and encouraged or condoned the practice. Id. ¶ 94.

City officials allegedly then made appeals futile for most religions, supplying DOE and arbitrators religion-specific materials supporting categorical exclusion based on the views of Pope Francis, a selected rabbi, and purported Muslim and Buddhist leaders and directing them to enforce the criteria in a maximally discriminatory manner. TAC ¶¶ 133-178. DOE representatives admitted that, "in accordance with the City's instruction," members of those faiths were presumptively ineligible regardless of sincere personal belief. Id.

The September 20-22 emails corroborate that participation. Banks reported that DOE had reviewed pending requests, sought employees' applications, and requested a City-doctor document for arbitrators that would explain why certain religious objections – including Collins' objection to the use of aborted fetal cells - were "BS." TAC Ex. 1 at 8-9.

Bray proposed government and internet materials connecting common medicines to fetal cell lines, suggested testing whether employees had avoided every listed medication, and requested employee letters and recurring phrases. Id. at 6-8. Banks expressed dismay that some of the sources were "more neutral" than he'd hoped and directed the team to "go further" by having Chokshi declare abortion-related objections religiously invalid. Id. at 6-7.

The chain coordinated OLR, City Hall, DOHMH, DOE, and the UFT. Varma approved the memorandum; Afshar allegedly restored assertions she knew were unverifiable; and Chokshi, privy to the whole correspondence, issued it under his authority, adding religion-specific content on pork and animal products and leaving in unverified misinformation about Tylenol and other

9

medications that he knew would be used to deny thousands of employees. TAC ¶¶ 133-178 & Ex. 1. The resulting letter allegedly was supplied to DOE, arbitrators, and the Citywide Panel to reject abortion-related objections even when sincere. Id.

Calling these communications internal deliberations does not defeat the allegations. The Award had issued, DOE was deciding applications, and policymakers were obtaining actual submissions and developing categorical grounds for rejection. Banks admitted the purpose of the letter was to prevent disfavored beliefs from being accommodated. The emails plausibly show City officials monitoring and interpreting the unified process and making its second stage more discriminatory.

Plaintiff appealed to the independent arbitrator but Chokshi's letter resulted in her immediate denial. She also appealed to the Citywide Panel, but never received any determination from the Panel. TAC ¶¶ 291-93, 295, 329. The emails support the futility of that process: City officials developed additional categorical grounds for denial rather than corrective review. Ultimately, only 165 employees whose beliefs satisfied the challenged criteria received accommodation, many of whom remained accommodated until the Mandate was lifted. Id. ¶ 334.

The Chokshi emails supply a nexus between the City and the DOE accommodation process absent from *Kane*'s preliminary record. In *Kane*, the Second Circuit discounted Mayor de Blasio's denominational statements because his role in the accommodation process had not been established by those plaintiffs "at this stage." 19 F.4th at 165. The TAC now alleges that the Mayor called the rules "100 percent" the product of City-involved arbitration; Banks represented him; and Banks coordinated City Hall, OLR, DOHMH, DOE, and the UFT to restrict accommodations. TAC ¶¶ 179-88.

10

**C. The City controlled the post-*Kane* remedy and knowingly perpetuated the discrimination**

After admitting the religious accommodation process was likely unconstitutional in *Kane*, the City promised "fresh consideration" under statutory standards through a central Panel. 19 F.4th at 161-62, 172-73. The TAC alleges that the Mayor's Office controlled that Panel and that Eichenholtz, a senior Law Department official defending the related litigation, designed and supervised it. TAC ¶¶ 206-251. But despite awareness that between 5,000 and 7,000 DOE employees were denied under the admittedly unconstitutional Stricken Standards policy, the City only bothered to review 500 or less applications, and only reinstated one employee. Those numbers suggest continued discrimination. *Does 1-11 v. Board of Regents of the University of Colorado*, 100 F.4th 1251 (10th Cir. 2024).

Plaintiff's own experience illustrates how that remedy failed and appears pretextual. She appealed to the Citywide Panel and has never received a determination. TAC ¶¶ 295, 329. She never received the "fresh consideration" the City promised to cure the acknowledged discriminatory denials. Id. ¶ 330. She was simply dismissed, after over a decade of exemplary service. Id. ¶ 331. Meanwhile, at least 165 employees favored under the original policy remained accommodated, many until the Mandate was lifted in February 2023. Id. ¶ 334.

Eichenholtz and the City also failed to repudiate the Stricken Standards. The Panel allegedly continued rejecting personal and abortion-related beliefs, relying on the Chokshi letter, and accepting blanket hardship claims that Eichenholtz admitted were not supported. TAC ¶¶ 206-251; see also id. ¶¶ 88-89 (Eichenholtz conceded no individualized assessment of cost or threat level and application of the wrong *de minimis* standard). In *NYFRL*, the Second Circuit later reinstated claims of a DOE employee who had a Citywide Panel review because the Panel rejected beliefs based on Holy Spirit guidance and abortion-related beliefs as sincere but ineligible. 121

11

F.4th at 463-64. The Second Circuit also reinstated the claims of an employee who, like Collins, was never given a Citywide Panel review.

Ultimately, the City created and controlled the remedy, selected who received review, supplied materials, and allegedly preserved nearly all original denials. TAC ¶¶ 206-251. Not only did Defendants fail to repudiate the original Stricken Standards, but the City even expanded their use, offering them as an option in nearly every City Department. That plausibly alleges policymaker ratification and continuation, not isolated DOE error. *Praprotnik*, 485 U.S. at 127.

Defendants' reliance on *Thorne-Long v. City of New York*, No. 23-CV-4305 (DG)(LB), 2024 U.S. Dist. LEXIS 119748 (E.D.N.Y. July 8, 2024), is misplaced. The facts of that complaint did not allege the City took any action affecting the terms of her employment. Here, the TAC pleads precisely what was absent there: the City's own Order making vaccination an employment condition; the City's responsibility under the Award; its role in selecting and formulating the governing criteria; the religion-specific materials supplied by City officials; the OLR, City Hall, DOHMH, DOE, and UFT communications; the Chokshi letter; and the City's control of the post-*Kane* remedial process. This TAC must be judged on its own materially different allegations and incorporated evidence.

The same allegations support statutory liability. City control over the employment condition, continued employment rules, and a remedial process empowered to award reinstatement and back pay supports a Title VII joint-employer theory. *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 842-45 (2d Cir. 2022). The SHRL and CHRL also impose aiding-and-abetting liability on entities that participate in discrimination. N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6); *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187-89 (2017).

## POINT II
### CLAIMS AGAINST INDIVIDUAL DEFENDANTS ARE TIMELY OR RELATE

**BACK**

Defendants assume Plaintiff knew which officials were responsible and deliberately omitted them. The TAC alleges instead that Defendants portrayed accommodations as a DOE process, concealed and improperly redacted communications revealing City officials' roles and participation in the DOE accommodation process, and produced evidence only after judicial intervention. Plaintiff then promptly amended to name the officials who designed, approved, or disseminated the challenged guidance.

Under Rule 15(c)(1)(C), an amendment adding a defendant relates back where the claim arises from the conduct set out in the original pleading and, within the Rule 4(m) period, the added defendant received notice sufficient to avoid prejudice and knew or should have known that the action would have been brought against that defendant but for a mistake concerning the proper party's identity. Fed. R. Civ. P. 15(c)(1)(B)–(C). The inquiry focuses on what the added defendant knew or should have known, not on whether the plaintiff knew the defendant's name. A plaintiff may know that a person exists while misunderstanding that person's "status or role in the events giving rise to the claim." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548–50 (2010).

The same-transaction requirement is plainly satisfied. The original complaint challenged the mandate, the Stricken Standards, the categorical rejection of disfavored religious beliefs, the City-created materials used in accommodation proceedings, and Plaintiffs' resulting exclusion from employment and ongoing retaliation, failure to reinstate and harassment claims. The TAC introduces no new policy or injury; it identifies the officials who withheld evidence suggests created, approved, and perpetuated the conduct previously attributed to the municipal Defendants. Defendants themselves acknowledge that the claims against Banks, Bray, Varma, Afshar, and Chokshi arise from the September 2021 communications concerning the same accommodation

13

process already at the center of this action. Defs.' Mem. at 8.

Those communications changed Plaintiff's understanding of personal responsibility. Banks initiated the Chokshi letter after DOE had reviewed requests in a naked attempt to impose special disability on disfavored beliefs like abortion; Bray sought employee letters and recurring phrases to ensure the letter would be crafted to prevent those beliefs from getting accommodation; Varma approved the memorandum even though he knew it contained misinformation; Afshar helped prepare it; and Chokshi issued it, knowing it was unverifiable. Eichenholtz allegedly administered the accommodation and Panel processes and perpetuated similar classifications while supervising the Law Department's resistance to disclosure. TAC ¶¶ 133-178, 206-251 & Ex. 1. The February 2026 production thus identified the policymakers and administrators of policies challenged from the outset.

Defendants' reliance on Plaintiff's earlier references to some officials therefore proves nothing. Knowing that Chokshi, Eichenholtz, or Varma existed did not mean Plaintiff knew that each was a proper individual-capacity defendant personally responsible for the conduct at issue. Varma illustrates the distinction. Defendants themselves note that the initial complaint cited Varma favorably. Defs.' Mem. at 9. The public account was that he had left City service in May 2021, before the mandate and accommodation process challenged here. The concealed September 2021 emails instead showed senior City officials still seeking his review through City channels and Varma approving the memorandum with the response, "Memo ok with me" using his official City email. TAC ¶¶ 240-41 & Ex. 1. Plaintiff's earlier reference to his publicly known views did not establish knowledge that he remained an active participant in the specific discriminatory process — indeed, that Plaintiff once cited him approvingly is affirmative evidence that she misunderstood his role. Under *Krupski*, a mistaken understanding of a known person's role or proper-party status

14

may support relation back. 560 U.S. at 549–50.

*Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013), involved substituting names for John Doe officers already known to be the wrongdoers; it nevertheless permitted relation back under New York law. Id. at 517-19. Plaintiff here alleges that Defendants concealed which officials participated at all. Her mistake concerned responsibility and proper-party status, not merely unknown names. *Krupski*, 560 U.S. at 548-50.

The notice and prejudice requirements likewise cannot be resolved against Plaintiff on the pleadings. Corporation Counsel represented the City and DOE from the outset and now represents at least Eichenholtz and Chokshi; the original complaint challenged an integrated City-and-DOE process; and the relevant evidence consisted of official communications already possessed by the City. Under the constructive notice doctrine, a court may impute knowledge "to a defendant or set of defendants because they have the same attorney(s)" when there is "some showing that the attorney(s) knew that the additional defendants would be added to the existing suit." *Scott v. Village of Spring Valley*, 577 F. App'x 81, 82 (2d Cir. 2014).

Such notice is particularly plausible where the original pleading describes the official conduct later attributed to the individual. *Abdell v. City of New York*, 759 F. Supp. 2d 450, 455-57 (S.D.N.Y. 2010); *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 603-07 (E.D.N.Y. 2017). The officials participated contemporaneously, anticipated litigation, and allegedly were omitted because Corporation Counsel possessed but concealed the records identifying them. What counsel communicated to each official during Rule 4(m) and what each knew are fact questions within Defendants' possession.

Equitable estoppel may also bar a limitations defense where affirmative misconduct prevents timely identification; causation and diligence are factual questions. *Keating v. Carey*, 706

15

F.2d 377, 382 (2d Cir. 1983); *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002).

Finally, there is no unfair prejudice: the claims concern the officials' own communications and policies and evidence the municipal Defendants have possessed and litigated throughout this action. Accordingly, the claims against the individual Defendants relate back under Rule 15(c)(1)(C), and Defendants' limitations argument should be rejected.

## POINT III
## PLAINTIFF PLEADED VIABLE CONSTITUTIONAL CLAIMS

### A. Plaintiff states Free Exercise claims under Kane and NYFRL

In *Kane*, the Second Circuit held that the religious-accommodation standards governing DOE employees were neither neutral nor generally applicable and therefore were subject to strict scrutiny. 19 F.4th at 167–69. The court concluded that the standards likely violated the First Amendment because they preferred "recognized and established religious organizations," disfavored personally held religious beliefs, and permitted denial based on the public position of someone deemed a leader of the applicant's faith. Id. at 168–69. The City acknowledged the policies used to deny Plaintiff were likely unconstitutional, then represented that it would offer "fresh consideration" from a Citywide Panel applying lawful standards more broadly than just to the *Kane* plaintiffs it was ordered to provide with remedial review and reinstate with back pay. Id. at 172–73.

In *NYFRL*, the Second Circuit held that an employee who never obtained that remedial review remained subject only to the original, constitutionally defective framework and thus stated viable constitutional claims. 121 F.4th at 463–64. The court therefore reversed dismissal of her constitutional claims, reasoning that "without the opportunity to submit to the Citywide Panel for fresh review, Solon's religious exemption request can only have been considered under the same framework that we held was likely unconstitutional in *Kane*." Id. at 464.

16

Plaintiff's case is *NYFRL* on all fours. She submitted a religious exemption request on or about September 21, 2021 and was denied on or about September 22, 2021 under the Stricken Standards. TAC ¶¶ 287-88. She appealed to the independent arbitrator, who denied the appeal. Id. ¶¶ 291-93. She then appealed to the Citywide Panel — and has never received any determination. Id. ¶¶ 295, 329. She never received the "fresh consideration" the City promised to cure the acknowledged discriminatory denials. Id. ¶ 330. She was terminated on April 29, 2022 with her Panel appeal still undecided. Id. ¶ 325.

Accepting those allegations as true, Plaintiff — like Solon — was never afforded consideration under any framework other than the one *Kane* held likely unconstitutional. Her exemption request "can only have been considered under" the Stricken Standards, because no other standard was ever applied to it. *NYFRL*, 121 F.4th at 464. Dismissal of her free exercise claim would thus be improper, as it was found to be for plaintiff Solon. Defendant offers no reason to deviate from the Second Circuit's binding holdings.

**1. The religious accommodation policies were neither neutral nor generally applicable**

First, the Second Circuit has twice held that the religious accommodation policies offered to Plaintiff were not neutral. "The minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

In *Kane*, the Second Circuit held the religious accommodation policy was not neutral because it privileged established organizations and clergy documentation, authorized denial based on religious leaders' views, and excluded "personal, political, or philosophical" objections. 19 F.4th at 168-169.

The TAC alleges that Defendants applied precisely those criteria to Plaintiff and worse. DOE representatives openly admitted that their policy — and the City's — was to treat Catholics as

17

presumptively ineligible because Pope Francis supported vaccination; used similar reasoning against Jewish, Muslim, Buddhist, Hindu, and other Christian applicants; rejected beliefs arising from personal prayer; and treated objections involving abortion-derived fetal cell lines as religiously invalid. TAC ¶¶ 74-87, 133-178. Those allegations independently establish non-neutrality. The TAC further alleges that the City directed these policies (as DOE admitted), sending articles and letters to support its instruction to categorically deny most faiths and common religious beliefs against the vaccines. Id. & Ex. 1.

The Second Circuit also found the policy was not generally applicable because it invited individualized assessment of religious reasons, affiliation, documentation, and leaders' statements. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Kane*, 19 F.4th at 169. Decisionmakers exercised discretion, and at least 165 employees whose beliefs were accepted received accommodation — many of whom remained accommodated until the Mandate was lifted in February 2023, while Plaintiff was terminated. TAC ¶ 334. *Kane* held that arbitrators' deviations from the policy underscored, rather than cured, the absence of general applicability. 19 F.4th at 169. Because the religious accommodation policies are not neutral or generally applicable, strict scrutiny therefore governs employees like Plaintiff who were denied under those Standards without remedial review.

### 2. The mandate's facial neutrality does not defeat Plaintiff's as-applied claims

Defendants focus on the argument that the vaccination mandate itself was facially neutral and generally applicable. Defs.' Mem. at 18. But Plaintiff challenges the religious-accommodation standards and their application — not merely the vaccination requirement in the abstract.

Defendants' brief never engages that distinction. It cites *Kane* five times for the mandate's general validity and never once acknowledges that the same opinion held the accommodation

18

standards applied to Plaintiff likely unconstitutional. Defendants likewise cite *New Yorkers for Religious Liberty* for the proposition that a neutral law of general applicability does not excuse compliance, Defs.' Mem. at 18, without acknowledging that the same decision reinstated the constitutional claims of an employee who, like Plaintiff, never received Citywide Panel review. 121 F.4th at 463-64. An argument that omits the controlling holdings of the two cases it principally relies upon cannot support dismissal.

*Kane* itself distinguished the two. Although the court did not find the mandate facially discriminatory "at this stage" on the preliminary-injunction record,[2] it nevertheless held that the accommodation standards applied to religious objectors were not neutral and could not survive strict scrutiny in any event. 19 F.4th at 166–69. *NYFRL* then confirmed that an employee denied access to remedial Citywide Panel review retains a viable constitutional challenge because her request necessarily remained governed by that original framework. 121 F.4th at 463–64.

Thus, even assuming arguendo the mandate was facially neutral, that did not authorize Defendants to determine who received an exemption through criteria that preferred institutional over individual faith, favored some denominations over others, or judged an applicant's beliefs by the views of religious leaders. Plaintiff's as-applied claim survives regardless of whether the Court revisits the mandate's facial neutrality.

Nor have comparable claims been "uniformly rejected." Defs.' Mem. at 18-19. Beyond *Kane* and *NYFRL*, most courts have sustained materially similar First Amendment claims. See *Maiorino*

---

[2] Plaintiff preserves her contention that the SAC's materially fuller allegations warrant reconsideration of whether the Mandate itself was neutral. *Kane* addressed that question on the preliminary-injunction record then before it and merely held that "at this stage" those separate plaintiffs had not defeated facially defeated neutrality; because this is a different action, its determination is not law of the case here. Although the Court need not reach the issue—because the expressly religion-based Stricken Standards independently trigger strict scrutiny—it may evaluate the Mandate in light of the SAC's newly pleaded allegations and evidence. Plaintiff therefore does not waive that distinct challenge.

19

*v. City of New York*, No. 25-cv-0097, ECF No. 75 (S.D.N.Y. July 6, 2026) (Catholic objection rejected as insufficiently religious); *Lee v. New York City Fire Department*, 2025 WL 2772855, at *2 (E.D.N.Y. Sept. 29, 2025) (claims "fit squarely within" *NYFRL*); *Maita v. City of New York*, No. 24-cv-6559, ECF No. 29, at 10-11 (E.D.N.Y. Feb. 2, 2026); *Annicelli v. New York City Police Department*, 2026 WL 871393, at *10 (S.D.N.Y. Jan. 9, 2026), adopted, 2026 WL 867926 (S.D.N.Y. Mar. 30, 2026) (beliefs deemed too personal); *Mumin v. City of New York*, No. 23-cv-3932 (S.D.N.Y. Sept. 25, 2025).[3]

To the extent Defendants raise the district court's recent decision not to allow amendment in *Zapantis-Dalamakis v. City of New York*, No. 24-cv-4631, ECF No. 34 (E.D.N.Y. July 2, 2026), that case is distinguishable. It largely concerned plaintiffs who received Panel review and denials resting on Panel hardship determinations. Id. at 9-11. Plaintiff here received no Panel determination at all; *NYFRL* therefore controls. 121 F.4th at 464.

### 3. Defendants' remaining arguments do not reach the accommodation standards

Defendants argue that Plaintiff "has not alleged facts suggesting that the vaccine mandate or process to request a religious exemption were not neutral or generally applicable or that they unfairly targeted her religion." Defs.' Mem. at 18. That assertion cannot be reconciled with the TAC, which alleges the criteria by name and quotes them: preference for Christian Scientists, exclusion of beliefs derived from personal prayer, denial authorized by a religious leader's public support for vaccination, and a requirement of membership in an "established" organization with clergy-verified opposition. TAC ¶¶ 74-87. Whether those allegations are ultimately proven is not the question on a Rule 12(b)(6) motion.

Defendants also invoke *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905),

---

[3] Defendants cite to an earlier decision in *Mumin* but neglect to mention the case was repleaded and survived dismissal.

20

and cases holding that the mandate implicates no fundamental right. Defs.' Mem. at 21. Those authorities address compulsory vaccination as a public-health measure. None addresses whether a government may distribute religious exemptions according to denomination, institutional affiliation, and clergy endorsement. *Kane* answered that question, and answered it against Defendants.

**B. Plaintiff states an independent Establishment Clause claim**

Plaintiff also states a distinct claim under the Establishment Clause. The Free Exercise Clause asks whether the government impermissibly burdened Plaintiff's religious exercise. The Establishment Clause prohibits government from preferring some denominations, forms of religious organization, or theological positions over others.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). A policy that expressly differentiates among religions is subject to strict scrutiny without any separate showing of subjective animus. Id. at 246–47.

The Supreme Court recently reaffirmed that principle in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025). There, Wisconsin denied a religious exemption based on whether a Catholic organization's activities appeared sufficiently religious—looking to whether the organization proselytized, limited its services to Catholics, or otherwise operated in a manner the State considered characteristically religious. The unanimous Court held that such theological line-drawing created an unconstitutional denominational preference and triggered strict scrutiny. Id. at 248–52.

The Stricken Standards suffer from the same defect. They did not ask merely whether an applicant sincerely held a religious objection. They asked whether the applicant's religion had the

21

correct institutional form, the correct hierarchy, and the correct doctrinal position. The City then supplied DOE and the arbitrators with articles and instructions identifying which denominations and beliefs should be deemed religiously invalid. Each part of that system drew theological distinctions the government had no authority to make.

### 1. The Stricken Standards facially preferred some forms of religion over others

First, accommodation was restricted to adherents of "recognized and established religious organizations." TAC ¶¶ 74-78. An applicant whose faith was not organized into a government-recognized institution was disfavored by definition. That is the type of denominational preference condemned in *Larson*: government favoring established institutional religions over newer, smaller, decentralized, or less conventional faiths. 456 U.S. at 246–47.

Second, the standards expressly singled out Christian Scientists as an example of a religion whose adherents might qualify, while excluding "personally held" beliefs and applicants whose perceived religious leaders supported vaccination. TAC ¶¶ 74-78. The Mayor publicly reinforced that distinction, identifying Christian Science and Jehovah's Witnesses as the two "well-established religions" that might possess a sufficiently longstanding objection, while declaring that an objection could not be "something someone can make up individually." TAC ¶¶ 179-88. The policy thus expressly preferred specified denominations and institutional forms of faith.

Third, the standards required documentation from a religious official and permitted denial whenever a perceived leader of the applicant's religious organization had publicly favored vaccination. TAC ¶¶ 74-78. Faiths organized around centralized hierarchies were judged according to the government's understanding of their hierarchy, even when an individual adherent's sincerely held beliefs differed. Faiths without formal clergy or centralized authority could not readily satisfy the documentation requirement at all. And decisionmakers were given broad discretion to select

22

who counted as the "leader" of a given faith. Id.

Fourth, the standards excluded objections deemed "personal" rather than institutionally prescribed. But whether religious authority comes through clergy, denominational doctrine, scripture, direct revelation, prayer, or individual conscience is itself a theological question. By treating institutionally transmitted beliefs as more legitimate than beliefs arising through individual conscience or prayer, Defendants preferred some modes of religious belief over others.

These were not merely theoretical defects in the written criteria. The TAC alleges that the City adopted an official policy, transmitted to DOE and the arbitrators, under which Jews, Catholics, Muslims, Buddhists, most Christian denominations other than the few favored examples, and other faiths were categorically barred from accommodation because officials selected some public figure as the "leader" of each faith and concluded that the leader supported vaccination. TAC ¶¶ 133-178. DOE representatives allegedly acknowledged that, pursuant to City instruction, these faiths were considered per se ineligible even when applicants' beliefs were sincere and supported by their own clergy. Id.

Concrete examples include reliance on a vaccinated Israeli rabbi against Jewish applicants; Pope Francis against Catholics, non-Catholic Christians, and even a Buddhist; an asserted Muslim leader against Muslims; and the Dalai Lama against Buddhists. Non-denominational Christians depended on whether an arbitrator deemed their churches sufficiently "valid." TAC ¶¶ 133-178.

Plaintiff was denied under precisely this regime. Her application was denied the day after she submitted it. TAC ¶¶ 287-88. She received no individualized review and no cooperative dialogue before that denial; decisionmakers at DOE admitted in sworn testimony that no one even reviewed the applications before sending out blanket denials, and 100% of applicants were denied without any human review — including those already approved to work entirely remotely. Id. ¶¶ 90-93.

23

These allegations are not limited to the acts of individual DOE employees. The TAC alleges that the City, acting through OLR, the Law Department, DCAS, and other senior officials, affirmatively supplied articles and instructions used to impose categorical denominational exclusions. TAC ¶¶ 133-178 & Ex. 1. DOE representatives and arbitrators allegedly admitted that the City-provided articles and the Chokshi letter were the bases for denying members of the identified faiths and particularly religious objections to abortion, which Plaintiff had. Id.

*Kane* already held that the governing criteria "presuppose[] the illegitimacy of religious beliefs and practices" and impermissibly judge an applicant's faith by the views of other adherents or leaders. 19 F.4th at 168–69. Although *Kane* resolved the issue under the Free Exercise Clause and therefore had no need to reach the independent Establishment Clause claim regarding the religious accommodation policies, *Larson* and *Catholic Charities* confirm that the same express classifications also constitute denominational preferences subject to strict scrutiny.

Defendants do not meaningfully confront this claim. Defs.' Mem. at 18-21. To the extent they rely on decisions rejecting Establishment Clause challenges to the mandate itself, Plaintiff challenges the accommodation criteria and the religion-specific instructions through which they were administered. The neutrality of the mandate's general vaccination requirement does not immunize a separate accommodation system that formally preferred certain denominations, institutional structures, religious authorities, and theological conclusions over others.

### 2. Defendants impermissibly lent government authority to one side of theological disputes

The Establishment Clause also prohibits government from resolving contested questions of religious doctrine. Government may not "lend its power to one or the other side in controversies over religious authority or dogma." *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990). Nor may government decide which religious authority

24

speaks for an applicant, which interpretation of a faith is correct, or whether an adherent's understanding of religious obligation is theologically sound.

The TAC alleges that Defendants did all those things. The City did not merely ask whether Plaintiff had sincerely held religious beliefs. It supplied adjudicators with articles identifying purported religious leaders, instructed them to treat those leaders' support for vaccination as dispositive, and thereby declared contrary understandings of Judaism, Catholicism, Islam, Buddhism, and numerous Christian traditions invalid. TAC ¶¶ 133-188.

The Chokshi letter provides an additional and particularly stark example. At Banks's request, senior City officials developed a letter for DOE and arbitrators to use against applicants whose objections concerned aborted fetal cell lines, tainted blood, animal products, and related religious concerns. TAC ¶¶ 133-178 & Ex. 1. Banks expressly requested a document signed by a City doctor that would establish why those religious claims were "BS" and could be cited by arbitrators deciding pending requests. Id. & Ex. 1 at 8-9.

The resulting letter purported to resolve not merely scientific questions about vaccine development, but the religious significance of those facts. Chokshi invoked an "array" of religious authorities and asserted that "the Catholic Church" had determined that Roman Catholics could receive vaccines developed or tested using fetal cell lines. TAC ¶¶ 133-178. The letter was then distributed to DOE, the arbitrators, and the Citywide Panel and invoked to deny applicants whose abortion-related objections were found sincere.

The TAC further alleges that City officials broadened the proposed guidance to target objections involving pork, beef, and other animal products and devised an additional theological-sincerity test based on whether applicants had previously avoided Tylenol, Advil, and other medications. TAC ¶¶ 133-178 & Ex. 1 at 6-8. Chokshi specifically requested that the language

25

concerning pork and animal products and medications be restored; and the letter was disseminated even though the medication list could not be verified (and in fact was not accurate).

That conduct imposed government-created requirements on religious consistency. Defendants effectively declared that an applicant could not sincerely object to one product unless she had independently discovered and religiously avoided every other product the City placed on its list— even though the TAC alleges that the factual premise underlying that list was false or unverifiable and that applicants had no reason to know of the alleged comparison. TAC ¶¶ 133-178. The City then allegedly used the resulting misinformation to deny thousands of employees who did not state that avoiding those common medications was part of their religious practice.

Whether an individual's receipt of a vaccine constitutes impermissible complicity in abortion, contamination by prohibited animal products, violation of religious purity rules, or another form of religious wrongdoing is a theological and moral question on which adherents and authorities may disagree. Defendants had no constitutional authority to select the religious answer they preferred, designate the authorities whose views would govern, and impose those answers on individual applicants as the official position of the City.

Defendants' characterization of this effort as an attempt to ensure that accommodation decisions rested on "accurate" information does not cure the violation. Defs.' Mem. at 18-19. First, the City did not confine itself to correcting objective facts. It instructed decisionmakers which religious authorities to follow, which theological interpretations to accept, and which religious concerns should be deemed invalid. Second, the Second Circuit has rejected the underlying "accuracy" defense in *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996).

*Jolly* held that permissible inquiry is limited to whether a belief is sincerely held and religious in nature; courts may not ask whether it is "appropriate or true—however unusual or unfamiliar."

26

Id. at 476. It therefore rejected the government's argument that a Rastafarian's belief about a tuberculosis test was objectively inaccurate or illogical. Id.

The constitutional problem here is even more direct. Defendants did not merely dispute a factual premise concerning vaccine development. They invoked selected religious authorities to instruct decisionmakers that Plaintiff's own understanding of religious obligation was wrong. If government may not tell a Rastafarian what qualifies as "artificial" within his faith, it may not tell a Catholic what constitutes complicity in abortion, a Jew which rabbi speaks for Judaism, a Buddhist whether the Dalai Lama's conduct resolves his individual obligation, a Muslim which authority controls his faith, a prayer based objector that guidance believed to be from God is personal not religious, or a non-denominational Christian that his church is insufficiently established to generate protected religious beliefs.

*Kane* confirms the point in the context of this very policy: government cannot deny accommodation based on the contrary views of another adherent or even a purported leader of the applicant's faith. 19 F.4th at 168–69. What matters is what the believer sincerely believes not any search for what is "objectively" true. Id.

### C. Plaintiff states Equal Protection claims

The TAC also states claims under the Equal Protection Clause. Government classifications based expressly on religion are inherently suspect and subject to strict scrutiny. See *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *Larson*, 456 U.S. at 246. When a challenged policy expressly classifies persons by a suspect characteristic, the classification itself supplies the discriminatory purpose; plaintiffs need not separately plead extrinsic evidence of animus or discriminatory effect. See *Jana-Rock Construction, Inc. v. New York State Department of Economic Development*, 438 F.3d 195, 204–05 (2d Cir. 2006); *Miller v. Johnson*, 515 U.S. 900,

27

904–05 (1995).

The Stricken Standards expressly classified applicants according to the institutional status, leadership, and perceived doctrines of their religions. They favored members of "recognized and established" organizations whose leaders had not publicly supported vaccination and disfavored applicants whose beliefs were personal, nonhierarchical, idiosyncratic, or inconsistent with the views of a perceived religious leader. TAC ¶¶ 72–92.

Plaintiff alleges a two-tiered accommodation system. Approximately 165 employees whose beliefs satisfied Defendants' favored religious criteria were accommodated and remained accommodated even after Kane. TAC ¶¶ 189–98. Plaintiff, whose beliefs fell outside the preferred categories, was denied and subjected to an additional purported undue-hardship barrier. Id. The pleaded distinction was not based on job title, worksite, duties, or any individualized safety assessment, but on whether Defendants approved of the source and doctrinal content of the employee's religious belief.

Defendants cannot defeat that claim by arguing that Plaintiff might ultimately have been denied accommodation on some permissible ground. When government "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," a plaintiff need not establish that she ultimately would have obtained the benefit absent the barrier. *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). The constitutional injury is "the denial of equal treatment resulting from the imposition of the barrier," not merely the ultimate denial of the benefit. Id.

### D.  The challenged policies cannot survive strict scrutiny

Each constitutional theory independently triggers strict scrutiny. The Stricken Standards were

28

neither neutral nor generally applicable under the Free Exercise Clause; they drew express denominational distinctions under the Establishment Clause; and they classified applicants according to religion under the Equal Protection Clause.

Under strict scrutiny, Defendants bear the burden of proving that the challenged classifications were narrowly tailored to further a compelling governmental interest. *Lukumi*, 508 U.S. at 546. General invocations of public health cannot satisfy that burden. Defendants must justify the particular religious classifications and barriers they imposed.

*Kane* already held that these procedures cannot survive strict scrutiny because criteria such as clergy letters bear no narrow relation to preventing COVID-19 transmission, and the City offered no meaningful contrary argument. 19 F.4th at 169.

The same conclusion follows here. Whether an employee belonged to a "recognized" religion, obtained a clergy letter, agreed with a religious leader, or derived her belief through personal prayer had no connection to whether a particular accommodation would create a workplace safety risk. Nor could the public-health objective justify categorically rejecting abortion-related objections based on the government's interpretation of Catholic or Christian doctrine.

### E. The Individual Defendants Personally Participated and Qualified Immunity Does Not Support Dismissal

Defendants' two-sentence § 1983 argument disregards the TAC's particularized allegations. Section 1983 requires a plaintiff to plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

The TAC and Points V and II allege direct participation by each named Defendant. Banks initiated and directed the effort to develop governmental materials defeating identified religious objections; Bray proposed the classifications and sought employees' actual submissions to target

29

them; Varma approved the resulting memorandum and admitted the mandates were a policy of "harassment"; Afshar helped prepare the Chokshi letter and restored assertions she knew could not be verified; and Chokshi issued it under his authority, added religion-specific content, and authorized its dissemination to accommodation decisionmakers. TAC ¶¶ 133-178, 238-242 & Ex. 1. Eichenholtz designed and administered the post-*Kane* Panel, restricted access to that remedy, and perpetuated substantially the same classifications while applying a *de minimis* hardship standard he conceded was wrong. Id. ¶¶ 88-89, 206-251. These are allegations of intentional participation in creating, disseminating, and administering the challenged policies — not liability by title or supervisory status.

Defendants' qualified-immunity argument reverses the governing capacity rule. They assert the individual Defendants are immune "to the extent that they acted in their official capacity." Defs.' Mem. at 21. The opposite is true: qualified immunity is a defense to personal-capacity damages liability and is unavailable in an official-capacity action. *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985). It is likewise unavailable against claims for equitable relief.

As to personal-capacity liability, it was clearly established well before 2021 that government may not determine which interpretation of a faith is correct, *Thomas v. Review Bd.*, 450 U.S. 707, 715-16 (1981), deny religious protection because a belief is not commanded by an organized religious body, *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989), or prefer some denominations over others, *Larson*, 456 U.S. at 244, 246. No reasonable official could believe employment protections could be allocated according to whether an applicant supplied a clergy letter, belonged to a "recognized" organization, or agreed with selected religious leaders.

*Kane* applied those settled principles to these very Standards in November 2021 and held them nonneutral and incapable of surviving strict scrutiny. 19 F.4th at 166-69. The alleged continuation

30

of substantially the same classifications *after* that decision — including through Plaintiff's undecided Panel appeal and her April 2022 termination — presents an even clearer case. At minimum, qualified immunity cannot be resolved on this motion, where all reasonable inferences belong to Plaintiff. *Chamberlain v. City of White Plains*, 960 F.3d 100, 110-11 (2d Cir. 2020).

## POINT IV
## PLAINTIFF STATES VIABLE TITLE VII CLAIMS

### A. Exhaustion

Exhaustion is a nonjurisdictional affirmative defense that Defendants bear the burden of proving. *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018). Defendants seek dismissal of every Title VII claim. That is broader than the record permits.

### 1. Plaintiff does not press claims encompassed by her first charge.

Plaintiff does not contend that her Title VII claims arising from the September 2021 denial, her placement on leave without pay, or her April 29, 2022 termination survive. Those events were encompassed by her first charge, filed May 16, 2022, which identified a discrimination period of October 1, 2021 through April 29, 2022. Smith Decl. Ex. C. A right-to-sue notice issued July 1, 2022, id. Ex. E, and Plaintiff did not sue within ninety days. A later charge re-alleging the same conduct does not revive those claims.

That concession is narrow. It reaches only Title VII claims arising prior to May 2022. It does not touch Plaintiff's claims under § 1983, the SHRL, or the CHRL, none of which requires EEOC exhaustion. And it does not touch Title VII claims arising from conduct that postdates the first charge — conduct that charge could not have encompassed.

### 2. The post-charge acts were timely exhausted.

Three discrete acts postdate May 16, 2022 which are still before the Court through Plaintiff's second EEOC filing:

31

- **The August 2022 vaccination-only offer.** DOE offered Plaintiff her position back with no break in service if she showed proof of vaccination by September 6, 2022, while knowing she required religious accommodation and offering none. TAC ¶¶ 276-77, 336-37.

- **The Problem Code.** Plaintiff learned on January 15, 2023 that her file and fingerprints had been flagged at DOE's Office of Personnel Investigations with a designation used for suspected misconduct. Id. ¶¶ 340-42.

- **The post-repeal refusals.** After the Mandate was repealed in February 2023, DOE refused to reinstate Plaintiff although her position remained open, refused to hire her elsewhere despite a staffing shortage, and conditioned rehire on a waiver of these claims. Id. ¶¶ 346-47, 370-71.

Each is a discrete act with its own accrual date. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-14 (2002). Plaintiff filed her second charge on February 21, 2023; the 300-day lookback reaches to April 27, 2022, capturing all three. The charge alleged religion and retaliation, ran through February 14, 2023, and checked "Continuing Action." Smith Decl. Ex. D. The right-to-sue notice issued September 18, 2023, and Plaintiff sued December 14, 2023. Defendants concede the ninety-day point. Defs.' Mem. at 10.

Defendants' only argument against the second charge is that it came more than 300 days after termination. Defs.' Mem. at 10. First, it is inaccurate (Plaintiff was terminated in April 2022 not February) and second, she concedes she cannot bring a Title VII challenge to her first termination because it pre-dated her lapsed first charge. Against the post-charge acts, Defendants say nothing.

### 3. Internal appeals are not a Title VII prerequisite.

Defendants' conflate Title VII's statutory EEOC requirement with exhaustion of an

32

employer's internal or collectively bargained procedures. Defs.' Mem. at 10. Title VII specifies the prerequisites to suit: a timely administrative charge and a timely action after receipt of a right-to-sue notice. It does not make completion of an employer-controlled accommodation appeal an additional prerequisite.

The Supreme Court has held that contractual and statutory discrimination rights are legally independent, and that an employee pursuing Title VII is not seeking review of an arbitrator's decision but enforcing a federal statutory right. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47-54 (1974). Nothing in the Impasse Award, the SOLAS process, the arbitrator appeal, or the Citywide Panel procedure purported to adjudicate Title VII claims or made completion of those mechanisms a condition of enforcing Title VII.

Defendants' cited authorities address entirely different doctrines. *Read v. Corning Inc.*, 351 F. Supp. 3d 342 (W.D.N.Y. 2018), involved environmental-remediation proceedings before the Department of Environmental Conservation. *Town of Oyster Bay v. Kirkland*, 19 N.Y.3d 1035, 1038-39 (2012), involved New York's state-law exhaustion doctrine where a municipality attempted to halt an ongoing SDHR proceeding before the agency developed a factual record. Neither makes an employer's internal accommodation appeal a prerequisite to Title VII relief. And to the extent Defendants press the same argument against the § 1983 claims, exhaustion of state administrative remedies is not a prerequisite to suit under § 1983. *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982).

The argument fails on its own terms in any event, because Plaintiff pursued every step Defendants made available to her. She appealed her denial to the independent arbitrator, receiving written confirmation that her materials had been forwarded to Scheinman Arbitration and Mediation Services. TAC ¶¶ 291-92. Shortly after the Chokshi letter reached the arbitrators, she

33

was denied without a hearing and without explanation — "an 'x' next to the word 'denied.'" Id. ¶ 293. When she attempted to grieve, she was told the grievance process had been suspended for the duration of the pandemic. Id. ¶ 296.

After *Kane*, Plaintiff tried to appeal to the Citywide Panel through SOLAS and received an error message stating that she was not in compliance with the Mandate and could not submit her request. TAC ¶¶ 318-19. She followed up by letter to DOE on or about November 29, 2021, asking that her application be reviewed by the Panel as the City had promised — a letter that also gave notice of her claims to the Chancellor and the Law Department. Id. ¶ 320. She was told that she would get a review but never received a determination. Id. ¶ 329.

Defendants' suggestion that Plaintiff may have been "ineligible" for Panel review therefore proves only that Defendants excluded her from their own remedial process, after promising the Second Circuit that fresh consideration would be provided. That is not waiver of independent federal rights. Plaintiff cannot be barred from Title VII relief for failing to complete an internal procedure that Title VII does not require, that she in fact pursued, and that Defendants themselves made unavailable to her

### B.  The surviving claims are adequately pleaded

### 1.  The August 2022 offer states a textbook *Bergin* accommodation claim.

Defendants recite the older test requiring a bona fide conflict, notice, and discipline for noncompliance that was in effect last month. Defs.' Mem. at 12-14. The Second Circuit recently held that *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015), abrogated that formulation. *Bergin v. N.Y. State Unified Ct. Sys.*, No. 25-721, slip op. at 11-13 (2d Cir. July 15, 2026). A plaintiff now states a claim by alleging "(1) that she actually required an accommodation of her religious practice, and (2) the employer's desire to avoid the actually required prospective

34

accommodation was a motivating factor in (3) an adverse employment decision." Id. at 13.

The August 2022 offer satisfies each element. Plaintiff actually required accommodation. Defendants knew it. Id. ¶ 337. (She had applied for one, appealed its denial, and had an appeal pending. TAC ¶¶ 287-95). And they structured the offer so that the only path back to work ran through abandoning the religious practice: same job, no break in service, on condition of vaccination. Id. ¶ 336. Under *Abercrombie*, an employer may not make an applicant's religious practice a factor in an employment decision; conditioning reinstatement on abandoning that practice is the paradigm case. 575 U.S. at 773-75.

Nothing about that offer reflects a hardship judgment. Defendants did not weigh accommodation and find it costly — they offered to restore the position while withholding the only thing that would let Plaintiff accept it. That was the third failure to accommodate, and it occurred the same month CDC advised that workplaces should not differentiate by vaccination status and that the primary series provided minimal protection against transmission. TAC ¶ 271.

### 2. Plaintiff has a direct evidence claim that applies to all subsequent actions

Defendants argue the TAC pleads no inference of discriminatory motive. Defs.' Mem. at 12-13. But they acknowledge *Littlejohn*'s framework applies only "absent direct evidence of discrimination." Where a written policy makes treatment turn on a protected characteristic, "the *McDonnell Douglas* test is inapplicable" because the policy is "discriminatory on its face." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

This is such a claim. The Stricken Standards classified employees by the source, affiliation, and perceived orthodoxy of their beliefs — recognized faith over personal faith, selected authorities over individual conscience. TAC ¶¶ 74-87. That is direct evidence. And an alternative rationale does not neutralize a facially discriminatory policy. *Int'l Union, UAW v. Johnson*

35

*Controls, Inc.*, 499 U.S. 187, 199 (1991). Religion remains actionable where it was "a motivating factor," even if other factors also motivated the practice. 42 U.S.C. § 2000e-2(m).

The September 2021 emails supply further direct evidence of religious animus aimed squarely at the two beliefs Plaintiff holds. Banks — First Deputy Commissioner and General Counsel of OLR, who represented the Mayor and the City in all labor relations — observed that two-thirds of appeals from the DOE blanket denials were religious and that many cited objections to abortion, then asked colleagues for "a document signed off on by a City Doctor that essentially makes the argument as to why this is BS." TAC ¶ 124 & Ex. 1 at 9. He stated the document's purpose was to give arbitrators something to justify denying religious accommodation requests. Id. ¶ 125.

The scheme did not stop at hostility. Banks solicited actual DOE employee accommodation letters to serve as models for arguments to "proactively categorically refute," id. ¶ 132, complained that a potential template for attacking abortion based beliefs was "a little bit more neutral than I was thinking," and proposed that "[w]e can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated" — meaning, by having the Commissioner declare it religiously acceptable. Id. ¶ 133. Bray sought the employee letters so she could "craft a response that would be tailored to deny them," acknowledging the effort "will absolutely be subject to litigation and will go far." Id. ¶ 131.

Plaintiff's beliefs sit at the center of that target. She objected to vaccination because aborted fetal cell lines were used in the development of all three vaccines, and she reached that conclusion through prayer with her pastor and her family. TAC ¶¶ 285-86. The Chokshi letter was engineered to defeat the first belief; the Stricken Standards excluded the second as merely "personally held."

The animus outlasted *Kane* and was still in effect during the period of the September 2022

36

reinstatement offer. Even after the Second Circuit held the original policy likely unconstitutional, the Citywide Panel continued — "as instructed by Eichenholtz" — to reject personally held beliefs derived from guidance through prayer and to reject religious objections to aborted fetal cells, noting internally that such beliefs, "while sincere, do not qualify." TAC ¶ 203. Chokshi never repudiated his advice, and his standing instruction to deny abortion-based objections because "the Pope and other leaders seemed okay with the connection" was relied on by both the Panel and the arbitrators. Id. ¶ 204.

### 3. **Undue hardship cannot be resolved on this pleading.**

Defendants argue accommodation would have imposed an undue hardship, invoking a burden that is "light indeed" given "the public-facing nature of a DOE teacher's work." Defs.' Mem. at 24 (quoting *Sides v. N.Y. State Div. of State Police*, 2005 U.S. Dist. LEXIS 12635 (N.D.N.Y. 2005)). Both the standard and the premise are wrong.

The standard is no longer good law. *Groff v. DeJoy* held an employer must show a burden "substantial in the overall context of an employer's business," expressly rejecting the *de minimis* test. 600 U.S. 447, 468-70 (2023). Undue hardship is Defendants' affirmative defense and may be resolved on a motion to dismiss only if established on the face of the complaint. *D'Cunha v. Northwell Health Sys.*, 2023 U.S. App. LEXIS 30612, at *6-7 (2d Cir. Nov. 17, 2023).

The premise fails. Plaintiff's job was not public-facing. TAC ¶ 300. As a Master Teacher — a citywide appointment — her primary role was assessing data for struggling schools, recommending professional development, and coordinating with building administrators. Id. ¶¶ 301-02. She did not need to enter any school building to do that work, and it occupied roughly 85% of her time. Id. ¶¶ 303-04. In fall 2021 she took on additional administrative work as a Transition Coordinator, coordinating IEP compliance and linking students with disabilities to

37

independent-living and service agencies. Id. ¶¶ 305-06. None of that work involved in-person classroom time, and all of it could have been performed remotely. Id. ¶¶ 307-08.

The remaining sliver of her duties was co-teaching one or two classes — and she was never the primary classroom teacher. TAC ¶¶ 309, 312. Even before the Mandate, she routinely joined class remotely while a co-teacher or aide was physically present with students. Id. ¶ 312. Defendants could have accommodated her by simply assigning her administrative work full time until the temporary Mandate was rescinded. Id. ¶ 310.

Defendants did exactly that for others. They accommodated at least 165 employees whose beliefs satisfied the favored criteria — including classroom teachers and administrators who worked in buildings with students — and those employees remained accommodated throughout the Mandate. TAC ¶¶ 168-69, 208. Defendants gave some teachers co-teachers and let them teach virtually from home or a DOE remote site. Id. ¶ 170. An art teacher whose beliefs qualified was permitted to work from home and join her class through Google Classroom while DOE hired a new long-term substitute to cover the room. Id. ¶ 171. Defendants thus incurred the cost of a replacement teacher for a favored employee, while refusing Plaintiff an accommodation that would have cost nothing. Allegations that an employer accommodated others support feasibility and preclude a facial hardship finding. *Chinchilla v. N.Y.C. Police Dep't*, 2024 WL 3400526, at \*10 (S.D.N.Y. July 12, 2024).

The infrastructure was standing empty. Remote work centers established after the Award to house employees whose beliefs merited protection "sat well-below capacity for the entirety of the mandate." TAC ¶ 254. DOE continued offering remote education throughout the 2021-2022 school year and was actively recruiting fully remote teachers rather than reassigning qualified employees like Plaintiff who needed accommodation. Id. ¶ 253.

38

Nor was Plaintiff a safety risk. She had already had COVID-19 and had natural immunity. TAC ¶ 313. For the preceding year and a half she had been teaching, sometimes in person, without exposing anyone. Id. At her own expense she underwent regular testing, daily health checks, medical surveys, temperature checks on entry, and daily masking, and presented a negative test each day before reporting. Id. ¶¶ 314-16. She remained ready and able to continue — as every other school district in the State permitted teachers to do, including neighboring Long Island. Id. ¶¶ 245, 317.

Against all of this, Defendants assessed nothing. Eichenholtz conceded that neither he, DOE, nor the City ever evaluated any request individually or as a whole to determine cost or threat level, TAC ¶ 88, never assessed a single study or any data bearing on safe accommodation, and possessed nothing refuting the Bhattacharya and Makary declarations provided to Defendants prior to any denials, id. ¶ 244 & Exs. 2, 4. He also testified that nothing in the amended Mandate precluded working unvaccinated in person or remotely. Id. ¶ 77.

Defendants' remaining answer — that Plaintiff cannot "substitute her preference for weekly testing in place of vaccination," Defs.' Mem. at 24 — mistakes the claim. Plaintiff sought accommodation, not a veto over vaccination policy, and the accommodation her job called for was remote administrative work she was already performing.

The defense collapses entirely as to the surviving claims. Defendants' hardship argument describes a public health emergency and a public-facing teacher: a September 2021 argument about someone else's job. It does not explain the August 2022 refusal after the CDC guidance, and it cannot explain a Problem Code or a February 2023 refusal to rehire after the Mandate was repealed. Once the vaccination requirement was gone, there was no cost left to incur.

**4. Retaliation**.

39

Defendants argue Plaintiff's protected activity postdated the conduct complained of and that she was terminated solely for noncompliance. Defs.' Mem. at 17-18. Both propositions fail as to the surviving claims, all of which postdate her May 2022 charge.

Requesting accommodation and appealing a denial are protected activity, as is filing an EEOC charge. Defendants knew of each because their own systems received them, and because DOE's legal intake officers were served with the July 1, 2022 right-to-sue notice. Smith Decl. Ex. D. The adverse actions followed.

**The Problem Code.** DOE flagged Plaintiff's file and fingerprints at its Office of Personnel Investigations with a designation reserved for employees who committed what DOE considers misconduct — typically applied to teachers who have sexually molested a student or are otherwise unhireable. TAC ¶¶ 340-42. Plaintiff was an exemplary employee in good standing whose only disciplinary charge was "failing to violate her religious beliefs by taking a Covid-19 vaccine." Id. ¶¶ 343-44. Upon information and belief, the fingerprints of unvaccinated teachers were shared with the FBI and the New York State Division of Criminal Justice Services. Id. ¶ 368. Branding a tenured educator with a child-abuse-adjacent designation, and transmitting it to law enforcement databases, is not enforcement of a vaccination requirement.

**Destruction of her outside livelihood.** The Problem Code reached beyond DOE employment. Plaintiff runs a not-for-profit serving students with disabilities and at-risk children, registered with the NYC vendor portals before the Code was placed. TAC ¶¶ 360-61. Because Defendants placed the Code at both the City and DOE levels, the organization was removed from those portals and can no longer submit grant or RFP proposals. Id. ¶ 362. Plaintiff was locked out of the HHS Accelerator, the Payee Information Portal, and PASSPort, and removed from the Mayor's Office of Contract Services portal — registration in which is required to receive City

40

contracts, bid on jobs, or communicate with vendors. Id. ¶ 363. Her vendor account, in good standing since January 2020, no longer exists; a search returns "vendor #vs0006018 is not found." TAC ¶¶ 364-65. Neither Plaintiff nor her not-for-profit committed any act warranting removal. Id. ¶ 367.

**Obstruction of benefits.** Defendants opposed Plaintiff's unemployment benefits by characterizing adherence to her religious beliefs as "misconduct" — a charge that would have required a contractual hearing she never received — and later asserted she was terminated for cause because her beliefs differed from the Pope's. TAC ¶ 389.

**Refusal to rehire.** After the Mandate was lifted in February 2023, DOE refused to reinstate Plaintiff although her position remained open, and refused to hire her for any other position despite a staffing crisis in her field. TAC ¶¶ 346-47. She applied for numerous positions she was well qualified for — special education teacher, transition coordinator, principal of special education, instructional coach, assistant superintendent, online instructor — reaching second and third round interviews before hearing nothing, with no reason ever given. Smith Decl. Ex. D; TAC ¶¶ 348-50. She is a highly commended tenured educator with multiple graduate degrees and a record of success at DOE. Id. ¶ 349.

**The waiver.** Knowing of ongoing litigation challenging its accommodation policies, DOE attached a waiver requirement to reinstatement and to some new-teacher applications, forcing employees denied religious accommodation to surrender their right to challenge that discrimination as the price of returning to work. TAC ¶¶ 369-71.

Each of these readily qualifies as an action capable of dissuading a reasonable employee from asserting protected rights. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Several exceed that standard: a waiver condition targets the protected activity itself, and a

41

misconduct designation transmitted to the FBI is punitive on its face.

Defendants' sole causation answer is that Plaintiff was terminated for noncompliance with a condition of employment. That may describe a termination. It does not explain a misconduct code applied to an employee who committed no misconduct, the deletion of an unrelated non-profit's vendor registration, opposition to unemployment benefits on a "misconduct" theory Defendants never adjudicated, a refusal to rehire when no vaccination requirement existed, or a demand that she waive these claims to return to work. Once the Mandate was repealed, those barriers could no longer be explained as enforcement of anything.

**5. Harassment.**

Defendants include "harassment" in a heading but develop no argument for its dismissal. That omission alone precludes the relief sought. A hostile environment claim is assessed on the totality of the circumstances, not by isolating incidents. *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387-90 (2d Cir. 2020).

The same allegations state Title VII claims. Defendants' motion offers no meaningful defense, instead relying on an abrogated accommodation test, disregarding direct religious classifications, invoking an unlawful hardship standard abrogated by *Groff*, and seeking premature resolution of factual disputes and an affirmative defense.[4]

### POINT V
### PLAINTIFF'S STATE AND LOCAL CLAIMS SURVIVE DEFENDANTS' PROCEDURAL ARGUMENTS

Defendants invoke two Education Law defenses against the SHRL and CHRL claims — the one-year limitations period under § 3813(2-b) and the notice requirement under § 3813(1) —

---

[4] DOE was Plaintiffs' formal employer and directly imposed the challenged employment consequences. For the reasons detailed in Point I, the SAC also plausibly alleges that the City assumed and controlled delegated accommodation and remediation functions. See, *Felder v. United States Tennis Ass'n*, 27 F.4th at 838, 843–45. But even if the Court concludes that the City is not subject to Title VII, the claims against DOE remain unaffected.

together with General Municipal Law § 50-e. Defs.' Mem. at 7, 11. Those provisions reach one only the DOE and even then, only as to state law claims. They do not touch the claims against the City or the individual Defendants, and they do not touch the federal claims at all.

### A. Any Education Law bar is confined to the SHRL and CHRL claims against DOE

Plaintiff concedes that her SHRL and CHRL claims against DOE are untimely under § 3813(2-b) insofar as they challenge discrete acts occurring before December 14, 2022 — including the September 2021 denial, her placement on leave without pay, and her April 2022 termination.

That concession is limited in two respects.

First, it does not reach DOE conduct within the one-year period. Plaintiff commenced this action on December 14, 2023. The TAC alleges discrete adverse acts by DOE after December 14, 2022, each with its own accrual date: the Problem Code Plaintiff discovered on January 15, 2023, TAC ¶ 342; DOE's refusal to reinstate her after the Mandate was repealed in February 2023 although her position remained open, id. ¶ 346; its refusal to hire her for any other position despite a staffing crisis in her field, id. ¶¶ 347-50; and the waiver requirement conditioning rehire on surrender of her discrimination claims, id. ¶¶ 369-71. Each is a separate act, not a continuing effect of the 2021 denial. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-14 (2002). Those claims against DOE are timely, and Defendants' brief does not address them.

Plaintiff also satisfied § 3813(1) as to those surviving claims. She served her notice of claim on February 21, 2023 — thirty-seven days after discovering the Problem Code, and before DOE's post-repeal refusal to reinstate her. Smith Decl. Ex. G.

Second, the concession does not impact state law claims against any other Defendant. Sections 3813(1) and 3813(2-b) govern claims against a school district, board of education, or specified school entity or officer. They do not apply to the City or to the individual Defendants, none of

43

whom is alleged to be a DOE officer or a member of a board of education. Plaintiff's SHRL and CHRL claims against those Defendants — including claims arising from the 2021 denial and her 2022 termination — remain fully viable and are governed by the three-year period addressed below.

Nor is § 3813(2-b) an adjudication that DOE's conduct was lawful. It is a defendant-specific limitations provision. Its application eliminates neither the underlying discriminatory acts nor the liability of other persons who participated in, aided, or compelled them.

### B. No notice of claim was required for the claims against the City and the individual Defendants, and those claims are governed by a three-year period

Defendants invoke General Municipal Law § 50-e against the City Defendants. Defs.' Mem. at 11. The Court of Appeals has squarely held that Human Rights Law claims are not tort claims subject to the notice-of-claim requirements of §§ 50-e and 50-i. *Margerum v. City of Buffalo*, 24 N.Y.3d 721, 730 (2015). No notice of claim was required as a condition precedent to Plaintiff's SHRL and CHRL claims against the City or the individual Defendants, and the timeliness of the February 21, 2023 notice is therefore immaterial to those claims.

The applicable limitations period is three years. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d). Defendants concede as much elsewhere in their brief, acknowledging that "Plaintiffs' Section 1983, SHRL, and CHRL claims are all subject to a three-year statute of limitations." Defs.' Mem. at 8. Plaintiff commenced this action on December 14, 2023. Every act alleged against the City Defendants — from the September 2021 denial through the 2023 Problem Code, vendor portal removals, and refusals to reinstate — falls within that period.

Finally, state notice and limitations provisions cannot restrict Plaintiff's federal claims against any Defendant. *Felder v. Casey*, 487 U.S. 131, 138, 153 (1988). The Title VII and § 1983 claims are unaffected by § 3813 or § 50-e regardless of how the Court resolves the state law questions.

44

### C. The Article 78 argument supplies no basis for dismissal

Defendants suggest in a footnote that these claims belonged in an Article 78 proceeding. Defs.' Mem. at 7 n.4. Plaintiff asserts independent statutory discrimination claims in a plenary action; she does not seek review of an administrative determination as arbitrary and capricious. The cited cases involved plaintiffs who elected Article 78 review. They do not make Article 78 the exclusive vehicle for enforcing the SHRL or CHRL, and they say nothing about Title VII or § 1983. See *Whitfield v. City of New York*, 96 F.4th 504 (2d Cir. 2024).

### D. The TAC states SHRL and CHRL violations

The SHRL and CHRL prohibit discrimination because of creed and require reasonable accommodation of religious observance. N.Y. Exec. Law § 296(1), (10); N.Y.C. Admin. Code § 8-107(1), (3). For the reasons set forth in Point IV, Plaintiff pleads direct evidence, failure to accommodate, retaliation, and harassment claims under standards more protective than Title VII's. The CHRL is construed independently and liberally and requires only that a plaintiff was treated "less well" at least in part because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-11 (2d Cir. 2013); N.Y.C. Admin. Code § 8-130.

Plaintiff was subjected to a facially discriminatory policy while at least 165 employees whose beliefs satisfied the favored criteria were accommodated — including classroom teachers, and one art teacher permitted to work from home by Google Classroom while DOE hired a long-term substitute to cover her room. TAC ¶¶ 168-71. Plaintiff, whose administrative work required no classroom presence at all, was summarily denied without cooperative dialogue. Id. ¶¶ 90-93, 300-10.

Undue hardship under state and local law requires proof of "significant expense or difficulty." N.Y. Exec. Law § 296(10)(d); N.Y.C. Admin. Code § 8-107(3)(b). The CHRL requires

consideration of enumerated factors — the nature and cost of the accommodation; the employer's overall financial resources, workforce, and the effect on expenses and resources; the type of operations; and the impact on the employer's ability to conduct business. N.Y.C. Admin. Code § 8-107(3)(b). A safety-based denial requires an individualized "direct threat" assessment based on current, objective information evaluating risk, duration, severity, and mitigation. 9 NYCRR § 466.11. Eichenholtz conceded that none of these factors was assessed — that neither he, DOE, nor the City ever evaluated any request individually or as a whole to determine cost or threat level. TAC ¶ 88. He further conceded that the City applied a *de minimis* standard throughout 2021-2023, knowing it was not the governing standard, despite repeated warnings beginning in September 2021. Id. ¶¶ 210-11. S

Defendants' cooperative-dialogue argument, Defs.' Mem. at 16, does not warrant dismissal. Plaintiff did not raise a standalone cooperative dialogue claim though the issue will become relevant in her discrimination claims as an issue of fact.

### E. The City and individual Defendants aided and abetted the violations

The SHRL makes it unlawful for "any person" to "aid, abet, incite, compel or coerce" a prohibited discriminatory practice, N.Y. Exec. Law § 296(6), and the CHRL is materially identical, N.Y.C. Admin. Code § 8-107(6). A defendant actually participates by affirmatively assisting, encouraging, compelling, or taking part in the conduct producing unlawful employment treatment. *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004).

Employer status is not required, and neither is a prior finding of employer liability. *Griffin v. Sirva, Inc.* held that § 296(6) reaches nonemployers and is meant to cover "all persons, no matter what their status," who assist forbidden discrimination. 29 N.Y.3d 174, 187-89 (2017). *Griffin* relied on *National Organization for Women v. State Division of Human Rights*, 34 N.Y.2d 416

46

(1974), where a newspaper aided employment discrimination by maintaining sex-segregated advertisements though it was not the applicants' employer — and the Court required no separate finding that any employer was liable for primary discrimination. Defendants therefore misstate the predicate requirement, and the dismissal of the state claims against DOE on limitations grounds does not immunize those who aided the conduct.

The claims against the City independently remain viable on the joint-employer and direct-participation theories set forth in Point I. And the TAC pleads individual participation with particularity: Banks sought a City-doctor letter to establish why religious objections were "BS" and solicited employee applications as models to "proactively categorically refute," TAC ¶¶ 124, 132; Bray sought those letters so she could "craft a response that would be tailored to deny them," id. ¶ 131; Chokshi issued the letter with content he knew was unverifiable, id. ¶¶ 144-48; Varma approved it, id. ¶ 136; and Eichenholtz directed the Citywide Panel to continue rejecting prayer-derived and abortion-based objections after *Kane*, noting internally that such beliefs were sincere but did not qualify, id. ¶ 203.

## POINT VI
## THE THIRD AMENDED COMPLAINT COMPLIES WITH RULE 8

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Dismissal on that ground is reserved for pleadings so confused or unintelligible that a defendant cannot frame a response.

The TAC is not that. It is organized by numbered section, proceeds chronologically, and separates Plaintiff's individual allegations from the policy allegations. Defendants' Statement of Facts summarizes those allegations accurately and by paragraph number, and each argument section engages them directly. Whatever else may be said of the pleading's length, it did not impair Defendants' ability to respond.

47

Plaintiff acknowledges that the TAC is detailed. That detail follows from the claims. Plaintiff pleads municipal liability under *Monell*, which requires allegations of official policy, final-policymaker authority, and ratification, and individual-capacity claims against six officials, each of whom must be shown to have "through the official's own individual actions, . . . violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Defendants demand that specificity elsewhere in their brief. Defs.' Mem. at 12-13, 21. It cannot be supplied in the abstract.

Defendants object particularly to the discussion of the Stricken Standards, arguing those criteria were stricken in November 2021 and are no longer in use. Defs.' Mem. at 24. But Plaintiff's request was denied under those criteria in September 2021, TAC ¶¶ 287-88, and she has never received review under any other standard — her Citywide Panel appeal remains undecided. Id. ¶¶ 295, 329. The Standards are the basis of the claims, not background to them.

The pleading's structure also reflects its relationship to related litigation. This action is one of several before this Court challenging the same centralized accommodation policies, the same Stricken Standards, and the same September 2021 communications among the same City officials. Plaintiff's counsel deliberately used a common framework across those pleadings so that the policy allegations — the criteria, the Chokshi letter, the Citywide Panel, and the individual Defendants' roles — appear in substantially identical form, with only each plaintiff's individual facts differing.

Uniformity across related pleadings aids rather than impairs orderly resolution: it allows the Court and Defendants to compare the common allegations directly and to address them consistently.

The bulk of the material Defendants call excessive is that shared framework. TAC ¶¶ 74-307. The allegations specific to Plaintiff occupy a considerably smaller portion of the pleading.

48

Defendants do not contend they were unable to identify or respond to those allegations, and their brief demonstrates otherwise.

Defendants' defense of the mandate's general legality likewise does not answer the pleaded claims. Defs.' Mem. at 22-24. Plaintiff's claims do not depend on invalidating the mandate; they challenge the religious classifications used to allocate accommodations, the denial of accommodation, and the retaliation that followed. Cases addressing only the mandate, such as *Broecker v. New York City Department of Education*, 585 F. Supp. 3d 299 (E.D.N.Y. 2022), are inapposite.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety, except as expressly conceded, direct Defendants to answer, and grant such further relief as is just.

Dated: Ithaca, New York
      July 22, 2026

Respectfully Submitted,

Gibson Law Firm, PLLC

By:   */s/ Sujata S. Gibson*
       Sujata S. Gibson
       120 E Buffalo Street, Suite 201
       Ithaca, NY 14850
       (607) 327-4125
       sujata@gibsonfirm.law

       *Attorneys for Plaintiff*

49

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify that the foregoing memorandum contains 14,469 words, excluding the portions exempted by Local Civil Rule 7.1(c), as calculated by Microsoft Word. The memorandum therefore complies with the 16,000-word limit authorized by the Court's Order.

Dated: July 22, 2026
/s/ Sujata Gibson
Sujata Gibson

50